IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

---

UNITED STATES OF AMERICA,              )
                                       )
                      Plaintiff,       )
                                       )
vs.                                    )   CRIM. NO. 2009-20
                                       )
JEROME BLYDEN, GELEAN MARK,            )
                                       )
                      Defendants.      )
_____)

REPORTER'S TRANSCRIPT

JURY TRIAL

DAY 3

Wednesday, May 5, 2010

---

BEFORE:        THE HONORABLE CURTIS V. GOMEZ
               Chief Judge

APPEARANCES:   OFFICE OF THE UNITED STATES ATTORNEY
               BY:  KIM LINDQUIST, AUSA
                    NOLAN PAIGE, AUSA


               For the Government

               MOORE DODSON RUSSELL
               BY:  TRESTON MOORE, ESQ.
                    For Defendant Blyden

               HODGE & FRANCOIS
               BY:  MARK HODGE, ESQ.


               For Defendant Mark
               ---

COURT REPORTER:   CHANDRA R. KEAN, RMR
                  Official Court Reporter
                  Virgin Islands District Court
                  St. Thomas, Virgin Islands

<pre>
1                            INDEX

2

3    WITNESS (Government)   DIRECT  CROSS  REDIRECT  RECROSS

4    James S. Springette        6     28        36      ---

5    Elton Turnbull            38     71        85      ---

6    Glenson Isaac            113    193       204      209

7    Michael Goldfinger       212    281       ---      ---

8    Kevin Adams              287    299       ---      ---

9    Darnell Blake            300    303       ---      ---

10   Mark L. Thomas, Sr.      304    ---       ---      ---

11   Michael Aguilar          308    325       ---      ---

12   Theodore Phillips        328    338       ---      ---

13   Patricia Burn            340    349       ---      ---

14   Lannette Allison         351    362       ---      ---

15   Carlos J. Diaz           363    372       ---      ---

16   Elizabeth Adkins         373    379       ---      ---

17   Deepa Vanmali            380    388       ---      ---

18   Mark Joseph              397  (Not completed)

19
        (Court recessed)
20

21                        ---

22

23

24

25
</pre>

```
 1                            EXHIBITS

 2    GOVERNMENT'S
      EXHIBIT NO.        MARKED       ADMITTED
 3
      21A                   6            11
 4    21B                   9            11

 5    31A, 31B              40           ---

 6    22B                   45           ---

 7    166B - 166Q           70        (See next line)
      166B, 166C, 166J                  323
 8
      32A, 32B             114           ---
 9
      27B                  130           ---
10
      24B                  141           143
11
      25B                  149           ---
12
      26B                  152           ---
13
      165K-1, 165K-2       206           ---
14
      36A                  218           219
15    36B                  220           ---

16    37A                  222           224
      37B                  226           348
17
      38A                  229           230
18    38B                  230           360

19    39A-1                237           238
      39A-2                239           368
20    39B-1                242           243

21    40A                  245           244
      40B                  246           ---
22
      41A                  248           249
23    41B                  249           378

24    36B-1                251           ---
      36B-2                251           ---
25    36B-3                254           ---
```

<u>EXHIBITS (Cont'd)</u>

| GOVERNMENT'S<br>EXHIBIT NO. | MARKED | ADMITTED |
|---|---|---|
| 42A | 264 | --- |
| 42B | 265 | --- |
| 43A | 266 | --- |
| 43B | 267 | --- |
| 44A | 268 | --- |
| 44B | 269 | --- |
| 33 | 269 | --- |
| 34 | 272 | 276 |
| 34A to 34H | 273 | --- |
| 35A | 291 | 291 |
| 35B | 293 | 388 |
| 36B | 295 | 388 |
| 37B | 296 | --- |
| 39B-2 | 298 | 370 |
| 166A | 315 | 316 |
| 35C-3 | 333 | 335 |
| 45C to 164C | 400 | --- |
| 45B to 164B | 409 | --- |

| DEFENDANT'S<br>EXHIBIT NO. | MARKED | ADMITTED |
|---|---|---|
| (None) | | |
| | --- | |

<u>PROCEEDINGS</u>

1

2

3    (Court in session, jury present, 9:03 a.m.)

4    (Witness resumed stand)

5    THE COURT:  Good morning, ladies and gentlemen.

6    I hope you had a pleasant evening.

7    We are still in the government's case-in-chief, as

8    you know.

9    Mr. Springette is still on the stand, and we are in

10    the direct of Mr. Springette's examination.

11    Counsel, good morning.

12    MR. LINDQUIST:  Good morning.

13    MR. MOORE:  Good morning, Your Honor.

14    THE COURT:  Is counsel ready to proceed?

15    MR. PAIGE:  Yes, we are, Your Honor.

16    THE COURT:  All right.  Good morning,

17    Mr. Springette.

18    THE WITNESS:  Good morning, Your Honor.

19    THE COURT:  Do you recall that you are under

20    oath, sir?

21    THE WITNESS:  Yes, sir.

22    MR. HODGE:  Your Honor?

23    THE COURT:  Yes.

24    MR. HODGE:  I need a sidebar.  There's

25    something fundamental, a fundamental issue I need to

```
 1   take up with the Court.
 2             THE COURT:  All right.  We'll take it at the
 3   next break.  Go ahead.
 4             MR. PAIGE:  Thank you, Your Honor.
 5        THEREUPON, JAMES S. SPRINGETTE, previously duly
 6   sworn, was examined and testified as follows:
 7                 DIRECT EXAMINATION (Continued)
 8   BY MR. PAIGE:
 9   Q.   Good morning, Mr. Springette.
10   A.   Good morning, sir.
11   Q.   Last evening I think we left off with you and the
12   organizational structure of your drug trafficking
13   organization.
14        There was a -- was there a hierarchy to your
15   organization?
16   A.   Yes, sir.
17             MR. PAIGE:  I would like to show you what has
18   been marked as Government's Exhibit 21A.
19        (Government's Exhibit No. 21A marked)
20             MR. PAIGE:  Your Honor, I have an original
21   here, if I may approach.
22             THE COURT:  Is it a single item?
23             MR. PAIGE:  I'm sorry?
24             THE COURT:  Is it a single item that you can
25   put on the Elmo?
```

```
 1                    MR. PAIGE:  Yes, it is.

 2                    THE COURT:  All right.  Go right ahead, then.

 3                    MR. PAIGE:  Your Honor, we're going to use the

 4          screen, if you don't mind.

 5                    THE COURT:  All right.

 6          BY MR. PAIGE:

 7          Q.   Do you see Government's Exhibit --

 8          A.   Yes, sir --

 9                    MR. PAIGE:  Your Honor, we're going have to

10          take that off the screen, I'm sorry.  Judge, this is

11          21A.  However, it's an original copy, and what's on

12          Sanctions is 21B.

13                    THE COURT:  What's, you just want to show it to

14          the witness, right?

15                    MR. PAIGE:  That's correct.

16                    THE COURT:  Well, go ahead and show it to him.

17                    THE WITNESS:  Yes, sir, I'm familiar with it.

18                    THE COURT:  Show it either on the Elmo or show

19          it on the computer, however you choose to.

20                    MR. PAIGE:  All right.  I'm going to show it on

21          the Elmo.  Sorry.

22                    THE COURT:  It's already on the screen.  We can

23          all see it.

24                    MR. PAIGE:  This is the document we're seeking

25          to admit later.  This is not what I'm holding.  They're
```

1    similar.

2         So I can --

3              MR. HODGE:  Your Honor, the issue I wanted to

4    discuss had to do with representation --

5              THE COURT:  We'll get to it in a moment.

6    BY MR. PAIGE:

7    Q.   Mr. Springette, do you see Government's

8    Exhibit 21A?

9    A.   Yes, sir.

10   Q.   Do you recognize this?

11   A.   Yes, sir.

12   Q.   What do you recognize this to be?

13   A.   It's a, basically a chart, a graph that I, I wrote.

14   That's my handwriting and my signature and the date.

15   Q.   And generally speaking, what does it depict?

16   A.   It basically explains to, shows -- the letter shows

17   basically how I ran drugs from Venezuela to the U.S.

18   Virgin Islands on to North Carolina, and the people

19   involved and the steps and the roles that they played

20   during that process.

21   Q.   And what date does it bear?

22   A.   It says 3rd, 22nd of '06.

23   Q.   Would this help you to more fully clarify your

24   testimony today?

25   A.   Yes, sir.  I can explain the whole situation, sir.

1            MR. PAIGE:  I would like to show you what has

2       also been marked as 21B.

3            (Government's Exhibit No. 21B marked)

4       BY MR. PAIGE:

5       Q.   Do you recognize Government's Exhibit 21B?

6       A.   Yes, sir.

7       Q.   What do you recognize this to be?

8       A.   It's basically the same thing, sir.  It shows the

9       situation when the drugs came from Venezuela to the

10      Virgin Islands and then on to North Carolina.

11      Q.   And what is the relationship between 21A and 21B?

12      A.   Basically it shows the structure.  To give everyone

13      basically an idea of how the structure works, in

14      Venezuela in the year 2000 --

15      Q.   Well, I'm sorry.  No, no, no.  The document itself,

16      is there any -- what is the relation --

17      A.   It shows the different people involved.  It shows

18      Robert Joseph.  It shows Elton Turnbull.  It shows --

19            MR. HODGE:  Objection, Your Honor.

20            THE WITNESS:  -- Kerwin.

21            THE COURT:  Hold on, sir.  Wait for a question.

22      Sustained.

23      BY MR. PAIGE:

24      Q.   Is the document I'm holding, is that the original?

25      A.   It is -- it looks like a copy that I -- it's my

1    handwriting, sir.

2    Q.    Okay.  The copy that you're looking at --

3    A.    Yes, sir.

4    Q.    -- is there any difference between the original of

5    that same document?

6    A.    They're basically the same, sir.

7              MR. PAIGE:  Your Honor, with that, I move for

8    the admission of Government's Exhibit 21B.

9              MR. HODGE:  Objection.

10              THE COURT:  Attorney Moore?

11              MR. MOORE:  I object, and we request a Rule 105

12    instruction, Your Honor.

13              THE COURT:  All right.  This is -- did you

14    inquire of the witness whether 21B would assist his

15    testimony?

16              MR. PAIGE:  Yes, Judge.

17              THE COURT:  I know you did as to 21A.  I don't

18    recall it for 21B.

19    BY MR. PAIGE:

20    Q.    Mr. Springette, would Government's Exhibit 21B

21    assist you in your testimony today, to more fully

22    explain your organization?

23    A.    Yes, sir.

24              THE COURT:  All right.  21A and 21B are

25    admitted as demonstrative exhibits to assist the witness

1    in his testimony.

2         (Government's Exhibit Nos. 21A, 21B admitted)

3              THE COURT:  Go ahead.

4              MR. PAIGE:  Your Honor, if we may publish 21B.

5    BY MR. PAIGE:

6    Q.   Mr. Springette, do you see 21B on the screen?

7    A.   Yes, I do, sir.

8    Q.   If you would -- there should be a laser pointer at

9    the witness stand with you.

10   A.   Yes, sir.

11   Q.   I think there might be a bottom -- a button at the

12   bottom of it.

13   A.   All right.

14   Q.   Press that.

15        Using the laser pointer, can you identify this

16   document?

17   A.   Yes.  That's me in Venezuela.  That's my

18   handwriting there.  This is -- I made this chart.  And

19   this is, basically shows the structure of how the

20   organization worked.

21        I would be in Venezuela.  I would have the drugs

22   sent to a gentleman in Tortola.  Some of the drugs in

23   Tortola would go to a gentleman, his name is Jeffrey, on

24   to Puerto Rico and on to --

25   Q.   Tell you what.  Let's just deal with the right

1    side.  The gentleman in Tortola, who is that person?

2    A.   A gentleman by the name of Bob Hodge, sir.

3    Q.   And from Mr. Bob Hodge, where would it go?

4    A.   From Mr. Bob Hodge the drugs would come by

5    speedboat, and come from Mr. Hodge to a gentleman by the

6    name of Robert Joseph --

7    Q.   And who is --

8    A.   -- and Elton Turnbull, my cousin on St. Thomas.

9    Some of the drugs would be distributed in St. Thomas.

10    The drugs that were going to the States would go to a

11    gentleman by the name of Kerwin.

12        Kerwin was in charge of the person dealing with the

13    security at the airport and assisting in getting the

14    drugs from St. Thomas to North Carolina, where my cousin

15    Elton lived.

16    Q.   Okay.  Let's discuss the persons that you've

17    identified very briefly.

18        Mr. Robert Joseph, who is he?

19    A.   Robert Joseph was one of my lieutenants.  Robert

20    Joseph -- basically, in my organization I had certain

21    people that were close to me that can actually directly

22    speak to me.  Robert Joseph, Elton Turnbull, Jeffrey,

23    all these people worked directly close to me, and then

24    they would basically have other people working under

25    them who could do different jobs.

1    Q.    Okay.  Let me ask you this:  How much were you
2    purchasing the cocaine for initially, from the outset?
3    A.    In Colombia, a kilo of cocaine would cost about
4    2,000 -- $2,800, in Colombia, to get a general idea.
5    And then I would sell the cocaine here in the Virgin
6    Islands for $10,000 a kilo.
7         My cousin --
8              MR. HODGE:  Objection.
9              THE WITNESS:  -- Elton would sell it for
10   20,000.
11             MR. HODGE:  Objection.
12             THE COURT:  Okay.  Overruled.
13   BY MR. PAIGE:
14   Q.    You can pick up with that $10,000 reference, I
15   believe.
16   A.    Excuse me?
17             THE COURT:  Well, ask your next question.
18   BY MR. PAIGE:
19   Q.    How much would it sell for in the Virgin Islands?
20   A.    A kilo of cocaine would sell for $10,000 in the
21   Virgin Islands.  And then in the United States, when it
22   left the Virgin Islands through the airport to my cousin
23   in North Carolina, it would sell for $20,000 or more.
24        And that's the wholesale price, sir.  That's not
25   the retail price.  That's the wholesale price.

```
 1              MR. HODGE:  Objection.  Foundation.

 2              THE COURT:  Sustained.

 3     BY MR. PAIGE:

 4     Q.   Mr. Springette?

 5     A.   Yes, sir.

 6     Q.   The name Kerwin is up on that chart.

 7     A.   Yes, sir.

 8     Q.   Do you know a person by the name of Kerwin?

 9     A.   Yes, sir.  Kerwin is the gentleman who came into

10     the organization around the 2000 -- around 2000, 2001.

11          His association in the organization was with a

12     gentleman by the name of Robert Joseph.

13     Q.   Do you know Kerwin's name, his full name?

14     A.   I've learned his name is Mr. Gelean Mark, sir.

15              MR. HODGE:  Objection.  Foundation.

16              THE COURT:  How is it that you know his name?

17              THE WITNESS:  From the last trial, sir.

18              THE COURT:  No.

19          Sustained.

20              MR. HODGE:  Move for mistrial.

21              THE COURT:  All right.  Denied.

22          You're to disregard the last two answers from the

23     witness, ladies and gentlemen.  It's not properly before

24     you.

25          Next question.
```

1      Come to sidebar.

2      (Sidebar discussion held as follows)

3          THE COURT:  All right.  Tell me where you're

4  going with this witness, and can you get there a little

5  more expeditiously, so we don't have statements like

6  "the other trial."

7      I don't like to hear that.  I think everyone knows

8  I don't like to hear that, and yet I've heard it.  Now

9  he's talking about information he learned from a trial.

10  We don't need that.  So you need to get where you're

11  going, and you need to get there in an expeditious

12  fashion.

13          MR. PAIGE:  Your Honor, I --

14          THE COURT:  What else do you need to elicit

15  from this witness?

16          MR. PAIGE:  Your Honor, he's going to just tell

17  us the methods, means that were employed to get the

18  cocaine to the United States.  That was not the

19  government's intent, to elicit that response.  He was

20  going to actually testify that he's never met Gelean

21  Mark.  That was what the government was about to elicit

22  from him.

23          THE COURT:  Well, if he says -- if you

24  understand that he's never met him, why are you asking

25  him about the name, when he says he clearly learned it

1    from the trial?

2              MR. PAIGE:  I didn't ask him that, Judge.

3              THE COURT:  All right.  I thought that the name

4    came out because you made an inquiry of him, and that

5    was Kerwin.

6              MR. PAIGE:  I was going to ask him the origin

7    or the source of the name.

8              THE COURT:  All right.  Well, I thought you

9    asked who was Kerwin, and he gave the name --

10             MR. PAIGE:  And that's all.

11             THE COURT:  -- Gelean Mark.

12             MR. PAIGE:  That's all I was going to ask.

13             THE COURT:  How would he have known the name?

14             MR. PAIGE:  I wasn't going to ask him that,

15   Judge.

16             THE COURT:  My point is that you did ask him --

17             MR. PAIGE:  I didn't ask him --

18             THE COURT:  -- who was Kerwin.

19             MR. PAIGE:  Yes, yes, Your Honor.

20             THE COURT:  All right.  Anyway, you need to get

21   to the essential part of what you need to place before

22   the jury, because I don't want any more errant

23   statements coming out that are improperly before them.

24             MR. PAIGE:  I'll make every effort to make sure

25   that that doesn't happen.

```
 1                THE COURT:  All right.

 2            (End sidebar discussion, open court as follows)

 3       BY MR. PAIGE:

 4       Q.   Mr. Springette, can you just -- what is your

 5       personal knowledge of Kerwin's involvement in this

 6       process?

 7                THE COURT:  Do you have any personal knowledge?

 8       Yes or no.

 9                THE WITNESS:  Yes, I do, sir.

10       BY MR. PAIGE:

11       Q.   What, if any, knowledge do you have --

12                MR. HODGE:  Objection.  Objection.

13                THE COURT:  Sustained.

14       BY MR. PAIGE:

15       Q.   What was Kerwin's involvement?

16                MR. HODGE:  Objection.

17                THE COURT:  Are you aware of Kerwin's

18       involvement?

19                THE WITNESS:  Yes, Your Honor.  I'm aware of

20       Kerwin's involvement, sir.

21                THE COURT:  All right.  Go ahead.

22                MR. HODGE:  Objection.  Foundation.

23                THE COURT:  Overruled.

24       BY MR. PAIGE:

25       Q.   Mr. Springette, what was Kerwin's first
```

```
 1    involvement?
 2              MR. HODGE:  Objection.  Foundation.
 3              THE COURT:  Overruled.
 4              MR. MOORE:  Your Honor, may I object and
 5    request the source of his awareness, whether it's of his
 6    own direct, personal knowledge?
 7              THE COURT:  I think the witness answered that
 8    it is of his personal knowledge.
 9         Do you have personal knowledge, Mr. Springette --
10              THE WITNESS:  Yes, sir.
11              THE COURT:  -- of the person referred to as
12    Kerwin's -- involvement?
13              THE WITNESS:  Yes, sir, I do, sir.
14              THE COURT:  All right.  Go ahead.
15              MR. HODGE:  I'm sorry, Your Honor.  Do we get
16    to know how?
17              THE COURT:  Next question.
18    BY MR. PAIGE:
19    Q.   Mr. Springette, what was Kerwin's first involvement
20    with the organization?
21    A.   Kerwin's involvement in the organization was, came
22    about by a gentleman by the name of Robert Joseph.  We
23    needed someone to assist us in getting the drugs from
24    the Virgin Islands to the United States, and --
25              THE COURT:  Mr. Springette, before you go on --
```

```
 1              THE WITNESS:  Yes, Your Honor.
 2              THE COURT:  Did -- is the source of your
 3    information Mr. Joseph?
 4              THE WITNESS:  No, Mr. Joseph and Mr. Elton
 5    Turnbull, sir.
 6              MR. HODGE:  Move to strike.
 7              THE COURT:  Provided you with this information
 8    that you're talking about?
 9              THE WITNESS:  Direct, sir.  Yes, sir.
10              THE COURT:  All right.
11              MR. HODGE:  Move to strike.
12              THE COURT:  All right.  Overruled.
13         Go ahead.
14              THE WITNESS:  Yes.  And because of my -- I was
15    living in Venezuela, I contacted Ker- -- I spoke to
16    Elton Joseph [sic], my cousin, and Robert Joseph at the
17    time.  And they needed someone to help us get the drugs
18    from St. Thomas to North Carolina through the airport in
19    St. Thomas.  And that's how we got in contact with
20    Kerwin, sir.
21    BY MR. PAIGE:
22    Q.   Okay.
23              MR. MOORE:  Your Honor, may my Rule 105
24    objection be continuing?
25              THE COURT:  Yes.
```

| | |
|---|---|
| 1 | MR. HODGE:  I join in that, Your Honor. |
| 2 | THE COURT:  Yes. |
| 3 | BY MR. PAIGE: |
| 4 | Q.   Now, Mr. Elton Turnbull -- |
| 5 | A.   Yes, sir. |
| 6 | Q.   -- what was his -- withdraw that. |
| 7 | Once the drugs got to North Carolina -- |
| 8 | A.   Yes, sir. |
| 9 | Q.   -- what, if anything, would happen? |
| 10 | A.   Well -- |
| 11 | MR. HODGE:  Objection.  Foundation. |
| 12 | THE COURT:  Sustained. |
| 13 | BY MR. PAIGE: |
| 14 | Q.   Once the drugs left the Virgin Islands, what, if |
| 15 | anything, happened? |
| 16 | MR. HODGE:  Objection.  Foundation. |
| 17 | THE COURT:  Sustained. |
| 18 | BY MR. PAIGE: |
| 19 | Q.   Do you have any personal knowledge of what happened |
| 20 | to the drugs when they left the Virgin Islands? |
| 21 | A.   Yes, sir.  They were -- |
| 22 | MR. HODGE:  Objection.  Objection.  Foundation. |
| 23 | THE COURT:  Sustained. |
| 24 | BY MR. PAIGE: |
| 25 | Q.   Mr. Springette, do you have any personal |

```
 1    knowledge --
 2              MR. HODGE:  Asked and answered.
 3              THE COURT:  Overruled.
 4    BY MR. PAIGE:
 5    Q.   Do you have any personal knowledge of what would
 6    happen to the cocaine once it left the Virgin Islands?
 7    A.   Yes.  It would go to the --
 8              MR. HODGE:  Objection.  Foundation.
 9    BY MR. PAIGE:
10    Q.   Yes or no?
11              MR. HODGE:  Objection.  Foundation.
12              THE COURT:  Overruled.
13         It's a yes or no.
14              THE WITNESS:  Yes, sir.  Yes, I do.
15    BY MR. PAIGE:
16    Q.   How do you know that?
17    A.   Because the drugs were sold to me and then I would
18    receive the money for the drugs, sir.
19              MR. HODGE:  Objection.
20              THE COURT:  Overruled.
21    BY MR. PAIGE:
22    Q.   Where was the location of the money that you
23    received coming from?
24    A.   The money would be flown in --
25              MR. HODGE:  Objection.  Foundation.
```

1          THE COURT:  Overruled.

2          THE WITNESS:  Go ahead?

3          MR. PAIGE:  Yes, please.

4          THE WITNESS:  The money would be flown in by

5    private plane, one of the planes that I owned, to my

6    ranch.  I had 2,200 acres that had a runway built in

7    Venezuela.

8          MR. HODGE:  Objection.

9          THE COURT:  Overruled.

10          MR. HODGE:  Nonresponsive.

11          THE COURT:  Overruled.

12          THE WITNESS:  The runway was built on my ranch

13    in Venezuela.  And then I would have the planes that I

14    own fly the money, millions of dollars, from the Virgin

15    Islands back to the ranch in Venezuela.

16    BY MR. PAIGE:

17    Q.   Do you have any personal knowledge of the source of

18    the money prior to it coming from the Virgin Islands to

19    you.  Yes or no?

20    A.   Yes, sir.

21    Q.   How do you have that knowledge?

22    A.   I spoke to my cousin Elton.  I communicated with my

23    cousin Elton.

24          MR. HODGE:  Objection.  Hearsay.

25          THE COURT:  Overruled.

1          THE WITNESS:  I would speak to my cousin Elton.

2     I would communicate by phone with my cousin Elton to

3     make arrangements to have the money flown in from the

4     Virgin Islands to Venezuela.

5     BY MR. PAIGE:

6     Q.    And in -- where was the source prior to the Virgin

7     Islands?

8          THE COURT:  Before you answer that --

9          THE WITNESS:  Yes, Your Honor.

10         THE COURT:  -- all of the information that you

11    are giving now, with flying things into Venezuela, who,

12    if anyone, devised that method of operation?

13         THE WITNESS:  I would basically come up with

14    the way, the plan of doing it, and then I would give

15    instruction -- we would all -- give instructions to

16    Elton, to give to different people to help facilitate

17    this, Your Honor.

18         THE COURT:  All right.

19       Go ahead.

20    BY MR. PAIGE:

21    Q.    Okay.  So what was the source of the money prior to

22    the Virgin Islands?

23    A.    North Carolina, sir.

24    Q.    And how often -- I'm sorry.  For how long did this

25    method, how long was this method utilized by your

1    organization?

2    A.    From about 2000 to 2001, from 2001 to 2002, trips

3    of cocaine were going out and moneys were flown in to

4    Venezuela.

5    Q.    Over that period of time, how many trips were made?

6    A.    For cocaine flights going out from Venezuela to the

7    Virgin Islands, it's about seven trips, totaling about

8    3,000 kilos of cocaine.

9    Q.    In what period of time was this that you're

10   speaking of?

11   A.    This is from 2001 to 2002.

12   Q.    2002 and beyond?

13   A.    No --

14          MR. HODGE:  Objection, Your Honor.

15          THE COURT:  Sustained.

16   BY MR. PAIGE:

17   Q.    Was there a similar method employed by your

18   organization beyond 2002?

19   A.    No.  For this first particular phase that we're

20   talking about right now, I'm talking from about 2001 to

21   2002, when the air drops were basically coming from

22   Venezuela to the Virgin Islands, British and U.S. Virgin

23   Islands.

24   Q.    Do you have any --

25          MR. HODGE:  Objection.  Relevance.

1          THE COURT:  Let's hear the question, first.

2    BY MR. PAIGE:

3    Q.   Do you have any personal knowledge as to who would

4    distribute the cocaine in North Carolina?

5          Yes or no.

6    A.   Yes, I do, sir.

7    Q.   And how do you have that personal knowledge?

8    A.   I spoke directly with my cousin, Elton.

9          MR. HODGE:  Objection.

10          THE COURT:  Overruled.

11         When you refer to your cousin Elton, what, if any,

12    role did you have for your cousin Elton.

13          THE WITNESS:  The role for Elton was basically,

14    he was the seller of the drugs, and he also assisted in

15    helping me get the money back to the island, sir.

16          MR. MOORE:  Your Honor, for this line of

17    questioning may I also have a continuing hearsay

18    objection?

19          THE COURT:  Yes.

20          MR. MOORE:  Thank you, Your Honor.

21          MR. HODGE:  I join in that, Your Honor.

22          THE COURT:  Yes.

23    BY MR. PAIGE:

24    Q.   What, if anything, was your cousin Elton's title

25    within the organization?

1    A.    He would be considered a lieutenant.  Basically in

2    the organization you have different people, have

3    different structures.  Lieutenants were the ones that

4    were closest to me, that can speak directly to me.  And

5    Elton would be considered a lieutenant, sir.

6    Q.    Who, if anyone, assisted Elton in distributing the

7    drugs in North Carolina?

8    A.    Yes.  Elton would have -- each department --

9    Q.    Who, if anyone?

10   A.    Who, if anyone?

11   Q.    Assisted Elton.

12   A.    Elton would have his different group of people.

13   Each section of the organization --

14           MR. HODGE:  Objection.  Foundation.

15           THE COURT:  Overruled.

16           THE WITNESS:  Each department of the drug

17   trafficking trade has different people who would run

18   certain structures of the organization.  For instance,

19   in Venezuela I had a group of people who --

20           MR. HODGE:  Objection.  Relevance.

21           THE COURT:  Overruled.

22           THE WITNESS:  I would have a group of people

23   who work under me, and they would assist me.  In the

24   Virgin Islands you would have another group of people

25   who would work under, for instance, Kerwin.

1          In North Carolina you would have another group of

2     people that would work under Elton.

3          MR. HODGE:  Objection.  Foundation.

4          THE COURT:  Okay.  Overruled.

5          THE WITNESS:  And each --

6          THE COURT:  Mr. Springette, just so the record

7     is clear, you mentioned this operation.  Who were the

8     people who were involved?

9          You mentioned a cousin and you mentioned some other

10    people.  Who were the people involved, and what were

11    their roles, that you are personally aware of, while you

12    were involved in this operation?

13         THE WITNESS:  All the people, Your Honor?

14         THE COURT:  Well, just for the names you've

15    already mentioned on the record, I just want to make

16    sure that we're clear as to those people.

17         THE WITNESS:  The persons involved, involved in

18    the operation were Elton Turnbull, Kerwin --

19         THE COURT:  What was Mr. Turnbull's role, or

20    the -- and was -- this role that you tasked him with?

21         THE WITNESS:  Yes, sir.  I, he was part -- yes,

22    sir.

23         THE COURT:  All right.  Just list the names

24    that you have already mentioned and what, if any, role

25    you may or may not -- or rather may have tasked them

1    with.

2           THE WITNESS:   The role of Elton was basically

3    the one who assisted in selling drugs.  Kerwin was the

4    one who assisted in getting the drugs from the

5    Virgin Islands --

6           MR. HODGE:  Objection.  Foundation.

7           THE WITNESS:  -- to --

8           THE COURT:  Overruled.

9           THE WITNESS:  Go ahead?

10          THE COURT:  Yes.

11          THE WITNESS:  -- through the airport in St.

12   Thomas to North Carolina.  And then in Tortola you had

13   Mr. Hodge, who was basically using the boats to pick up

14   the drugs in Tortola.

15          THE COURT:  All right.  Go ahead.

16          MR. PAIGE:  Court's indulgence one second.

17      (Pause)

18          MR. PAIGE:  All right.  Thank you,

19   Mr. Springette.

20      I have no further questions.

21          THE COURT:  Attorney Hodge?

22                   CROSS-EXAMINATION

23   BY MR. HODGE:

24   Q.   Good morning, Mr. Springette.

25   A.   Good morning, sir.

```
 1    Q.   Looking at Government's Exhibit 21B --

 2    A.   Yes, sir.

 3    Q.   -- who is the leader of that organization?

 4    A.   Who's the leader of the organization?

 5    Q.   Yes.

 6    A.   There is -- there's a different structure.  There's

 7    not -- it's an organization.  It's an all-inclusive.

 8    It's not a person who is a leader.  It's an organization

 9    of many people involved in the organization.  Each

10    person --

11    Q.   Sir, I believe you said you have lieutenants --

12    A.   Yes, sir.

13    Q.   -- beneath you?

14    A.   I have lieutenants beneath me, sir.

15    Q.   Who is the top of that organization?

16    A.   My name is the person who is sending the drugs from

17    the, from the, Venezuela to the United States, sir.

18    Q.   And you testified that the money came back to you

19    in Venezuela, correct?

20    A.   Yes, sir.

21    Q.   Did Bob Hodge work under Kerwin in this diagram?

22    A.   He worked along -- he was part of the organization,

23    sir.

24    Q.   Sir, did he work under -- was he a lieutenant of

25    Kerwin?
```

1    A.    If Bob Hodge was a lieutenant of Kerwin?

2          No, I wouldn't say Bob Hodge was a lieutenant of

3    Kerwin.

4    Q.    Was he an underling of Mr. Mark?

5    A.    No.  He worked along with Mr. Mark.

6    Q.    So he was not an underling, he wasn't a lieutenant?

7    A.    No, Mr. Hodge worked along with Kerwin in the

8    operation.

9    Q.    Did Elton Turnbull work under the direction of

10   Mr. Mark?

11   A.    He worked along, side by side with Mr. Mark, sir.

12   Q.    So he wasn't a lieutenant of Mr. Mark?

13   A.    No, I wouldn't say he was a lieutenant of Mr. Mark,

14   sir.

15   Q.    And Robert Joseph, did he work under Robert --

16   Mr. Mark?

17   A.    He worked alongside him, sir.

18   Q.    So he was not a lieutenant of Mr. Mark?

19   A.    As far as being a lieutenant -- he might have been

20   a partner with him.

21   Q.    Was he an underling of Mr. Mark?

22   A.    I don't understand what you say by "underling,"

23   sir.  You have to explain what you mean by "underling,"

24   sir.

25   Q.    Was it Mr. Mark who told Robert Joseph what to do?

1    A.    Was it Mr. Mark that did -- was it Mr. Mark that
2    told Robert Joseph what to do?
3    Q.    Yes.
4    A.    No.  They worked together, sir.
5    Q.    Did Mr. Mark tell Elton Turnbull what to do?
6    A.    He would tell him that the drugs were coming from
7    the Virgin Islands to the United States.  He -- he's
8    being paid for it.
9    Q.    Did he tell him what to do?
10   A.    He got paid.  That's part of his job, sir.
11   Q.    Who is "he"?
12   A.    Mr. Marks.
13   Q.    So he was an underling?
14   A.    He's getting paid.  That's part of his job.  It's
15   part of an organization.
16   Q.    So he was an employee?
17   A.    He worked for the organization.
18   Q.    Mr. Mark was an employee --
19   A.    No, he was --
20   Q.    -- in --
21   A.    -- he was more a contractor in the organization,
22   sir.
23   Q.    So he was a separate, a separate organization?
24   A.    He was part of the contract in the organization,
25   sir.

1  Q.   Did Bob Hodge -- did Mr. Mark tell Bob Hodge what

2  to do?

3  A.   I don't know if he told him what to do, but they

4  communicated in order for the drugs to get from the

5  British Virgin Islands --

6           MR. HODGE:  Your Honor, excuse me --

7           THE COURT:  Hold on.

8       All right.  Go ahead.  Ask your next question.

9       Mr. Springette, wait for a question and then answer

10  the question as directly as possible.

11           THE WITNESS:  Okay.  I'm sorry, Your Honor.

12           THE COURT:  Go ahead, Attorney.

13  BY MR. HODGE:

14  Q.   I'm not asking about anybody who is a partner.  I'm

15  talking about just like you described in your

16  organization, having lieutenants underneath you.  The

17  lieutenants did what you told them to do, correct?

18  A.   Lieutenants worked along with me.  The basic role

19  of a lieutenant -- I'm sorry.

20  Q.   Sir, you indicated that you communicated with your

21  lieutenants, and for the most part you didn't

22  communicate with anyone beneath them.  They were the

23  in-between people, correct?

24  A.   The people in -- my lieutenants were the people who

25  I spoke with, because for security purposes --

1    Q.    Sir, they were the ones who you communicated with

2    about this, the object of your drug conspiracy, correct?

3    A.    They -- the ones who I spoke, communicated directly

4    as part of the organization, yes, sir.

5    Q.    And you would not communicate with the people who

6    they were directing?

7    A.    In most situations, for my security, no.  I spoke

8    to my lieutenants, and my lieutenants would speak to the

9    other people within the organization.

10   Q.    So the, this structure was designed to protect you?

11   A.    The structure was designed to protect the

12   organization, sir.

13   Q.    Are you the organization, sir?

14   A.    No.  We are all the organization, sir.

15         MR. HODGE:   Court's indulgence?

16         THE COURT:   Yes.

17        (Pause)

18   BY MR. HODGE:

19   Q.    Looking at Government's Exhibit 21B, when they

20   were -- when your cocaine was to be distributed on St.

21   Thomas, it appears to go in a different direction than

22   Mr. Mark, is that correct?

23   A.    Yes, sir.  The cocaine will be -- when it left from

24   Venezuela, the drugs, some would go to Puerto Rico, some

25   would come to the Virgin Islands, sir.

1    Q.    Sir, up here, there's a Puerto Rico branch and then

2    there's the St. Thomas branch over here.   There's Robert

3    Joseph and Elton, correct?

4    A.    Yes, sir.

5    Q.    And underneath that there are two branches,

6    correct?

7    A.    Yes, sir.

8    Q.    One branch says "Kerwin," correct?

9    A.    Yes, sir.

10    Q.    The other branch says "distribution on St. Thomas"?

11    A.    Yes, sir.

12    Q.    They are listed as two distinct branches, correct?

13    A.    Yes, sir.

14    Q.    So the distribution on St. Thomas was not part of

15    Kerwin, or Mr. Mark's, responsibility, correct?

16    A.    No, as --

17    Q.    Thank you, sir.

18    A.    -- to the --

19    Q.    Thank you, sir --

20    A.    -- to the --

21    Q.    Thank you, sir --

22    A.    -- to the contrary --

23    Q.    Thank you, sir --

24                THE COURT:  Hold on.

25            Mr. Springette, you have to wait for a question.

1           All right.  Go ahead.  Next question.

2               MR. HODGE:  Court's indulgence?

3               THE COURT:  Yes.

4           (Pause)

5       BY MR. HODGE:

6       Q.   Did you ever meet Mr. Mark?

7       A.   No, sir.

8       Q.   Did you ever speak to Mr. Mark?

9       A.   No, sir.

10      Q.   At the time this was going on, had you ever seen

11      Mr. Mark?

12      A.   No, sir.

13      Q.   Had you ever heard his voice?

14      A.   No, sir.

15      Q.   You testified that Mr. Mark's involvement with this

16      organization was from 2001 to 2002, correct?

17      A.   From 2001 to 2002, yes, sir.

18              MR. HODGE:  Thank you.

19          No further questions, Your Honor.

20              THE COURT:  All right.

21          Attorney Moore?

22              MR. MOORE:  Your Honor, I have no questions of

23      this witness.

24              THE COURT:  All right.

25              Redirect.

```
1              MR. PAIGE:  Briefly, Your Honor.
2                    REDIRECT EXAMINATION
3    BY MR. PAIGE:
4    Q.   Mr. Springette, did Kerwin have any responsibility
5    as to the distribution of the drugs here in St. Thomas?
6              MR. HODGE:  Objection.  Asked and answered.
7              THE COURT:  Overruled.
8              THE WITNESS:  Here in the Virgin Islands, to
9    get an idea of how the drug distribution works, the
10   drugs --
11             MR. HODGE:  Objection --
12             THE COURT:  It's a yes or --
13             MR. HODGE:  -- objection.  Not responsive.
14             THE COURT:  It's a yes or no question.
15             THE WITNESS:  To get -- excuse me.  Repeat your
16   question, sir.
17   BY MR. PAIGE:
18   Q.   Did Kerwin have a responsibility as far as the
19   drugs -- excuse me -- distributed here in St. Thomas
20   Virgin Islands?
21   A.   It's a part of his role --
22             MR. HODGE:  Objection, Your Honor.
23             THE COURT:  I think it's a yes or no question,
24   Mr. Springette.
25             THE WITNESS:  I don't know if he would be
```

1    part -- his actual role in the distribution --

2              MR. HODGE:  Objection, Your Honor.

3              THE COURT:  Overruled.

4              MR. PAIGE:  Thank you, sir.

5              THE COURT:  Mr. Springette, thank you for your

6    testimony.

7              THE WITNESS:  Thank you.

8              THE COURT:  You may step down.

9              THE WITNESS:  Excuse me.

10             THE COURT:  Is there any further need for

11   Mr. Springette?

12             MR. LINDQUIST:  No.

13         May he be excused?

14             THE COURT:  All right.  Attorney Hodge, any

15   further need for Mr. Springette?

16             MR. HODGE:  No, Your Honor.

17             THE COURT:  Attorney Moore?

18             MR. MOORE:  I'm sorry?

19             THE COURT:  Any further need for

20   Mr. Springette?

21             MR. MOORE:  Oh, none -- no, Your Honor.

22             THE COURT:  All right.

23         Mr. Springette is excused.

24             THE WITNESS:  Excuse me, sir.

25         (Witness excused)

```
1              THE COURT:  Your next witness?
2              MR. PAIGE:  Mr. Elton Turnbull.
3         (Pause)
4              THE CLERK:  Please raise your right hand to
5    take the oath.  At the end respond, "I do."
6         (Witness sworn)
7              THE WITNESS:  I do.
8              THE CLERK:  Please be seated.
9         THEREUPON, ELTON TURNBULL, having been duly sworn,
10   was examined and testified as follows:
11                   DIRECT EXAMINATION
12   BY MR. PAIGE:
13   Q.   Good morning, sir.
14   A.   Good morning.
15   Q.   Will you please state your name for the record?
16   A.   Elton Turnbull.
17   Q.   Mr. Turnbull, how old are you?
18   A.   Thirty-nine years old.
19   Q.   Where are you from, Mr. Turnbull?
20   A.   St. Thomas, U.S. Virgin Islands.
21   Q.   Where do you -- how long did you live in St.
22   Thomas -- do you live in St. Thomas right now?
23   A.   No, I do not.
24   Q.   When did you last live in St. Thomas?
25   A.   June of 1988 was when I was permanent -- was the
```

1    last time I permanently lived there.

2    Q.   Tell us a little bit about your educational

3    background.

4    A.   I attended All Saints Cathedral School.  That's

5    where I graduated from.  Upon graduation, I attended

6    Tuskegee University, where I graduated in 1993.  And

7    after that, I was, I was enrolled in obtaining a

8    master's degree at North Carolina A&T.

9    Q.   Okay.  When you left St. Thomas immediately where

10   did you go?  The location?

11   A.   Tuskegee, Alabama.

12   Q.   From Tuskegee to where?

13   A.   For a brief period I came back here, before en- --

14   well, await -- while I was awaiting enrollment at North

15   Carolina A&T, which is in Greensboro, North Carolina.

16   Q.   Okay.  Where do you presently reside?

17   A.   I'm incarcerated presently at MDC Guaynabo.

18   Q.   When were you arrested?

19   A.   In October of 2002.

20   Q.   Do you have a criminal history?

21   A.   Currently I do, yes.

22   Q.   Do you have any felony convictions?

23   A.   Yes, I do.

24   Q.   And for what?

25   A.   Drug trafficking and money laundering.

1    Q.    When did you receive those convictions?

2    A.    I was sentenced in, I think it was April of 2003.

3    Q.    And what was your sentence?

4    A.    Twenty-nine years and -- twenty-nine years for the

5    drug conspiracy and twenty years for the money

6    laundering.

7    Q.    Were you convicted pursuant to a plea agreement?

8    A.    Yes, I was.

9    Q.    Are you here today pursuant to a plea agreement?

10   A.    Yes, I am.

11   Q.    Are you here today pursuant to a cooperation

12   agreement?

13   A.    Yes, I am.

14   Q.    What is your understanding of your responsibilities

15   pursuant to those agreements?

16   A.    To divulge all involvement I had with my drug

17   dealing activities, any and all activity that I was

18   involved with.

19            MR. PAIGE:  I would like to show you what's

20   been marked as Government's Exhibit 31A and 31B.

21        (Government's Exhibit Nos. 31A, 31B marked)

22            MR. PAIGE:  Your Honor, may I approach the

23   witness?

24            THE COURT:  Are they single pages?

25            MR. PAIGE:  No, they're not, Your Honor.

1          THE COURT:  All right.  Yes.

2     BY MR. PAIGE:

3     Q.   Mr. Turnbull, do you recognize Government's

4     Exhibit 31A?

5     A.   Yes, I do.

6     Q.   What do you recognize that to be?

7     A.   I recognize the first one as the motion for my

8     sentencing, as far as the 5K1 and my plea agreement.

9     Q.   How many pages are those documents?

10    A.   The one in reference to the 5K1 is four pages, and

11    the other one is ten pages.

12    Q.   Now, the one that's labeled 31A, how many pages is

13    that?

14    A.   Ten pages.

15    Q.   That's ten pages.  Okay.

16         Now the other one with four pages, is that 31B?

17    A.   Yes, that's correct.

18    Q.   Okay.  Let's start with 31A. Is your signature on

19    that agreement?

20    A.   Yes, it is.

21    Q.   Is your signature on 31B, as well?

22    A.   Yes, it is.

23    Q.   What is the date on 31A?

24    A.   The date is March -- well, no, March 24th, 2003.

25    It looks like 24.

1    Q.    And 31B?

2    A.    The 8th of January, 2003.

3          MR. PAIGE:  Your Honor, I move for admissions

4    of Government's Exhibits 31A and -B.

5          MR. HODGE:  No objection.

6          MR. MOORE:  Court's indulgence just a moment?

7          THE COURT:  Yes.

8       (Pause)

9          MR. MOORE:  Your Honor, I'm going to have some

10   continuing objections --

11         THE COURT:  You object?

12         MR. MOORE:  Yes, Your Honor, in conjunction --

13         THE COURT:  All right.  I'll take it under

14   advisement as to 31A and 31B.

15         MR. HODGE:  I join in any objections Attorney

16   Moore has raised.

17   BY MR. PAIGE:

18   Q.    Mr. Turnbull, do you know a person by the name of

19   Gelean Mark?

20   A.    Yes, I do.

21   Q.    How do you know Mr. Mark?

22   A.    I know him, I know of him through a coconspirator

23   of mine named Robert Thomas.

24   Q.    How long have you known Mr. Mark?

25   A.    Since, I think it was late in the fall of 1998, I

1    think, if I'm not mistaken.

2    Q.   Where did you meet him?

3    A.   The first time I originally met him was in

4    Greensboro, North Carolina.

5    Q.   Do you know him by any other names?

6    A.   Yes, I do.

7    Q.   What would those be?

8    A.   The Married Man, Goatee, Maestro.

9    Q.   Do you see Mr. Mark in court today?

10   A.   Yes, I do.

11   Q.   Would you please point him out and describe what

12   he's wearing?

13   A.   He's over here to my left in the pastel yellow

14   shirt, with the black glasses on.

15          MR. PAIGE:   Your Honor, I ask that the record

16   reflect the identification of Mr. Gelean Mark.

17          THE COURT:   Yes, the record will reflect the

18   witness has identified Defendant Mark.

19   BY MR. PAIGE:

20   Q.   Do you know a person by the name of Mr. James

21   Springette?

22   A.   Yes, I do.

23   Q.   How do you know Mr. Springette?

24   A.   Mr. Springette is my cousin.

25   Q.   Have you ever had any business dealings with

```
 1    Mr. Springette?

 2    A.   Yes, I have.

 3    Q.   What is that -- what were those business dealings?

 4    A.   Mr. Springette was a supplier of narcotics, which I

 5    sold.

 6    Q.   Over what periods of time?

 7    A.   Roughly from '96 or '97, in that area, until 2002.

 8              MR. HODGE:  Objection.  Relevance.

 9              THE COURT:  Overruled.

10    BY MR. PAIGE:

11    Q.   What was your -- was there an organizational

12    structure to you-all's trafficking of cocaine?

13    A.   Yes, there was.

14    Q.   Did you have a role in that structure?

15    A.   Yes, I did.

16    Q.   Did you have a title in that structure?

17    A.   I was referred to as, as a lieutenant within the

18    organization.

19    Q.   What was your role?

20    A.   Part of my role was -- well, one of my roles was,

21    at that stage was communication with, communication with

22    other members of the organization.

23    Q.   How frequent was your communication with

24    Mr. Springette?

25    A.   During certain times it would be practically on a
```

1   daily basis, and during other times at least four to

2   five times per week.

3   Q.   Were there other members of the organization?

4   A.   Excuse me?

5   Q.   Other members of the organization?

6   A.   When you say "other members of the organization,"

7   essentially you mean would I have contact with other

8   members?

9   Q.   No, I'm sorry.  Let me clarify.

10       Were there any other members of your direct

11  trafficking endeavors, any other persons assist you?

12  A.   Yes, there were.

13  Q.   And who were they?

14  A.   There were several other members that assisted in

15  various things such as air drops and smuggling the

16  narcotics through the airports.  And we had couriers,

17  things of that nature, money couriers, drug couriers.

18          MR. PAIGE:  I would like to show you what's

19  been marked as Government's Exhibit 22A, and ask you if

20  you recognize it.

21          MR. HODGE:  Your Honor, are we looking at 22A?

22          THE COURT:  I don't know.  We'll see what the

23  government shows.

24          MR. PAIGE:  Okay.  I'm sorry, 22B, 22B.

25          (Government's Exhibit No. 22B marked)

1    BY MR. PAIGE:

2    Q.    Do you recognize Government's Exhibit 22B?

3    A.    Yes, I do.

4          MR. PAIGE:  I believe it's a two-page document.

5          Go forward to the second page.

6    BY MR. PAIGE:

7    Q.    Do you see the second page of 22B?

8    A.    Yes, I do.

9          MR. PAIGE:  Let's go back to the first one.

10   BY MR. PAIGE:

11   Q.    Mr. Turnbull, what do you recognize that to be?

12   A.    Basically a chart of the major members of the

13   organization and the duties that they performed.

14   Q.    Did you prepare this?

15   A.    Yes, I did.

16   Q.    And what did you prepare it in relation to?

17   A.    Where -- excuse me.  Could you repeat?

18   Q.    Why did you prepare it?

19   A.    To show the basic structure of the organization.

20   Q.    Would it be helpful in assisting you and to more

21   fully clarify your testimony today with respect to the

22   organization?

23   A.    Yes, it would be, it would be helpful, correct.

24          MR. PAIGE:  Your Honor, I move for admission of

25   Government's Exhibit 22B.

```
1              MR. MOORE:  Your Honor, if --
2              MR. HODGE:  Objection, Your Honor.
3              MR. MOORE:  I object, too.  If this witness has
4      his own direct personal knowledge --
5              THE COURT:  Hold on.
6         (Simultaneous discussion)
7              THE COURT:  Hold on.  Stop.  Stop.
8         I'll take it under advisement.
9      BY MR. PAIGE:
10     Q.   Did Mr. Gelean Mark have any business dealings with
11     your organization?
12     A.   Yes, he did.
13     Q.   Do you have any personal knowledge of his role in
14     the organization?
15     A.   Yes, I do.
16     Q.   How do you have that personal knowledge?
17             MR. HODGE:  Objection, Your Honor.  Is the
18     document still on the witness' screen?
19             THE COURT:  Overruled.
20             THE WITNESS:  Could you repeat the question?
21     BY MR. PAIGE:
22     Q.   How do you have any personal knowledge of his role?
23     A.   With, by -- I have personal knowledge because of
24     direct, direct dealings with Mr. Mark.
25     Q.   And from what period of time did this start?
```

1    A.   Like I said, in -- like I said previously, in late,

2    late fall of 1998.

3    Q.   What was Mr. Mark's first involvement with the

4    organization?

5    A.   During that time, Mr. Mark had came to North

6    Carolina and he had sold some narcotics.  And he didn't

7    want to come back to St. Thomas --

8              MR. HODGE:  Objection --

9              THE COURT:  Sustained.

10             MR. HODGE:  Objection.  Foundation.

11   BY MR. PAIGE:

12   Q.   Mr. Turnbull, is this from your personal knowledge?

13   A.   Yes, it is.

14   Q.   How, how did you acquire this information?

15   A.   Because Mr. Robert Joseph informed me that

16   Mr. Mark --

17             MR. HODGE:  Objection.  Hearsay.

18             THE COURT:  Okay.  Come to sidebar.

19         (Sidebar discussion held as follows)

20             THE COURT:  Attorney Paige, what are you trying

21   to elicit out of this witness?

22             MR. PAIGE:  Mr. Mark --

23             MR. HODGE:  Your Honor, I can't -- I didn't

24   hear that.

25             THE COURT:  Well, then come closer.

1          I -- we can't keep repeating --

2               MR. HODGE:  It's four of us, Your Honor.

3               THE COURT:  We've had eight up here before.

4     Just come in a little closer.

5               MR. PAIGE:  Mr. Mark's involvement, Your Honor,

6     we've had prior testimony that Mr. Robert Joseph was a

7     member of the organization and a coconspirator.  So he

8     got that information from a coconspirator, which would

9     make --

10              THE COURT:  Right.  But my question is:  What

11    is the information?

12         Because if you're trying to elicit just some

13    general information about what Mr. Mark is doing in

14    North Carolina, that doesn't necessarily come in.  If

15    it's something in furtherance of this RICO conspiracy,

16    that's a different matter; that is, if there's some

17    utterance that's made in furtherance of.

18         If it's just, "I learned that Mark was hanging out

19    in North Carolina, doing" blah, blah, blah, that's not

20    in furtherance of.  So -- and that's what I think he was

21    just saying, "I heard from" -- so and so -- "that he

22    didn't want to do this and that."

23         That's not a statement in furtherance of a

24    conspiracy.

25              MR. PAIGE:  That's correct.

1          THE COURT:  So that's not coming in.

2          MR. PAIGE:  But the government --

3          THE COURT:  What is it --

4          MR. PAIGE:  The question was, what his --

5          THE COURT:  I'm not debating the issue with

6    you.  I'm asking you, what is it you want to elicit from

7    this witness?

8          MR. PAIGE:  Specific involvement with the

9    organization, which was the question.

10          THE COURT:  All right.  All right.

11      Well, the objection is sustained.  So you need to

12    beware of eliciting things that are not statements in

13    furtherance of a conspiracy.

14          MR. PAIGE:  Yes, Judge.

15          THE COURT:  All right.  Thank you.

16      Yes, Attorney.

17          MR. MOORE:  We can just do it here instead of

18    in front of the jury, if that's all right.  I, again,

19    for this witness, raise the 105.  I request a limiting

20    instruction.  I also raise the hearsay objection to

21    everything said by -- anything other than this witness.

22          THE COURT:  All right.

23          MR. HODGE:  I join in that, Your Honor.

24          THE COURT:  Yes, yes.  Well, as I said before,

25    it's -- you're all in unless you're out, you

1    specifically opt out.

2              MR. HODGE:  Thank you, Your Honor.

3         (End sidebar discussion, open court as follows)

4              THE COURT:  All right.  Go ahead.

5    BY MR. PAIGE:

6    Q.   Mr. Turnbull --

7              THE COURT:  The objection was sustained, by the

8    way.

9         Go ahead.

10   BY MR. PAIGE:

11   Q.   Mr. Turnbull, did you see Mr. Gelean Mark in July

12   of 2000, or the summer of 2000?

13   A.   Yes, I did.

14   Q.   What were the circumstances surrounding -- was

15   it -- withdrawn.

16        Was that meeting in relation to the organization?

17   A.   Yes, it was.

18   Q.   Where did it take place?

19   A.   Well, during that summer, one of the meetings --

20   because we had several meetings during that summer.  But

21   one of the meetings that took place concerned the

22   movement of narcotics through the airport on St. Thomas

23   to North Carolina.

24   Q.   Where did this meeting take place?

25   A.   It took place at a property in, I think it's the

1    Contant area.

2    Q.   And you spoke directly to Mr. Mark in this regard?

3    A.   Yes, I did.

4    Q.   What was said by Mr. Mark in relation to moving

5    those narcotics through the airport?

6    A.   Well, basically he gave me a description of how the

7    narcotics would be moved through the airport, and what

8    would be entailed of the couriers and things of that

9    nature.

10   Q.   Exactly how did he explain this to you?

11   A.   There would be a gentleman that worked for one of

12   the airlines, I think it was Delta, who would have a

13   leather laptop case that contained the narcotics.  And

14   the courier would come through the airport, and by --

15   would come through Customs with an identical bag that

16   contained, basically, books and magazines; and at which

17   point they would go to the Delta ticket counter, after

18   he passed through Customs and Immigration, and the bags

19   would be switched at that point; and then at which point

20   the courier would board a US Air flight to North

21   Carolina.  And, you know, that was the basic mode

22   of operandum [sic].

23   Q.   Okay.  At some point in the future did you all

24   employ this mode --

25   A.   Yes, we did.

1    Q.   -- of operation?

2    A.   Yes, we did.

3           MR. HODGE:   Objection.   Foundation.

4           THE COURT:   Overruled.

5    BY MR. PAIGE:

6    Q.   And when did that begin?

7    A.   That modus of operandum [sic] had been taking place

8    since, I want to say early 1999.

9    Q.   And more specifically with respect to Mr. Mark,

10   from what date, from what year to what year?

11   A.   1999 until 2002.

12   Q.   In 1999, approximately how many times did you all

13   employ this method?

14   A.   Well over ten times.

15   Q.   In 2000, approximately how many times did you

16   employ this method?

17   A.   Again, well over ten times.

18   Q.   2001?

19   A.   2001, I would say between 15 and 20 times.

20   Q.   And how many years thereafter?   I'm sorry, I missed

21   that?

22   A.   Excuse me?

23   Q.   How many years thereafter?

24   A.   Well, until my incarceration came in October of

25   2002.   And basically that's when everything ceased.

1    Q.   Now once the drugs were flown from the Virgin

2    Islands, do you have any personal knowledge as to where

3    their destination was?

4    A.   Yes, I did.

5    Q.   Where was that?

6            MR. HODGE:   Objection.   Foundation.

7            THE COURT:   Overruled.

8            THE WITNESS:   The narcotics would be flown in

9    to Charlotte, North Carolina, on a commercial US Air

10   flight --

11           THE COURT:   Before you go on any further, tell

12   us how you know this.

13           THE WITNESS:   The reason I know this is because

14   the, all the -- a lot of --

15           THE COURT:   Do you know it from anyone that you

16   previously mentioned?

17           THE WITNESS:   Yes, I did -- yes, I do.

18           THE COURT:   All right.   Go ahead.   Answer the

19   question.

20           THE WITNESS:   I know this information because

21   it was the modus of operandum [sic] that was discussed

22   by Mr. Mark as -- well, that was the flight we were

23   using, as far as that the couriers would board and come

24   to North Carolina -- well, Charlotte, North Carolina.

25           I lived in Greensboro, North Carolina, which is

1    approximately an hour and a half by car --

2         MR. HODGE:  Objection.  Calls for speculation.

3         THE COURT:  Overruled.

4         THE WITNESS:  -- which is an hour -- Charlotte

5    is an hour and a half by vehicle from -- it's an hour

6    and a half from Greensboro, North Carolina, where I

7    lived, to Charlotte.

8         And I would have couriers or drivers go to the

9    airport and meet the couriers at the airport and bring

10   the narcotics back to Greensboro, North Carolina.

11   BY MR. PAIGE:

12   Q.   And this was on each of the occasions that you just

13   mentioned?

14   A.   Correct.

15        Excuse me.  There were, there was an occasion or

16   two when the couriers flew into Raleigh-Durham Airport,

17   which, again, is an hour and a half from Greensboro.

18   Q.   Would you get any notification that this would

19   happen, prior to?

20   A.   Yes, I would.

21   Q.   How would you gain that information?

22   A.   Mr. Mark would call me on the specific day and

23   notify me that we're working today.  And later on in the

24   day he would provide me with a physical description of

25   the individual that would be traveling, if it was a

1     courier that he, himself, had recruited.

2     Q.   Now once the drugs were transported to you, what

3     would you do with them?

4     A.   Once the drugs made it to Greensboro, North

5     Carolina, I had various --

6               MR. HODGE:  Objection.  Relevance.

7               THE COURT:  Overruled.

8               THE WITNESS:  Once the drugs got to Greensboro,

9     North Carolina, I had various locations where the drugs

10    would be stored.

11    BY MR. PAIGE:

12    Q.   How much were you selling the drugs for,

13    Mr. Turnbull?

14    A.   I was selling one kilogram of cocaine --

15              MR. HODGE:  Objection.

16              THE WITNESS:  -- for $22,000.

17    BY MR. PAIGE:

18    Q.   How much of that money did you keep?

19    A.   It varied, depending on who, who was the actual

20    owner of the kilo of cocaine.

21    Q.   On average, how much would you keep?

22    A.   On average, four to five thousand dollars.

23    Q.   What, if anything, would happen with the remainder?

24    A.   The remainder would go basically to who the owner

25    of that kilo of cocaine would belong to.

1   Q.   Did you have anyone -- who, if anyone, assisted you

2   in the distribution of the narcotics in North Carolina?

3   A.   I had various people within the organization who

4   handled such things as driving, storing narcotics --

5            MR. HODGE:   Objection.  Relevance.

6            THE COURT:   Sustained.

7   BY MR. PAIGE:

8   Q.   Who, if anyone, would assist you in distributing

9   the cocaine in North Carolina?

10      Would you sell --

11           MR. HODGE:   Objection.  Relevance.

12           THE COURT:   Overruled.

13  BY MR. PAIGE:

14  Q.   Would you sell the cocaine to anyone else

15  personally?

16  A.   Yes, I did.

17  Q.   Who would that be?

18  A.   I sold to various -- I had about, roughly eight to

19  nine people that I sold narcotics directly to in

20  Greensboro, North Carolina.

21           MR. HODGE:   Objection.  Relevance.

22           THE COURT:   Okay.  Overruled.

23  BY MR. PAIGE:

24  Q.   Was there anyone you sold it to regularly?

25  A.   Yes, I did.

```
1    Q.   Who was that?

2    A.   It was -- you want me to refer to them by name

3    or --

4         MR. HODGE:  Your Honor, may I have a continuing

5    objection?

6         THE COURT:  Yes.

7         MR. HODGE:  Thank you.

8    BY MR. PAIGE:

9    Q.   Yes, by name and/or nickname, however you would --

10   A.   There was a gentleman by the name of Big Ho.

11   Q.   Do you know any names -- birth-given names?

12   A.   In this business, very few people -- especially

13   when you're dealing hand-to-hand sales, you very seldom

14   use your birth-given names.  So most of the names are

15   nicknames.

16   Q.   Do you know a person by the name of Glenson Isaac?

17   A.   Yes, I do.

18   Q.   Who is Glenson Isaac?

19   A.   He was a friend of Mr. Gelean Marks that lived in

20   the Raleigh-Durham area of North Carolina.

21   Q.   Did Mr. Glenson Isaac participate in this drug

22   trafficking with you and Mr. Mark?

23   A.   Yes, he did.

24   Q.   How do you have -- do you have any personal

25   knowledge of that?
```

1    A.    On several occasions I've sold kilograms of

2    cocaine --

3            MR. HODGE:   Objection.   Nonresponsive.

4            THE COURT:   Overruled.

5            THE WITNESS:   On several occasions I had -- I

6    have sold narcotics to Mr. Glenson Isaac.

7    BY MR. PAIGE:

8    Q.    Where did Mr. Glenson Isaac reside?

9    A.    As far as my knowledge, he resided in the

10   Raleigh-Durham area of North Carolina.

11   Q.    Did you play any active role in the organization

12   outside of your activities in North Carolina?

13   A.    Yes, I did.

14   Q.    And where was that?

15   A.    I was responsible, I was -- part -- one of my

16   duties was to be present at the boat drops that took

17   place to the northeast of, in the waters northeast of

18   Tortola.

19   Q.    Would you generally describe how that came about?

20   A.    Well, Mr. Springette, my cousin, he would notify me

21   on the time and dates when planes would be coming with

22   the cocaine, with bales of cocaine.   And I would travel

23   to St. Thomas and be at specific locations, via boat, to

24   retrieve the cocaine that was dropped from the airplane.

25   Q.    And how would you retrieve the cocaine?

1    A.   We would just, basically retrieve it with gaff

2    hooks.   The cocaine would come bundled in bales of 30,

3    30 kilograms of cocaine per bale.   And we would

4    basically retrieve them from the water by gaff hooks and

5    store them on the boat until we took them back to land.

6    Q.   Where was the physical location that you met

7    Mr. Mark?

8    A.   Could you repeat the question?

9    Q.   Where did you meet Mr. Mark?   Where?

10   A.   On the initial occasion or --

11   Q.   The initial occasion.

12   A.   The initial time I met Mr. Mark was in Greensboro,

13   North Carolina.

14   Q.   Where?

15   A.   It was, if I'm not mistaken, the parking lot of a

16   UPS, UPS distribution center.

17   Q.   How often did Mr. Mark come to North Carolina?

18   A.   Initially, Mr. Mark told me he didn't travel to

19   North Carolina on many occasions, because he had a fear

20   of flying during that time.   So -- but I can't really

21   give you an exact number.

22        Because in the fall of 1998, that was my first time

23   meeting Mr. Mark, so we weren't discussing, "How many

24   times do you come to North Carolina?"   That wasn't a

25   topic, an issue of discussion.

1    Q.    Have you ever been to Mr. Mark's residence?

2    A.    Yes, I have.

3    Q.    Where was it?

4    A.    It's, as you go up the hill from the Reichhold

5    Center, right as you crest that hill, he owns property

6    right above there.  I'm not exactly sure.  But it was in

7    the Bonne Esperance area or something.

8         I can't remember the exact name, but it's like a

9    lookout, that you can see the airport and beach and

10   everything right there.

11   Q.    Mr. Turnbull, have you ever had any involvement in

12   gambling and dogfights?

13   A.    Yes, I have.

14   Q.    When did this begin?

15   A.    I was involved actively in the dogfighting, or the

16   sport of dogfighting, ever since, roughly, 1994, I

17   became active in the sport.

18   Q.    And what would you call active?

19   A.    Participating directly, rather than just being a

20   spectator.

21   Q.    Did you fight the dogs for sport, or gamble, for

22   money purposes?

23   A.    Both.

24   Q.    Do you have any personal knowledge of Mr. Mark

25   engaging in gambling on dogfights?

1    A.   Yes, I do.

2    Q.   How do you have that personal knowledge?

3    A.   I have given Mr. Mark several -- dogs on several

4    occasions, and he and I have both attended several

5    dogfights together, on St. Thomas and in North Carolina.

6    Q.   Where would you --

7              MR. HODGE:  Objection.  Relevance.

8              THE COURT:  Overruled.

9    BY MR. PAIGE:

10   Q.   Where on St. Thomas have you attended dogfights

11   with Mr. Mark?

12   A.   At an area in the north side area called the farm,

13   what's referred to as the farm.

14   Q.   Can you describe the farm?

15   A.   It's an area, I think it's near the agricultural

16   station.

17   Q.   Could you describe the layout of the farm,

18   generally?

19   A.   It's basically on a hillside.

20   Q.   What type of things are there?

21   A.   Cages for the birds to be stored in.  There was, I

22   think, two rooms where the birds were actually

23   exercised, in order to prepare them for fights --

24             MR. HODGE:  Objection, Your Honor.  Relevance.

25             THE COURT:  Overruled.

1   BY MR. PAIGE:

2   Q.   Were there any dogs there?

3   A.   Yes.  There were several dogs at the location.

4   Q.   How were the dogs kept?

5   A.   They were kept on chains.

6   Q.   Do you have any personal knowledge of how Mr. Mark

7   became associated with the farm?

8   A.   Yes, I do.

9   Q.   How do you have that knowledge?

10  A.   At one point Mr. Mark was keeping his, his chickens

11  that he used for cockfighting, and his dogs, at some

12  property in the Contant area, which is the area I was

13  discussing where we had a meeting previously.  And he

14  informed me that the owner of that property had a, was

15  getting ready to sell the property --

16       THE COURT:  Stop.  Stop.

17       Let's move on to the next question.

18  BY MR. PAIGE:

19  Q.   Did Mr. Mark have an ownership interest in the

20  farm?

21  A.   No, he did not.

22  Q.   Did he have any exclusive use of it?

23  A.   Yes, he did.

24       MR. HODGE:  Objection.  Foundation.

25       THE COURT:  Sustained.

1    BY MR. PAIGE:

2    Q.   Do you have any personal knowledge of whether he

3    had exclusive use of the farm?

4    A.   Yes, I do.

5    Q.   How do you have that personal knowledge of how he

6    had exclusive use of the form?

7    A.   From, from conversations that Mr. Mark and I had,

8    and along with the gentleman that owned the property.

9    It was discussed as far as --

10             THE COURT:  Hold on.  Just tell us about

11   your -- don't speak about your --

12             THE WITNESS:  He was --

13             THE COURT:  Hold on.

14       Do not talk about conversations with someone other

15   than Mr. Mark.

16       Do you understand?

17             THE WITNESS:  Correct.  Correct.

18             THE COURT:  All right.  Go ahead.

19             THE WITNESS:  Conversations with Mr. Mark and

20   I.  He would detail his, his, basically 24-hour access

21   to the farm, as far as feeding the chickens and the

22   dogs, storing feed there, and general upkeep and

23   maintenance of the property.

24   BY MR. PAIGE:

25   Q.   Did you have any involvement with him acquiring

1    access -- exclusive access to the farm?

2    A.   Yes, I did.

3    Q.   What was that involvement?

4    A.   I spoke to the gentleman who was, who actually

5    owned --

6         MR. HODGE:  Objection, Your Honor.

7    Mischaracterizes the testimony.

8         THE COURT:  Okay.  Overruled.

9    BY MR. PAIGE:

10   Q.   Tell us what you told that gentleman?

11   A.   I told him Mr. Marks needed a, needed some space

12   where he could store his own chickens and dogs, because

13   he, at the time he didn't have anywhere to store them.

14   Q.   Did you assist him in any other way with the use of

15   the farm?

16   A.   Other than helping him to acquire access to the

17   farm initially, no.

18   Q.   Other than speaking to the gentleman, did you

19   assist him in any other way in acquiring access?

20        MR. HODGE:  Objection.  Asked and answered.

21        THE COURT:  Sustained.

22   BY MR. PAIGE:

23   Q.   Approximately how many times have you been to the

24   farm?

25   A.   Well over 100 times.

1    Q.    I would like to show you --

2            MR. PAIGE:   One second, Your Honor.   Court's

3    indulgence?

4        (Pause)

5    BY MR. PAIGE:

6    Q.    Can you tell us, elaborate on how the gambling was

7    involved with the dogfighting?

8    A.    I'm not understanding the question.

9    Q.    You testified that gambling was involved with the

10   dogfighting that you --

11   A.    Correct.

12   Q.    -- did.   Okay.

13           Was Mr. Mark involved in the gambling as well?

14   A.    Correct.

15   Q.    Was that in conjunction with you?

16   A.    Correct.

17   Q.    Can you describe exactly how you gambled on the

18   dogfight?

19   A.    Well, the gambling would take place if you, when

20   you match the dog with someone else, you would set a

21   dollar amount as far as -- that would be the bet.   And

22   the dog that won the fight, the owner would collect the

23   wager from the opposing owner.

24   Q.    What were the average amounts that were gambled on

25   the dogs?

```
 1              MR. HODGE:  Objection.  Relevance.

 2              THE COURT:  If he has personal knowledge.

 3    BY MR. PAIGE:

 4    Q.   Do you have any personal knowledge of the amounts

 5    that were gambled on the dogs?

 6    A.   Yes, I do.

 7    Q.   How do you have that knowledge?

 8    A.   From dogs that I fought personally.

 9    Q.   And what were those amounts?

10    A.   Those amounts --

11              MR. HODGE:  Objection to relevance.

12              THE COURT:  Sustained.

13    BY MR. PAIGE:

14    Q.   Are you aware of the gambling amounts, personally

15    aware of the gambling amounts of any dogfights involving

16    Mr. Mark?

17    A.   Yes.

18              MR. HODGE:  Objection.  Relevance.

19              THE COURT:  Overruled.

20              THE WITNESS:  Yes, I do.

21    BY MR. PAIGE:

22    Q.   How do you have that personal knowledge?

23    A.   Because I myself was, I helped pool the money

24    together to fight dogs on more than one occasion.

25    Q.   How many, more than one occasion?
```

1    A.    Well, twice, to be specific, to be specific.

2    Q.    How about the first time?

3    A.    Do you want to know the amount?

4    Q.    Yes.

5    A.    Okay.  That amount was --

6              MR. HODGE:  Objection.  Relevance.

7              THE COURT:  First of all, tell us who was

8    involved.

9              THE WITNESS:  Well, on one occasion there was a

10   dog that I sent from North Carolina personally to --

11             THE COURT:  Stop.  Stop.

12        The question is who was involved.

13             THE WITNESS:  Mr. Mark was personally involved

14   with finding somebody else to match the dog against here

15   on St. Thomas, that I was sending from North Carolina to

16   fight.

17             THE COURT:  All right.  Ask your next question.

18   BY MR. PAIGE:

19   Q.    And what was the amount?

20   A.    The amount for that fight, if I'm not mistaken,

21   was, I think $5,000.

22   Q.    Did you attend that fight?

23   A.    No, I did not.

24   Q.    How about the second one?

25   A.    There was another fight that took place at the

1    farm, that I attended.

2    Q.   And when was this?

3    A.   It was, if I'm not mistaken, it was around Carnival

4    time of 19- -- either 1999 or 2000.

5    Q.   Where was it located?

6    A.   At the farm.

7    Q.   Describe what you saw there?

8    A.   A pit was constructed behind, there was a house

9    that was not occupied, and there was a pit that was

10   constructed at the rear to the house.  And that's where

11   the fight took place.

12   Q.   Were there others there?

13   A.   Yes, there were.

14   Q.   Do you have any personal knowledge as to the amount

15   that was being gambled on that fight?

16           MR. HODGE:  Objection.  Relevance.

17           THE COURT:  Overruled.

18           THE WITNESS:  I don't -- I'm personally not

19   aware of the exact amount, but I --

20           THE COURT:  Stop.

21       Next question.

22   BY MR. PAIGE:

23   Q.   Was the farm -- do you have any personal knowledge

24   that the farm was being used for any other purposes?

25   Yes or no.

1    A.    Yes, I do.

2    Q.    How do you have that knowledge?

3    A.    From the owner of the farm.

4          MR. HODGE:   Objection.   Hearsay.

5          THE COURT:   He hasn't said what the knowledge

6    is.   Overruled.

7    BY MR. PAIGE:

8    Q.    Who was the person?

9    A.    The person was --

10          THE COURT:   It's already been answered.   He

11    said the owner of the farm.

12        Next question.

13          MR. PAIGE:   I would like to show you what's

14    been marked as Government's Exhibits 166B through 166Q,

15    and ask you if you recognize it.

16        (Government's Exhibit Nos. 166B to 166Q marked)

17    BY MR. PAIGE:

18    Q.    Do you see Government's Exhibit 166B?

19    A.    No, I do not.

20        Okay.   I see a picture now.

21    Q.    Do you recognize 166B?

22    A.    No, I do not.

23    Q.    Let's try 166C.

24        Do you recognize 166C?

25    A.    No, I do not.

1    Q.    Okay.

2          MR. PAIGE:  You can take that down.

3     All right.  Thank you, Mr. Turnbull.  I have no

4    further questions.

5          THE COURT:  All right.

6     Attorney Hodge?

7          MR. HODGE:  Court's indulgence?

8          THE WITNESS:  Good morning.

9          MR. HODGE:  Court's indulgence?

10          THE COURT:  Yes.

11     (Pause)

12                    CROSS-EXAMINATION

13    BY MR. HODGE:

14    Q.    Good afternoon, Mr. Turnbull.

15    A.    Good afternoon.

16          MR. HODGE:  I would like to have, I believe

17    it's Government's Exhibit 16B.

18     (Counsel conferring)

19          MR. HODGE:  22B.

20     (Counsel conferring)

21          MR. HODGE:  21B, sorry.

22     Your Honor, I believe this was admitted into

23    evidence.

24          THE COURT:  You want to publish?  Yes.

25    BY MR. HODGE:

1    Q.   Sir, could you take a look at Government's

2    Exhibit 21B, here?

3    A.   Yes, sir.

4    Q.   Do you recognize it?

5    A.   Not as something that I've written.

6    Q.   What would you say it depicts?

7    A.   It details and depicts the structure of the

8    organization I was involved in.

9    Q.   Is it accurate?

10   A.   Fairly accurate.

11   Q.   So at the top of the organization -- sorry.  At the

12   top of the organization is Springette, correct?

13   A.   Correct.

14   Q.   And under him he had, he had lieutenants, correct?

15   A.   Correct.

16   Q.   And you were one of those, correct?

17   A.   Correct.

18   Q.   And generally speaking, he didn't communicate with

19   people lower than his lieutenants?

20   A.   Correct.

21   Q.   Did Mr. Springette act at the direction of

22   Mr. Mark?

23   A.   Did he act at the direction of Mr. Mark?

24   Q.   Did Mr. -- was Mr. Mark the one who told Springette

25   what to do?

1     A.    No, he did not.

2     Q.    Was Mr. Mark the one who told Bob Hodge what to do?

3     A.    On certain occasions, yes.

4     Q.    Who was it who paid Bob Hodge?

5     A.    Bob Hodge was paid in cocaine.  A portion of the

6     narcotics proceeds that would -- a percentage -- not a

7     portion, but a percentage of the amount of cocaine that

8     came through the waters of -- well, via the air drops.

9     Q.    So he was paid by Springette?

10    A.    Correct.

11    Q.    And so it would be Springette who would tell him to

12    coordinate with Mr. Mark?

13    A.    No, it would not.

14    Q.    It would be you?

15    A.    Yes, it would.

16    Q.    So really, when you say that he acted at the

17    direction of Mr. Mark, you mean --

18    A.    When you say "he"?

19    Q.    I'm sorry.  I'll rephrase.

20          So when you say that Bob Hodge occasionally acted

21    at the direction of Mr. Mark, you mean that he and --

22    excuse me -- Bob Hodge and Mr. Mark coordinated through

23    you, correct?

24    A.    There would be occasions when Mr. Mark might have

25    knowledge that a certain day would not -- would be a not

1    too opportune day to bring narcotics from Tortola to St.

2    Thomas, and Mr. Mark would instruct Mr. Hodge, "Not

3    today," basically.  So that's what I mean in reference

4    to there would be times when Mr. Mark would instruct

5    Mr. Hodge.

6    Q.   I see.

7         But the question of whether or not to do the drop

8    is not -- is made by Springette, correct?

9    A.   That's correct.

10   Q.   Thank you.

11        You testified before about the ownership of the

12   cocaine that arrived in North Carolina.  Do you recall?

13   A.   Correct.

14   Q.   Was any of that cocaine owned by Mr. Mark?

15   A.   On occasions, yes.

16   Q.   Really?

17        How much of the cocaine was owned by Springette?

18   A.   The vast majority of it was owned by

19   Mr. Springette.

20   Q.   And the proceeds of those sales would go to

21   Mr. Springette?

22   A.   Correct.

23   Q.   If, if cocaine -- excuse me.  I'll rephrase.

24        Who was responsible for making sure that the

25   cocaine was distributed in North Carolina?

1   A.   I was responsible for that.

2   Q.   And this was at the direction of Springette?

3   A.   Yes, it was.

4   Q.   Did Mr. Mark play any role with respect to Jeffrey,

5   Puerto Rico, and New York?

6   A.   Yes, he did.

7   Q.   What role was that?

8   A.   It was one specific occasion where Mr. Mark

9   helped -- he obtained a key to the property, to access

10   the property above the beach.  And I think the beach is

11   named Santa Maria.  And Mr. -- well, Jeffrey was to meet

12   with some individuals coming from Puerto Rico via boat

13   to transfer several bales of cocaine to the --

14   Q.   So basically he got a key, in terms of actually --

15   a key that opens a lock?

16   A.   To open --

17        THE COURT:  Stop, stop.  Counsel, come to

18   sidebar.

19        (Sidebar discussion held as follows)

20        THE COURT:  All right.  Attorney Hodge, I

21   thought you wanted to stay away from Puerto Rico and you

22   didn't want to have your client implicated in that.  And

23   I don't think any of the testimony to this point said

24   anything about your client's involvement in anything in

25   Puerto Rico.

1          MR. HODGE:  Well, Your Honor --

2          THE COURT:  Hold on.  Let me finish.

3     I thought that Mr. Springette talked about his

4     involvement and the people who were involved under him,

5     and only on one side of the diagram was there reference

6     to a subset of activity that Mr. Springette undertook

7     that involved your client.

8          And I thought that you were concerned about

9     bringing in Puerto Rico and implicating your client in

10    that.  And I, I'm not really sure where you're going,

11    but I didn't -- I just wanted to make sure that, you

12    know, if that was your intent, to go into the Puerto

13    Rico material -- is that your intent?

14          MR. HODGE:  Your Honor --

15          THE COURT:  I'm not trying to direct your --

16          MR. HODGE:  -- my intent.

17          THE COURT:  I just --

18          MR. HODGE:  -- my intent, once the Court

19    admitted that into evidence and showed the jury -- first

20    of all, Springette yesterday testified about drugs going

21    to Puerto Rico, one.

22     Two, the Court admitted --

23          THE COURT:  I'm not --

24          MR. HODGE:  -- please let me finish.

25          THE COURT:  I'm going to give you a chance.

1      I'm just saying -- I'm not trying to debate an

2    issue with you.  I'm just -- I just wanted to make sure

3    that that was your intention.  If that's your intention,

4    to go into Puerto Rico, then, you know, it's your

5    cross-examination.  You can go ahead.

6      But I thought there was some concern with it.  And,

7    you know, if that's what your intent is, then --

8            MR. HODGE:  Your Honor, what I'm saying is

9    Puerto Rico was brought in by the prosecution.  And now

10   at this point I need to distance my client from that.

11     There's a gigantic conspiracy put in front of this

12   jury, and I need to show them that this is not my

13   client.

14            THE COURT:  Okay.

15            MR. HODGE:  This is an enterprise.  He is not

16   the leader of any of this.  He's not the -- you know --

17            THE COURT:  Okay.

18            MR. HODGE:  And all this evidence of that stuff

19   completely independent of him, things that he was not

20   the leader of.  And the charge is enterprise where he is

21   the leader.

22            THE COURT:  All right.  I understand.  I'm not

23   trying -- I'm not directing you.  I don't have an

24   opinion one way or the other.  I just wanted to make

25   sure, because I know you had voiced some concern about

1    that.

2         And I was just -- I think my recollection of the

3    record is that there was absolutely no testimony -- that

4    the government would be precluded from arguing anything

5    that would suggest your client was involved in any way

6    with anything that Mr. Springette was involved with,

7    that may have involved Puerto Rico or any other place.

8         MR. HODGE:  But Your Honor never struck

9    that testimony --

10        THE COURT:  Hold on.  Hold on.

11        There -- I'm just telling you my recollection was

12   there was no such testimony.

13        So but if -- you know, my recollection is not

14   always the best.  So I just wanted to make sure that

15   that was your intent.  Now I understand your intention.

16        Okay.  That's fine.  Thank you.

17        (End sidebar discussion, open court as follows)

18        MR. HODGE:  Court's indulgence?

19        THE COURT:  Yes.

20        (Counsel conferring with defendant)

21        MR. HODGE:  Your Honor, I move to strike all of

22   this witness' testimony with regard to Puerto Rico.

23        THE COURT:  All right.  This is testimony that

24   came out on cross-examination?

25        MR. HODGE:  Yes, Your Honor.

```
 1              THE COURT:  All right.  I'll take it under
 2      advisement.
 3          All right.  Any other questions?
 4              MR. HODGE:  Court's indulgence?
 5              THE COURT:  Yes.
 6          (Pause)
 7      BY MR. HODGE:
 8      Q.   Sir, when the drugs were dropped into the sea off
 9      the coast of Tortola, who was with you on those boats
10      picking it up?  Generally speaking.
11      A.    Myself, Bob Hodge.  There were other members --
12      there were other individuals that Bob Hodge knew
13      personally, that I don't know personally.  And one other
14      individual that I -- Robert, Robert Joseph, I think, is
15      his name, we refer to him as Unki; Stuart Taylor, and
16      there was another gentleman referred to as the
17      Frenchman.
18      Q.   But not Mr. Mark?
19      A.   No.
20      Q.   And after picking it up there, you testified that
21      you put it onto a dinghy and drive it into --
22      A.    Well, originally they were placed on 31-foot Open
23      Fisherman speed boats.  Then when we got closer to the
24      shore of Tortola, that's when they would be placed on
25      dinghies and taken to shore.
```

1    Q.   The shore of Tortola?

2    A.   Tortola, correct.

3    Q.   And where would they go from there?

4    A.   They would be stored on Tortola until further

5    notice, as to how much was going to Puerto Rico, how

6    much was destined to eventually come to North Carolina,

7    and vice versa.

8    Q.   And that decision was made by Springette?

9    A.   The decision as far as how much was going -- yes,

10   correct.

11          MR. HODGE:   Court's indulgence?

12          THE COURT:   Yes.

13       (Pause)

14   BY MR. HODGE:

15   Q.   And Mr. Mark had no role in the storage of the

16   drugs on Tortola, correct?

17   A.   Not on Tortola, no.

18          MR. HODGE:   Court's indulgence?

19          THE COURT:   Yes.

20       (Pause)

21   BY MR. HODGE:

22   Q.   When you were -- you would occasionally have

23   couriers transport money from North Carolina to St.

24   Thomas, correct?

25   A.   That's correct.

1    Q.    And this, and that money was under the control of

2    Springette's organization until it got to -- from the

3    time it left North Carolina, correct?

4    A.    I'm not, I'm not understanding what you mean, it

5    was under Springette's control.

6    Q.    Springette's organization was responsible for that

7    money until it got onto the plane in North Carolina,

8    correct?

9    A.    Narcotics would come to North Carolina, and there

10    would be on occasions when --

11    Q.    Sir, I'm asking about the money.

12    A.    And I'm trying to describe to you exactly -- to

13    answer your question in detail, so it's not vague.

14    There would be occasions, let's say --

15    Q.    Sir, you'll have an opportunity on redirect.  My

16    question is this:  When the money was transported from

17    North Carolina to St. Thomas, who was responsible for

18    packaging it?

19    A.    I was responsible for packaging the money.

20    Q.    And who was responsible for getting it to the

21    airport?

22    A.    I was responsible for having one of my drivers take

23    it to the airport, take it to the airport along with a

24    courier.

25    Q.    Now, this was one of your drivers?

1    A.   Yes, correct.

2    Q.   And this is one of your couriers?

3    A.   That's correct; on most occasions, but not all.

4    Q.   And when you -- and once you put them on a plane,

5    then -- I'll stop there.

6         MR. HODGE:  Withdrawn.

7         Court's indulgence?

8         THE COURT:  Yes.

9         (Pause, counsel conferring with defendant)

10        MR. HODGE:  I apologize, Your Honor.

11

12   BY MR. HODGE:

13   Q.   Isn't it true that the person you referred to as

14   Maestro or Kerwin was not a member of Springette's

15   organization?

16   A.   Yes, he was part of the organization.

17   Q.   Sir, do you remember testifying under oath on -- in

18   response to that very question?

19   A.   Yes, I have.

20   Q.   And do you recall responding that it is correct

21   that the person you referred to as Maestro or Kerwin was

22   not a member of Springette's organization?

23   A.   In the early days of my acquaintance with Mr. --

24   Q.   Sir, sir, that wasn't my question.  Do you recall

25   testifying under oath that it was correct that the

```
1    person you referred to as Maestro or Kerwin was not a

2    member of Springette's organization?

3    A.    Correct.

4    Q.    You do recall stating that under oath?

5    A.    I recall it.

6    Q.    Okay.

7              MR. HODGE:  Court's indulgence?

8              THE COURT:  Yes.

9         (Pause)

10             MR. HODGE:  No further questions, Your Honor.

11        I would like to reserve this witness.

12             THE COURT:  Yes.  Thank you, Attorney Hodge.

13        Attorney Moore?

14             MR. MOORE:  Good morning, this honorable Court,

15        and ladies and gentlemen, government's counsel; and to

16        you, too, Mr. Turnbull.

17             THE WITNESS:  Good morning.

18                    FURTHER CROSS-EXAMINATION

19   BY MR. MOORE:

20   Q.    Earlier you stated that you were a spectator before

21        you got into the sport of dogfighting?

22   A.    That is correct.

23   Q.    How long were you a spectator?

24        What year did you start going?

25   A.    I really became interested in the sport of
```

1    dogfighting around the age of 11 or 12 years old, here

2    on St. Thomas.

3    Q.   And you, when you got involved, you said you got

4    involved into it in 1994?

5    A.   Hands on, I got involved into it around 1994; '94,

6    '95, correct.

7    Q.   "Hands on," that means you were --

8    A.   I was actually owning dogs and matching dogs.

9    Q.   Were you also putting together matings and breeding

10   and things of that sort?

11   A.   Yes, I was.

12   Q.   Did you ever, like, read any books about it, or --

13   A.   Yes.  I read extensively about the sport, and

14   animals -- I have a degree in animal science, you know,

15   so I have a lot of knowledge as far as animals,

16   breedings, and things of that nature.

17   Q.   With regard to dogs, did you ever read anything

18   about -- by a person named Wilson Sparks?

19   A.   I'm not familiar with that name.

20   Q.   All right.

21        MR. MOORE:  I have no further questions, Your

22   Honor.  Thank you.

23        THE COURT:  Thank you, Attorney Moore.

24   Redirect?

25                    REDIRECT EXAMINATION

1 BY MR. PAIGE:

2 Q. Mr. Turnbull, was Mr. Mark always a member of the

3 Springette organization?

4 A. No.  He was -- he was not always what I would

5 consider a member of the organization.

6 Q. Did Mr. Mark have anything to do with the storage

7 of drugs here on St. Thomas?

8 A. Yes, he did.

9 Q. In what way?

10 A. He would store the drugs that were --

11   MR. HODGE:  Objection.  Foundation.

12   THE COURT:  Sustained.

13 BY MR. PAIGE:

14 Q. Do you have any personal knowledge of whether he

15 had anything to do with the storage of drugs here on St.

16 Thomas?

17 A. Yes, I do.

18 Q. Where do you have that knowledge from?

19 A. From Mr. Mark directly.

20 Q. Exactly what was his involvement in that regard?

21 A. Mr. Mark instructed me and told me as to some of

22 the locations he would store the drugs at, in

23 preparation for them being transported to North Carolina

24 via couriers.

25 Q. Where were those locations?

1    A.   One of the locations was at the farm.   Another one

2    was at a property located in, I think it was --

3         THE COURT:   Mr. Turnbull, you said that you

4    were told this.   When were you told this?

5         THE WITNESS:   I was told this on several

6    occasions, several occasions.

7         THE COURT:   All right.   When did you first

8    learn this, then?

9         THE WITNESS:   Of the locations where the drugs

10   were stored at?

11        THE COURT:   Yes.

12        THE WITNESS:   In roughly 1999.

13        THE COURT:   All right.

14   BY MR. PAIGE:

15   Q.   Now, the second location -- I believe you said the

16   farm --

17   A.   Would be an area, I think it was in the Solberg

18   area.

19        MR. PAIGE:   All right.   Thank you,

20   Mr. Turnbull.

21      I have no further questions.

22        THE COURT:   All right.   Mr. Turnbull, thank you

23   for your testimony --

24        MR. HODGE:   Your Honor, Your Honor, brief

25   recross.

1           THE COURT:  No, I don't think we went beyond

2    the cross.

3           Thank you, Mr. Turnbull.  You may step down.

4           THE WITNESS:  You're welcome.

5           THE COURT:  Mr. Turnbull is not excused.

6       I understand, Attorney Moore, Attorney Hodge, you

7    wish to have him?

8           MR. HODGE:  Yes, Your Honor.

9           MR. MOORE:  Your Honor, I -- I'm through, but I

10   respect my co-counsel's position.

11          THE COURT:  All right.

12      Does the government have any further need?

13          MR. PAIGE:  No, Your Honor.

14          THE COURT:  All right.  Next witness.

15      Well, actually, you know what?  This might be a

16   good time for our morning break, ladies and gentlemen.

17      We will take a 15-minute break.

18      (Jury not present, 10:43 a.m.)

19          THE COURT:  All right.  Did counsel need the

20   Court to address any matters?

21          MR. HODGE:  Yes, Your Honor, the matter I tried

22   to raise at the beginning of the day.

23          THE COURT:  All right.  Go ahead.

24          MR. HODGE:  I need it to be at sidebar, Your

25   Honor.

1           THE COURT:  All right.  Are there any other

2    matters we need to attend to?

3           All right.  I know that the parties have submitted

4    on that question on the activities in the BVI.  The

5    Court is considering that.  We should have a ruling

6    fairly soon on that.

7           Let me just remind counsel, no speaking objections

8    are necessary.  If you have a basis, just state whether

9    it's hearsay or whatever it is.  And the Court will

10   rule.  But speaking objections, I don't want those in

11   front of the jury.

12          With sidebars, I just want to remind counsel, as I

13   said yesterday, that the Court is available before the

14   9:00 a.m. start.  The reason the Court is available is

15   so that when the jury is here we can start, not first

16   thing they hear when we're ready to start is that we

17   need to begin with a sidebar.

18          So the Court is available during all breaks, and

19   always before the start of the day.

20          Now, there was a motion, Attorney Hodge.  Did you

21   want to hear -- be heard on your motion?

22          You had elicited some testimony.  Then I think you

23   then moved to have that testimony struck.

24          You want to be heard on that?

25          MR. HODGE:  Yes, Your Honor.

1           THE COURT:  Would you please stand?

2           MR. HODGE:  Actually, Your Honor, I think that

3 should wait until I've addressed the issue I need to

4 have addressed at sidebar.

5           THE COURT:  Well, I -- all right.

6     Well, why don't you tell us basically what your

7 outline is?

8     You made the motion, and I think I can hear from

9 the other parties.  There's no need to hear that at

10 sidebar.

11           MR. HODGE:  Your Honor, I would argue that

12 the -- as I explained yesterday, when government first

13 brought Springette onto the stand, that they were going

14 to bring up Venezuela, Colombia, Puerto Rico.

15     And minutes -- over my objection, Your Honor

16 allowed Springette to testify.

17     Minutes into his testimony, he had already brought

18 up Colombia, Venezuela and Puerto Rico.

19     The -- and at that point Your Honor -- and in

20 addition, today Your Honor allowed an exhibit in with a

21 structure of the organization, with an entire branch

22 dedicated to Puerto Rico, and, of course, Venezuela at

23 the top.

24     And Your Honor, at that point I was in the position

25 I warned the Court I would be in yesterday, which is

1    forced to question about that, to show that my client

2    was not connected.

3         And it's, it was irrelevant to begin with, and it's

4    irrelevant now.  And the witness' effort to connect my

5    client should be stricken, Your Honor.

6              THE COURT:  But Attorney Hodge, I don't think

7    that the government elicited any testimony implicating

8    your client in Puerto Rico.

9         You did.  So -- but I think I understand your

10   position.

11        Attorney Moore, do you want to be heard on this?

12             MR. MOORE:  Yes, Your Honor.

13             THE COURT:  All right.

14             MR. MOORE:  First, I would like to state, I

15   previously made my objections regarding a variety of

16   issues, and I'm soon going to get to Crawford, as well,

17   to add to the other two.

18             THE COURT:  Right.  We'll deal with the

19   Bourjaily issues shortly.

20        Go ahead.

21             MR. MOORE:  Currently, Your Honor, I didn't

22   want to open that door regarding anything involving

23   Puerto Rico.  And I wish to, first off, disagree there's

24   a conspiracy.  My client has opted to minimize any

25   conspiracy, and to demonstrate his lack of involvement

1    with it.

2              THE COURT:  All right.  So you join in the

3    motion, but for other reasons.

4              MR. MOORE:  Yeah.  I don't want the Puerto

5    Rico-New York part of it involved at all.

6              THE COURT:  All right.  I understand.

7         All right.  What's the government's position?

8              MR. PAIGE:  Your Honor, the government objects.

9    In the first instance, the government intentionally

10   stayed away from that prong of that organization.

11        Counsel elicited that testimony on

12   cross-examination, intentionally so.  So we do not think

13   it should be stricken.

14             THE COURT:  All right.  But notwithstanding

15   what defense counsel has done or said, or their

16   position, isn't there a 403 issue?

17        That is, at the core of the government's case,

18   isn't it that the racketeering activity, the criminal

19   enterprise undertook its deeds primarily here in St.

20   Thomas?

21        That is, the drugs was -- drugs were sourced from

22   South America, they were dropped in the BVI, but the nub

23   of the activity is right here.  You don't really want to

24   get into Puerto Rico, do you?

25             MR. PAIGE:  No.  We made no effort to do so,

1    Judge.

2              THE COURT:  Well, that's my point, though.

3    Isn't there a 403 issue that -- I don't think counsel

4    had mentioned this, but it seems to me there's a 403

5    issue that the Court, in its gatekeeping function,

6    should be concerned with, and that is that this is a

7    sideline issue that the jury need not get into.

8         So shouldn't I strike it, just on that basis?

9              MR. PAIGE:  Yes, Judge.

10              THE COURT:  All right.  I think that's what I'm

11    going to do.

12         Thank you, Counsel.

13         All right.  I'll let the jury know, as soon as we

14    come back, on that.

15         All right.  And then what's your issue, Attorney

16    Hodge?  What's your other issue?

17              MR. HODGE:  Your Honor, it's a sidebar issue.

18              THE COURT:  All right.  Does it involve a

19    juror?

20              MR. HODGE:  No, it doesn't, Your Honor.

21              THE COURT:  All right.  Come to sidebar.

22         (Sidebar discussion held as follows)

23              THE COURT:  All right.

24              MR. LINDQUIST:  I'm sorry.

25              THE COURT:  There is a juror note that the

1    Court received.  One of the jurors has indicated that

2    the juror would like to be dismissed, and I'll read the

3    rest of this:  "I find this case to be difficult.  I

4    have not been able to sleep in two nights.  My spouse is

5    off-island on business."

6         There's some business concerns that the juror has.

7    And the juror gets into some of those business

8    considerations, including payroll, handling certain

9    activities in the juror's business, and notes that in

10   the absence of the spouse, the juror has to pick up the

11   responsibilities of the spouse, which is adding to the

12   stress of serving on the jury.

13        And the juror also mentions a physical ailment, not

14   related to sitting or something that we typically hear

15   of, which is the need to urinate; none of that sort of

16   stuff, a physical injury, just dealing with a bad

17   joint -- bad shoulder, that is.

18        And says, "Serving on the jury pulls me away from

19   the proper therapy on the shoulder."

20        And the juror, of course, in the beginning starts

21   with they would like to be dismissed; and notes that,

22   hopes that the Court would take this into consideration.

23        The Court's intention was to indicate to the juror

24   that there are some difficulties in serving as a juror.

25   It's never easy, and to remind the juror that serving on

1   this case might mean they wouldn't be called for the

2   rest of the month or the rest of the duration of their

3   jury service.

4         But there is nothing in here, other than the

5   mention of the shoulder, that suggests there's some

6   discomfort that, at least in the first instance, gives

7   the Court some pause.

8         If this were something where there was a need for

9   some, a procedure, medical procedure, then the Court

10  would be very, very concerned and say we have to

11  accommodate this juror.

12        That's my intention, but I would like to hear from

13  the parties.  Let me hear from the government first.

14             MR. LINDQUIST:  I agree with you.  I think

15  that's the proper way to respond to it.

16             THE COURT:  All right.

17  Attorney Moore?

18  Or are we going Hodge first?  Attorney Hodge.

19             MR. HODGE:  I would, I think that the issue I

20  need to discuss may result in me having to hold off on

21  -- I'm sorry -- on my position on that.

22             THE COURT:  Well, let's deal with the jury

23  issue.  I mean, do you have a position on that?  What's

24  your position?

25             MR. HODGE:  Your Honor, I don't think that's a

1   good idea to keep someone on the jury who's, you know,

2   complaining about, has a medical complaint.  Because

3   when they get in the jury box, they're going to be

4   looking for the fastest way out.

5        THE COURT:  All right.

6   Attorney Moore.

7        MR. MOORE:  At this time, Your Honor, I

8   wouldn't be inclined to release them, although I'm

9   somewhat sympathetic to the argument of co-counsel.  But

10  I think you told us yesterday about another juror who's

11  got a need to, possibly, leave early.

12       And we had four alternates.  And I think it would

13  be a good idea to try to go as long as we can.  If

14  necessary, we can release somebody who's got those

15  problems closer to deliberation.

16       THE COURT:  All right.  Well, there are two

17  other matters that had come up with jurors.

18       One was -- well, the one passed yesterday -- not

19  passed, but that issue has been resolved.  That was why

20  we ended early.  I was hoping we could end the

21  Springette testimony, but one juror had another matter

22  that came up, and had to leave to meet that commitment

23  at 7:00.

24       I don't know if that's a recurring thing.  I

25  haven't inquired.  I hope it isn't.  But that's just --

1          MR. MOORE:  I disagree with Your Honor.  I'll

2     keep that juror.

3          THE COURT:  So, you know, if that's -- that's

4     one issue that we had.  Then there's another juror who

5     had vacation.  But that, too, was resolved.

6          The juror, I thought we would have to discuss it

7     this morning, but the juror has indicated that they will

8     just put off their vacation.  Apparently they had been

9     excused for a later time in the week, and they were

10    ready to go, and brought it to the Court's attention.

11         But this morning, before we had a chance, they said

12    no.  So that just is another consideration with this.

13         There are issues that pop up all the time with

14    jurors, and this is one.  So I'm inclined to go the

15    route that the Court initially suggested.

16         I note your objection, Attorney Hodge.

17         How do the parties suggest that the Court handle

18    this?

19         My inclination was to have Mrs. Trotman let them

20    know that the Court has considered this, and that, you

21    know, give them a time when we think the trial will be

22    over, and let them know that, you know, they'll be

23    excused from serving for the next six weeks, or

24    something like that.

25         Alternatively, I can have them come here at sidebar

1    in the presence of counsel, and the Court can address

2    that juror directly.

3        My inclination is the former.  I think it might be

4    a little less --

5            MR. LINDQUIST:  Intimidating.

6            THE COURT:  -- intimidating.  But I am also

7    aware that counsel has a right to be there for every

8    contact with any juror.

9        Let me start with the defense.

10       Attorney Hodge, what's your position?

11           MR. HODGE:  I vote for the former, Your Honor.

12           THE COURT:  Mrs. Trotman?

13           MR. HODGE:  (Indicating)

14           THE COURT:  Okay.

15       Attorney Moore?

16           MR. MOORE:  Mrs. Trotman, Your Honor.

17           MR. LINDQUIST:  Yes.

18           THE COURT:  All right.  That's how we'll handle

19   it, then.

20       All right.  Attorney Hodge, what's your issue?

21           MR. HODGE:  When I arrived this morning, my

22   client indicated to me that in light of my lack of

23   familiarity with the evidence in this case and the

24   witnesses in this case, given my limited time to

25   prepare, that he wants me removed as counsel and that he

1    wants to proceed pro se.

2             THE COURT:  All right.  Well, he has a right to

3    proceed pro se.  I don't think he has a right to dismiss

4    you, though.

5        My inclination, although I'll hear from all the

6    parties on this, is to have you continue there as

7    standby counsel.  He needs to be advised of the risk of

8    proceeding pro se.  That's my first thought.  And he

9    needs to be advised of some of the difficulties

10   procedurally, et cetera, and that you would still be

11   there to assist.

12       What's the government's position?

13            MR. LINDQUIST:  Yes.  As to that which you've

14   just said, at least that, I, I'm just being a bit

15   cautious, because it's an unusual circumstance, and I

16   want to make sure that I --

17            THE COURT:  Usually this happens before the

18   trial --

19            MR. LINDQUIST:  Yes.

20            THE COURT:  -- and then we --

21            MR. LINDQUIST:  That's what I'm --

22            THE COURT:  But the result, I think, is usually

23   the same, which is that I would never allow a defendant

24   to proceed without the aid of counsel.  If they choose

25   to avail themselves of that opportunity, it's always

1    there for the defendant.  But the defendant has a

2    constitutional right to stand in court and conduct his

3    own cross-examination and call witnesses.  It's his

4    trial, so.

5         MR. LINDQUIST:  I --

6         THE COURT:  But if the parties want some time

7    to think about this, I suggest you do that over the

8    break, since --

9         MR. LINDQUIST:  May we just confer a bit?

10    I think the Court is absolutely correct on the way

11    to handle it.  I'm sensing, though, that as far as

12    advice to him, advice to the jury as to what's

13    happening, those have to be calculated and be done very

14    carefully.

15         THE COURT:  I don't think the jury necessarily

16    needs to get too involved in that, lest it flag more

17    things than need to be flagged.

18    I think that a general instruction at some point, I

19    don't -- you know, I might do that before Mr. Mark

20    starts, or sometime in the afternoon, and say, "You may

21    have noticed Mr. Mark -- as every person who appears in

22    court, has a constitutional right to represent

23    themselves, that does not mean that counsel may not

24    assist, and that is precisely what is happening here";

25    something like that.

1     But I'll let counsel weigh in on that.

2     Attorney Moore, do you have something to say?  I've

3     heard from everyone except for you.

4          MR. MOORE:  Your Honor, it's sort of a subtle

5     move.  I think it's more along the lines of some

6     synchronized swimming type considerations, and it has,

7     it has effects on not only the presentation, but

8     planning and some other aspects of this.

9     And it's sort of like, I guess, in a horse race, to

10    have a horse loose with the jockey not on it around the

11    other horses, so it poses some surprises and some new

12    concerns for me and my client.

13    And I, I'll take all the time you'll give us to

14    speak with my client and figure out what's -- maybe he

15    wants to do it, too.

16         THE COURT:  Of course, you know it's a right

17    that's Mr. Mark's to exercise.

18         MR. MOORE:  I have no problem with that --

19         THE COURT:  And it doesn't necessarily

20    implicate your client.

21         MR. MOORE:  Yes, Your Honor.  Because he's my

22    -- he will become my co-counsel, and I would ordinarily

23    have -- there would be aspects of what we do and what we

24    don't do that I have to completely reconsider.

25         THE COURT:  Well, you know, that's a private

1    arrangement, the co-counsel, the closeness of

2    co-counsel, then, if Mr. Mark chooses to.

3             MR. MOORE:  Yes, Your Honor.

4             THE COURT:  So --

5             MR. MOORE:  Yes, Your Honor.

6             THE COURT:  But I appreciate what your concern

7    is.

8         All right.  Well, we'll take a 15-minute break.  I

9    don't want the jury cooling their heels for too long.

10        I don't know if this is a discussion we need to

11   have a sidebar.  In fact, I think it would behoove all

12   concerned to have this more in open court, because the

13   defendant needs to be addressed, it seems to me.

14            MR. LINDQUIST:  I agree.

15            THE COURT:  Of course, that was without

16   prejudice to the parties spending the next 15 minutes

17   informing themselves on anything that would add to the

18   conclusion.

19        But I think this needs to be done sooner, rather

20   than later, to at least let Mr. Mark know about the

21   difficulty of conducting his own defense.

22        All right.  Do you have any objection to that?

23            MR. MOORE:  The question --

24            THE COURT:  Hold on.  Attorney Mark -- Attorney

25   Hodge?

1        MR. HODGE:  Your Honor would explain to him the

2    difficulties?

3        THE COURT:  Of course, yes.  That's what I

4    said.  I want to do that as soon as possible, and then

5    we'll take the break, so everyone has a chance --

6        MR. HODGE:  -- Your Honor.

7        THE COURT:  -- including the defendant, to

8    consider the ramifications on the undertaking he's about

9    to embark on.

10        MR. HODGE:  That's fine with me, Your Honor.

11        THE COURT:  Attorney Moore, do you have any

12    problem with that?

13        MR. MOORE:  No, Your Honor.

14        THE COURT:  Attorney Lindquist?

15        MR. LINDQUIST:  No.  That's fine.

16        THE COURT:  All right.

17        (End sidebar discussion, open court as follows)

18        THE COURT:  All right.  Attorney Hodge, I

19    understand your client has indicated a desire to

20    represent himself; is that correct?

21        MR. HODGE:  Yes, Your Honor.

22        THE COURT:  All right.  Well, all right.

23        It's unusual that this happens at this time of the

24    case.  It's not unusual that a party may want to

25    represent themselves, and in fact it's a party's right

1     to represent themselves.

2          Mr. Mark, if you can rise for the moment, please.

3               THE DEFENDANT:  Stand up?

4               THE COURT:  Stand up, yes.

5          You have a right to represent yourself.  Of course,

6     you should be aware that in any trial it is difficult,

7     and there are certain rules of procedure and certain

8     rules of law that anyone who appears in court has to be

9     aware of.  So it's an undertaking that is difficult, if

10    you are inclined to go that way.

11         Notwithstanding that, you have a constitutional

12    right to appear and defend yourself.

13         At the same time, the Court, being aware of the

14    difficulties, and since Attorney Hodge has been involved

15    in this case since February of this year, the Court will

16    continue to have Mr. Hodge as your standby counsel.  He

17    is there to provide any assistance that you may wish to

18    avail yourself of, to consult with you, but it would be

19    your defense to conduct as you choose to.

20         But before I do that, I need to make sure that

21    you're aware that you need to abide by the rules of

22    procedure.  Are you aware of that, sir?

23               THE DEFENDANT:  Yes, Your Honor.

24               THE COURT:  All right.  And I need to be sure

25    that you are aware that there are many, many, many

1    difficulties involved in any case, difficulties for the

2    government, for the defendant, for defense counsel, for

3    anyone in a criminal or civil case, particularly in a

4    criminal case.  And I need you to know that it is

5    extremely difficult to conduct a case, or represent a

6    party, regardless of which side you're on.  Are you

7    aware of that?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  Do you understand what I'm saying?

10           THE DEFENDANT:  Yes, I do, Your Honor.

11           THE COURT:  All right.  And so when you take

12   this on your own, you are taking on that heavy burden on

13   your own shoulders to do the primary job of defending

14   yourself.

15       Do you understand that?

16           THE DEFENDANT:  Can I respond to that --

17           THE COURT:  I just need to know if you

18   understand.

19           THE DEFENDANT:  Yes, I understand.

20           THE COURT:  And you understand that there are

21   rules of procedure that you would need to abide by.  Do

22   you understand that?

23           THE DEFENDANT:  You're asking if I know the

24   rules?

25           THE COURT:  No, I'm asking you if you're aware

1    that you need to abide by certain rules of procedure?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  All right.  Do you also understand

4    that Mr. Hodge will remain here as your standby counsel,

5    so if you need to ask some questions or consult with him

6    on procedural matters or on the law, or anything you see

7    fit to, that he is there for your benefit?

8         Are you aware of that?  Yes or no.

9         Do you understand what I've just said?

10             THE DEFENDANT:  Yes, I understand what you

11   said.

12             THE COURT:  All right.

13        All right.  I think what we're going to do, then,

14   is we will take a break so that the parties can consider

15   the information that the Court has just shared, and then

16   we can revisit this when we reconvene.

17        You know, it is very -- again, I said it's very

18   difficult to represent yourself, and I just think that

19   you can consider that.

20        What I'm allowing, Mr. Mark, is you to represent

21   yourself, but you should know that if you choose to at

22   some point revert to what was going on before, which was

23   having Mr. Hodge be your representative here in court,

24   we can go back to that.  You just need to let the Court

25   know that.

1       Do you understand that?

2             THE DEFENDANT:  Yes.

3       But can I address that issue?

4             THE COURT:  Hold on one second.  Then one final

5       thing with respect to your counsel.

6       While the Court is well aware that it is difficult

7       to have new counsel, and I think in this case you may

8       have had -- or at least in this and related cases, four

9       different counsel, and I, at least four, I believe, in

10      this and the related cases in which you've appeared in

11      this court, and it's difficult to adjust to one.  It is

12      always difficult, even where there's been a

13      long-standing relationship.

14      But you should also be aware that all lawyers who

15      appear in this court have an obligation to represent you

16      zealously.  They have an obligation to abide by the

17      rules of law, the rules of procedure and the orders of

18      this Court.  And to do anything less would be a

19      violation of their duty as lawyers and as officers of

20      this court.

21      So while there might be some discomfort with a

22      counsel who has come into this case, I think February

23      the 5th or thereabouts, and while there may be some

24      strategic concerns, you should be aware that every

25      lawyer who appears in this court has to be a zealous

1    advocate.

2         And everyone discharges that duty, everyone has

3    discharged that duty to the Court's -- at least in my

4    view, and in particular in this case, I -- you know,

5    I'll just point out that defense counsel, your counsel

6    has made vigorous and cogent and competent arguments at

7    sidebar and before the Court on a number of issues,

8    including the inquiry of one of the individuals who was

9    not charged with certain activities.

10        I think the government wanted some information, or

11   that line of testimony stricken, and the Court agreed

12   with your counsel that it should not be stricken.  It

13   was permissive inquiry.

14        There's a matter under advisement now about

15   activities that took place in the BVI, and again there

16   was cogent and persuasive argument.  I don't know which

17   way I'm going to rule on it yet.  But again, your

18   counsel has made that argument.

19        There was some discussion about photographs, I

20   think they were the "5" series photographs, 5Q through

21   W, that were daylight photographs of where this alleged

22   incident took place, and there's been vigorous and

23   competent argument that they should be used for

24   locational purposes, and not a depiction of the scene as

25   it appeared at the time of the incident.

1       That's a significant thing the Court agreed with

2    and the Court will instruct the jury on.

3       I highlight just those few things to let you know

4    that while there may be some discomfort because of the

5    newness, because of the general discomfort in any human

6    relation, that it doesn't mean that your lawyer isn't

7    working hard and in a competent fashion on behalf of

8    you.

9       So I say that all so that you can consider that.

10   But again, I'm well aware that it's your constitutional

11   right to represent yourself here in court, if you choose

12   to.  At the same time, you will have the availability of

13   counsel.

14      Before you address me, I think what we'll do is

15   take a break so you can consider some of the things I

16   said and confer with your standby counsel.  And I'm

17   happy to hear what you have to say, but you need to be

18   advised that there are, just that there are certain

19   things you need to consider before we bring the jury

20   back in and go back into the examination of witnesses.

21      Do you understand that?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  All right.

24      Fifteen minutes, Counsel.

25      (Court in recess, 11:10 a.m.)

 1           (After recess, jury not present, 11:27 a.m.)

 2           THE COURT:  You can stand up, and I guess you

 3   can speak into that microphone or you can come to the

 4   lectern.

 5       All right.  Did you consider what I had said, sir?

 6           THE DEFENDANT:  Yes, I did.

 7           THE COURT:  All right.  Is it your desire to

 8   represent yourself still?

 9           THE DEFENDANT:  Could I explain, Your Honor.

10           THE COURT:  Well, I need a yes or no, because I

11   need to ask you a few more questions, and then we'll --

12           THE DEFENDANT:  No, Your Honor.

13           THE COURT:  You said "no"?

14           THE DEFENDANT:  No.

15           THE COURT:  No?

16           THE DEFENDANT:  No.

17           THE COURT:  All right.  Then if it's not your

18   desire, then I think I need to hear through your

19   counsel, then, what you're saying.  If it's not your

20   desire to represent yourself, then your counsel needs to

21   speak for you.

22           THE DEFENDANT:  Go back to my seat?

23           THE COURT:  Yes, you can -- thank you, sir.

24       (Counsel conferring with defendant)

25           MR. HODGE:  Your Honor, my client feels that at

1    this point the damage is done, in that there were two

2    key witnesses that were examined before this morning.

3    He had attempted to raise this issue this morning, and

4    Your Honor, I wasn't trying to -- this morning, I wasn't

5    trying to interrupt the jury by asking for a sidebar.

6         We had been told by the court clerk that Your Honor

7    would be calling us into his chambers this morning

8    before bringing in the jury, and I had been awaiting

9    that opportunity.  And when it didn't arise, that's why

10   I attempted to raise it at sidebar.

11        The -- but based on Your Honor's admonitions and

12   warnings, my client feels that he can't represent

13   himself at this point, that he should stick with

14   appointed counsel.

15             THE COURT:  All right.  Very well.

16        Line up the jury.

17        Attorney Hodge, is that position informed by the

18   examinations that took place this morning?

19        That is, if there's a need to examine someone and

20   you feel it's been, that there are other questions that

21   need to be asked, if that's the question, you're saying

22   that's the basis for the decision not to represent

23   himself?

24             MR. HODGE:  Your Honor, that was a part of it.

25   My preparedness, as well.  As Your Honor knows, the case

1    file wasn't provided to me until March 17th, although I

2    had technically been appointed to the case on

3    February 5th.

4              THE COURT:  Attorney Hodge --

5              MR. HODGE:  Yes.

6              THE COURT:  -- you keep saying that.  Now

7    you're appointed.  You're a zealous advocate.  You're a

8    member of the Bar.  You're the former president of the

9    Bar Association.  You have a duty to be a zealous

10   advocate when you're appointed.

11        That means if there are things in the record, you

12   go about and you review those things in the record.  You

13   know who your opponent is.  They're right here in the

14   building, the US Attorney's Office.  You go and you get

15   what you need to get in order to represent your counsel.

16        You repeat it and you repeat it as though, if you

17   continue to repeat it, somehow that's going to change

18   the outcome.

19        You are the appointed counsel.  You are obligated

20   as an officer of this court to be a zealous advocate for

21   your client.

22        Now, I don't think we need to revisit this anymore

23   on when you were appointed.  It's all in the record.

24   You've said it before.

25        Now, do you have something else you wish to add?

1          MR. HODGE:  Well, I would just clarify one

2     point, Your Honor.

3          THE COURT:  We're not debating this issue.  Do

4     you have something else you wish to add, other than the

5     issue of when you're appointed and things along that

6     line?

7          MR. HODGE:  Your Honor, you indicated that

8     under my duty to zealously --

9          THE COURT:  Attorney, maybe you're, you're not

10    understanding me.  This is not a debate.

11      Do you have something else that is germane to the

12    representation of your client before we bring in the

13    jury and bring in the next witness?

14      Yes or no?

15          MR. HODGE:  No, Your Honor.

16          THE COURT:  All right.  Thank you.

17      (Jury present, 11:34 a.m.)

18          THE COURT:  Is the government ready to proceed?

19          MR. PAIGE:  Yes, we are, Your Honor.

20          THE COURT:  Okay.  Call your next witness.

21          MR. PAIGE:  The government calls Glenson Isaac.

22      (Pause)

23          THE CLERK:  Please raise your right hand to

24    take the oath, and at the end respond, "I do."

25      (Witness sworn)

```
 1                THE WITNESS:  I do.

 2                THE CLERK:  Please be seated.

 3           THEREUPON, GLENSON ISAAC, having been duly sworn,

 4      was examined and testified as follows:

 5                     DIRECT EXAMINATION

 6      BY MR. PAIGE:

 7      Q.   Good morning, sir.

 8      A.   Good morning.

 9      Q.   Would you please state your name for the record?

10      A.   Glenson Isaac.

11      Q.   Mr. Isaac, are you here -- let me ask you this:  Do

12      you have any criminal convictions?

13      A.   Yes.

14      Q.   And what would that be?

15      A.   Dogfighting and drug charges.

16      Q.   When was your first felony, criminal conviction?

17      A.   '91.

18      Q.   And what was that for?

19      A.   Possession.

20      Q.   Of what?

21      A.   Drugs.

22      Q.   What kind of drugs?

23      A.   Cocaine.

24      Q.   And your second conviction?

25      A.   Dogfighting and trafficking.
```

1    Q.    Would that be drug trafficking as well?

2    A.    Yes.

3    Q.    Are you here today pursuant to a plea agreement?

4    A.    Yes.

5    Q.    And what was that plea to?

6    A.    I pled guilty to a conspiracy.

7    Q.    Would that be conspiracy -- in what sense?  I'm

8    sorry.

9    A.    Drug charges.

10   Q.    And what is your understanding of your

11   responsibilities pursuant to that plea agreement?

12   A.    To testify and tell the truth.

13            MR. PAIGE:  Court's indulgence for one second,

14   Judge.

15       (Pause)

16            MR. PAIGE:  Mr. Isaac, I would like to show you

17   what's been marked as Government's Exhibit -- Exhibits

18   32A and 32B.

19       (Government's Exhibit Nos. 32A, 32B marked)

20            MR. PAIGE:  They are multiple-page documents,

21   Your Honor.  May I approach the witness with the

22   originals?

23            THE COURT:  Yes.

24   BY MR. PAIGE:

25   Q.    Mr. Isaac, do you recognize Government's Exhibit --

1    let's start with Exhibit 32A?

2    A.    Yes.

3    Q.    What is it?

4    A.    Plea agreement.

5    Q.    And how many pages is that plea agreement?

6    A.    Seven.

7    Q.    And how about 32B?

8    A.    Seven.

9    Q.    Are those two --

10          THE COURT:  What is 32B?

11          MR. PAIGE:  Your Honor, may I retrieve 32B,

12    just to --

13          THE COURT:  I'm asking the witness a question.

14        What is 32B?

15          THE WITNESS:  Supplement of -- to guilt --

16    guilty plea agreement.

17          THE COURT:  All right.  You can retrieve them.

18    Go ahead.

19          MR. PAIGE:  Okay.  He's identified it.  That's

20    fine.

21    BY MR. PAIGE:

22    Q.    Now, is that the plea agreement that you just

23    testified about a couple minutes ago?

24    A.    Yes.

25    Q.    Is your signature contained within that agreement?

```
 1              THE COURT:  Are you asking him about A or B, or
 2      both?
 3              MR. PAIGE:  Actually both.  I'm sorry.
 4      BY MR. PAIGE:
 5      Q.   Let's start with A.  Is your signature on A?
 6      A.   Yes, at the back, last page.
 7      Q.   And what date does it bear?
 8      A.   October 24, '06.
 9      Q.   How about 32B?
10      A.   Same date, October -- no, October 26, '06.
11              MR. PAIGE:  Your Honor, I move for admissions
12      of Government's Exhibit 32A and -B.
13              THE COURT:  Attorney Hodge?
14              MR. HODGE:  No objection, Your Honor, other
15      than the same objection as to the previous agreements.
16              MR. MOORE:  Your Honor, I object to the
17      admission, and I may need to state my grounds.
18              THE COURT:  All right.  I'll take it under
19      advisement.
20      BY MR. PAIGE:
21      Q.   Mr. Isaac, have you had any legitimate forms of
22      employment, sources of income?
23      A.   Yes.
24      Q.   And what would that be?
25      A.   A kennel and a promoter.
```

1    Q.    What kind of kennel?

2    A.    Dog.

3    Q.    During what years did you have a dog kennel?

4    A.    '94 to '98.

5    Q.    And what would you do with the dog kennel?

6          What type of business was it?

7    A.    Breeding.

8              MR. HODGE:  Objection.  Relevance.

9              MR. MOORE:  Objection.

10             THE COURT:  Overruled.

11   BY MR. PAIGE:

12   Q.    What did you do in relation to your dog kennel?

13   A.    Breeding and dogfighting.

14             MR. HODGE:  Objection.  Relevance.

15             THE COURT:  Overruled.

16

17   BY MR. PAIGE:

18   Q.    Did you dogfight for a sport or for financial gain?

19   A.    Sport and a financial gain, both.

20   Q.    And where was this dog kennel located?

21   A.    In North Carolina, Hillsborough, North Carolina.

22             MR. MOORE:  Objection.  Leading.

23             MR. HODGE:  Move to strike.

24             THE COURT:  Overruled.

25   BY MR. PAIGE:

1    Q.   You said you did some promotion; in what regard?

2    A.   Bringing in rap, rap artists and regular artists to

3    clubs.

4    Q.   Mr. Isaac, when did you begin selling drugs?

5    A.   In '91.

6              MR. HODGE:  Objection.  Leading.

7              THE COURT:  Overruled.

8              THE WITNESS:  '91.

9    BY MR. PAIGE:

10   Q.   What type of drugs were you selling?

11   A.   I was on a small scale --

12             MR. HODGE:  Objection.  Relevance.

13             THE COURT:  Overruled.

14   BY MR. PAIGE:

15   Q.   I'm sorry?

16   A.   A small-scale, cocaine.

17   Q.   Now prior to your most recent conviction, what was

18   the nature of your drug trafficking, or drug selling?

19   A.   Like what, quantity?

20   Q.   Yes, quantity.

21   A.   Ten kilos, maybe, a week or two, something like

22   that.

23   Q.   Over what period of time?  Years.

24   A.   On the big scale, '95, '96, on.

25   Q.   On to what?

1  A.    'Til I got busted in '98.

2  Q.    Any time thereafter?

3         MR. HODGE:  Objection.  Relevance.

4         THE COURT:  Overruled.

5         THE WITNESS:  Yeah.  I started back up when I

6  got out of prison.

7  BY MR. PAIGE:

8  Q.    And what were the years you were in prison?

9  A.    December '99 to November '02.

10 Q.    And you started back up at what point beyond then?

11 A.    Starting back in '03.

12 Q.    '03 until when?

13 A.    Until '05.

14 Q.    Okay.  Mr. Isaac, do you know a person by the name

15 of Gelean Mark?

16 A.    Yes.

17 Q.    How long have you known Mr. Mark?

18 A.    Grown up in child -- since childhood.

19 Q.    Do you see Mr. Mark in court today?

20 A.    Yes.

21 Q.    Would you please point him out and describe what

22 he's wearing?

23 A.    He's wearing a white shirt.  I mean -- yeah, white

24 or tan shirt, with some glasses on.

25 Q.    And who is he sitting beside?  Can you describe?

```
1    A.   A gentleman in a blue suit.

2         MR. PAIGE:  Your Honor, I ask that the record

3    reflect the identification of the Defendant Gelean Mark.

4         THE COURT:  Okay.  The record will reflect

5    Defendant Mark has been identified by the witness.

6    BY MR. PAIGE:

7    Q.   Mr. Isaac, do you know a person by the name of

8    Jerome Blyden?

9    A.   Yes.

10   Q.   When did you first meet Mr. Blyden?

11   A.   '03, '04.

12   Q.   Do you see Mr. Blyden in court today?

13        MR. MOORE:  Objection, Your Honor.  I believe

14   there's a -- objection, Your Honor.

15        THE COURT:  All right.  Overruled.

16        THE WITNESS:  Yes.

17   BY MR. PAIGE:

18   Q.   Will you please point him out and describe what

19   he's wearing, as well?

20   A.   He's right behind of you.  I think that's an orange

21   or a pink shirt.

22        MR. PAIGE:  Your Honor, I ask that the record

23   reflect the identification of Defendant Jerome Blyden.

24        MR. MOORE:  Your Honor, I object.

25        THE COURT:  All right.  The record will reflect
```

1    the witness has identified the Defendant Blyden.

2    BY MR. PAIGE:

3    Q.   Mr. Isaac, how did you come to meet Mr. Blyden?

4    A.   Mark sent him on a trip to me.

5    Q.   Would that be Gelean Mark?

6    A.   Yes.

7    Q.   When was this?

8         MR. HODGE:  Objection.  Foundation.

9         THE COURT:  Overruled.

10        THE WITNESS:  I believe it was '04.

11   BY MR. PAIGE:

12   Q.   What, if anything, did Mr. Mark say about sending

13   him to you?

14   A.   He called me up one day, told me he sending his

15   bodyguard.

16   Q.   And where were you living at the time?

17   A.   North Carolina.

18        MR. MOORE:  Your Honor, I object.  And if Your

19   Honor would hear some more specific objections, but I'll

20   just object at this time.

21        THE COURT:  What is your basis?  I'm not asking

22   for a speaking objection, just asking for the basis.  Is

23   it hearsay?

24        MR. MOORE:  Bruton.

25        THE COURT:  All right.  Come to sidebar.

```
 1          (Sidebar discussion held as follows)
 2              THE COURT:  All right.  Just so counsel is
 3     aware, speaking objections are the issue, not stating
 4     your basis.  You can always state your basis.  So if you
 5     think it's hearsay, you know, there's a confrontation
 6     clause issue, just say it.  Just, when it gets to be
 7     three sentences or a paragraph, then sometimes there's
 8     too much for the jury.
 9          So what's the Bruton issue?
10              MR. MOORE:  Your Honor, this gentleman
11     basically said that he met my client in 2003, then he
12     says it was on a trip in 2004.  He's never laid eyes on
13     my client.
14          And the Bruton issue is when Mark says, "I'm
15     sending my bodyguard," and they're identifying
16     Mr. Blyden as the bodyguard, then if Mark is saying that
17     Mr. Blyden is the bodyguard, I can't cross-examine Mark.
18          He can say what Mark, what Mark said about Mark.
19     He can say what Mark did.  He can say any number of
20     things.
21          But this becomes to, the situation where Mark is
22     saying some particular comments that implicate my client
23     as codefendant and my client has no way of refuting what
24     Mark said.
25              THE COURT:  Yes.  Well, I suspect there's some
```

1    more development.  This is early in the testimony.  I

2    suspect there's going to be some more development.  But

3    if it is a coconspirator statement in furtherance of

4    drug trafficking, couldn't it come in as non-hearsay,

5    then?

6                MR. MOORE:  My client's not -- there's no

7    testimony my client is involved in drug trafficking.

8                THE COURT:  I know -- I understand your point.

9    I'm just saying it's early in the testimony.

10            I don't know yet what's coming in, so --

11                MR. MOORE:  Well --

12                THE COURT:  -- subject to connection; that is,

13    if there's more that's going to come in -- he's only

14    been on the stand for less than 10 minutes now.  I

15    suspect he's probably got a little more to say.  I don't

16    know what else they're going to say about Mr. Blyden.

17            But I think at some point, depending on what he

18    says, then the Court can make the appropriate Bourjaily

19    finding, which the Court is prepared to make with

20    respect to Mr. Mark, given the testimony of Springette

21    and Mr. Turnbull and Mr. Hodge.

22            The Court makes a finding that there's a

23    preponderance of the evidence that there was a

24    conspiracy, and that those several individuals,

25    including Mr. Mark, Mr. Hodge, Mr. Springette, and

1    Mr. Turnbull, were in a conspiracy.  And there were a

2    few other names, which I can't recall just yet, but I

3    will at the appropriate time make the appropriate

4    finding.  That's in accord with Bourjaily.

5        And I don't know what else is going to come in yet.

6    I appreciate your concern, though, Attorney Moore.  And

7    if there is, if there is a failure to connect up, there

8    will be the appropriate instruction.

9            MR. MOORE:  Thank you, Your Honor.  There's

10   going to be a combination of hearsay, Crawford and

11   Bruton.  So I --

12           THE COURT:  So we're clear, I don't -- if you

13   get up, I generally can figure it out.  If you say

14   "objection," we're good.  If you say "objection" and

15   state the basis, it's even best.  If it's not right on

16   point, I'll figure it out.

17           MR. HODGE:  And Your Honor, just to clarify,

18   your finding is that there's, the evidence presented is

19   of a single conspiracy?

20           THE COURT:  My finding is that, the finding

21   that's required under Bourjaily, that there's a

22   preponderance of the evidence that there was a

23   conspiracy at hand, and that those several people who I

24   named were members of the conspiracy.  That would

25   include Mr. Mark.

1           Okay.  Thank you.

2           (End sidebar discussion, open court as follows)

3    BY MR. PAIGE:

4    Q.   Mr. Isaac, did Mr. Mark tell you why he was sending

5    Mr. Blyden to you?

6    A.   He just told me he sending him to cool out.

7    Q.   And approximately how long did he stay in North

8    Carolina?

9    A.   Maybe a week.

10          MR. HODGE:  Objection.  Foundation.

11          THE COURT:  Overruled.

12   BY MR. PAIGE:

13   Q.   Mr. Isaac, have you ever had a business

14   relationship with Mr. Mark?

15   A.   Yes.

16   Q.   In what sense?

17   A.   Dogfighting --

18   Q.   Any other --

19   A.   -- selling drugs.

20   Q.   I'm sorry.

21        And when did this relationship begin as to these

22   activities?

23   A.   '03.

24   Q.   And how soon after your 2002 release from prison

25   did this begin?

```
1    A.    In 2003.

2    Q.    When were you released from prison?

3    A.    November --

4          MR. HODGE:  Objection.  Asked and answered.

5          THE COURT:  Sustained.

6    BY MR. PAIGE:

7    Q.    Do you recall a month in which you began this

8    relationship?

9    A.    In March '03.

10   Q.    And how did that come about?

11   A.    I flew down to St. Thomas.

12   Q.    And what was the purpose of your trip?

13   A.    Trying to get back in the swing of things.

14   Q.    What do you mean when you say "swing of things"?

15   A.    Selling drugs.

16   Q.    Did you see Mr. Mark when you got here?

17   A.    Yes.

18   Q.    Where did you stay?

19   A.    Sapphire.

20   Q.    How long did you stay?

21   A.    A week.

22   Q.    Did you and Mr. Mark meet?

23   A.    Every day.

24   Q.    Did you discuss doing business, getting back in the

25   swing of things?
```

1          THE COURT:  All right.  You need to stop asking

2     leading questions.

3          Next question.

4     BY MR. PAIGE:

5     Q.   What, if anything, was discussed?

6     A.   I had some jewelry I was going to pawn for some

7     drugs.

8     Q.   What, if any, agreement was made with regard to how

9     you would begin the swing of things?

10    A.   Repeat your question.

11    Q.   What, if any, agreement, particularly, was made as

12    to how you would get back into selling drugs?

13    A.   Well, he told me he would get me back on my feet.

14    Q.   Did he provide any specifics?

15         MR. HODGE:  Objection.  Leading.

16         THE COURT:  Sustained.

17    BY MR. PAIGE:

18    Q.   Did you and Mr. Mark make an arrangement as to how

19    you would begin selling drugs?

20    A.   Yes.

21    Q.   What, if any, arrangement was made?

22    A.   When I came to visit, me and Mr. Mark talk about

23    how it was going to arrange getting drugs move from the

24    mainland to the U.S.

25    Q.   "From the mainland to the U.S."?

1  A.    St. Thomas.

2  Q.    From St. Thomas to the U.S.

3        Did Mr. Mark provide any particulars?

4             MR. HODGE:  Objection.  Leading.

5             THE COURT:  Sustained.

6  BY MR. PAIGE:

7  Q.    What, if anything, in specific in that regard was

8  said by Mr. Mark?

9  A.    Can you repeat your question?

10  Q.    What, if any, specifics were given by Mr. Mark as

11  it relates to getting drugs from St. Thomas to the

12  mainland?

13  A.    Yes.

14  Q.    I'm sorry?

15             THE COURT:  It's not a yes or no question.

16  That response is stricken.  Next question.

17  BY MR. PAIGE:

18  Q.    What, if any, specifics were given by Mr. Mark as

19  regard to moving drugs from St. Thomas to the mainland?

20  A.    I were going to receive some drugs from another

21  individual from New York.

22  Q.    How would those drugs get to New York?

23  A.    By commercial plane.

24  Q.    From where?

25             MR. HODGE:  Objection.  Relevance.

```
 1                    THE COURT:  Overruled.

 2    BY MR. PAIGE:

 3    Q.    From where?

 4    A.    Out of St. Croix.

 5              MR. HODGE:  Objection.  Relevance.

 6              THE COURT:  Overruled.

 7    BY MR. PAIGE:

 8    Q.    Was St. Thomas involved in that arrangement, too?

 9              MR. HODGE:  Objection.  Leading.

10              THE COURT:  Sustained.

11    BY MR. PAIGE:

12    Q.    Did you receive any drugs from Mr. Mark from

13    anywhere other than St. Croix?

14    A.    Yes.

15    Q.    And where was that?

16    A.    From both islands, St. Thomas and St. Croix.

17    Q.    How soon after your trip here to St. Thomas did

18    this arrangement begin?

19    A.    Maybe two months after.

20    Q.    Mr. Isaac, was there an organizational structure as

21    to how this would come about?

22    A.    Yes.

23              MR. PAIGE:  I would like to show you what's

24    been marked as Government's Exhibit 27B.

25              (Government's Exhibit No. 27B marked)
```

1    BY MR. PAIGE:

2    Q.    Do you recognize Government's Exhibit 27B?

3    A.    Yes.

4    Q.    What do you recognize this as?

5    A.    Organization chart.

6    Q.    Have you seen this chart before?

7    A.    Yes.  I drew it.

8    Q.    Would this chart aid you in your testimony today,

9    to clarify exactly how these arrangements were made

10   between you and Mr. Mark?

11   A.    Repeat one more time.

12   Q.    Would this aid you in your testimony today?

13   A.    Yes.

14            MR. PAIGE:  Your Honor, I offer Government's

15   Exhibit 27B for admission.

16            MR. HODGE:  Objection, Your Honor.

17            THE COURT:  Attorney Moore?

18            MR. MOORE:  I join the objection.

19            THE COURT:  All right.  I'll take it under

20   advisement.

21   BY MR. PAIGE:

22   Q.    Mr. Isaac, how often would you receive drugs from

23   Mr. Mark from St. Thomas?

24   A.    Twice a week -- twice a month.  I'm sorry.

25   Q.    Approximately how much would come with each

1    shipment?

2    A.    Ten kilos per trip.

3    Q.    Ten kilos of what?

4    A.    Cocaine.

5    Q.    Were you selling this cocaine?

6    A.    Yes.

7    Q.    What were you selling the cocaine for?

8    A.    22,000.

9    Q.    22,000 --

10   A.    Apiece.

11   Q.    22,000 a kilo?

12   A.    Yes.

13   Q.    How long did it take you to sell each kilo, or each

14   load, rather?

15          MR. HODGE:   Objection.   Relevance.

16          THE COURT:   Sustained.

17   BY MR. PAIGE:

18   Q.    How much of the $22,000 did you keep?

19   A.    2,000 per key.

20   Q.    And where did the rest of the money go?

21   A.    Send it back down to St. Thomas, to Mark.

22   Q.    What method did you use to do that?

23   A.    Pack it in a suitcase and give it to a female

24   courier.

25   Q.    During the year 2000, approximately how many kilos

1    of cocaine did Gelean Mark ship to you, to the mainland?

2              MR. HODGE:  Objection.

3              THE COURT:  Sustained.

4    BY MR. PAIGE:

5    Q.   During the year 2003, did Gelean Mark send

6    quantities of cocaine to you?

7              MR. HODGE:  Objection.  Leading.

8              THE COURT:  Sustained.

9    BY MR. PAIGE:

10   Q.   Mr. Isaac, who would you get the kilos of cocaine

11   from, person?

12             MR. HODGE:  Objection.

13             THE COURT:  Which kilos?

14             MR. PAIGE:  Any that he received during this

15   period of time.

16             MR. HODGE:  Objection.

17             THE COURT:  Which period of time?

18             MR. PAIGE:  Particularly the year 2003.

19             THE COURT:  Overruled.

20             THE WITNESS:  My first two time was an

21   individual I met in New York.

22   BY MR. PAIGE:

23   Q.   Who was the individual in New York?

24             MR. HODGE:  Objection.  Relevance.

25             THE COURT:  Overruled.

```
 1                    THE WITNESS:  Dorian Swan.

 2      BY MR. PAIGE:

 3      Q.   Do you have any personal knowledge as to who Dorian

 4      Swan got the kilos of cocaine from?

 5                    MR. HODGE:  Objection.  Relevance.

 6                    THE COURT:  Overruled.

 7                    THE WITNESS:  Yes.  Gelean Mark.

 8                    THE COURT:  How is it that you --

 9                    MR. HODGE:  Objection.  Foundation.

10                    THE COURT:  How is it that you know this?

11                    THE WITNESS:  Mark told me.

12                    THE COURT:  All right.

13      BY MR. PAIGE:

14      Q.   During the year 2003, did you receive any other

15      kilos of cocaine from Dorian Swan?

16      A.   Only two times.

17      Q.   How many were on the first time?

18      A.   The first time I received two kilos.

19      Q.   And how about --

20      A.   No, the first time I only received a half a kilo.

21      And the second time I was supposed to receive four.  I

22      only got two.

23      Q.   Do you have any personal knowledge as to where

24      Dorian Swan got the second shipment of cocaine from?

25      A.   Yes.
```

```
1              MR. HODGE:  Objection.  Foundation.

2              THE COURT:  Overruled.

3              THE WITNESS:  Gelean Mark.

4              THE COURT:  How is it that you know?

5              THE WITNESS:  He told me.

6              THE COURT:  Who is "he"?

7              THE WITNESS:  Gelean Mark.

8    BY MR. PAIGE:

9    Q.   How about the year 2004; did you receive any

10   quantities of cocaine from Gelean Mark?

11             MR. HODGE:  Objection.  Leading.

12             THE COURT:  Sustained.

13         Rephrase.

14   BY MR. PAIGE:

15   Q.   During the year 2004, did you receive any

16   quantities of cocaine by commercial air flight?

17             MR. HODGE:  Objection.  Leading.

18             THE COURT:  Sustained.

19   BY MR. PAIGE:

20   Q.   During the year 2004, did you receive any kilograms

21   of cocaine?

22             MR. HODGE:  Objection.  Leading.

23             THE COURT:  Sustained.

24   BY MR. PAIGE:

25   Q.   How long did your business relationship with Gelean
```

1    Mark last?

2    A.   Until 2005.

3    Q.   Was this a regular and consistent relationship,

4    drug-wise, with him?

5    A.   Yes.

6    Q.   Was it on a monthly basis?

7              MR. HODGE:   Objection.   Leading.

8              THE COURT:   Sustained.   Come to sidebar.

9         (Sidebar discussion held as follows)

10             THE COURT:   All right.   Attorney Paige, I --

11   this is your, your witness and you're on direct,

12   correct?

13             MR. PAIGE:   That's correct.

14             THE COURT:   All right.   It seems that the

15   witness is on direct, is normally someone who tells,

16   relays a series of events.   And I think we're getting a

17   number of objections.   I think Attorney Hodge is

18   objecting appropriately, everything that's a leading

19   question, and in some instances he hasn't objected to

20   matters that are leading questions.

21        If you're asking a question where all the witness

22   has to do is stay there and say, "Yes," "yes," "yes,"

23   you've suggested the answer in the question, which means

24   it is a leading question.

25        And I guess for some introductory purposes it may

1    be permissible.  But as a general matter, leading

2    questions are impermissible.  So I expect that there are

3    going to be continuous objections from Attorney Hodge if

4    you continue along that line.

5         So let's see if we can make this testimony go

6    through a little more expeditiously.

7         Thank you, Counsel.

8         MR. HODGE:  Thank you, Your Honor.

9         (End sidebar discussion, open court as follows)

10   BY MR. PAIGE:

11   Q.   Who, if anyone, during the year 2003 did you

12   receive kilograms of cocaine from?

13   A.   Physically?

14   Q.   Yes.

15   A.   From guys who brought the drugs up.

16   Q.   Do you have personal knowledge as to who those guys

17   were?

18   A.   A first-name basis, no, I didn't know who they was.

19   Q.   Do you have any personal knowledge of -- well, you

20   said not on a first-name basis.  What, you knew

21   nicknames, only?

22   A.   Yeah.

23        MR. PAIGE:  Court's indulgence one second,

24   please?

25        THE COURT:  Yes.

```
 1          (Pause)
 2     BY MR. PAIGE:
 3     Q.   You said you wouldn't know on a first-name basis.
 4     Who said it?
 5               MR. HODGE:  Objection.  Leading.
 6               THE COURT:  Overruled.
 7               THE WITNESS:  Who would send the couriers
 8     were --
 9               MR. HODGE:  Objection.  Foundation.
10               THE COURT:  If he knows.
11               THE WITNESS:  Henry Freeman.
12     BY MR. PAIGE:
13     Q.   Do you know who would send Henry Freeman?
14               MR. HODGE:  Objection.  Foundation.
15               THE WITNESS:  No.
16               THE COURT:  Okay.  Overruled.
17               MR. HODGE:  Your Honor, move to strike.
18               THE COURT:  Denied.
19     BY MR. PAIGE:
20     Q.   Who was Henry Freeman?
21     A.   He was part of the organization.
22     Q.   Who did he work for?
23     A.   Gelean Mark.
24               MR. HODGE:  Objection.  Foundation.
25               THE COURT:  How is it that you know this?
```

1          THE WITNESS:  Mark told me.

2     BY MR. PAIGE:

3     Q.   And for what period of time did he send you

4     cocaine?

5          THE COURT:  Who is "he"?

6          MR. PAIGE:  The Henry Freeman.

7          THE COURT:  Did Henry Freeman send, that's what

8     you're asking?

9          MR. PAIGE:  Yes.

10          THE COURT:  All right.

11          MR. HODGE:  Objection.  Leading.

12          THE COURT:  Overruled.

13     BY MR. PAIGE:

14     Q.   For what period of time did Henry Freeman send you

15     cocaine?

16     A.   '03 until '05.

17     Q.   Who, if anyone, sent the cocaine to him during that

18     period?

19          MR. HODGE:  Objection.  Foundation.

20          THE COURT:  Sustained.

21     BY MR. PAIGE:

22     Q.   Do you have any personal knowledge as to who he got

23     his cocaine from during that period of time?

24          THE COURT:  Mr. Isaac, it's a yes or no

25     question.

1          Do you understand?

2               THE WITNESS:  Yes.

3               THE COURT:  All right.  Answer the question.

4     BY MR. PAIGE:

5     Q.   Do you have personal knowledge?

6     A.   Yes.

7     Q.   And how do you have that personal knowledge?

8     A.   Because Mark told me.

9     Q.   During that period of time, during the year 2003,

10    approximately how many kilograms did he, being Henry

11    Freeman, send you?

12              MR. HODGE:  Objection.

13              THE COURT:  Overruled.

14              THE WITNESS:  '03, maybe about 50 or more.

15    BY MR. PAIGE:

16    Q.   During the year 2004, approximately how many

17    kilograms of cocaine did he, being Henry Freeman, send

18    you?

19              MR. HODGE:  Objection.  Leading.

20              THE COURT:  Overruled.

21              THE WITNESS:  Over 100.

22    BY MR. PAIGE:

23    Q.   In the year 2005, approximately how many kilograms

24    of cocaine did Henry Freeman send you?

25              MR. HODGE:  Objection.

```
1                    THE COURT:  Overruled.

2                    THE WITNESS:  That year it was under a hundred.

3      BY MR. PAIGE:

4      Q.   When did your drug dealing end?

5      A.   Repeat.

6      Q.   When did you -- when did this arrangement end?

7      A.   Right after --

8                    MR. HODGE:  Objection.  Asked and answered.

9                    THE COURT:  Sustained.

10     BY MR. PAIGE:

11     Q.   At some point, did this arrangement end?

12                   MR. HODGE:  Objection.  Asked and answered.

13                   THE COURT:  Sustained.

14     BY MR. PAIGE:

15     Q.   What, if any, forms of communications did you have

16     with Gelean Mark?

17     A.   We talked about dogs and our drug activity.

18     Q.   Would this be by phone, or in person?

19     A.   Both.

20     Q.   What, if any, other forms of communication did you

21     have with Mr. Mark?

22     A.   Letter.

23                   MR. PAIGE:  I would like to show you what's

24     been marked as Government's Exhibit 24A, and I ask you

25     if you recognize it.
```

1          I'm sorry, that's 24B.

2          (Government's Exhibit No. 24B marked)

3     BY MR. PAIGE:

4     Q.   Do you recognize Government's Exhibit 24B?

5     A.   Yes.

6               MR. HODGE:  Objection.  Relevance.

7               THE COURT:  Overruled.

8     BY MR. PAIGE:

9     Q.   What do you recognize Exhibit 24B to be?

10    A.   A letter from Mark.

11    Q.   And who is it to?

12    A.   To me.

13    Q.   I believe this is -- you -- what is the date of

14    this letter?

15    A.   November 30th, '05.

16              MR. PAIGE:  Your Honor, this is a multiple-page

17    document.  May I approach the witness with the letter?

18              THE COURT:  How many pages is it?

19              MR. PAIGE:  One moment, Judge.

20              THE COURT:  Can you just scroll through the

21    pages using the Elmo, or the presentation?

22              MR. PAIGE:  It's a three-page document.

23    BY MR. PAIGE:

24    Q.   Now, how do you know this is a letter that was sent

25    to you from Mr. Mark?

1    A.   Because I give him my fiancee address to send

2    letters to.

3    Q.   Is it in the same condition as it was when you,

4    when he first sent it?

5    A.   Yes.

6           MR. HODGE:  Objection.  Foundation.

7           THE COURT:  Overruled.

8    BY MR. PAIGE:

9    Q.   Any changes, alterations or deletions to it?

10   A.   No.

11   Q.   You'll see there are portions -- look at it closer.

12   Are there any alterations at all?

13          MR. HODGE:  Objection.  Leading.

14          THE COURT:  Overruled.

15   BY MR. PAIGE:

16   Q.   I'm sorry, sir?

17          MR. HODGE:  Objection.  Asked and answered.

18          THE WITNESS:  It got some -- I guess --

19          THE COURT:  Overruled.

20          THE WITNESS:  It got, it got some black

21   mark-outs.

22   BY MR. PAIGE:

23   Q.   But outside of that, it's the same letter?

24   A.   Yes.

25          MR. PAIGE:  Your Honor, I offer for admission

```
 1     Government's Exhibit 24B.
 2               MR. HODGE:  Your Honor --
 3               THE COURT:  Mr. Hodge?
 4               MR. HODGE:  Your Honor, I object.  There's been
 5     no testimony to provide a foundation for why he would
 6     know where that came from.
 7               THE COURT:  All right.
 8         Attorney Moore?
 9               MR. MOORE:  I join co-counsel's objection.
10               THE COURT:  All right.  Exhibit 24B is
11     admitted.
12         (Government's Exhibit No. 24B admitted)
13               MR. PAIGE:  I would like to publish
14     Exhibit 24B.
15               THE COURT:  Let me see counsel briefly at
16     sidebar.
17         (Sidebar discussion held as follows)
18               THE COURT:  All right.  There are some
19     redactions on this.  So the record is clear, why are
20     there redactions, and is defense aware of the reason for
21     the redactions?
22               MR. PAIGE:  Your Honor, the redactions are just
23     unrelated issues that are irrelevant to the charges.  So
24     out of an abundance of caution, it was redacted for that
25     purpose.
```

1          THE COURT:  Okay.  Well, the second question

2     is:  Are defense counsel aware of the redactions, and do

3     they have an unredacted version?

4          MR. PAIGE:  They have had access -- we have the

5     original, and it's been on our exhibit list, the

6     original form and the redacted form.

7          THE COURT:  My question isn't whether you have

8     it on your list.  My question is whether you've provided

9     it to defense.

10        Does defense have the --

11        MR. PAIGE:  Yes, they have it.

12        MR. MOORE:  But not unredacted.

13        THE COURT:  You do not have an original copy?

14        MR. MOORE:  We have the --

15        (Counsel conferring)

16        MR. MOORE:  So the -- we have the redacted and

17    unredacted?

18        MR. LINDQUIST:  Yes.

19        MR. MOORE:  Okay.

20        THE COURT:  Now, normally in these

21    circumstances, before it's published there's usually

22    some agreement on the redacted portion.  Has there been

23    an effort to reach that agreement.

24        Are the parts that are redacted agreed upon by both

25    sides?

1      MR. HODGE:  No, I don't think we discussed the

2  redaction.

3      THE COURT:  That is, what is the -- he's

4  identified a certain document, and as I understand it

5  there are portions that have been redacted.  He's

6  mentioned it.  It's obvious from what's been presented.

7      What is it that's redacted?

8      Is it a reference to some crime, term of

9  imprisonment, or what is it?

10     MR. PAIGE:  Your Honor, I can't specify.  It's

11 only three letters, but it's just unrelated to this

12 indictment.

13     MR. LINDQUIST:  I can -- I can add a little

14 more.  Generally speaking, the portions that were

15 unredacted, for example, where Mr. Isaac is in jail.

16 He's receiving these letters in jail.  So there's

17 references to lawyers and cases and so forth -- excuse

18 me.

19     But in any event, there's references to lawyers and

20 cases and so forth, that would be potentially 403.  We

21 went through and looked for 403 items.

22     THE COURT:  All right.  All right.  Well, the

23 defense has a complete copy.  So if they wish to attempt

24 to introduce that -- but usually we obviate the need for

25 a conflict, if there's some agreement.

1        But if that can't be accommodated, then the defense

2   in its cross can bring in the, or attempt to bring in

3   the other, the entire document, if it's not otherwise

4   objectionable, which I haven't reached that issue yet.

5   So.

6        MR. HODGE:  In the interest of that, could we

7   take a moment to review the unredacted version, so we

8   can tell what's been pulled out?

9        THE COURT:  Sure, you can do that.  I think

10  what we're going to do, though, is proceed with the

11  examination.

12      You can do that.

13      The government doesn't have to introduce the entire

14  document.

15      MR. HODGE:  Okay.

16      THE COURT:  But in order so we don't have the

17  conflicting documents in there, a full one, if the Court

18  finds the redacted portions are unobjectionable and it's

19  redacted, then I encourage the parties to discuss that.

20      MR. HODGE:  Thank you.

21      THE COURT:  You can look at it.  And I suspect

22  lunch will be here soon, and we'll have another break

23  before we get too much further into this.

24      MR. HODGE:  Can I add one thing, Your Honor?

25      Is the foundation at this point -- I understand

1    that there's no signature of my client on that letter,

2    and I understand that this witness hasn't testified that

3    he recognized my client's handwriting; but rather that

4    he had given my client his, what was his ex-wife or

5    girlfriend's address, and therefore this is his letter.

6    Is that the foundation?

7             THE COURT:  I can't -- it sounds like you're

8    asking for an advisory, but --

9             MR. HODGE:  Well, I understand -- I objected on

10   foundational grounds --

11            THE COURT:  No, your objection is on the

12   record.

13        Okay.  Thank you.

14        (End sidebar discussion, open court as follows)

15            THE COURT:  Go ahead, Counsel.

16   BY MR. PAIGE:

17   Q.   Mr. Isaac, do you see the letter in front of you?

18   A.   Yes.

19   Q.   What is this -- when did you receive this letter?

20   A.   Where did I receive it?

21   Q.   Yes.

22   A.   In North Carolina.

23   Q.   What was the date of the letter?

24   A.   November the 30th, '05.

25   Q.   Can you -- you can use the laser pointer there in

1     front of you.  You can indicate on the screen.

2     A.   What you want me point at?

3     Q.   The date.

4     A.   (Indicating)

5     Q.   Okay.  Now this letter, what does this letter

6     reference?

7          What is it talking about?

8     A.   If you enlarge it.

9          MR. HODGE:  Objection, Your Honor.  The

10    document speaks for itself.

11         THE COURT:  Overruled.

12    BY MR. PAIGE:

13    Q.   What was Mr. Mark conveying to you in this letter?

14         MR. HODGE:  Objection, Your Honor.  Calls for

15    speculation.

16         THE COURT:  Overruled.

17         THE WITNESS:  If this was the first letter,

18    this was talking about dogs.

19    BY MR. PAIGE:

20    Q.   In what context?

21         MR. HODGE:  Objection, Your Honor.

22         THE COURT:  Overruled.

23         THE WITNESS:  He wanted me to send him some dog

24    journals.  Basically, you know, we're just talking about

25    dogs.

```
 1              MR. PAIGE:  Okay.  I would like to show you

 2      what's been marked also as Government's

 3      Exhibit 24B [sic], and ask you if you recognize it --

 4              THE COURT:  Isn't -- didn't we just show 24B?

 5              MR. PAIGE:  25B now.

 6              THE COURT:  All right.

 7          (Government's Exhibit No. 25B marked)

 8      BY MR. PAIGE:

 9      Q.   Do you see Government's Exhibit 25B?

10      A.   Yes.

11      Q.   What is this?

12      A.   A letter.

13      Q.   Who is this letter to?

14      A.   Can you enlarge it a little bit?

15              MR. PAIGE:  Sure.

16              THE WITNESS:  This letter was to me.

17      BY MR. PAIGE:

18      Q.   Have you seen this letter before?

19              MR. HODGE:  Objection.  Foundation.

20              THE COURT:  Overruled.

21              THE WITNESS:  Yes.

22

23      BY MR. PAIGE:

24      Q.   What's the date of the letter?

25      A.   December the 28th, '05.
```

1    Q.    Who sent you this letter?

2            MR. HODGE:  Objection.  Relevance.

3            THE COURT:  Overruled.

4            THE WITNESS:  Gelean Mark.

5    BY MR. PAIGE:

6    Q.    This letter --

7            MR. HODGE:  Objection.  Foundation.

8    BY MR. PAIGE:

9    Q.    Is this letter in the same condition as it was --

10           THE COURT:  Overruled.

11   BY MR. PAIGE:

12   Q.    -- as when you first received it?

13   A.    No.

14   Q.    And what are the differences, if any?

15   A.    It got some black shaded areas inside the letter.

16   Q.    Outside of that, is it in the same condition that

17   it was when you received it?

18   A.    Yes.

19           MR. PAIGE:  Let's see, how many page document

20   this letter is.  Okay, this is a one-page document.

21       Your Honor, I move for admission of Government's

22   Exhibit 25B.

23           MR. HODGE:  I object.

24           MR. MOORE:  Your Honor, I object to the

25   document as well.

```
 1                 THE COURT:  Sustained.
 2    BY MR. PAIGE:
 3    Q.   Generally speaking, what is this letter about?
 4    A.   About dogs.
 5                 MR. PAIGE:  I move for the admission of 25B.
 6                 MR. HODGE:  Object.
 7                 THE COURT:  Same ruling.
 8    BY MR. PAIGE:
 9    Q.   Mr. Isaac, who did you receive this letter from?
10                 MR. HODGE:  Objection.  Asked and answered.
11                 THE COURT:  Sustained.
12    BY MR. PAIGE:
13    Q.   How did you know Mr. Mark was the source of this
14    letter?
15    A.   Because I get it out of my mailbox, my fiancee's
16    mailbox.
17    Q.   Is there anything else about this --
18                 MR. HODGE:  Move to strike, Your Honor.
19                 THE COURT:  Overruled.
20    BY MR. PAIGE:
21    Q.   Anything else about the letter that tells you it's
22    from Mr. Mark?
23    A.   His handwriting.
24    Q.   Were you familiar with Mr. Mark's handwriting at
25    the time you received this letter?
```

```
 1   A.   Yes.

 2            MR. PAIGE:  Your Honor, I move --

 3            MR. HODGE:  Objection.  Foundation.

 4            THE COURT:  Overruled.

 5            MR. PAIGE:  Move for admission of Government's

 6   Exhibit 25B.

 7            THE COURT:  Attorney Hodge?

 8            MR. HODGE:  Objection.

 9            MR. MOORE:  Your Honor, relevance and 403.

10            THE COURT:  All right.  I'll take it under

11   advisement.

12            MR. PAIGE:  I would like to show you what's

13   marked as Government's Exhibit 26B.  It's a one-page

14   document.

15       (Government's Exhibit No. 26B marked)

16   BY MR. PAIGE:

17   Q.   Do you recognize Government's Exhibit 26B?

18   A.   Yes.  It's a letter.

19   Q.   Who is it from?

20   A.   Can you enlarge it a little bit?

21   Q.   Do you recognize it?

22   A.   This has my initial, and a signature --

23   Q.   What is the -- when did you -- who did you receive

24   this letter from?

25            MR. HODGE:  Objection.  Asked and answered.
```

```
1                 THE COURT:  Overruled.

2                 THE WITNESS:  From Gelean Mark.

3                 MR. HODGE:  Objection.  Foundation.

4    BY MR. PAIGE:

5    Q.   How do you know, how do you know Mr. --

6                 THE COURT:  Overruled.

7    BY MR. PAIGE:

8    Q.   -- Mark was the source of this letter?

9    A.   Because he told me that he was writing me and he's

10   going to send me a letter.

11                MR. HODGE:  Objection.

12   BY MR. PAIGE:

13   Q.   Is it in the same condition as it was when you

14   received it?

15   A.   No.

16   Q.   What are the differences?

17   A.   Black shaded areas.

18   Q.   Outside of that, are there any changes or

19   alterations to it?

20   A.   Can you enlarge it a little more?

21        No.

22                MR. HODGE:  Objection.  Leading.

23   BY MR. PAIGE:

24   Q.   Anything else about the letter itself that let you

25   know that the source was Gelean Mark?
```

1          MR. HODGE:  Objection.  Leading.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes, because we talk about dogs

4     that we own.

5          MR. PAIGE:  Your Honor, I move for admission of

6     Government's Exhibit 26B.

7          MR. HODGE:  Objection.  In addition to the

8     issues raised before, the date, Your Honor.

9          THE COURT:  All right.  It's under advisement.

10         MR. MOORE:  I join the objection.

11    BY MR. PAIGE:

12    Q.   Okay.  Mr. Isaac --

13         MR. MOORE:  I join the previous objection with

14    the 403 and the relevance.

15    BY MR. PAIGE:

16    Q.   Mr. Isaac, what, if any, personal knowledge did you

17    have with Mr. Gelean Mark participating in dogfighting?

18         MR. HODGE:  Objection.  Foundation.

19         THE COURT:  Overruled.

20         THE WITNESS:  I introduced him into

21    dogfighting.

22    BY MR. PAIGE:

23    Q.   When was this?

24    A.   Around '96, '97.

25    Q.   How did you introduce him?

```
 1              MR. HODGE:  Objection.  Relevance.

 2              THE COURT:  Overruled.

 3   BY MR. PAIGE:

 4   Q.   How did you introduce him to dogfighting?

 5   A.   Well, he used to come and visit, visit Everett

 6   Mills in North Carolina.

 7   Q.   Who is Everett Mills?

 8   A.   A friend of ours, who is a part in the

 9   organization.

10   Q.   What, if anything, did you do in particular to

11   introduce him into dogfighting?

12   A.   I teach him about pedigrees and bloodline.

13   Q.   Did you do anything else specifically to introduce

14   him besides teaching him.

15              MR. HODGE:  Objection.  Leading.

16              THE COURT:  Sustained.

17   BY MR. PAIGE:

18   Q.   What, if anything, else did you do to introduce him

19   specifically --

20              MR. HODGE:  Objection.  Leading.

21              MR. PAIGE:  -- to dogfighting?

22              THE COURT:  Rephrase your question.

23   BY MR. PAIGE:

24   Q.   What, if anything, else besides teaching him, did

25   you do to introduce him into dogfighting?
```

1          MR. HODGE:  Objection.  Leading.

2          THE COURT:  Sustained.

3    BY MR. PAIGE:

4    Q.   Do you have any personal knowledge of Mr. Mark

5    dogfighting?

6    A.   Yes.

7    Q.   How do you have that personal knowledge?

8    A.   This is an activity me and Mark was doing together,

9    fighting dogs, breeding, selling, selling dogs.

10   Q.   You said selling dogs.  Did you ever have the

11   occasion to sell him a dog?

12   A.   Repeat.

13   Q.   Did you ever have the occasion to sell him a dog?

14          THE COURT:  Counsel, are you relating this to a

15   certain period of time, or are you saying if ever this

16   happened?

17   BY MR. PAIGE:

18   Q.   From the years of 1998 to '99, did you sell Mr. --

19          MR. HODGE:  Objection, Your Honor.  Relevance.

20          THE COURT:  Overruled.

21   BY MR. PAIGE:

22   Q.   During the period of 1998 to 1999, did you sell

23   Mr. Mark a dog?

24   A.   I sell him several dogs.

25   Q.   How much did you sell him the dogs for?

```
 1              MR. HODGE:  Objection.  Relevance.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  He purchased like five dogs I

 4    sold him, for like $2,000.

 5    BY MR. PAIGE:

 6    Q.   Have you ever attended any dogfights with Mr. Mark?

 7              MR. HODGE:  Objection.  Asked and answered.

 8              THE COURT:  I think we've covered that.  He

 9    says he has.

10    BY MR. PAIGE:

11    Q.   Approximately how many dogfights have you been to

12    with Mr. Mark?

13              MR. HODGE:  Objection.  Asked and answered.

14              MR. MOORE:  Your Honor, we object --

15              THE COURT:  Overruled.

16              MR. MOORE:  We object on -- we're awaiting a

17    ruling related to part of that.

18              THE COURT:  All right.

19    BY MR. PAIGE:

20    Q.   When did you -- when did you attend a dogfight with

21    Mr. Mark?

22              MR. MOORE:  Your Honor, it's the jurisdictional

23    issue.

24              THE COURT:  All right.  What period are you

25    talking about?
```

1            Are you just asking generally?

2     BY MR. PAIGE:

3     Q.   Between the period --

4            THE COURT:  Why don't you direct the witness to

5     a period.

6     BY MR. PAIGE:

7     Q.   During the period of 2002 to 2005, did you attend

8     any dog --

9            THE COURT:  Come to sidebar.

10           (Sidebar discussion held as follows)

11           THE COURT:  All right.  While there are

12    sometimes objections and sometimes a basis, it might be

13    leading, it's not necessarily that the Court is ruling

14    or sustaining the objection for leading.  It's probably

15    a 403.

16          The reason that the Court is ruling on some of

17    those -- I think Attorney Hodge has been making

18    foundation and leading objections.  That's not

19    necessarily the basis.  In some instances, it's 403.

20          Now with respect to this, I think the reason that

21    Attorney Moore is objecting and raising the

22    jurisdictional -- not so much a jurisdictional, a

23    subject matter jurisdiction issue, I think he's raising

24    more the issue of the BVI, and that dogfighting.

25          Is that why you're raising this objection?

1          MR. MOORE:  Or in North Carolina, Your Honor.

2          THE COURT:  All right.  Well, with respect to--

3          MR. HODGE:  I would say the same is true as to

4     North Carolina, Your Honor.

5          THE COURT:  All right.  With respect to the BVI

6     issue, the Court's going to rule on that shortly.  So --

7     in fact, I -- my ruling is going -- is that the

8     reference to the BVI dogfighting, that's going to be

9     stricken.

10         And the jury is going to be so instructed.

11         I think the evidence on the record is that he

12    attended a dogfight with a witness who testified here in

13    court.  The witness, I think it was Damian Daniel.

14         MR. LINDQUIST:  Damian Daniel.

15         THE COURT:  Damian Daniel indicated that the

16    dog lost.  Mr. Mark walked away with the dog.  The

17    witness heard a shot.  Mr. Mark came back without the

18    dog.  And the witness said that the dog was shot, and

19    also said that he did not see any dog being shot.

20         Witnesses aren't permitted to argue or to make

21    inferences.  They testify based on fact, that is, things

22    that they observe, they do.  That witness was not

23    testifying based on that.

24         Significantly, the charge here is betting on

25    dogfighting or the racketeering activity.  And while it

1    is true that legal activity may serve as evidence of

2    racketeering crimes, there hasn't been, at least at this

3    point, the connecting up that would indicate that this

4    is connected to dogfighting for bet, I think, as the

5    statute is worded.

6         So the Court, in thinking about this, was

7    considering if someone is involved in illegal, running a

8    brothel in the Virgin Islands, the fact that they might

9    go to Reno, Nevada, where it is permissible to --

10              MR. HODGE:  Partake?

11              THE COURT:  -- engage in the things that are

12   offered at these places, or if they went to Amsterdam,

13   isn't necessarily proof that the person is running or

14   promoting or doing something in the Virgin Islands, just

15   because they happen to go to a place where it may or may

16   not be legal.

17        So the Court's inclined to strike that.

18        Now I said that there hasn't been any connecting

19   up.

20        The Court's concern, though, and the reason why the

21   Court is inclined to make the ruling after the next

22   break and instruct the jury, is because I don't want so

23   much time to go by and waiting for some connecting up of

24   the evidence.  It hasn't happened to this point.

25        I, you know I'll wait until the end of this

1    testimony, until our next break, but the Court's

2    inclination is to strike it.  But, so that's sort of a

3    related matter.

4        But I think it, it provided the jumping point for

5    the Court, based on Attorney Moore's objection to what I

6    think is an open-ended question, "Did you ever attend

7    any dogfights?"

8        The crime charged, as I understand it certainly

9    with the dogfighting, I think it's limited to a certain

10   period of time.  And I don't know, with an open-ended

11   question, what this witness is going to say, if he's

12   going to talk about something from the beginning of time

13   through yesterday.  I don't know if he's going to talk

14   about the BVI.

15       So I think for those purposes, and to obviate the

16   need for some correction later, I think you -- it would

17   behoove you to narrow the scope of your questioning.

18   And I think --

19            MR. LINDQUIST:  Could I just -- could I just

20   add something with regard to the jurisdictional issue --

21            THE COURT:  Yes.

22            MR. LINDQUIST:  -- for the record?

23       And using the analogy that the Court used, if two

24   individuals are running a brothel in the Virgin Islands,

25   and it's illegal, evidence that the same two individuals

1    are running a brothel in Amsterdam, where it's legal, is

2    still relevant to show the enterprise of running

3    brothels as it pertains to the Virgin Islands.

4         The legality is irrelevant.  It's still relevant to

5    show -- now I will candidly admit, if the evidence

6    consists of two individuals running a brothel in the

7    Virgin Islands, and the proffered evidence is those two

8    individuals visiting a brothel in Amsterdam, that would

9    not be relevant.

10        But if the -- if what is taking place in Amsterdam

11   is significantly what is taking place in the Virgin

12   Islands, which has been charged and is illegal, the

13   Amsterdam information is relevant to prove the

14   enterprise.

15        THE COURT:  Well, I understand your position.

16   I'm not persuaded by it.

17        Attending a dogfight in -- or let's use Amsterdam.

18   Attending a brothel in Amsterdam and using the services

19   there doesn't necessarily provide proof that someone is

20   running a brothel in the Virgin Islands.

21        Attending a dogfight in the BVI and even doing

22   something that doesn't -- it could serve as some indicia

23   that the person is running, for bet, a dogfight in the

24   Virgin Islands, which is against Virgin Islands law; but

25   it doesn't necessarily prove it.

1    And like I said, up to this point it hasn't been

2    something to draw what took place in the BVI, draw that

3    in and serve as some competent evidence for what is

4    charged here and that occurred in the Virgin Islands.

5         Moreover, from a 403 perspective, I think what we

6    have here is evidence that Mr. Mark attended a dogfight

7    in Tortola, and that at the end of the fight a dog lost

8    the fight, and I think there's been enough to, certainly

9    I think a juror could infer, based on the definitive

10   testimony of Mr. Damian Daniel, that the dog was shot,

11   that Mr. Mark shot the dog.

12        MR. LINDQUIST:  I understand.

13        THE COURT:  I think on the prejudicial part, I

14   think that's what we have here.  And I don't want the

15   jury going in and holding something against Mr. Mark,

16   because they think he's a dog killer, which may or may

17   not be the case.  The Court doesn't have an opinion one

18   way or the other.  But that's not what this case is

19   about.

20        MR. LINDQUIST:  I don't dispute that issue.

21   It's just the other one --

22        MR. HODGE:  Is Your Honor's ruling --

23        THE COURT:  Let's end this now.  We need to

24   move on.

25        MR. HODGE:  Does Your Honor's ruling extend to

1    the allegations of -- guys?

2              THE COURT:  Let's...

3         (End sidebar discussion, open court as follows)

4              THE COURT:  All right.  Go ahead.

5         The objection is sustained.

6    BY MR. PAIGE:

7    Q.   Mr. Isaac, did you attend any dogfights during the

8    years of 2002 and 2005 with Mr. Mark in the Virgin

9    Islands?

10             MR. HODGE:  Objection.  Leading.

11             THE COURT:  Overruled.

12             THE WITNESS:  2003, 2004, 2005.

13   BY MR. PAIGE:

14   Q.   Where was that?  Where on St. Thomas?

15   A.   At the farm, Bordeaux.  We even went over to

16   Tortola --

17   Q.   No, no.  I said in the Virgin Islands.

18   A.   Oh.  Okay.

19   Q.   In St. Thomas.

20   A.   Okay.  I'm sorry.

21             MR. HODGE:  Move to strike.  Move to strike.

22             THE COURT:  All right.  Sustained.

23        The jury will disregard that last part of the

24   response with respect to Tortola.

25        Go ahead.

1   BY MR. PAIGE:

2   Q.   Do you have any personal knowledge whether or not

3   there was gambling on -- at the dog fight that you

4   attended at the farm?

5   A.   Yes.

6   Q.   How do you have that personal knowledge?

7   A.   We fought a dog -- if we fight a dog, we bet money

8   on the dog.

9   Q.   Now --

10          THE COURT:   When you say "we," who are you

11   talking about?

12          THE WITNESS:   Me, Mark and the opposing

13   fighter.

14   BY MR. PAIGE:

15   Q.   Now in this particular fight, whose dog was

16   fighting?

17   A.   Our dog.

18          MR. HODGE:   Objection, Your Honor.   What are we

19   talking about?

20          THE COURT:   Overruled.

21      Counsel, do you want to inquire of the witness, the

22   use of all these pronouns, "he," "we," "our."

23   BY MR. PAIGE:

24   Q.   Whose dog was it?

25   A.   Me and Gelean Mark.

1          MR. HODGE:   Your Honor, could we have a date?

2          THE COURT:   Okay.  Overruled.  You'll get a

3     chance to cross-examine.

4          Go ahead.

5     BY MR. PAIGE:

6     Q.   How much were you and Gelean Mark gambling on this

7     dog on this fight?

8     A.   Which fight?

9     Q.   The one we're talking about 2004 at the farm.

10    A.   We had so many at the farm, so I don't know which

11    fight you're talking about.

12    Q.   The first one.  Do you remember -- just give us

13    one, one particular one.

14         MR. HODGE:   Objection, Your Honor.

15         THE COURT:   All right.  Rephrase your question.

16    BY MR. PAIGE:

17    Q.   How many fights at the farm did you have, where you

18    and Gelean Mark's dog fought in 2004?

19    A.   How many fights that we had at the farm?

20    Q.   Yes.

21    A.   We had several fights.

22    Q.   In those several fights, what was the average purse

23    that was gambled?

24         MR. HODGE:   Objection.  Relevance.

25         THE COURT:   Overruled.

1           THE  WITNESS:   One fight we had for 40,000.

2    BY MR. PAIGE:

3    Q.   How about -- would you know the amount for the

4    second fight?

5           MR. HODGE:   Objection.   403.

6           THE COURT:   Overruled.

7        Rephrase your question.

8        I don't think that the witness said that what he

9    was talking about was the first fight, or any ordinal

10   series to any of them.   He just gave an example of an

11   average before.

12       So the second fight wouldn't necessarily correspond

13   or -- to what he said before.   He was responding to an

14   average question.

15   BY MR. PAIGE:

16   Q.   Who was it --

17          THE COURT:   Hold on one second.

18       (Pause)

19       (Court conferring)

20          THE COURT:   All right.   Go ahead.

21   BY MR. PAIGE:

22   Q.   What were the various amounts that were bet?

23   A.   A range from 5,000 and up.

24   Q.   Up to what?

25   A.   The largest purse was $50,000.

1           MR. HODGE:  Objection.  Leading.

2    BY MR. PAIGE:

3    Q.   How about in 2003.  What were the varying amounts

4    that you fought in 2003?

5    A.   Five, ten, in that range, in 2003, until --

6    Q.   That's number of fights?

7    A.   No we had several, you know, couple fights, several

8    fights in 2003.

9    Q.   What were the varying amounts bet on fights in

10   2003?

11          MR. HODGE:  Objection.  Relevance.  403.

12          THE COURT:  When you're asking the witness in

13   the use of pronouns, are you talking -- who is the

14   witness -- did you inquire of who the witness is talking

15   about?

16        You used the pronoun "we."

17   BY MR. PAIGE:

18   Q.   When you say "we," who are you referring to?

19   A.   Me and Gelean Mark.

20   Q.   Did the same go for 2002?

21   A.   I was in prison in 2002.

22          MR. HODGE:  Objection.  Objection.

23          THE COURT:  Overruled.

24   BY MR. PAIGE:

25   Q.   How many -- approximately how many people were at

1    the fights in 2002, on average?

2             MR. HODGE:  Objection, Your Honor.

3             THE COURT:  Sustained.

4    BY MR. PAIGE:

5    Q.   Mr. Isaac, do you have any personal knowledge of

6    Mr. Blyden being at any dog fights?

7             MR. HODGE:  Objection.  Asked and answered.

8             THE COURT:  Overruled.

9             THE WITNESS:  Yes.

10   BY MR. PAIGE:

11   Q.   How do you have that personal knowledge?

12   A.   I saw him at dogfights, dogfights that we host.

13   Q.   Did you see Mr. Blyden at dog fights, at any dog

14   fights that you and Mr. Gelean Mark hosted in 2004?

15            MR. HODGE:  Objection.  Leading.

16            THE COURT:  Sustained.

17   BY MR. PAIGE:

18   Q.   Do you have any personal knowledge of Mr. Blyden

19   attending any dogfights in the year 2004?

20   A.   Yes.

21   Q.   How do you have that knowledge?

22   A.   I was there at the fight.  Me, Blyden, Gelean Mark,

23   and several, several others.

24   Q.   What, if anything, was Mr. Blyden doing at those

25   dog -- at the dogfight?

```
1    A.    Security.

2    Q.    What, if anything, was he wearing?

3    A.    He was dressed in black.

4              MR. HODGE:  Objection.

5    BY MR. PAIGE:

6    Q.    Can you be more particular about what he was

7    wearing?

8              MR. HODGE:  Objection.  Asked and answered.

9              THE COURT:  Sustained.

10   BY MR. PAIGE:

11   Q.    What did he have on?

12             MR. HODGE:  Objection.

13             MR. MOORE:  Your Honor, may I -- can we voir

14   dire as to the basis of the witness' knowledge --

15             THE COURT:  No.

16             MR. MOORE:  -- as to Mr. Blyden?

17             THE COURT:  No.

18       Sustained.

19   BY MR. PAIGE:

20   Q.    Did you have -- can you tell us whether or not you

21   had a conversation with Mr. Blyden at any dogfights in

22   2004?

23             MR. HODGE:  Objection.  Leading.

24             THE COURT:  Overruled.

25             THE WITNESS:  Yes.
```

```
1    BY MR. PAIGE:

2    Q.   What was said?

3              MR. HODGE:  Objection.  Leading.

4              THE COURT:  Overruled.

5              THE WITNESS:  What was said, okay --

6              THE COURT:  Hold on a second.  Hold on a

7    second.

8         Ladies and gentlemen, lunch is here.  This is a

9    good time for us to break.

10        We'll have one hour for lunch.  Enjoy your lunch.

11        (Jury out, 12:44 p.m.)

12             THE COURT:  All right.  Mr. Isaac, we're going

13   to take a one-hour break.  You remain under oath.

14        Do you understand that?

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  All right.  You're not to discuss

17   your testimony with anyone in the interim.

18        Do you understand that?

19             THE WITNESS:  Yes, Your Honor.

20             THE COURT:  All right.  You need to be back on

21   the witness stand in an hour.

22        Do you understand?

23             THE WITNESS:  Yes, Your Honor.

24             THE COURT:  All right.  Thank you, sir.  You

25   can step down.
```

 1          (Witness stood aside)

 2          THE COURT:  All right.  I think that the

 3    open-ended questions like that, "What did you say,"

 4    could lead to a whole host of things that would be

 5    difficult for the Court to correct or would

 6    unnecessarily create issues for the Court.

 7          So you may need to rephrase that.

 8          "What did you say," there could be any number of

 9    things that I would hope wouldn't be structurally

10    defective, but there's always a risk that that happens.

11    So if there is some way to narrow that question, or if

12    there's some particular thing you seek to elicit, then,

13    you know, you need to do -- phrase your question in a

14    way that that's what's elicited.

15          Because the look on the witness' face when the

16    question was posed, and the witness turning to the Court

17    as if the Court is going to narrow the scope of the

18    question, when the Court's not sure what the purpose of

19    the general question, is -- could lead to some problems.

20          So -- all right.  Anything else we need to cover

21    before we have our break?

22          MR. PAIGE:  No, Your Honor.

23          THE COURT:  Attorney Hodge?

24          MR. HODGE:  No, Your Honor.

25          THE COURT:  Attorney Moore?

1           MR. MOORE:  No, Your Honor.

2           THE COURT:  All right.  One hour.  Enjoy your

3    lunch.

4        (Court in recess, 12:47 p.m.)

5        (After recess, 1:52 p.m., jury present)

6        (Witness resumed stand)

7           THE COURT:  Good afternoon, ladies and

8    gentlemen.

9        How was lunch?

10       (Jurors indicating)

11          THE COURT:  It's getting better everyday, it

12   looks like.

13       All right.  We're heading in the right direction,

14   then.

15       Good afternoon, Counsel.

16       As you know, we are still in the government's

17   case-in-chief.  We're in the examination of Mr. Isaac.

18   Is the government ready to proceed?

19          MR. PAIGE:  Yes, Your Honor.

20          THE COURT:  Go right ahead.

21

22

23       THEREUPON, GLENSON ISAAC, previously duly sworn,

24   was examined and testified further as follows:

25                   DIRECT EXAMINATION (Cont'd)

1    BY MR. PAIGE:

2    Q.   Mr. Isaac, earlier in your testimony you said that

3    you saw Mr. Blyden at a dogfight.

4         Do you remember that?

5    A.   Yes.  Yes.

6    Q.   You said that he was working security.  What do you

7    mean by "working security"?

8    A.   Collecting pay.

9    Q.   Did you see him doing this?

10   A.   Yes.

11   Q.   What was being collected?

12   A.   Money.

13   Q.   How much money was being collected?

14         MR. HODGE:  Objection.  Foundation.

15         THE COURT:  Overruled.

16         THE WITNESS:  I can't say specific what he was

17   collecting at the door, because Mark would allow him to

18   keep the funds at the door.

19   BY MR. PAIGE:

20   Q.   Do you have any knowledge whether there was--

21         MR. HODGE:  Objection.  Foundation.

22   BY MR. PAIGE:

23   Q.   -- a fee that was being collected?

24         MR. MOORE:  Objection, Your Honor.  Asked and

25   answered.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  We usually charge like a hundred

 3     dollars to come in to see a fight, per head.

 4     BY MR. PAIGE:

 5     Q.   You said he was dressed in black.  Describe what he

 6     was wearing from head to toe, please?

 7              MR. HODGE:  Objection.  Asked and answered.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  Black military clothing, with a

10     mask.

11     BY MR. PAIGE:

12     Q.   How did you know it was Mr. Blyden?

13     A.   He told me it was him.  He said, "It's me, Trush."

14     Q.   Was he armed?

15     A.   Yes.

16     Q.   What was he armed with?

17     A.   Assault rifle.

18     Q.   Who hosted this fight?

19     A.   Gelean Mark.

20              MR. HODGE:  Objection.  Foundation.

21              THE COURT:  Overruled.

22     BY MR. PAIGE:

23     Q.   I'm sorry?

24     A.   Gelean Mark.

25     Q.   Who promoted the fight?
```

1    A.    Gelean Mark.

2    Q.    How much money was gambled?

3          MR. HODGE:  Objection.  Foundation.

4          THE COURT:  Sustained.

5    BY MR. PAIGE:

6    Q.    Do you have any personal knowledge of whether this

7    fight was for bet?

8    A.    Yes.

9    Q.    How did you have that knowledge?

10   A.    Because we fought two dogs there.  We fought two

11   our own personal dogs at the fight.

12   Q.    So the dog --

13         MR. HODGE:  Objection.

14   BY MR. PAIGE:

15   Q.    So the dog that was fighting was yours?

16   A.    Yes.

17   Q.    Who is "we"?

18   A.    Oh, I'm sorry.  Me and Gelean Mark.

19   Q.    Whose dog won?

20         MR. HODGE:  Objection.  Relevance.

21         THE COURT:  Sustained.

22   BY MR. PAIGE:

23   Q.    Whose dog was you all, you all fighting?

24         MR. HODGE:  Objection.  Relevance.

25         THE COURT:  Overruled.

```
1    BY MR. PAIGE:

2    Q.   Whose dog, who is the owner of the other dog?

3    A.   Someone from the States.

4    Q.   Were there any other people there from the States?

5         MR. HODGE:  Objection.  Relevance.

6         THE COURT:  Sustained.

7    BY MR. PAIGE:

8    Q.   Did you and Gelean Mark win any money?

9    A.   Yes.

10   Q.   How much money?

11        MR. HODGE:  Objection.  Relevance.

12        THE COURT:  Overruled.

13        THE WITNESS:  40,000; a total of 80.

14   BY MR. PAIGE:

15   Q.   Do you recall having a conversation with Mr. Mark

16   after the fight?

17        Yes or no.

18        MR. HODGE:  Objection.  Leading.

19        THE COURT:  Overruled.

20        THE WITNESS:  Yes.

21

22   BY MR. PAIGE:

23   Q.   What was that conversation in relation to?

24   A.   After the fight?

25   Q.   Yes.
```

1        I'll withdraw that.

2        Was the conversation in relation to your business

3    relationship, as far as dogfighting?

4            MR. HODGE:  Objection.  Leading.

5            THE COURT:  Sustained.

6    BY MR. PAIGE:

7    Q.   What was the conversation about?

8    A.   Dogfighting.

9    Q.   What, if anything, did you say to Mr. Mark?

10   A.   It's so much thing we talk about, I just, you know.

11   Q.   Did you see any police in or around that area after

12   the fight?

13           MR. HODGE:  Objection.  Leading.

14           THE COURT:  Sustained.

15   BY MR. PAIGE:

16   Q.   Did you and Mr. Mark get your winnings that

17   particular evening?

18   A.   Yes.

19   Q.   How were you paid?

20   A.   Cash.

21   Q.   Who was paid cash?

22   A.   Gelean Mark.

23   Q.   How much cash did Mr. Mark get?

24   A.   It was a total of $80,000.

25           MR. HODGE:  Objection.  Foundation.

1      THE COURT:  Overruled.

2   BY MR. PAIGE:

3   Q.   How much was his share, Mr. Mark's share?

4   A.   Majority out of the bet, because I only had like

5   5,000.

6   Q.   Did you and Mr. Mark's dogs fight any more during

7   that time of the year, 2004?

8   A.   Yes, several times.  We had several fights.

9   Q.   Approximately how much money did you all win in

10   that year on dogfighting?

11      MR. HODGE:  Objection.  Relevance.

12      THE COURT:  Sustained.

13   Come to sidebar.

14   (Sidebar discussion held as follows)

15      THE COURT:  I suspect that your questions are

16   designed to inquire about Mr. Mark's involvement in

17   dogfighting, is that right?

18      MR. PAIGE:  That's correct.

19      THE COURT:  All right.  You keep saying "you

20   all" and it presumes -- when you ask "you," and when you

21   say "you all," there's a chance that he'll talk about

22   himself and Mr. Mark, or someone else other than

23   himself.

24   If you say "you," he's going to talk about himself.

25   And so that question, it seems to me, would presume that

1    every time he talks about himself, he's talking about

2    Mark, which isn't necessarily the case.

3        The only person of relevance here -- that's why

4    I've been sustaining a bunch of these questions, not so

5    much because of foundation, but because you're asking

6    questions about "him" and, you know, "he might have a

7    dog," the record isn't clear that every dog that he has

8    is a dog in which Mr. Mark has an interest, or in which

9    Mr. Mark fights it.

10       When you say, "For the year 2004," for example,

11   "did you have a dog fight" or "did your dog

12   participate," it may or may not include Mr. Mark.

13       I suspect that what you're asking is, did Mr. Mark?

14       Isn't that what you're asking?

15           MR. PAIGE:  Yes, it is.

16           THE COURT:  All right.

17       Counsel have anything to add?

18       I suspect that that's part of your objection, too,

19   that it's too generalized --

20           MR. HODGE:  Certainly, Your Honor.

21           THE COURT:  All right.

22           MR. HODGE:  And also, the other --

23           THE COURT:  That would make it a relevancy

24   issue.

25           MR. HODGE:  Right.

1      And the other relevancy issue to that -- that I'm

2   saying, Your Honor, is -- and also sort of a 403 issue,

3   is just the repeated questions about exactly how much

4   money is being made on each of these dog fights, when

5   this isn't like the drug issue, where you have to

6   establish a certain amount for the jury.  It's either

7   there's dog fighting or there isn't.

8          THE COURT:  All right.  Well, it is for bet.

9   It's not just dog fighting.  It's dog fighting for bet,

10  I think is how the statute is worded.

11         MR. HODGE:  Well, actually, the statute reads

12  "willful" --

13         THE COURT:  Well, let's not, let's not debate

14  the statute.

15      All right.  Thank you, Counsel.

16         MR. HODGE:  Thank you.

17      (End sidebar discussion, open court as follows)

18         THE COURT:  Go ahead.

19  BY MR. PAIGE:

20  Q.   Did you attend any other dog fights that were

21  hosted by Mr. Mark in 2004?

22  A.   Yes.

23  Q.   Were they all at the farm, hosted by Mr. Mark?

24         MR. MOORE:  Objection.

25         MR. HODGE:  Objection.  Leading.

1          THE COURT:  Sustained.

2    BY MR. PAIGE:

3    Q.   Were all of those fights that you just referred to

4    held at the farm?

5          MR. HODGE:  Objection.  Leading.

6          THE COURT:  It's the same question.  Sustained.

7    BY MR. PAIGE:

8    Q.   Where were they held?

9    A.   At the farm.

10         MR. HODGE:  Objection, Your Honor.

11         THE COURT:  Overruled.

12   BY MR. PAIGE:

13   Q.   Was anybody doing security at any others?

14         MR. HODGE:  Objection.  Leading.

15         THE COURT:  Overruled.

16         THE WITNESS:  Jerome did all the security at

17   the fights.

18   BY MR. PAIGE:

19   Q.   How many times did you see Jerome doing security at

20   the fights?

21   A.   Several times.

22   Q.   How many times did you see him collecting at the

23   fights?

24   A.   All fights at the farm, Jerome Blyden, collect.

25   Q.   How many times did you see him dressed in

1    camouflage at the fights at the farm?

2              MR. HODGE:  Objection.  Relevance.

3              THE COURT:  Sustained.

4    BY MR. PAIGE:

5    Q.    Were there any fights at the farm that were not for

6    bet?

7    A.    No.

8    Q.    I'm going to direct your attention to

9    September 2003.  Do you recall an incident at the

10   St. Thomas airport relating your drug trafficking?

11        Yes or no?

12             MR. HODGE:  Objection.  Leading.

13             THE COURT:  Overruled.

14             THE WITNESS:  Yes.

15   BY MR. PAIGE:

16   Q.    Do you have personal knowledge of this?

17   A.    Yes.

18   Q.    And what is your -- how did you have that personal

19   knowledge?

20   A.    Gelean Mark told me.

21   Q.    Explain what happened.

22   A.    Well, I was supposed to receive some drugs.  I sent

23   them up in 2003.  And they got seized at the airport.

24   Q.    How much drugs?

25   A.    I think --

```
1              MR. HODGE:  Objection.

2              THE COURT:  Overruled.

3              THE WITNESS:  I think it was like 30 keys or

4    something like that.

5              MR. HODGE:  Objection.  Foundation.

6              THE COURT:  Overruled.

7    BY MR. PAIGE:

8    Q.    Thirty keys of what?

9    A.    Cocaine.

10   Q.    I would like to direct your attention to a time

11   when -- do you recall a time when you, Mr. Blyden and

12   Mr. Mark were in a vehicle in St. Thomas in 2003?

13        Yes or no?

14             MR. HODGE:  Objection.  Leading.

15             THE COURT:  Sustained.

16   BY MR. PAIGE:

17   Q.    Do you recall a time when you, Mr. Mark and

18   Mr. Blyden were together discussing business?

19             MR. MOORE:  Objection.

20             MR. HODGE:  Objection.  Leading.

21             THE COURT:  Sustained.

22

23   BY MR. PAIGE:

24   Q.    Mr. Isaac, would you tell us about any

25   conversations that you heard where Mr. Mark and
```

1    Mr. Blyden, Blyden, discussed payments?

2              MR. HODGE:  Objection.  Leading.

3              THE COURT:  Overruled.

4              THE WITNESS:  Discussed what?

5    BY MR. PAIGE:

6    Q.   Payments.

7              MR. MOORE:  Your Honor, I'm sorry, I didn't

8    hear the -- discuss what, Your Honor?

9              THE COURT:  He said "payments."

10   BY MR. PAIGE:

11   Q.   Payments.

12   A.   Yes.

13   Q.   When was this?

14             THE COURT:  Was that a yes or no question?  I

15   thought it was -- you asked the witness to tell you

16   about them.

17   BY MR. PAIGE:

18   Q.   Tell us about any --

19             MR. HODGE:  Your Honor, could we get a time

20   frame?

21             THE COURT:  The witness understands the

22   question.

23             THE WITNESS:  A time frame?

24   BY MR. PAIGE:

25   Q.   Tell us about the conversation.

1    A.    Okay.   We were taking Mr. Blyden home, and Gelean

2    Mark and Blyden was arguing in the car about, about

3    Mr. Mark paying his attorney fees.

4         And Blyden --

5              THE COURT:   Stop.

6              MR. HODGE:   Objection.   Relevance.

7              THE COURT:   Come to sidebar.

8         (Sidebar discussion held as follows)

9              MR. MOORE:   Can I -- I'm sorry, Your Honor.

10             THE COURT:   What is it that he's going to go

11   into here?   He's talking about lawyers and stuff.   I

12   don't want him to run off to the races or talk about

13   objectionable stuff.

14        Are you trying to find out what, if any,

15   discussions this gentleman had about narcotics

16   trafficking --

17             MR. PAIGE:   No --

18             THE COURT:   -- and then with whom and then what

19   the substance of those discussions were?

20             MR. PAIGE:   No.   It's about Mr. Blyden being

21   compensated for his work that he was doing as his

22   bodyguard, to further the enterprise.

23             THE COURT:   All right.

24             MR. PAIGE:   In general, that Mr. Mark was

25   paying him.

1    THE COURT:  All right.  Because now we're

2  getting into attorney's fees, and I don't know what's

3  going to come out of this witness' mouth.  And it's hard

4  to put the horse back in the barn.

5    And, you know, I think you need to -- first of all,

6  the objection is sustained.  I think you need to

7  rephrase your question.  He's headed down a road that

8  I'm a little concerned about.

9    Attorney's fees.  Does anyone -- what's he talking

10  about?

11    MR. MOORE:  Your Honor, I have no clue.

12    MR. PAIGE:  Well, Mr. Mark --

13    THE COURT:  Do you have a clue, Attorney Paige?

14    MR. PAIGE:  Yes.  Mr. Mark was of the opinion

15  that he need not pay him any more than he was because,

16  as it were, he was already paying his attorney's fees.

17  Mr. Blyden wanted more payment in general for his

18  services to the enterprise.

19    THE COURT:  This witness is about to talk about

20  attorney's fees.  Is he talking about some case that's

21  going to roll out of his mouth next?

22    MR. LINDQUIST:  What he, what he's -- what the

23  conversation was about was Blyden was hitting Mark up

24  for more money, as opposed to the relationship between

25  the two of them.

1          Mr. Blyden didn't feel that Mark was paying him

2     enough money for what he was doing for Mark.

3          And Mark's response was, "Look, I'm covering your

4     attorney fees" -- I think that's what Isaac indicated --

5     "I'm paying for your attorney fees."

6          And then Blyden says, "Well, I need more money

7     besides that."

8          That's the gist of the -- we can avoid the attorney

9     fees, but it goes directly to their relationship and the

10    fact that Mark was paying Blyden money for what he was

11    doing for him.

12               THE COURT:  All right.  That's legitimate.

13               MR. LINDQUIST:  And it's difficult for this

14    witness to distinguish that, as far as the attorney

15    fees, because it was all part of the conversation.

16               THE COURT:  All right.  All right.

17          All right.

18               MR. LINDQUIST:  What I would ask is --

19               THE COURT:  All right.  When he started he

20    didn't start with what you started with.  He started

21    with what you ended with.

22               MR. LINDQUIST:  Yeah.

23               THE COURT:  He started with attorney's fees.

24    And I don't want him to talk about some case that he may

25    be involved in --

1        MR. LINDQUIST:  He makes, he makes no reference

2   to a case.  It's just a general reference, "Look, I'm

3   paying for your attorney."

4       And Blyden said, "I want more money."

5        THE COURT:  All right.  Okay.

6        MR. MOORE:  Your Honor?

7        THE COURT:  Attorney Moore.

8        MR. MOORE:  Yes.  I know that our firm has

9   represented Mr. Blyden on prior occasions, but I'm not

10  sure that, again, this is, if there was any particular

11  reference to something like that, I would have

12  appreciated something of a heads up about it.  But I

13  don't think it's us.  He has other lawyers.

14       MR. LINDQUIST:  We have no idea what the

15  attorney reference is, other than what I just indicated;

16  no case, no firm, no nothing, just, "Hey, I want more

17  money."

18      "I'm paying for your attorneys."

19      "I want more money."

20       MR. HODGE:  Your Honor?

21       THE COURT:  Yes.

22       MR. HODGE:  Excuse me.

23      Your Honor, I believe that the issue here for my

24  client is that under the, under the indictment we're

25  dealing with two racketeering acts that allege

1   conspiracy.

2        And right now he's -- this witness just testified

3   about the financial arrangements, paying for Blyden's

4   attorney.  Even if he doesn't specify what the attorney

5   was for, the jury is here watching them standing side by

6   side right next to their attorneys in this case, and

7   they're going to use that as evidence of an existence of

8   this conspiracy involving Blyden and Mark.

9        And, Your Honor, it -- you can't unring the bell,

10  as Your Honor was saying.  And you know, at this point

11  and I feel like I have to move for a mistrial.

12            THE COURT:  Okay.  Well, that's denied.  I

13  think all he said was, he just mentioned the attorney's

14  fee, and I stopped him there.

15       All right.  Is there some way we can take him to

16  that point in the conversation where we get to the nub

17  of the discussion, without --

18            MR. LINDQUIST:  Yeah, I could --

19            THE COURT:  Because I think that Attorney Hodge

20  makes a valid point, which is the jury is seeing them

21  here, they don't want to think -- I don't think we want

22  to create the impression that Mr. Mark is here, slipping

23  a check under the table.

24            MR. LINDQUIST:  Would you allow Paige to simply

25  say, without talking --

```
1              THE COURT:  He can lead to get us through that
2      thicket, just for the moment, just to get us to that
3      point --
4              MR. LINDQUIST:  Would Your Honor --
5              THE COURT:  -- to the period in time or the
6      period of discussion --
7              MR. LINDQUIST:  Could he say, without -- could
8      the question be this:  Look, without mentioning anything
9      about attorney fees, what was the nature of the
10     conversation between --
11             THE COURT:  That would cover it, yeah.
12             MR. MOORE:  Your Honor, if it's going to be a
13     statement about --  if it's going to be a statement
14     about some payment, we have got to -- I mean --
15             THE COURT:  Yeah.  I think, I mean you've got
16     some cross-examination.  I mean, I --
17             MR. MOORE:  Yes, Your Honor.
18             MR. HODGE:  Your Honor --
19             THE COURT:  -- it's for the government --
20             MR. HODGE:  Your Honor --
21             THE COURT:  -- to do its direct.
22         Thank you.
23         (End sidebar discussion, open court as follows)
24             THE COURT:  The objection is sustained.  Go
25     ahead.
```

1    BY MR. PAIGE:

2    Q.   Mr. Isaac, without any reference to attorneys fees,

3    tell us what the conversation was about between Mr.

4    Blyden and Mr. Mark.

5            MR. HODGE:  Objection.

6            THE COURT:  Overruled.

7            THE WITNESS:  Blyden had want a monthly

8    allowance from Gelean Mark.

9    BY MR. PAIGE:

10   Q.   And did Gelean Mark want to give him that

11   allowance?

12   A.   If Gelean Mark wanted to give him that allowance?

13   Q.   Right.

14   A.   No.

15           MR. PAIGE:  Court's indulgence?

16           THE COURT:  What do you mean by "allowance."

17           THE WITNESS:  He was suspended pending a --

18           THE COURT:  Stop.  Stop.

19           THE WITNESS:  Okay.

20           THE COURT:  All right.  Next question.

21           MR. PAIGE:  Court's indulgence?

22           MR. MOORE:  Your Honor, we would like a motion

23   to strike with regard to that last --

24           THE COURT:  Well, the jury -- that last remark

25   is to be disregarded.  It's not properly before you.

1    Mr. Isaac, I'm just asking, you meant -- used the

2    word "allowance."  And I just want to know what you mean

3    when you say "allowance."

4              THE WITNESS:  A monthly payment.

5              THE COURT:  Next question.

6              MR. PAIGE:  I have no further questions.

7              THE COURT:  Attorney Hodge?

8         Or was it Attorney --

9              MR. HODGE:  Court's indulgence?

10             THE COURT:  Yes.

11             MR. MOORE:  Your Honor, I can go first.

12             THE COURT:  All right.  Go right ahead.

13                      CROSS-EXAMINATION

14   BY MR. MOORE:

15   Q.   Good afternoon, Mr. Isaac.

16   A.   Good afternoon.

17   Q.   As I understand it -- you made how many trips to

18   the Virgin Islands from the time you were released from

19   prison until, I guess the time you returned to prison?

20   A.   Several.

21   Q.   Do you remember testifying in this court -- excuse

22   me.

23        Do you remember testifying under oath previously

24   regarding your trips to the Virgin Islands?

25   A.   Yes.

1   Q.    And do you recall saying it was approximately eight

2   during that period between 2003 and 2005?

3   A.    I never said that.

4   Q.    Do you recall -- I'll tell you what -- what exactly

5   did you say about the number of trips on the, while you

6   were testifying under oath previously?

7             THE COURT:  You're asking him a memory

8   question, what he said at some other time, or do you

9   want to ask him now what --

10            MR. MOORE:  Yes.

11  BY MR. MOORE:

12  Q.    How many trips did you take to the Virgin Islands,

13  an exact number?

14  A.    I can't recall a number, but it was a lot.

15  Q.    Do you recall whether or not you had plane tickets

16  or vouchers or things to count up the number of trips

17  you took?

18  A.    If I have?

19  Q.    Yes.

20  A.    On my possession, I don't have any.

21  Q.    Do you recall that you did not mention dogs,

22  dogfighting, at all on your prior sworn testimony?

23            MR. PAIGE:  Objection.  That's improper

24  impeachment.

25            THE COURT:  Sustained.

1    BY MR. MOORE:

2    Q.   Mr. Isaac, do you recall testifying here today that

3    Mr. Mark sent some person to North Carolina to cool out

4    or rest up?

5    A.   Yes.

6    Q.   Was that in 2004?

7    A.   It could be '03 or '04.

8    Q.   And you weren't even there to receive that person,

9    were you?

10   A.   I was there.

11   Q.   Did you pick that person up at the airport?

12   A.   No.

13   Q.   Did that person come by your house?

14   A.   Yes.

15   Q.   You met that individual?

16   A.   Yes.

17   Q.   Mr. Isaac, isn't it true that you never met

18   Mr. Blyden before coming to court today?

19   A.   I apologize.  Can you repeat your question again?

20   Q.   Yeah.  Is it true that you have never visually laid

21   your eyes on the face of Mr. Blyden before coming to

22   court today?

23   A.   I met Mr. Blyden at my home -- the very first time

24   I met Mr. Blyden is when he came to my house in North

25   Carolina.

1    Q.   And what year was that?

2    A.   It could have been '03 or '04.

3    Q.   And is it your testimony that when you went to a

4    dogfight, the individual you identify as Mr. Blyden was

5    dressed head to toe in black and was wearing a mask?

6    A.   Yes.

7    Q.   And did you recognize the face of Mr. Blyden on

8    that occasion?

9    A.   At first, no, until he spoke to me.

10   Q.   And so it wasn't his face; you're saying you

11   recognized his voice?

12   A.   Yes.

13   Q.   And you heard his voice on a prior occasion?

14   A.   Yes.

15   Q.   Mr. Isaac, direct your attention to Government's

16   Exhibit Number 32 -- Number 32B.

17            MR. MOORE:  Sorry, Your Honor.

18            THE COURT:  Do you want the government to pull

19   it up, or -- oh, you've got it.  It's there.

20   BY MR. MOORE:

21   Q.   You were previously shown this document by

22   government's counsel, were you not?

23   A.   Yes.

24   Q.   And do you recognize the document as something

25   you're familiar with?

```
 1    A.   Yes.
 2    Q.   In fact, let me take you back to page -- do you see
 3    your signature on that page?
 4    A.   Yes.
 5    Q.   Now, when were you convicted upon your plea of
 6    guilty in the drug conspiracy case?
 7    A.   When I entered my plea?
 8    Q.   When -- yes.
 9    A.   It was '06.
10    Q.   And have you been sentenced on that plea yet?
11    A.   No, sir.
12    Q.   And is it my understanding that -- or excuse me.
13    Is it your understanding that between now and the time
14    you are sentenced, you have the opportunity to obtain a
15    recommendation for a reduced sentence?
16    A.   My attorney did not instruct me of that.
17    Q.   Well --
18    A.   Inform me.
19    Q.   Do you understand by virtue of the document there
20    before you that subject to you testifying as required in
21    proceedings by the United States, that under this
22    agreement you may receive a recommendation from the
23    government for a lower sentence?
24    A.   My attorney did not -- my attorney did not inform
25    me of that.
```

1    Q.   Directing your attention to page 5.

2        Did you read this with your attorney prior to

3    signing it?

4    A.   I brief -- briefly read it.

5    Q.   Well, at the conclusion, and prior to signing this

6    agreement, were you -- or are you currently aware that

7    you, through this agreement, this supplemental

8    agreement, may receive a lower sentence at the time of

9    your sentencing as -- based upon your cooperation under

10   this agreement?

11       Is that correct?

12   A.   I guess.  But my attorney told me that --

13   Q.   You can't --

14   A.   -- it's up to the judge.

15   Q.   You can't tell me what your lawyer told you, sir.

16       I apologize for that.

17       But you -- you're aware that whatever sentence you

18   receive is up to the Court.

19       But you may be able to receive a recommendation

20   from the government for a lower sentence at the time of

21   your sentencing, based upon their recommendation for

22   that lower sentence, correct?

23   A.   Yes.

24   Q.   And is it your understanding that the government,

25   in its sole discretion, will determine whether or not

1    you've fulfilled your obligations under your plea

2    agreement?

3    A.    Yes.

4    Q.    And is it your understanding that you were obliged,

5    and you agreed to testify as a witness before any court

6    or other proceeding as required by the government?

7    A.    Yes.

8    Q.    Is it your hope to receive a lesser sentence at the

9    time of your sentencing?

10   A.    Yes.

11   Q.    And is it your wish and desire to cooperate as

12   fully as possibly with the government --

13   A.    And truthful.

14   Q.    -- prior to then?

15   A.    And truthful, yes.

16   Q.    And how many times have you testified for the

17   government since the date of your plea until today?

18   A.    This my third time.

19   Q.    And you're not in jail currently, are you?

20   A.    No.

21   Q.    And you haven't been in jail since the time of your

22   plea, have you?

23   A.    No.

24   Q.    Now, you testified that you were with Mr. Blyden

25   and Mr. Mark in 2003; is that correct?

1    A.    '03 or '04.

2    Q.    So it could have been '04 that you had this -- or

3    heard this conversation about receiving some monthly

4    payment?

5    A.    Yes.  Mostly leaning to '04, yes.

6    Q.    And were you on a street corner or in a car, or

7    where were you?

8    A.    We were in a car.

9    Q.    And how many -- how long were -- which visit to the

10   Virgin Islands was it, that this occurred?

11   A.    What you mean by "which visit"?

12   Q.    I mean, how many times did you come to the Virgin

13   Islands in 2004?

14   A.    A few times.

15   Q.    All right.  And you speak about this one occasion

16   where you overheard that conversation?

17   A.    Yes, I was in the car.

18   Q.    Anybody else in the car with you?

19   A.    Myself, Gelean Mark and Jerome.

20   Q.    Let me take you back to your dogfighting.  You do

21   breeding, and I think I heard you say you did pedigree.

22   You would match dogs for breeding?

23   A.    Match them for breeding; what you mean "match"?

24   Q.    What did you mean by -- you talked about, in your

25   earlier testimony, that you raised dogs, and you read

1    about pedigree?

2    A.    The bloodline of the dog.

3    Q.    Okay.  I'm sorry.  The bloodlines.  Did you, did

4    you consult books or magazines or anything to assist you

5    in doing this?

6    A.    I did a lot of reading.

7    Q.    What publications did you read?

8    A.    American Pit Bull Gazette.  Sport and Dog Journal.

9    Q.    And let me take you -- American Pit Bull was about

10   the breeding and fighting of pit bulls?

11   A.    Mostly advertising.

12   Q.    And what about the Gazette; is that the full name

13   of it?

14   A.    American Pit Bull Gazette.

15   Q.    And what was the other one, the sporting -- the

16   last one you spoke about?

17   A.    Sport and Dog Journal.

18   Q.    What is the substance or the subject of Sport and

19   Dog Journal?

20   A.    Putting in ads on your dog kennel, breeding,

21   selling, so forth.

22   Q.    Was that primarily for pit bulls, or for other

23   breeds as well?

24   A.    Pit bulls.

25   Q.    Mr. Isaac, you regard pit bull fighting as a sport,

1    don't you?

2    A.   Yes.

3    Q.   And it's more of a hobby, correct?

4    A.   Yes.

5    Q.   And you've been engaged it in for many years?

6    A.   Yes.

7    Q.   And it had nothing to do with the drug part of your

8    life, did it?

9    A.   Yes.

10    Q.   Well, in what way -- is it because you just had

11    some money?

12    A.   For betting that kind of --

13    Q.   I'm sorry?

14    A.   Okay.  Repeat your question.

15    Q.   You had your dogfighting and breeding and raising

16    hobby, correct?

17    A.   Uhm-hmm.

18    Q.   Then you had your drug stuff; is that correct?

19    A.   Yes.

20    Q.   All right.

21        Do you still maintain a kennel?

22    A.   No.

23    Q.   Do you still subscribe to the magazines?

24    A.   No.

25        MR. MOORE:  Court's indulgence, please?

```
 1              THE COURT:  Yes.

 2          (Counsel conferring with defendant)

 3              MR. MOORE:  Pardon me, Your Honor.

 4              THE COURT:  Yes.

 5   BY MR. MOORE:

 6   Q.   Mr. Isaac, isn't it true, when the gentleman sent

 7   Mr. Mark to Puerto Rico --  I'm sorry.

 8        When you testified earlier about someone coming to

 9   North Carolina to cool out, when that person arrived,

10   isn't it true you were at a cockfight in Puerto Rico at

11   the time?

12   A.   That was couple days after I went to Puerto Rico.

13   Q.   It is a couple of days after?

14   A.   Yes, sir.

15   Q.   Very well.

16        Do you currently have a sentencing date?

17   A.   No, sir.

18              MR. MOORE:  No further questions, Your Honor.

19              THE COURT:  All right.

20          Attorney Hodge?

21              MR. HODGE:  No questions, Your Honor.

22              THE COURT:  All right.

23          Redirect?

24                     REDIRECT EXAMINATION

25   BY MR. PAIGE:
```

```
1    Q.   Mr. Isaac, going back to that conversation that

2    Attorney Moore asked you about in the car, where was

3    that car at the time the conversation took place?

4         Where were you?

5    A.   In St. Thomas.

6    Q.   Where in St. Thomas?

7              MR. HODGE:  Objection.  Relevance.

8              THE COURT:  Overruled.

9              THE WITNESS:  We were going towards Bordeaux.

10   BY MR. PAIGE:

11   Q.   Do you know where you were going, in particular?

12   A.   We were going to drop Jerome off to his girlfriend

13   house.

14   Q.   Who was driving?

15             MR. HODGE:  Objection.  Relevance.

16             THE COURT:  Overruled.

17             THE WITNESS:  Gelean Mark.

18   BY MR. PAIGE:

19   Q.   Attorney Moore asked you whether drugs are related

20   to dogs, and I think you said yes.

21        How is that?

22             MR. HODGE:  Objection.  Mischaracterizes the

23   testimony.

24             THE COURT:  Overruled.

25             THE WITNESS:  To bet that large quantity of
```

1   money at dogfights.

2   BY MR. PAIGE:

3   Q.   So, but for your money from the drug trade, you

4   couldn't afford to bet those amounts?

5   A.   You can, but...

6        MR. HODGE:  Objection.  Leading.

7        THE COURT:  Sustained.

8   BY MR. PAIGE:

9   Q.   Attorney Moore asked you about journals and

10   periodicals on dog breeding and pit bulls.  Did you see

11   any pit bulls on Mr. Mark's property when you visited

12   the farm?

13   A.   Yes.

14        MR. PAIGE:  Your Honor, I would like to show

15   the witness some exhibits.

16        MR. MOORE:  Your Honor, objection.  I believe

17   that's beyond the scope of redirect -- re-  --

18        THE COURT:  Unless this one has already been

19   showed.  I don't know what the exhibits are.

20        MR. MOORE:  The only exhibits, Your Honor, I

21   think...

22        MR. PAIGE:  I would like to show him

23   Government's Exhibit 165K-1 and 165K-2.

24        MR. HODGE:  Your Honor, that wasn't previously

25   used.

```
 1              THE COURT:  All right.  Go ahead.

 2         (Government's Exhibit Nos. 165K-1, 165K-2 marked)

 3    BY MR. PAIGE:

 4    Q.   Do you recognize 165K-1?

 5    A.   Yes.

 6    Q.   What is it?

 7    A.   A photograph of myself, Gelean Mark, Everett Mills,

 8    Vernon Fagan, Tom Garner, Louis Rabsatt, Kilo Emanuel.

 9    Q.   Is there anything else included in this photograph,

10    as well?

11              MR. HODGE:  Objection.  Leading.

12              THE COURT:  Overruled.

13              THE WITNESS:  A dog named Bolo.

14    BY MR. PAIGE:

15    Q.   Does this photograph fairly and accurately

16    depict --

17    A.   Repeat.

18    Q.   Does this photograph fairly and accurately depict

19    you gentlemen with that photograph --

20    A.   Yes.

21    Q.   -- taking this photograph on the date?

22    A.   Yes.

23              MR. PAIGE:  Your Honor, I move for admission of

24    Government's Exhibit 165K-1.

25              MR. MOORE:  I'm going to object to it.  It
```

1    would be a Virgin Islands --

2              THE COURT:  All right.  Attorney Hodge?

3              MR. HODGE:  Same objection, Your Honor.

4              THE COURT:  All right.  Sustained.

5    BY MR. PAIGE:

6    Q.   When was this photograph taken?

7    A.   In North Carolina -- when?

8    Q.   Yeah.

9    A.   I cannot say.  I don't remember what day it was.

10             MR. PAIGE:  Your Honor, I move for admission of

11   165K-1.

12             MR. MOORE:  Your Honor, I would object again.

13   Jurisdiction.  403.  Relevance.

14             THE COURT:  Attorney Hodge?

15             MR. HODGE:  Same objection, Your Honor.

16             THE COURT:  All right.  I'll take it under

17   advisement.

18             MR. PAIGE:  Let me see 165K-2.

19   BY MR. PAIGE:

20   Q.   Do you recognize Government's Exhibit 165K-2?

21   A.   Yes.

22   Q.   What is it?

23   A.   A photograph.

24   Q.   What does it depict?

25   A.   Names?

1    Q.   Yes.

2    A.   Louis Rabsatt, Gelean Mark, Kilo Emanuel, Vernon

3    Fagan and -- I forgot his name.

4    Q.   Were you present when this photograph was taken?

5    A.   Yes.

6    Q.   When was it taken?

7    A.   When was it?  I cannot give you a month and a

8    day --

9    Q.   Does it fairly --

10   A.   -- but --

11   Q.   I'm sorry.  Go ahead.

12   A.   -- but it was in North Carolina.

13   Q.   Does it fairly and accurately depict these

14   gentlemen as they were on the date that it was taken?

15   A.   Yes.

16        MR. PAIGE:  Your Honor, I move for admission of

17   165K-2.

18        MR. MOORE:  Objection, Your Honor, for all the

19   same reasons and --

20        MR. HODGE:  Same objections, Your Honor.

21        THE COURT:  All right.  It's under advisement.

22   BY MR. PAIGE:

23   Q.   Where is the literal location of where this

24   photograph was taken?

25        I know you said North Carolina.  Can you be more

1      specific?

2      A.   The guy who I cannot remember his name right now,

3      at his home.

4      Q.   Is this a home, business, or just residential home?

5      A.   Residential.

6      Q.   Did it have anything to do in relation to the

7      activities that you and the persons depicted in it were

8      engaging in at that time?

9              MR. HODGE:  Objection.  Leading.

10             THE COURT:  Sustained.

11             MR. PAIGE:  One moment, Your Honor?

12             THE COURT:  Yes.

13             MR. PAIGE:  I have no further questions.

14             MR. MOORE:  Your Honor, may I inquire?

15             THE COURT:  Yes, on those exhibits.

16             MR. MOORE:  Your Honor -- very well.

17             THE COURT:  And that's the only thing that went

18     beyond the scope, so -- but they weren't admitted, so --

19     but if you wish to inquire on them, go right ahead.

20                        RECROSS-EXAMINATION

21     BY MR. MOORE:

22     Q.   With regard to 165K-2, the gentleman whose name you

23     don't know, is --

24     A.   Do not remember.

25     Q.   Do not remember.

 1          (Continuing) -- does he, was he a person who bet on

 2     dog fights?

 3     A.    He do bet on dog fights.

 4     Q.    And do you know what his job or his source of

 5     income for -- was?

 6     A.    He was a breeder.

 7     Q.    All right.  On the prior picture, 165K-1, the big

 8     house in North Carolina, and the blond gentleman in that

 9     one, do you recall his name?

10     A.    Tom Garner.

11     Q.    What does Mr. Donner [sic] do for a living?

12     A.    He has several businesses.

13     Q.    And does he bet on dog fights?

14     A.    Yes.

15     Q.    When you say "several businesses," could you -- is

16     one of them like a contractor or something?

17          What kind of -- give me -- legitimate businesses?

18     A.    Yes.

19     Q.    And with regard to the dogfighting, if I had a

20     thousand dollars, I could bet on one, too?

21     A.    Yes, if you're there.

22          MR. MOORE:  No further questions.

23          THE COURT:  All right.

24     Any cross on that?

25          MR. HODGE:  No thank you, Your Honor.

1          MR. PAIGE:  Your Honor, with those additional

2     inquiries by counsel, we move for their admission.

3          THE COURT:  All right.  It's under advisement.

4     Okay.  Mr. Isaac, thank you for your testimony.

5     You may step down.

6          MR. MOORE:  Your Honor, may we hold him just

7     briefly -- just to hold for a day?

8          THE COURT:  All right.  You're not excused,

9     though.  You may step down.

10     Next witness.

11          MR. LINDQUIST:  Michael Goldfinger.

12     (Pause)

13          THE WITNESS:  Good afternoon.

14     Good afternoon, Your Honor.

15          THE CLERK:  Please raise your right hand to

16     take the oath.  Please respond, "I do."

17     (Witness sworn)

18          THE WITNESS:  Yes, I do.

19          THE CLERK:  Please be seated.

20     THEREUPON, MICHAEL GOLDFINGER, having been duly

21     sworn, was examined and testified as follows:

22                    DIRECT EXAMINATION

23     BY MR. LINDQUIST:

24     Q.   Good afternoon, sir.

25     A.   Good afternoon, sir.

1    Q.    Tell us your name.

2    A.    My name is Michael Goldfinger.

3    Q.    What do you do for a living?

4    A.    I'm a special agent for the Drug Enforcement

5    Administration.

6    Q.    How long have you done that?

7    A.    Since 2000.

8    Q.    Before that, were you involved in law enforcement?

9    A.    No, sir, I was not.

10    Q.    Give us an idea of your educational background.

11    A.    I graduated, bachelor of arts from Boston

12    University, 1991.

13    Q.    In a word or two, tell us what you do as a DEA

14    agent?

15    A.    My primary responsibilities is to investigate

16    narcotic traffickers, narcotic organizations and to

17    enforce the federal narcotic laws.

18    Q.    I would like you to think back to 2004.  Were you

19    involved in an investigation here in the Virgin Islands?

20    A.    Yes, sir, I was.

21    Q.    And in what capacity, generally speaking?

22    A.    I was what we call the lead investigator.

23    Q.    Generally, what did the investigation involve?

24    A.    This particular investigation involved a drug

25    trafficking area in Savan, St. Thomas.

1  Q.   Did the investigation -- describe the investigation

2  as far as its component parts.

3  A.   There were three major components to this

4  investigation.

5       The first part of this particular investigation

6  involved street-level buys using a confidential

7  informant.

8       The second phase of the investigation involved a

9  Title III investigation, better known as a wiretap.

10      And the third part of the investigation primarily

11  involved the execution of search warrants and arrest

12  warrants.

13  Q.   Who were the primary subjects of that

14  investigation?

15  A.   All the subjects of the investigation, sir?

16  Q.   The primary subjects of that investigation?

17  A.   Mr. Allen Dinzey, Vernon Fagan, Gelean Mark, Tyrone

18  Prince.

19  Q.   Are those the primary ones?

20  A.   Yes, sir.

21  Q.   All right.  Of those individuals that you've named,

22  is one of them in the courtroom today?

23  A.   Yes, sir, he is.

24  Q.   Which one is in the courtroom?

25  A.   Mr. Gelean Mark.

1    Q.    Would you point him out and describe what he's

2    wearing, please?

3    A.    Yes.  Mr. Gelean Mark is sitting to the far left,

4    wearing black glasses and what appears to be an

5    off-white, button-down shirt, shaved head.

6              MR. LINDQUIST:  May the record reflect that the

7    witness has identified Defendant Mark.

8              THE COURT:  Yes.  The record will reflect

9    Defendant Mark has been identified by the witness.

10   BY MR. LINDQUIST:

11   Q.    When did the investigation get started?

12   A.    November 2004.

13   Q.    How did it get started?

14   A.    We had, through our own historical investigative

15   means and information received from other law

16   enforcement agencies, learned of an area in St. Thomas

17   in the Savan area which was being utilized primarily --

18             THE COURT:  Stop.

19        Hearsay.

20        Next question.

21   BY MR. LINDQUIST:

22   Q.    With regard to that information, what did you do as

23   far as your investigation?

24   A.    We conducted an investigation using a confidential

25   source into the Savan area of St. Thomas.

1    Q.    Who was the confidential source?

2    A.    Mr. Theodore Phillips.

3    Q.    And how is it that you were using Mr. Phillips?

4    A.    Mr. Phillips was signed up by my agency to be a

5    confidential informant.

6    Q.    How did you utilize him?

7    A.    Mr. Phillips was provided with an objective for the

8    day, to go and purchase narcotics.  He was given

9    instructions and done -- did what we asked him to do as

10    far as that was concerned.

11    Q.    Were you personally involved in those activities?

12    A.    Yes.

13    Q.    I would like to refer you to December 7 of 2004.

14    Was that your first involvement?

15    A.    Yes, sir, it was.

16    Q.    Tell us what happened that particular day with

17    regard to Mr. Phillips?

18    A.    December 7th, 2004, we instructed Mr. Phillips to

19    enter the Savan area to attempt to purchase crack

20    cocaine.

21    We had provided him with $400 worth of government

22    funds to go into the area and purchase crack cocaine.

23    Q.    What did you do?

24    A.    We have a certain procedure before sending people

25    in to purchase narcotics.

1        Initially, Mr. Phillips was debriefed as to exactly

2   what we wanted him to do.  He was then searched.  We

3   search our informants before we send them in to make a

4   search.

5        At that same time, surveillance units were placed

6   in that particular area of Savan so they could observe

7   exactly what was going on.

8        Mr. Phillips was equipped with digital, audio and

9   video equipment so we could monitor everything and

10  record everything that had taken place.

11  Q.   What do you mean by that?

12  A.   It's -- there are devices which are put on a

13  person's body which will digitally record all

14  conversation and video of the transaction taking place.

15  Q.   All right.  What happened?

16  A.   We then drove Mr. Phillips to the area near

17  Windward Passage, where he was released from our vehicle

18  and sent into the Savan area.

19       Mr. Phillips was in the area for approximately 10

20  to 15 minutes before returning to the vehicle, at which

21  time the drug evidence which he had purchased was

22  relinquished to myself.

23            MR. HODGE:  Objection.  Foundation.

24            THE COURT:  Overruled.

25  BY MR. LINDQUIST:

1    Q.    What did you do with the drug evidence as you --

2    first of all, describe the drug evidence as you received

3    it from him?

4    A.    The drug evidence was $400 worth of crack cocaine

5    which Mr. Phillips purchased.

6    Q.    All right.  Describe it.  Was it -- describe it.

7    A.    Describe crack cocaine?

8    Q.    No.  Describe what he handed to you.

9    A.    It was a bag which contained crack cocaine.

10   Q.    What did you do with that bag containing the crack

11   cocaine?

12   A.    That crack cocaine was then brought back to our

13   office where --

14            MR. HODGE:  Objection.  Foundation.

15            THE COURT:  Overruled.

16        This is based on your -- what you did, is that

17   correct?

18            THE WITNESS:  Yes, Your Honor.

19            THE COURT:  All right.  Go ahead.

20            THE WITNESS:  The crack cocaine is brought back

21   to our office where it is weighed, photographed, then

22   placed in an evidence bag and secured in a vault in our

23   office.

24            MR. HODGE:  Your Honor --

25            THE COURT:  You're testifying based on what you

1    did?

2            THE WITNESS:  Yes, Your Honor.

3            THE COURT:  All right.  Go ahead.

4            MR. HODGE:  Your Honor, there's been no

5    testimony identifying any substance as crack cocaine.

6            THE COURT:  Overruled.

7            MR. LINDQUIST:  Could we put up Exhibit 36A,

8    please, for identification.

9        (Government's Exhibit No. 36A marked)

10   BY MR. LINDQUIST:

11   Q.   Take a look at that.  Do you recognize that

12   photograph, 36A?

13   A.   Yes, sir, I do.

14   Q.   And what is that?

15   A.   Those are the bags of crack cocaine which were

16   purchased.

17   Q.   And how are you able to recognize that?

18           THE COURT:  Hold on one second.  Those are the

19   items that you then believed to be crack cocaine, is

20   that correct?

21           THE WITNESS:  Yes, Your Honor.

22           THE COURT:  All right.  Go ahead.

23   BY MR. LINDQUIST:

24   Q.   And how are you able to recognize that?

25   A.   Based on what I observed on that day, those are the

1    same bags which were handed to me by the confidential

2    informant, Mr. Phillips?

3    Q.    Does this photograph fairly and accurately portray

4    what you received from Mr. Phillips on that particular

5    day?

6    A.    Yes, sir, it does.

7              MR. LINDQUIST:  I offer it into evidence,

8    please.

9              THE COURT:  Attorney Hodge?

10             MR. HODGE:  Objection, Your Honor.

11             MR. MOORE:  Best evidence; not best evidence,

12   Your Honor.

13             THE COURT:  All right.  Exhibit 36A is

14   admitted.

15       (Government's Exhibit No. 36A admitted)

16             MR. LINDQUIST:  May we publish that, please?

17   BY MR. LINDQUIST:

18   Q.    Agent Goldfinger, what are we seeing here?

19   A.    You are seeing the small Ziploc bags containing

20   individual pieces of crack cocaine which Mr. Phillips

21   purchased for $400 of government funds in the Savan area

22   of St. Thomas.

23   Q.    Okay.

24             MR. LINDQUIST:  All right.  If we could have

25   the lights back up, please.

1          And Your Honor, I'm going to apologize, we need to

2     apply some stickers to the, some exhibits that were just

3     delivered.

4               THE COURT:  All right.  Go ahead.

5               MR. LINDQUIST:  Thank you.

6               Your Honor, I would like to use the document

7     camera, but I think he needs to have this in his hand in

8     order to identify it properly.

9               THE COURT:  Why don't we try the document cam

10     first.

11          It's there.  It's not evidence, right?

12          It's on the screen?

13               MR. LINDQUIST:  I'm sorry?

14               THE COURT:  It's on the screen.

15               MR. LINDQUIST:  I'm sorry.  I'm looking at the

16     wrong monitor.

17          All right.  Agent Goldfinger, I'm showing you --

18     yes -- Exhibit 36B.

19          (Government's Exhibit No. 36B marked)

20     BY MR. LINDQUIST:

21     Q.   Do you recognize that?

22     A.   Yes, sir, I do.

23     Q.   And what is that?

24     A.   That's the evidence bag in which the evidence is

25     contained in.

1    Q.    Let me just turn it over.

2          Do you recognize that?

3    A.    Yes, sir, I do.

4    Q.    Okay.  And what, what did you do as far as bagging

5    that evidence and securing it at this particular time?

6    A.    Well, the evidence is placed in the bag, sealed by

7    myself, witnessed by Special Agent Kevin Adams.  The bag

8    is heat-sealed and then placed in our vault for

9    safekeeping.

10   Q.    When the bag went into the vault, was it intact as

11   far as its integrity was concerned?

12   A.    Yes, sir, it was.

13   Q.    Agent Goldfinger, I would now like to refer you to

14   December 21st of 2004.  What happened on that date as

15   far as this investigation was concerned?

16   A.    On that date, sir, again, Mr. Phillips was brought

17   to our office, where he was briefed by myself and other

18   agents as far as what his objective would be for that

19   particular day.  That particular day he was again

20   instructed to go into the Savan area and attempt to

21   purchase $400 of government funds of crack cocaine from

22   the same source which he had purchased from previously.

23         Mr. Phillips was searched by myself prior to going

24   into the location.

25         He was also -- had an audio and video digital

1    component put on his person in order to record all the

2    activities that took place during the purchase.

3         Surveillance units were then put in position in the

4    Savan area for observation and safety of Mr. Phillips.

5         We then at that time drove Mr. Phillips to the

6    Windward Passage, where we let him out of the car and

7    sent him on foot into the Savan area to again purchase

8    crack cocaine.

9    Q.   What happened?

10   A.   Again, approximately 10 to 15 minutes later,

11   Mr. Phillips returned to the vehicle, came into the

12   vehicle.  He was searched.  He immediately handed me the

13   drug evidence, which was crack cocaine.

14        The audio/video devices were taken off

15   Mr. Phillips, and Mr. Phillips was debriefed as far as

16   everything that took place during his meet and we

17   returned to the office.

18   Q.   What did you do with regard to the drug evidence?

19   A.   The drug evidence was brought back to the office

20   where it was immediately photographed, weighed, field

21   tested, and then it was sealed in an evidence bag.

22        MR. LINDQUIST:  May we have the witness please

23   look at Government's Exhibit 37A for identification.

24        (Government's Exhibit No. 37A marked)

25   BY MR. LINDQUIST:

1    Q.   All right.  Take a look at 37A.  Do you recognize

2    that?

3    A.   Yes, sir, I do.

4    Q.   And what is that?

5    A.   Those are the Ziploc baggies containing crack

6    cocaine which Mr. Phillips had purchased.

7    Q.   How is it you're able to recognize that?

8    A.   They are exactly the same bags which I had received

9    from him the day of the buy.

10   Q.   Does this photograph fairly and accurately portray

11   what you received from Mr. Phillips that day?

12   A.   Yes, sir, they do.

13        MR. LINDQUIST:  I offer it into evidence,

14   please.

15        THE COURT:  All right.

16   Exhibit 37A, what is it?

17        THE WITNESS:  It's crack cocaine, sir.

18        THE COURT:  Is it crack?

19        THE WITNESS:  Yes, crack.

20        THE COURT:  What is the item itself?

21   What is 37A?

22        MR. LINDQUIST:  I'm sorry.

23   BY MR. LINDQUIST:

24   Q.   What are we looking at?

25   A.   Multiple Ziploc bags, each bag containing a piece

1    of crack -- rock crack cocaine.

2    Q.    It's a photograph; is that correct?

3    A.    Yes, sir, it is.

4           THE COURT:  Any objection, Attorney Hodge?

5           MR. HODGE:  Same objection.

6           THE COURT:  Attorney Moore?

7           MR. MOORE:  With counsel.

8           THE COURT:  All right.  37A is admitted.

9       (Government's Exhibit No. 37A admitted)

10          MR. LINDQUIST:  May we -- thank you, Your

11   Honor.

12   BY MR. LINDQUIST:

13   Q.    Now Agent Goldfinger, what are we seeing here?

14   A.    We're seeing multiple Ziploc bags containing

15   individual pieces of crack cocaine which Mr. Phillips

16   purchased for $400 of government funds.

17   Q.    All right.

18          MR. LINDQUIST:  Let's go ahead and take that

19   down.

20          THE COURT:  Agent Goldfinger, what was 36A?

21          THE WITNESS:  The photograph, Your Honor.

22          THE COURT:  Can the government put 36A up so

23   the witness can view that?

24       What is 36A?

25          THE WITNESS:  36A is multiple small Ziploc

1    bags.  Each Ziploc bag containing individual pieces of

2    crack cocaine, Your Honor.

3              THE COURT:  Is it a bag?  What is the -- what

4    is 36A itself?

5              THE WITNESS:  It's a photograph --

6              THE COURT:  All right.

7              THE WITNESS:  -- of the Ziploc bags.

8              THE COURT:  All right.  Okay.

9    BY MR. LINDQUIST:

10   Q.   Agent Goldfinger, what did you then do -- we're

11   back to the December 21 transaction.

12        What did you do with the actual substance that you

13   got from Mr. Phillips?

14   A.   The substance was field tested.  It was then

15   weighed.  It was photographed and then it was placed in

16   a heat-sealed envelope and placed in a vault for

17   safekeeping.

18             MR. LINDQUIST:  Your Honor, to save some time,

19   may I just hand all of these physical exhibits up to

20   him, so that they're right in front of him, rather than

21   switching back and forth?

22             THE COURT:  Yes.

23             MR. LINDQUIST:  That might be --

24        May I approach, Your Honor?

25             THE COURT:  Yes.

1           THE WITNESS:  Thank you.

2    BY MR. LINDQUIST:

3    Q.   Did you see 37B there?

4    A.   Yes, sir, I do.

5         (Government's Exhibit No. 37B marked)

6    Q.   Do you recognize that?

7    A.   Yes, sir, I do.

8    Q.   What is that?

9    A.   This exhibit is a Ziploc bag containing crack

10   cocaine.

11   Q.   And how does that relate to the December 21

12   transaction?

13           MR. HODGE:  Objection, Your Honor.  There's

14   been no identification.

15           THE COURT:  Overruled.

16           THE WITNESS:  Also on that date, Mr. Phillips

17   was again sent back into the Savan area.

18   BY MR. LINDQUIST:

19   Q.   This is December 21?

20   A.   Yes, sir.

21   Q.   Okay.

22   A.   On December 21, you're asking me -- okay.

23   Q.   I'm asking you, this is 37B?

24   A.   Yes, sir.

25   Q.   You just identified the substances in the

1    photograph, 37A?

2    A.    Yes.

3    Q.    How does 37B relate to 37A?

4    A.    It's the same substance.

5    Q.    All right.  When you placed -- when that package

6    was placed in the vault in evidence what was the -- just

7    describe the integrity of that package.

8    A.    It was heat-sealed with integrity stickers on it.

9    It was intact.

10   Q.    And at the time you're putting this stuff, this

11   drug evidence into the vault, who was responsible for

12   the evidence in the vault?

13   A.    Special Agent Mike Aguilar.

14   Q.    And give us an idea of the role of Mike Aguilar as

15   far as the evidence in the fault was concerned,

16   generally speaking?

17   A.    Special Agent Mike Aguilar is what we call our drug

18   evidence custodian in the office.  He's responsible for

19   taking custody of the evidence once it is sealed and

20   photographed.  It's placed in the vault for safekeeping.

21   Then it is his responsibility to ensure that it is sent

22   out to our laboratory for analysis.

23   Q.    Go ahead and set that aside, if you would, sir.

24   A.    (Complies)

25   Q.    Now I would like to refer you to December 28 of

1    2004.

2    A.    Okay.

3    Q.    Did another activity occur, as far as the

4    investigation was concerned?

5    A.    Yes, sir.  December 28, 2004, Mr. Phillips was

6    again given the objective to enter the Savan area of St.

7    Thomas to utilize $400 of government funds to purchase

8    crack cocaine in the Savan area.

9         After Mr. Phillips was briefed as to what his

10   objective would be for that day, he was thoroughly

11   searched, audio and video digital devices were placed on

12   his body.

13        He was driven to the area of Windward Passage.

14   Prior to that surveillance, agents had established

15   themselves in the Savan area.

16        Mr. Phillips was then released from the vehicle and

17   walked on foot into the Savan area, where he again

18   purchased $400 worth of crack cocaine from the same

19   source at Savan.

20             MR. HODGE:  Objection.  No identification, Your

21   Honor.

22             THE COURT:  Overruled.

23             THE WITNESS:  He was in the area for

24   approximately 10 to 15 minutes, again, before returning

25   to the vehicle.

1          Once Mr. --

2     BY MR. LINDQUIST:

3     Q.    What happened then?

4     A.    Once Mr. Phillips returned to the vehicle, he

5     immediately relinquished custody of the drug evidence to

6     me.  He was searched again.  The video and audio devices

7     were taken off his person.

8          He was again thoroughly debriefed as to all the

9     activities that took place during his meet in Savan.

10         We then drove to the office with the drug evidence

11    for processing.

12    Q.    All right.

13              MR. LINDQUIST:  Could we show 38A, please, for

14    identification.

15         (Government's Exhibit No. 38A marked)

16    BY MR. LINDQUIST:

17    Q.    Do you see Exhibit 38A?

18    A.    Yes, sir, I do.

19    Q.    Physically what is that exhibit?

20    A.    38A is a photograph.

21    Q.    Of what?

22    A.    Of the individual Ziploc bags containing crack

23    cocaine which Mr. Phillips purchased for $400.

24    Q.    And how were you able to recognize that photograph?

25    A.    It is in the same condition as the bags of crack

1    cocaine which were purchased by Mr. Phillips.

2            MR. HODGE:  Objection.

3    BY MR. LINDQUIST:

4    Q.   And does this fairly and accurately portray what

5    you received from Mr. Phillips on that day?

6    A.   Yes, sir, it does.

7            MR. LINDQUIST:  I offer 38A into evidence,

8    please.

9            MR. HODGE:  Same objection, Your Honor.

10           THE COURT:  Attorney Moore?

11           MR. MOORE:  Objection, Your Honor.

12           THE COURT:  All right.  38A is admitted.

13       (Government's Exhibit No. 38A admitted)

14           MR. LINDQUIST:  And may we publish that?

15   BY MR. LINDQUIST:

16   Q.   What are we seeing there as we look at 38A?

17   A.   Again, sir, that is a photograph which accurately

18   shows the multiple Ziploc bags which Mr. Phillips bought

19   from a source in Savan containing crack cocaine.

20           MR. LINDQUIST:  Thank you.

21       Can we have the lights back up.

22       Now, if you would look at one of those packages

23   there in front of you.  Can you find 38B?

24       (Government's Exhibit No. 38B marked)

25           THE WITNESS:  Yes, sir.  I have 38B in front of

1    me here.

2    BY MR. LINDQUIST:

3    Q.    All right.  Do you recognize that?

4    A.    Yes, sir, I do.

5    Q.    What's that?

6    A.    This is the evidence bag in which the crack cocaine

7    which was purchased on that date was sealed in.

8    Q.    On December 28th of '04?

9    A.    Yes, sir.

10   Q.    What did you do with that drug evidence as far as

11   bagging it and preserving it that day?

12   A.    This drug evidence was placed into a heat-sealed

13   envelope with an integrity sticker, initialed by myself.

14   It was then turned over to drug evidence custodian

15   Special Agent Mike Aguilar to be temporarily stored in a

16   vault before being sent to the laboratory for analysis.

17   Q.    And when you turned it over to Aguilar for storage

18   in the vault, what was the packaging like as far as its

19   integrity?

20   A.    It was perfectly intact, heat-sealed, initialed and

21   signed.

22   Q.    Go ahead and set that aside, if you would.

23          Now I would like to refer you to January 18th of

24   2005.  Did another event occur as far as this

25   investigation was concerned?

1    A.    Yes, sir.

2    Q.    What happened?

3    A.    On that particular date, Mr. Phillips was again

4    brought to our office.  Mr. Phillips was instructed by

5    us to place a phone call, this time to the source of

6    supply in Savan to arrange a meet to purchase

7    narcotics --

8    Q.    Tell me -- just pause for a moment.

9          How is it now that Mr. Phillips is able to call

10   this individual, as far as you were concerned, your

11   knowledge?

12   A.    Yes.  During --

13              MR. HODGE:  Objection.  Hearsay.

14              THE COURT:  Overruled.  It's his knowledge.

15              THE WITNESS:  Yes, sir.

16         During the last meet, which was December 28, 2004,

17   Mr. Phillips was able to acquire the phone number from

18   the source of supply in Savan.

19   BY MR. LINDQUIST:

20   Q.    Okay.  So as a result of the call that you made

21   using that phone number -- by the way, do you remember

22   that number?

23   A.    Yes, I do.

24   Q.    What's that number?

25   A.    It's 340-344-6598.

1    Q.    Okay.  As a result of that call, what then

2    happened?

3    A.    On January 17th, actually, Mr. Phillips came to the

4    office and made a call to the source of supply in Savan,

5    indicating that he was interested in buying narcotics.

6         As a result of that conversation, the following

7    day, January 18th --

8              THE COURT:  Stop.  Stop.

9         Come to sidebar.

10        (Sidebar discussion held as follows)

11             THE COURT:  All right.  The witness just said

12   something about the, what Phillips said or Phillips did.

13   Phillips made a call to request something, or something

14   to that effect.

15        That's not a coconspirator statement.  That's

16   hearsay, is it not?

17             MR. LINDQUIST:  No, because it's not being

18   offered for the truth of the matter asserted in it.

19   It's simply being offered to show that Phillips made a

20   call ordering up cocaine.

21             THE COURT:  Well, it is for the truth of the

22   matter that he did call that specific number that's

23   attributable to someone who is the subject of

24   investigation, isn't it?

25        That is, you want to establish the point that that

1    person Mr. Phillips was calling was someone who is, I

2    guess, the source of the narcotics.

3             MR. LINDQUIST:  Yeah, but this isn't hearsay,

4    and I can clarify it.  The agent himself would have,

5    would have overseen the placement of that call to that

6    number.

7             THE COURT:  All right.

8             MR. LINDQUIST:  He would have done that

9    himself.

10            THE COURT:  All right.

11            MR. HODGE:  Your Honor --

12            THE COURT:  Yeah.

13            MR. HODGE:  I apologize.  This is what I was

14   originally talking about with the hearsay.  How does he

15   know that is the number that this guy was given?  None

16   of that has been developed.  It's just --

17            MR. LINDQUIST:  Yes.  He testified that as a

18   result of him coming back the prior time, Phillips gave

19   him a telephone number.

20        That's not hearsay.  He gave him a number.

21            MR. HODGE:  Yes, but where did Phillips get the

22   number?

23            THE COURT:  Phillips gave a number to --

24            MR. LINDQUIST:  To Goldfinger.

25            THE COURT:  Goldfinger.  All right.

1          MR. HODGE:  And he got the number from?

2          THE COURT:  All right.  Did Goldfinger testify

3     that this was a number attributable to someone?

4          MR. LINDQUIST:  He testified that he -- that in

5     getting the number from Phillips, then investigatively

6     his assumption was it was the number attributable to the

7     source, and they used that number to place a call.

8          THE COURT:  Hold on one second.

9          (Pause; judge reviews record)

10         THE COURT:  All right.  It seems that the only

11    way that the witness would have -- would be by hearsay,

12    based on what's on the record.  He said he got it from

13    the source.

14         The only way that -- unless Goldfinger was there

15    when he saw and observed the, Mr. Phillips getting the

16    number from the source, it would seem that the only way

17    he could get it is based on hearsay.  Someone told him

18    that it was from the source, because the question was

19    asked how you got --

20         MR. LINDQUIST:  That's fine.

21         THE COURT:  So --

22         MR. LINDQUIST:  We'll have Phillips testify

23    later, and he can relate that he got the number and gave

24    it to him.

25         THE COURT:  All right.  So I'm going to sustain

1    the objection with respect to the information about the

2    phone number.

3            MR. LINDQUIST:   Okay.   That's fine.

4            MR. HODGE:   Thank you, Your Honor.

5        (End sidebar discussion, open court as follows)

6            THE COURT:   All right.   The objection is

7    sustained.

8        Ladies and gentlemen, you heard some testimony

9    about a phone number and the source of the phone number.

10        That portion of the testimony is to be disregarded

11    by you.

12        All right.   Go ahead.

13    BY MR. LINDQUIST:

14    Q.   Agent Goldfinger, as a result of the call on the

15    17th, you were taking us to the 18th.   What happened

16    that day?

17    A.   On January 18th, 2005, we again had Mr. Phillips

18    come to our office.

19        Mr. Phillips was again instructed to make a phone

20    call into the Savan source to arrange a meet to purchase

21    narcotics.

22        We instructed Mr. Phillips again that he would be

23    entering the Savan area, meeting with the same source in

24    Savan to purchase, this time $600 government funds of

25    crack cocaine.   Mr. Phillips was then thoroughly

1    searched.

2        He was provided with audio and digital video

3    equipment which was placed on his body.

4        We then drove Mr. Phillips to the Windward Passage

5    area on waterfront.  Surveillance units again were

6    established, and Mr. Phillips walked on foot into the

7    Savan area and purchased the crack cocaine.

8    Q.   What happened then?

9    A.   Approximately 15 minutes later, Mr. Phillips then

10   returned to the same spot.  We picked him up in our

11   vehicle.

12       Mr. Phillips immediately relinquished custody of

13   the drug evidence to me.  He was searched and thoroughly

14   debriefed as to what took place during his meet in Savan

15   with the source.

16       He was then driven to our office along with the

17   narcotics, and the drugs were processed.

18           MR. LINDQUIST:  Could the witness --

19           MR. HODGE:  Objection, Your Honor.  There's

20   been no identification.

21           THE COURT:  Overruled.

22           MR. LINDQUIST:  Could the witness be shown

23   39A-1 for identification, please.

24       (Government's Exhibit No. 39A-1 marked)

25   BY MR. LINDQUIST:

1    Q.    Do you see 39A-1, Agent Goldfinger?

2    A.    Yes, sir, I do.

3    Q.    What is that?

4    A.    That is a photograph showing a white clear sandwich

5    bag which contained crack cocaine, which was purchased

6    by Mr. Phillips in Savan on January 18th, 2005.

7    Q.    And you indicated this is a photograph; is that

8    correct?

9    A.    Yes, sir, I did.

10   Q.    Does this photograph fairly and accurately portray

11   what Mr. Phillips gave you on that day?

12   A.    Yes, it does.

13              MR. LINDQUIST:  I offer it into evidence;

14   39A-1.

15              MR. HODGE:  Same objection, Your Honor.

16              MR. MOORE:  I join, Your Honor.

17              THE COURT:  Okay.  39A-1 is admitted.

18        (Government's Exhibit No. 39A-1 admitted)

19   BY MR. LINDQUIST:

20   Q.    Agent Goldfinger, tell us what we're seeing there.

21   A.    That is a photograph of -- showing a white -- I'm

22   sorry -- a clear sandwich bag containing crack cocaine

23   which was purchased for $600 of government funds by

24   Mr. Phillips from a source in Savan.

25   Q.    Thank you.

1          MR. LINDQUIST:  Have the lights back up,

2     please.

3          Now, Agent, take a look at one of the bags there in

4     front of you, 39A-2.

5          (Government's Exhibit No. 39A-2 marked)

6     BY MR. LINDQUIST:

7     Q.   Can you find that?

8     A.   39A-2?

9     Q.   Yes.

10          MR. HODGE:  Your Honor, can I have a continuing

11     objection with respect to the references to crack

12     cocaine?

13          THE COURT:  All right.  Whenever you need to

14     object, just object.

15     BY MR. LINDQUIST:

16     Q.   Do you have that?

17     A.   Yes, I do, sir.

18     Q.   Do you recognize it?

19     A.   Yes, I do.

20     Q.   What is 39A-2?

21     A.   39A-2 is a heat-sealed evidence envelope which

22     contains the crack cocaine which was purchased --

23          MR. HODGE:  Objection.

24          THE COURT:  All right.

25          Agent Goldfinger, the thing that's in 39A-2 at the

1    time when you received it, did you know it to be crack

2    cocaine, or just suspect it to be crack cocaine?

3           THE WITNESS:  Yes, sir, suspected crack

4    cocaine.

5           THE COURT:  All right.  Go ahead.  Use that

6    reference.  Go ahead.

7           THE WITNESS:  Yes, sir.

8       This is a heat-sealed envelope bag which contains

9    the suspected crack cocaine which was purchased by

10   Mr. Phillips on January 18th, 2005.

11      The integrity sticker is on top, where the bag is

12   sealed, with my initials on it.

13   BY MR. LINDQUIST:

14   Q.   And the status of the bag at the time it went into

15   evidence on that occasion?

16   A.   Yes.  It appears --

17   Q.   Intact?

18   A.   Yes, sir.

19   Q.   All right.  Did anything else occur on that same

20   day?

21      Go ahead and set that aside.

22          MR. HODGE:  Objection.  Leading.

23          MR. LINDQUIST:  Just introductory.

24          THE COURT:  All right.  Overruled.

25          THE WITNESS:  Yes.

1    BY MR. LINDQUIST:

2    Q.   What else happened that day?

3    A.   On that same day, when Mr. Phillips brought this

4    particular exhibit to us and it was brought back to the

5    office, we weighed the suspected crack cocaine and

6    determined that the amount which Mr. Phillips purchased

7    was less than what he was supposed to have gotten from

8    the source in Savan.

9    Q.   What, if anything, did you do in response to that?

10   A.   We immediately had Mr. Phillips place another phone

11   call to the Savan source to let them know that he did

12   not receive the proper amount of suspected crack

13   cocaine.

14   Q.   What happened then?

15   A.   We then again searched Mr. Phillips, placed digital

16   and audio/video equipment on him, and drove him back to

17   the area of Windward Passage, where we sent him back

18   into Savan to meet with the source, again, to get the

19   remainder of the crack cocaine.

20   Q.   What happened?

21   A.   Mr. Phillips was out of the vehicle for

22   approximately 15 minutes.  Soon after, he returned with

23   the remainder of the suspected crack cocaine.

24   Q.   What happened then?

25   A.   Again Mr. Phillips was thoroughly searched.  The

1    drug evidence which he had purchased was relinquished to

2    me.

3        The digital audio/video devices were removed from

4    his person and we debriefed him thoroughly regarding the

5    events that took place and then returned to our office

6    to process the suspected crack cocaine.

7            MR. LINDQUIST:  May the witness be shown

8    Exhibit 39B-1 for identification.

9        (Government's Exhibit No. 39B-1 marked)

10   BY MR. LINDQUIST:

11   Q.    There's 39B-1 in front of you.  Do you recognize

12   that?

13   A.    Yes, sir, I do.

14   Q.    What is it?

15   A.    That is a photograph which depicts a picture of a

16   sandwich bag a, clear sandwich bag containing the

17   remainder of the suspected crack cocaine which

18   Mr. Phillips purchased on January 18th, 2005.

19   Q.    Does 39B-1 fairly and accurately portray what you

20   beheld that day, what you got from Mr. Phillips?

21   A.    Yes, sir, it does.

22           MR. LINDQUIST:  I offer 39B-1.

23          MR. HODGE:  Same objection, Your Honor.

24          THE COURT:  Attorney Moore?

25          MR. MOORE:  I join.

```
 1              THE COURT:  All right.  39B-1 is admitted.

 2         (Government's Exhibit No. 39B-1 admitted)

 3              MR. LINDQUIST:  Thank you.

 4    BY MR. LINDQUIST:

 5    Q.   Tell us what we're seeing as we look at 39B-1,

 6    Agent Goldfinger.

 7    A.   39B-1 -- 39B-1 sir, is a photograph showing a clear

 8    sandwich bag knotted, which contains suspected crack

 9    cocaine which Mr. Phillips received from the Savan

10    source.

11    Q.   Thank you.  Go ahead and set that aside.

12              MR. LINDQUIST:  If we can have the lights back

13    up, please.

14    BY MR. LINDQUIST:

15    Q.   Now, sir, I would like to refer you to -- let me

16    see, refer you to January 24 of 2005.

17         What happened with regard to the investigation on

18    that day?

19    A.   January 24th, 2005, again, Mr. Phillips was brought

20    to our office.

21         We briefed Mr. Phillips on what his objective would

22    be for that particular day, which again would be to

23    place a phone call into the Savan source in order to

24    arrange the purchase of crack cocaine.

25         Mr. Phillips was provided with $600 worth of
```

1    government funds.

2         At that time, Mr. Phillips was searched and again

3    equipped with audio and video digital equipment.

4    Surveillance units again established themselves in the

5    area of Savan to observe the purchase and to ensure the

6    safety of Mr. Phillips.

7         Mr. Phillips was then driven to the area of

8    Windward Passage, where he was let out of the vehicle,

9    and observed on foot traveling into Savan to purchase

10   suspected crack cocaine for $600 worth of government

11   funds.

12   Q.   All right.

13        What happened then?

14   A.   Approximately 15 minutes later Mr. Phillips

15   departed the Savan area, was picked up in my vehicle.

16   Mr. Phillips immediately relinquished the drug evidence

17   to me.  Mr. Phillips was then searched.  The audio and

18   digital video equipment was removed from his person.

19        Mr. Phillips again was thoroughly debriefed as far

20   as the events and activities which took place between

21   him and the source in Savan.

22        We then returned to our office, where the drug

23   evidence was processed.

24             MR. LINDQUIST:  Could we show the witness,

25   please, 40A for identification.

1       (Government's Exhibit No. 40A marked)

2    BY MR. LINDQUIST:

3    Q.    There's 40A for identification, Agent Goldfinger.

4          What are we seeing?

5    A.    Exhibit --

6    Q.    What is that?

7    A.    Exhibit 40A is a photograph showing a clear

8    sandwich bag containing the crack -- suspected crack

9    cocaine which Mr. Phillips purchased on the 25th of

10   January, 2005.

11   Q.    Does that photograph fairly and accurately portray

12   what you obtained from Mr. Phillips that day?

13   A.    Yes, sir, it does.

14         MR. LINDQUIST:  I offer 40A into evidence,

15   please.

16         THE COURT:  Attorney --

17         MR. HODGE:  Same objection, Your Honor.

18         MR. MOORE:  I join, Your Honor.

19         THE COURT:  Okay.  40A is admitted.

20      (Government's Exhibit No. 40A admitted)

21         MR. LINDQUIST:  May that be published?

22   BY MR. LINDQUIST:

23   Q.    Tell us what we're seeing as we look at 40A.

24   A.    40A, sir, is a photograph showing a clear sandwich

25   bag, knotted, containing the suspected crack cocaine

1    which Mr. Phillips purchased from the source in Savan in

2    St. Thomas for $600.

3    Q.   Thank you.

4         MR. LINDQUIST:   If we can have the lights back

5    up.

6         Take a look at 40B, a package there in front of

7    you.

8         (Government's Exhibit No. 40B marked)

9    BY MR. LINDQUIST:

10   Q.   Can you find that?

11   A.   Yes, sir.

12   Q.   Do you recognize it?

13   A.   Yes, sir, I do.

14   Q.   Describe what that exhibit consists of.

15   A.   40B is a heat-sealed envelope which contains the

16   exhibit of suspected crack cocaine.   It has an

17   integrity -- a signed integrity sticker on it.

18   Q.   And just tell us what you did with that suspected

19   crack cocaine when you sealed it up that day?

20   A.   Once the bag was sealed and signed, it was turned

21   over to -- excuse me -- to the drug evidence custodian,

22   Special Agent Mike Aguilar, who then placed it in the

23   vault for safekeeping pending transfer to the laboratory

24   for analysis.

25   Q.   All right.   Go ahead and set that aside.

1            Now Agent Goldfinger, I'm referring you to

2      February 15th of 2005.  Did another event take place in

3      the investigation?

4      A.   Yes, sir.

5      Q.   What?

6      A.   Again, Mr. Phillips was brought to our office,

7      again for the purpose to be briefed on purchasing more

8      crack cocaine from the source in Savan.

9            Mr. Phillips was requested by us to make a

10     controlled call to the Savan source, which he did, and

11     to arrange to purchase on this particular date, $1,800

12     worth of suspected crack cocaine.

13     Q.   What happened?

14     A.   Again, Mr. Phillips was thoroughly searched.  Audio

15     and digital video devices were placed on his person.

16           He was briefed to exactly what we wanted him to do,

17     which was to meet with this source and purchase $1,800

18     worth of crack cocaine.

19           Surveillance units were established, again for the

20     safety of Mr. Phillips and for observation purposes.

21           Mr. Phillips was then driven to the area of

22     Windward Passage, released from the vehicle and sent

23     into the Savan area to meet with the Savan source.

24     Q.   What happened?

25     A.   Approximately 15 minutes later, Mr. Phillips was

1    then picked up by myself.  He relinquished the drug

2    evidence to me immediately.

3        Again, Mr. Phillips was searched.  The digital and

4    audio and video devices were removed from his person.

5    He was thoroughly debriefed as far as the events that

6    took place between him and the Savan source.  And then

7    he, along with the narcotics, were driven to our office,

8    where the drugs were processed.

9            MR. LINDQUIST:  Could the witness be shown

10   Exhibit 41A for identification, please.

11       (Government's Exhibit No. 41A marked)

12   BY MR. LINDQUIST:

13   Q.   What are we seeing there?

14        What is that exhibit?

15   A.   Exhibit 41A is a photograph which shows multiple

16   sandwich bags containing suspected crack cocaine which

17   was purchased by Mr. Phillips on February 15th, 2005 --

18   Q.   Is the --

19   A.   -- from the --

20   Q.   Go ahead.

21   A.   -- from the source in Savan.

22   Q.   Does this photograph fairly and accurately portray

23   what you received from Mr. Phillips that day?

24   A.   Yes, it does, sir.

25           MR. LINDQUIST:  I offer 41A into evidence,

1    please.

2                MR. HODGE:  Same objection, Your Honor.

3                MR. MOORE:  Join, Your Honor.

4                THE COURT:  Okay.  41A is admitted.

5          (Government's Exhibit No. 41A admitted)

6    BY MR. LINDQUIST:

7    Q.   Agent Goldfinger, tell us what we're seeing here on

8    41A.

9    A.   41A, sir, is a photograph which shows multiple

10   sandwich bags containing suspected crack cocaine which

11   was purchased on February 15th, 2005, for 1,800 of

12   government funds, from a source in Savan.

13   Q.   All right.  Thank you.

14               MR. LINDQUIST:  If we could have the lights

15   back up.

16   BY MR. LINDQUIST:

17   Q.   Now there in front of you, do you see an exhibit

18   that has "41B" on it?

19   A.   Yes, I do, sir.

20         (Government's Exhibit No. 41B marked)

21   BY MR. LINDQUIST:

22   Q.   And do you recognize that?

23   A.   Yes, I do.

24   Q.   What is that?

25   A.   41B is the suspected crack cocaine which was

1    purchased on February 15th, 2005.  It is inside a

2    heat-sealed envelope bag with my initials on it.

3    Q.   Describe the bag as it went into evidence on that

4    particular day.

5    A.   It looks the same as it did on that particular day,

6    sealed with an integrity sticker.  The integrity sticker

7    is still in place with my initials and name on it.

8    Q.   Agent Goldfinger, with regard to these exhibits

9    that you've looked at, meaning the bags --

10   A.   Yes, sir.

11   Q.   -- and I'm referring to 36B, 37B, 38B, 39A-2,

12   39B-2, 40B, and 41B --

13   A.   Yes, sir.

14   Q.   -- what, if any, involvement did you have as far as

15   those packages were concerned and being sent to the lab?

16   A.   My involvement was, once, once I placed the drug

17   evidence into the bag, sealed it, initialed it, all the

18   bags were then turned over to the evidence custodian,

19   Special Agent Mike Aguilar.

20       From that point it was his responsibility to safely

21   secure it in our drug vault and then have it sent to our

22   laboratory for analysis and safekeeping.

23   Q.   All right.

24       Now I need to have you back up --

25       MR. LINDQUIST:  And if I may, Your Honor.

1      Your Honor, may I approach the witness?

2           THE COURT:  Is it a single item that we can all

3    see?

4           MR. LINDQUIST:  It's multiple and packaged, and

5    I think he would be better off handling it.

6           THE COURT:  All right.  Approach.  Go ahead.

7    BY MR. LINDQUIST:

8    Q.   Agent Goldfinger, referring back to the events of

9    December 7, 2004, you indicated, did you not, that there

10   was an audio/video recording device involved?

11   A.   Yes, sir.

12   Q.   Do you recognize those exhibits that have been

13   placed before you there, 36B-1 and 36B-2?

14   A.   Yes.  These are the CDs that contain the audio and

15   video evidence.

16       (Government's Exhibit Nos. 36B-1, 36B-2 marked)

17   BY MR. LINDQUIST:

18   Q.   How do you know that?

19   A.   Because my name is on it, and -- indicating the

20   exhibit and the date.

21   Q.   All right.  So 36B-1 is what?

22       What is that, as far as the -- just look at 36B-1.

23   A.   Okay.  Yes, sir.

24   Q.   Just concentrate on that.  That is what, as far as

25   that recording is concerned?

1    A.    That is the copy of the recording.

2    Q.    Now when you say a "copy of the recording,"

3    describe what you would do, how that apparatus would

4    work, as far as your obtaining a recording.

5            MR. HODGE:  Objection, leading.

6            THE COURT:  Overruled.

7            THE WITNESS:  The initial recording is a

8    digital recording.  So in order to make a copy it has to

9    be transferred through a computer system onto a CD.

10   BY MR. LINDQUIST:

11   Q.    Did you do that?

12   A.    Yes, I did.

13   Q.    Okay.  What did you do?

14   A.    It's a basic process of just plugging the device

15   into the computer, and burning it onto a CD.

16   Q.    So that Exhibit 36B-1, that you have there, is that

17   the burned CD that you created?

18   A.    Yes, sir, it is.

19   Q.    All right.  How does that, 36B-1, relate to the

20   digital recorder?

21        Any alterations, adjustments or deletions as far as

22   that is concerned?

23   A.    It's the exact recording from start to finish, from

24   the original.

25   Q.    Once you did that download and came up with 36B-1,

1    what, if anything, did you do with it as far as

2    preserving it as evidence?

3    A.   It was placed in an evidence bag and sealed.

4    Q.   Before you placed it in the evidence bag and sealed

5    it, did you do anything else as far as making any other

6    copies?

7    A.   Yes.  Another copy was made.

8    Q.   Take a look at 36B-2.  Tell us if you recognize

9    that.

10   A.   Yes, sir.

11   Q.   Okay.  And what's 36 -- just look inside there.

12        Do you recognize 36B-2?

13   A.   Yes, sir, I do.

14   Q.   What is that?

15   A.   These are copies of Exhibit 36B-1.

16   Q.   Okay.  And how did you make that copy?

17   A.   Using a CD burner, just made an exact duplicate of

18   the original copy.

19   Q.   Any alterations or deletions, as far as the 36B-2

20   is concerned in relation to 36B-1?

21   A.   No, sir.  It's exact.

22   Q.   All right.  Just go ahead and put that back inside

23   that package, if you will.

24   A.   (Complies)

25   Q.   And I'm showing you one more --

1          MR. LINDQUIST:  May I, Your Honor?

2          THE COURT:  Yes.

3          MR. LINDQUIST:  That's 36B-3.

4     (Government's Exhibit No. 36B-3 marked)

5     BY MR. LINDQUIST:

6     Q.   Do you see that?

7     A.   Yes, sir, I do.

8     Q.   Do you recognize that?

9     A.   Yes, I do.

10    Q.   What's that?

11    A.   This is a CD which contains the, a recording from

12    January -- this is the recording from the original

13    digital video device.

14    Q.   Okay.  The trial disk; is that correct?

15    A.   Yes, sir.

16    Q.   And how do you know that?

17    A.   Because of the, my initials are on it and it's

18    dated, and it's exactly as I remember seeing it when I

19    reviewed it.

20    Q.   What's the content of that 36B-3 in relation to

21    36B-2 and 36B-1?

22    A.   It is the audio recording.

23    Q.   Any difference?

24    A.   No, no, no difference at all.  Exact replicate.

25    Q.   All right.  Go ahead and set that aside, if you

1   would.

2   A.   (Complies)

3   Q.   Agent Goldfinger, after the transaction that

4   occurred on February 15th of 2005, just generally

5   speaking, where did the investigation go?

6   A.   From that point, sir, the investigation started

7   going towards the Title III investigation.

8   Q.   What do you mean by a Title III investigation?

9   A.   Title III investigation, more commonly known as a

10   wiretap investigation, is where we're able to monitor

11   and listen to phone conversations by people we are

12   investigating.

13   Q.   What allowed you to go from the Savan transactions

14   to a Title III component of your investigation?

15   A.   The controlled phone calls which were being made

16   between the confidential informant and the source of

17   supply in Savan.

18   Q.   Just generally speaking, tell us how you go about

19   doing a Title III investigation.

20   A.   Mechanically, technically?

21   Q.   Yeah.  What steps you took initially in this

22   Title III investigation.  What did you do?

23   A.   Well, the purchases were made, an affidavit was

24   written, and --

25   Q.   So an application is made to whom?

1    A.    To the judge, sir.

2    Q.    All right.  And what happens then?

3    A.    We received a signed court order from the judge,

4    and we were then able to receive the audio conversations

5    taking place between whoever the subject of our

6    investigation is and the people which he's speaking to.

7    Q.    And were you personally involved in this particular

8    aspect?

9    A.    Yes, sir, I was.

10   Q.    What was your role in this particular phase?

11   A.    I was in charge of the wire room; wire room

12   supervisor.

13   Q.    When you say "wire room," what are you referring

14   to?

15   A.    The wire room is a particular room which, during a

16   Title III investigation or wiretap investigation, is

17   secluded from all other parts of the office; a locked

18   room where only people who have been, what's called

19   minimized, are allowed to enter that room and listen to

20   monitored conversations.

21   Q.    All right.  Are you familiar with the, with that

22   particular type of operation?

23   A.    Yes, sir, I am.

24   Q.    Had you -- prior to this time had you been involved

25   in that before?

1    A.   Multiple times.

2    Q.   Okay.  Were you familiar with the particular

3    mechanical equipment that was involved in that at that

4    particular time?

5    A.   Yes, sir, I was.

6    Q.   How is it that you were familiar with that?

7    A.   From working numerous other Title III

8    investigations.

9    Q.   In addition to working other Title III

10   investigations, had you received formal training as far

11   as how to deal with that machinery, operate that

12   machinery?

13   A.   Yes, sir; not only in my basic agent training

14   classes did we go through Title III training, but I've

15   taken multiple courses in telecommunications and

16   Internet telecommunications and monitoring of Title

17   III's.

18   Q.   Okay.  Tell us what happened as far as going up on

19   the first telephone interception.

20   A.   In April 2005, we began our first wiretap intercept

21   on the phone number, on the Savan source.

22   Q.   And how did it begin?

23        How -- describe mechanically how the equipment was

24   set up and your involvement in that.

25   A.   Well, the equipment is actually turned on by a

1    technical assistant who worked for DEA.

2    Q.   Who is the assistant that helped you on this

3    situation?

4    A.   David Velez.

5    Q.   All right.  What happened?

6    A.   Mr. Velez came to our office, to our wire room.  He

7    installed what's called magnetic optical disks, also

8    known as MO disks.

9    Q.   Were you there?

10   A.   Yes, sir, I was.

11   Q.   Okay.

12   A.   A test was done to make sure that the equipment was

13   working properly.  And then it's turned on, and we

14   listened.

15   Q.   And for how long did you listen on this first wire

16   interception?

17   A.   The first wire interception lasted 30 days.

18   Q.   Just describe how that went forward day by day in

19   the wire room, how it would work?

20   A.   What would happen is you sit in the wire room and

21   you hear -- the machine turns on when incoming calls are

22   being made.  And the machine turns on when outgoing

23   calls are being made.

24        Typically, the phone numbers that are being dialed

25   and received show up on our computer screen.  And as the

1    conversations take place, we are able to listen to the

2    conversations and type on the computer exactly what's

3    being said during those conversations.

4    Q.   And the conversations are recorded onto what

5    medium?

6    A.   The magnetic optical disk which I referred to, an

7    MO disk.

8    Q.   Are you familiar with the term "minimization"?

9    A.   Yes, sir, I am.

10   Q.   What is minimization?

11   A.   A minimization is a term which allows agents to

12   listen to a call for a certain amount of time.  If the

13   call at a certain amount of time is not deemed to be

14   what would be considered criminal nature or involved in

15   criminal activity, we are then required by law to

16   minimize that call.  When I say "minimize," that means

17   there's a button you push.  The call is muted.  We can't

18   hear the conversation anymore.

19        We are then allowed to let the call stay muted for

20   a particular amount of time before we then can turn the

21   call back on and listen again, to see if that call then

22   transpired to a conversation of criminal nature.

23   Q.   And did minimization occur with regard to this

24   first telephone interception?

25   A.   Yes, sir, it did.

1    Q.    How do you know that?

2    A.    Because I was there and took part, and very often

3    was the one who determined whether or not to minimize

4    the phone calls.

5    Q.    After the period of time involved in the

6    interception took place, what was done as far as that,

7    that interception ending?

8    A.    Once the, that particular interception was done,

9    the MO disk was removed.

10   Q.    Who and how -- who was involved and how was that

11   done?

12   A.    Again, our technical assistant, David Velez, came

13   over, removed the magnetic optical disk from the system

14   for us.

15   Q.    Were you present?

16   A.    Yes, I was.

17   Q.    Okay.

18   A.    It was immediately placed into an evidence bag,

19   which was then sealed.

20   Q.    All right.  Who sealed that?

21   A.    It was sealed in front of, I sealed it in front of

22   the judge, sir.

23   Q.    Okay.  And when you say sealed it, meaning what?

24   A.    It's put in a heat-sealed evidence bag, an

25   integrity sticker is put over it, signed by myself, and

1   then sealed shut.

2   Q.   After that was done, was there another phase of the

3   wire, of a wire intercept?

4   A.   Yes, sir, there was.

5   Q.   Different number, same number?

6   A.   It was a different number, sir.

7   Q.   How is it that you then went up on a different

8   number?

9   A.   During the course of a Title III investigation, as

10  you intercept calls deemed to be criminal activity, you

11  learn who your subjects are speaking to.

12      If you are able to observe an individual who you

13  believe is also engaged in criminal activity, you can

14  then roll up onto that next phone, which is what we did

15  in this case.

16  Q.   So the first phone, as far as your investigation is

17  concerned, was directed towards what level of individual

18  trafficker?

19  A.   Street level to mid-level drug trafficker.

20  Q.   And the second telephone?

21  A.   Second telephone was, I would say, between

22  mid-level to a higher-level drug trafficker.

23  Q.   And what procedures were followed -- first of all,

24  how long did this second telephone interception last?

25  A.   The second telephone interception also lasted for a

1   period of 30 days.

2   Q.   Was your role -- did your role remain the same?

3   A.   Yes, sir, it did.

4   Q.   Did the same minimization take place?

5   A.   Yes, it did.

6   Q.   Was the same procedure involved as far as setting

7   up the MO disk and retrieving them?

8   A.   Exactly the same, yes.

9   Q.   And who else was involved as far as the tech person

10  in that process?

11  A.   Mr. David Velez.

12  Q.   When the MO disk was removed on this particular

13  location, tell us about that?

14  A.   Same thing.  The MO disk -- Mr. Velez came to the

15  wire room that particular day, removed the MO disk.  I

16  held open an evidence bag.  It was dropped directly from

17  the machine into the evidence bag, which was then

18  initialed by myself, the judge, and heat-sealed.

19  Q.   All right.  Very good.

20       Was there another interception after that?

21  A.   Yes.  There was a third interception.

22  Q.   And how did that come about?

23  A.   Same as the second interception.  Again, calls were

24  listened to --

25  Q.   No.  What I'm referring to is, how is it that you

1   came to a third telephone interception?

2       Why didn't you stop with the second one?

3   A.   Because as we listened to the conversations on the

4   second line, it was determined that there was a person

5   who was a higher-level drug trafficker than the

6   individual who we were listening to on the second line.

7   Q.   All right.  And tell us what procedures were

8   followed as far as this third telephone interception was

9   concerned.

10  A.   It was same as the other two lines, as far as

11  minimization procedures are concerned.  The equipment

12  was again put together by Mr. David Velez, as far as

13  installing a new magnetic optical disk.  The calls were

14  listened to.  They were minimized.  They were listened

15  to when they were deemed phone calls containing criminal

16  activity.

17  Q.   And when the interception ended, what was done?

18  A.   The system was shut down.  Mr. Velez came over,

19  again removed the magnetic optical disk, which was

20  placed, again, in an evidence bag held by me,

21  heat-sealed, signed by myself and by the judge.

22          MR. HODGE:  Objection, Your Honor.  Vouching.

23          THE COURT:  Overruled.

24          MR. LINDQUIST:  Your Honor, may I approach the

25  witness with some exhibits?

```
1              THE COURT:  Yes.
2              MR. LINDQUIST:  Agent Goldfinger, take a look
3    at Exhibit 42A.
4         (Government's Exhibit No. 42A marked)
5    BY MR. LINDQUIST:
6    Q.   Do you recognize that?
7    A.   Yes, sir, I do.
8    Q.   What is that?
9    A.   Exhibit 42A is the magnetic optical disk contained
10   from the first 30 days of wiretap interceptions.
11   Q.   What telephone number did that involve?
12   A.   Area Code 340-344-6598.
13   Q.   How are you able to recognize that particular
14   exhibit?
15   A.   The exhibit contains my writing on the exhibit.  It
16   contains my writing and initials on the evidence bag and
17   it contains the signature of the judge at the
18   heat-sealed area.
19   Q.   Has there been any change of that packaging as you
20   look at it right now from when you sealed it up?
21   A.   No, sir, there has not.
22   Q.   Prior to sealing it up, did you do anything as far
23   as making another copy?
24   A.   Yes, sir.
25   Q.   Why do you that?
```

1   A.   Because the magnetic optical disk is not the type

2   of medium that can be played outside of the computer

3   which it records in.

4           MR. LINDQUIST:   Take a look at 42B.

5       (Government's Exhibit No. 42B marked)

6   BY MR. LINDQUIST:

7   Q.   Do you recognize that?

8   A.   Yes, sir, I do.

9   Q.   What's 42B?

10   A.   42B is a CD which contains all the calls that were

11   contained on the magnetic optical disk.

12   Q.   How do you know that?

13   A.   Because it is the CD which I used to make the copy

14   and it has my handwriting on it.

15   Q.   As far as the content of 42B in relation to 41A,

16   what is it?

17   A.   Exact.

18   Q.   Any additions, alterations or deletions?

19   A.   No, sir.

20   Q.   All right.  How many -- give us an idea, if you

21   can, how many calls, intercepted calls, are contained on

22   the MO disk 41 -- or excuse me -- 42A.  Any idea?

23   A.   Hundreds.

24   Q.   Okay.  All right.

25       Now take a look at -- and excuse me.  And that

 1    Exhibit 42 -- those Exhibits 42A and 42B, they

 2    correspond to which, which of the three telephones that

 3    you've talked about, the first, second or the third?

 4    A.   The first, sir.

 5    Q.   Okay.  Go ahead, and set that aside, if you will.

 6    A.   (Complies)

 7            MR. LINDQUIST:  Now look at 43A.

 8    (Government's Exhibit No. 43A marked)

 9    BY MR. LINDQUIST:

10    Q.   Do you recognize that?

11    A.   Yes, sir, I do.

12    Q.   What's 43A?

13    A.   43A, again, is the magnetic optical disk from the

14    second 30 days of Title III intercepts which were made.

15    Q.   All right.  How do you know that?

16    A.   The magnetic optical disks contains my handwriting

17    on it.  The bag which it is heat-sealed in contains my

18    signature and my initials and the signature of the judge

19    at the heat-sealed area.

20    Q.   Is there any difference between what you're holding

21    there and what you sealed up on the day that you've

22    indicated?

23    A.   No, sir.

24    Q.   Prior to -- and that deals with what telephone

25    number?

1    A.    954-558-6188.

2    Q.    Prior to sealing that up, did you make a copy?

3    A.    Yes, sir, I did.

4    Q.    How did you go about doing that?

5    A.    The copy was made directly off the computer and

6    burned onto a compact disk.

7    Q.    Do you see 43B there?

8    A.    Yes, sir, I do.

9          (Government's Exhibit No. 43B marked)

10   BY MR. LINDQUIST:

11   Q.    What's 43B?

12   A.    43B is the CD which contains the copy of all the

13   calls from the magnetic optical disk for phone number

14   954-558-6188.

15   Q.    Were any alterations, addition, or deletions made

16   with regard to 43B in relation to 43A?

17   A.    No, sir.

18   Q.    Identical, is that correct?

19   A.    It's all identical, yes.

20   Q.    Now these two exhibits, 43A and 43B, which of the

21   two -- of the three calls did they correspond to -- not

22   calls -- of the three telephones?

23   A.    The second one, sir.

24   Q.    Thank you.

25         Go ahead and set that aside, if you would.

1    A.   (Complies)

2              MR. LINDQUIST:  And then take a look at the

3    file containing 44A.

4         (Government's Exhibit No. 44A marked)

5    BY MR. LINDQUIST:

6    Q.   Do you recognize 44A?

7    A.   Yes, sir.

8    Q.   What's that?

9    A.   44A is the magnetic optical disk which was removed

10   for the third line which we monitored.

11   Q.   Just look at 44A for right now.

12   A.   Okay.  I'm sorry.

13   Q.   That's the, that's the MO disk?

14   A.   Yes, sir.

15   Q.   The condition of that packaging, is it different

16   now from when you sealed it up?

17   A.    No, sir, it's not.  It has my signature on it, my

18   initials, my signature and the judge's signature at the

19   heat-sealed area of the envelope.

20   Q.   All right.  And what telephone number does that

21   correspond to?

22   A.   787-934-1177.

23   Q.   Thank you.

24              MR. LINDQUIST:  Now take a look at 44B.

25        (Government's Exhibit No. 44B marked)

```
 1              THE WITNESS:  Okay.

 2   BY MR. LINDQUIST:

 3   Q.    What's 44B?

 4   A.    44B is the CD containing the calls which were

 5   downloaded from the MO disks, 44A.

 6   Q.    What's the content relationship between 44B and

 7   44A?

 8   A.    Identical.

 9   Q.    How do you know that?

10   A.    I made the copy.  My initials, I'm sorry, not my

11   initials but my handwriting around the CD for the copy.

12   Q.    Any additions, alterations or deletions?

13   A.    No, sir.

14   Q.    All right.  Just go ahead and set those aside for a

15   moment, if you will.

16   A.    (Complies)

17              MR. LINDQUIST:  Now if we could put up

18   Exhibit 33 for identification, please.

19         (Government's Exhibit No. 33 marked)

20   BY MR. LINDQUIST:

21   Q.    Agent Goldfinger, going back to the activities of

22   the investigation in the Savan area and Mr. Phillips,

23   I'm going to ask you if you recognize this particular

24   exhibit.

25         Do you see Exhibit 33 there?
```

1    A.    Yes, sir, I do.

2    Q.    What's that?

3    A.    That is a confidential source agreement made

4    between myself and Mr. Phillips.

5    Q.    What's a confidential source agreement?

6    A.    When agents from DEA establish someone that's

7    called a confidential source or a confidential

8    informant, they enter into a contract with us.  The

9    agreement basically states what we expect from them and

10   what they can expect from us.

11   Q.    All right.  Is there a second page to that?

12         MR. LINDQUIST:  Let's put up the second page;

13   make sure that you recognize that.

14   BY MR. LINDQUIST:

15   Q.    Do you see that?

16   A.    Yes, sir, I do.

17   Q.    Do you recognize any signatures there?

18   A.    Yes, I do.

19   Q.    Whose?

20   A.    I recognize the signature of Mr. Theodore Phillips.

21   Q.    How do you recognize his signature?

22   A.    I've seen it.  He signed it in front of me.

23   Q.    Okay.

24   A.    The other signatures on there is my signature, and

25   the other signature is that of Special Agent Kevin

```
 1    Adams.

 2    Q.   And the date of your signature and that of

 3    Mr. Phillips?

 4    A.   Both are October 14th, 2004.

 5    Q.   All right.  When this was filled out, it was at

 6    your behest and direction; is that correct?

 7    A.   Yes, sir, it was.

 8    Q.   When you created this agreement, was that done in

 9    the regular course of your work as a DEA agent?

10    A.   Yes.

11    Q.   Is it the regular practice of DEA to have these

12    types of documents, agreements filled out in relation to

13    people working like Mr. Phillips?

14    A.   Yes, very common.

15              MR. LINDQUIST:  Your Honor, I offer Exhibit 33

16    into evidence, please.

17              THE COURT:  Attorney Hodge?

18              MR. HODGE:  Same objection as before.

19              THE COURT:  Attorney Moore?

20              MR. MOORE:  Your Honor, I have no objection,

21    except potentially publication to the jury.

22              THE COURT:  All right.  I'm going to take it

23    under advisement.

24    BY MR. LINDQUIST:

25    Q.   Now, Agent Goldfinger --
```

1          MR. LINDQUIST:  Let's put up Exhibit 34.

2     BY MR. LINDQUIST:

3     Q.   And as that's coming up, Agent Goldfinger, what, if

4     any, compensation did Mr. Phillips receive?

5     A.   Mr. Phillips received compensation for purchases he

6     made for the Drug Enforcement Administration.

7     Q.   And for what?  What was he compensated for?

8     A.   For his work for us.

9     Q.   Give us an idea of what aspects of his work were

10    compensated for.

11    A.   The idea of going into the Savan area, purchasing

12    suspected crack cocaine, also reimbursements for

13    expenses which he had made.

14    Q.   Okay.

15         (Government's Exhibit No. 34 marked)

16    BY MR. LINDQUIST:

17    Q.   Do you see Exhibit 34 there?

18         Do you see the Exhibit 34?

19    A.   I'm sorry.  I was looking for it on the list.

20         Yes, I see Exhibit 34.

21    Q.   Do you recognize that?

22    A.   Yes, sir, I do.

23    Q.   What is that?

24    A.   That is a payment record for Mr. Phillips.

25    Q.   Okay.  And it consists of a number of entries; is

1    that correct?

2    A.   Yes, sir, it does.

3    Q.   Who created this?

4    A.   This was created by me.

5    Q.   And at the time you created it, was the information

6    fresh on your mind, so you had good knowledge of what

7    you were putting into this document?

8    A.   Yes, sir, I did.

9    Q.   Did you create this document as part of your

10   regular work as a DEA agent?

11   A.   Yes, sir, I did.

12   Q.   Is it the regular practice of DEA to have this type

13   of document created in relation to compensation going to

14   an individual like Mr. Phillips?

15   A.   Yes, it is.

16        MR. LINDQUIST:  Now I would like you to take a

17   look at -- we'll just do them one at a time -- Exhibits

18   34A through 34H.

19        (Government's Exhibit Nos. 34A through 34H marked)

20   BY MR. LINDQUIST:

21   Q.   Let's just do them one at a time, and tell us if

22   you -- there's 34A.  Do you recognize that?

23   A.   Yes, I do.

24   Q.   What is that?

25   A.   That's a payment voucher that we use to reimburse

1    an informant money.

2    Q.   And a payment voucher corresponding to what

3    individual?

4    A.   Mr. Phillips.

5    Q.   How does this relate to the compensation record

6    that we were just looking at Exhibit 34?

7    A.   It's just the, what's shown here is just listed on

8    Exhibit 34.

9    Q.   So this is one of the items listed; is that

10   correct?

11   A.   Yes, sir.

12   Q.   All right.  Let's look at 34B.  What's that?

13   A.   That's the same thing.  It's what we call a DEA

14   Form 103.  It's a voucher.

15   Q.   So, another voucher?

16   A.   A voucher, yes, which shows reimbursement of

17   payment to Mr. Phillips.

18   Q.   How does this relate to the compensation record,

19   Exhibit 34?

20   A.   Again, it's listed on Exhibit 34.

21   Q.   Let's look at 34C.  Do you recognize that?

22   A.   Yes, sir, I do.  This is also a DEA Form 103 which

23   is a voucher form, which verifies reimbursement payments

24   to Mr. Phillips.

25   Q.   And how does it relate to Exhibit 34?

1    A.    Again, it's listed on Exhibit 34.

2              MR. LINDQUIST:   34D, please.

3    BY MR. LINDQUIST:

4    Q.    Do you recognize 34D?

5    A.    Yes, I do.

6    Q.    Another voucher; is that correct?

7    A.    Yes, 34D is another DEA 103 voucher form.

8    Q.    Relating to whom?

9    A.    Mr. Theodore Phillips?

10   Q.    And how does it relate to Exhibit 34, the

11   compensation record?

12   A.    It's again listed on Exhibit 34.

13   Q.    34E, what is that?

14   A.    34E is also a DEA 103 voucher form, indicating

15   payment of reimbursement funds to Mr. Phillips.  Also

16   listed on the previous exhibit.

17   Q.    34F?

18             THE COURT:   Are F, G, and H pretty much the, of

19   the same ilk that you can present them all to the

20   witness and have him speak collectively about them?

21             MR. LINDQUIST:   We could.  I would just need to

22   pull them from there.

23             THE COURT:   All right.  If you can -- or you

24   can just flash through them now with the witness.

25   BY MR. LINDQUIST:

1   Q.   Let's look at 34- -- exhibit 34G and then 34H.   Do

2   you see those?

3   A.   Yes, sir, I do.

4   Q.   All vouchers?

5   A.   All vouchers.

6   Q.   All contained in the compensation record?

7   A.   Yes, sir, they are.

8   Q.   Were these vouchers all created by you?

9   A.   Yes, sir.

10   Q.   And were they created as part of DEA work?

11   A.   Yes, they are.

12   Q.   Is it the regular practice of DEA to create these

13   types of things?

14   A.   Yes, regular practice.

15        MR. LINDQUIST:  I offer Exhibit 34, and 34A

16   through -H, please.

17        MR. HODGE:  Your Honor, no objection to 34.  I

18   do object to 34A through -H on 304 [sic] grounds.

19        MR. MOORE:  Your Honor, I join in -- I'm sorry.

20   I join in co-counsel's objection.

21        THE COURT:  All right.  Exhibit 34 is in.

22      (Government's Exhibit No. 34 marked)

23        THE COURT:  34A through -H is under advisement.

24        MR. LINDQUIST:  Thank you.

25        May we publish 34?

```
 1              THE COURT:  Yes.  It's not on the screen,
 2      though.
 3      BY MR. LINDQUIST:
 4      Q.   Now we're looking at 34, Agent Goldfinger.  Just
 5      tell us what that is.
 6      A.    That is a payment record for Mr. Phillips.
 7      Q.   All right.  And the entries there correspond to the
 8      vouchers that you've just testified to, is that correct?
 9      A.   Yes, sir, they do.
10      Q.   All right.  Thank you.
11              MR. LINDQUIST:  If we could have the lights
12      back up.
13          Your Honor, if you could give me just a moment.
14          (Pause)
15              MR. LINDQUIST:  Agent Goldfinger, Your Honor,
16      thank you.  Those are all the questions I have.
17              THE COURT:  Thank you.
18          Ladies and gentlemen, this is a good time for our
19      afternoon break.  We will take a 15-minute break.
20          (Jury not present, 3:55 p.m.)
21              MR. HODGE:  Your Honor, that last objection
22      should have said 4- --
23              THE COURT:  Stop.  Stop.
24          All right.  Agent Goldfinger, you remain under
25      oath.  Do you understand?
```

```
 1              THE WITNESS:  Yes, sir, I do.
 2              THE COURT:  All right.  We're going to take a
 3    break for 15 minutes.  You need to resume to the witness
 4    stand in 15 minutes.
 5         Do you understand?
 6              THE WITNESS:  Yes, sir.
 7              THE COURT:  All right.  Do not discuss your
 8    testimony in the interim.
 9         Do you understand?
10              THE WITNESS:  Yes, Your Honor.
11              THE COURT:  All right.  Thank you.
12         (Witness stood aside)
13              THE COURT:  Yes, Attorney Hodge?
14              MR. HODGE:  I was just saying that I believe --
15              THE COURT:  Attorney Hodge, if it's not too
16    much of a problem, could you stand up?
17              MR. HODGE:  Sorry, Your Honor.
18         Before, I believe I might have said 304.  I meant
19    to say 403, in my last objection.
20              THE COURT:  Yes.  I thought that's what you
21    meant.
22         All right.  All right.  Anything else?
23              MR. LINDQUIST:  Yes, Your Honor, one item, very
24    quickly, if we may.
25         With regard to Mr. Isaac, I understood counsel to
```

1    say that they wanted him to remain the day.  I would ask

2    that he be released after today, so that the marshals

3    can get him off-island.

4            THE COURT:  All right.  I think it was Attorney

5    Moore who said just for --

6            MR. MOORE:  Yes, Your Honor.  There's a,

7    especially in the comment regarding him being in a car,

8    driving with Mr. Mark and Mr. Blyden in 2004.  That kind

9    of a comment was to have been some matter that would

10   have or should have been reflected, we believe, in a

11   prior discovery.

12       It was involving a transaction involving the Red

13   Ball or one of the other two cases.  And when we scanned

14   and went through, I may have made a representation in

15   some of my pretrial motions that my client's name never

16   appeared in any of the materials.

17       But we were able to ascertain in conjunction with

18   those two cases, and I want to go back and compare

19   specifically that conversation and specifically that

20   matter which I just pled surprise on.

21           THE COURT:  All right.  And that's something

22   you said that you will undertake this evening, correct?

23           MR. MOORE:  In fact, Your Honor, I note that

24   for another reason we were scanning those records again

25   in my office, when I went back at lunchtime to request

1    it.

2         THE COURT:  All right.  So, the bottom line is

3    that we'll know by either -- when we're done today or by

4    tomorrow morning; is that correct?

5         MR. MOORE:  Your Honor, you'll know by perhaps

6    tomorrow noon, if the Court can give me -- here is my

7    problem, Your Honor.

8         THE COURT:  All right.  I just need to know a

9    time.

10        MR. MOORE:  I would say by tomorrow noon.

11   Because I'm going to be here or -- a bit between now and

12   then.

13        THE COURT:  All right.  'Til tomorrow at noon,

14   then.

15       All right.  Thank you, Counsel.

16       (3:58 p.m., court in recess)

17       (After recess, jury present, 4:16 p.m.)

18       (Witness resumed stand)

19        THE COURT:  Attorney Hodge?

20       THEREUPON, MICHAEL GOLDFINGER, previously duly

21   sworn, was examined and testified further as follows:

22                    CROSS-EXAMINATION

23   BY MR. HODGE:

24   Q.   Good afternoon, Mr. Goldfinger.

25   A.   Good afternoon, sir.

1    Q.   In your testimony before you identified a number of

2    CD's and magnetic optical disks.

3    A.   Yes, sir.

4    Q.   And you indicated that they -- there have been no

5    additions, deletions or changes to those, the content of

6    those disks.  Was that, was that your testimony?

7    A.   I'm sorry, was that my what?

8    Q.   Testimony.

9    A.   Yes, sir.

10   Q.   How can you tell, looking at the disks, that there

11   have been no deletions, additions or changes to the

12   content of the disks?

13   A.   Because I have reviewed every call on all disks

14   before submitting them.

15   Q.   When did you submit them?

16   A.   When they were downloaded from the computer.

17   Q.   In 2004?

18   A.   Yes, sir, 2004, 2005.

19   Q.   And now it's 2010?

20   A.   Yes, sir.

21   Q.   And you're looking at them, disks, right now.  And

22   I'm saying, as you look at those disks, how do you know

23   that there are no deletions, additions or changes on

24   those disks?

25   A.   Because the copy disk was reviewed by me and dated

1    on the date that I reviewed it again.

2    Q.    When was that?

3    A.    Well, on this, I mean, there's different exhibits

4    here, but on this particular exhibit it says January

5    31st, 2009, my initials.

6    Q.    So a year and a half ago?

7    A.    Yes, sir.

8    Q.    How do you know that it's, that disk has no

9    additions, deletions or changes since January of 2009?

10   A.    Because this was sealed in evidence, and it has not

11   been tampered with or touched since.

12          MR. HODGE:  Your Honor, I move to exclude all

13   of the CDs and magnetic optical disk.

14          THE COURT:  Nothing has been moved into

15   evidence.  None of those items have been moved in.

16          MR. HODGE:  Very well, Your Honor.

17       Court's indulgence?

18          THE COURT:  Yes.

19       (Pause)

20          MR. HODGE:  Nothing further.  Thank you, sir.

21          THE COURT:  Thank you.

22       Attorney Moore?

23          MR. MOORE:  Just a few questions, Your Honor.

24              FURTHER CROSS-EXAMINATION

25   BY MR. MOORE:

1    Q.    Good afternoon, Agent Goldfinger.

2    A.    Good afternoon, sir.

3    Q.    Agent Goldfinger, between 2003 and 2006, did you

4    have the opportunity to approve any Form 103 paid

5    vouchers for Mr. Damian Daniel?

6    A.    No, sir.

7               MR. MOORE:  Thank you.

8               THE WITNESS:  Thank you very much.

9               THE COURT:  Redirect?

10              MR. LINDQUIST:  No, thank you.

11              THE COURT:  Agent Goldfinger, thank you for

12   your testimony.

13        You may step down.

14              THE WITNESS:  Thank you, Your Honor.

15              THE COURT:  Next witness.

16              MR. LINDQUIST:  Kevin Adams.

17              THE COURT:  Actually, before that witness comes

18   in -- you can just step out for one minute.

19        Let me see counsel briefly.

20        (Sidebar discussion held as follows)

21              THE COURT:  I thought this seems like a good

22   break in the testimony where I could make those

23   instructions on the photos, the BVI, and it seems there

24   was something about Puerto Rico, Puerto Rico testimony;

25   that is, instructing them that the reference that was

1   made to events occurring in Puerto Rico by -- which

2   witness was that?

3           MR. HODGE:  Oh, man --

4           MR. LINDQUIST:  Mr. Springette.

5           THE COURT:  Was it Springette?  No, it was

6   after Springette.  It was Turnbull.

7       (Simultaneous discussion)

8           THE COURT:  I'm sorry, I'm breaking my own

9   rules.

10      Turnbull.

11      All right.  That the photos, I think, the

12  government has agreed that they were 5R through -W, were

13  for the purposes of locational reference, not the scene

14  at the time of the incident.

15      And then finally, the reference to the events in

16  the BVI to which Mr. --

17          MR. MOORE:  Damian Daniel.

18          THE COURT:  -- Damian Daniel testified, that

19  they should disregard that.

20      Does counsel have an objection to me doing it at

21  this point before the witness takes the stand?

22          MR. HODGE:  I just wanted to clarify --

23          THE COURT:  Let me get an answer from the

24  government.

25          MR. LINDQUIST:  No.

1          THE COURT:  No?  Attorney Moore?

2          MR. MOORE:  No, Your Honor.

3          MR. HODGE:  Does that include the North

4     Carolina dogfighting?

5          THE COURT:  No, it just includes the BVI.

6          MR. HODGE:  The BVI.  No objection, Your Honor.

7          THE COURT:  Okay.  Good.  Thank you.

8        (End sidebar discussion, open court as follows)

9          THE COURT:  All right.  Ladies and gentlemen,

10    just a few things I wanted to clarify, and this is

11    related to some of the items that may have been brought

12    in as evidence or testimony that you may have heard.

13        You may recall there was reference to some

14    photographs that were numbered 5R through 5W.  And they

15    were of a -- photographs of a scene or an area in the

16    Smith Bay area of St. Thomas.

17        Those photographs were introduced for the purpose

18    of showing you location.  Those photographs, 5R through

19    5W, were not introduced for the purpose of showing you

20    the scene as it appeared at the time of the incident,

21    just to show you and give you a locational perspective

22    of where things occurred.

23        This is what we call a limiting instruction.  So

24    it's for a limited purpose, to show you location.

25        The other item that needs some discussion, just a

1    very brief instruction, is you may recall there was some

2    discussion or some testimony received while Mr. Damian

3    Daniel was testifying, and he referred to events taking

4    place in the British Virgin Islands, specifically

5    reference to a dogfight in the British Virgin Islands.

6         That reference to the dogfight occurring in the

7    British Virgin Islands, you are instructed to disregard

8    that.  That is not to be part of your consideration.

9         And then finally, there was some testimony that was

10   elicited during the cross-examination of Mr. Turnbull,

11   Mr. Elton Turnbull, and Mr. Turnbull began to testify

12   about events that occurred in Puerto Rico.

13        Those events to which Mr. Elton Turnbull testified

14   concerning events in Puerto Rico, those should be

15   disregarded by you, as well.

16        Counsel, does that cover the matters that we

17   discussed?

18             MR. LINDQUIST:  Yes --

19             THE COURT:  From the government?

20             MR. LINDQUIST:  I think it does.

21             THE COURT:  Attorney Moore?

22             MR. MOORE:  Yes, Your Honor.

23             THE COURT:  Attorney Hodge?

24             MR. HODGE:  Yes, Your Honor.

25             THE COURT:  All right.  You can bring in the

1    next witness.

2         (Pause)

3           THE CLERK:  Please raise your right hand to

4    take the oath.  At the end respond, "I do."

5         (Witness sworn)

6           THE WITNESS:  I do.

7           THE CLERK:  Please be seated.

8         THEREUPON, KEVIN ADAMS, having been duly sworn, was

9    examined and testified as follows:

10                        DIRECT EXAMINATION

11   BY MR. LINDQUIST:

12   Q.   Good afternoon, sir.

13   A.   Afternoon.

14   Q.   Tell us your name.

15   A.   Name is Kevin Adams.

16   Q.   What do you do for a living?

17   A.   I'm a supervisory special agent employed by the

18   Drug Enforcement Administration.

19   Q.   How long have you been with DEA?

20   A.   Approximately 13 years.

21   Q.   Where are you presently stationed?

22   A.   I'm currently assigned to the New Orleans Field

23   Division Office.

24   Q.   And before that, where were you?

25   A.   I --

1          THE COURT:  Agent Adams, if you can bring the

2     microphone up towards your mouth, so -- yes -- so we can

3     hear you clearly.

4          Go ahead.

5          THE WITNESS:  I'm currently assigned to the New

6     Orleans Field Division Office.

7     BY MR. LINDQUIST:

8     Q.   And before that, where were you?

9     A.   Prior to that, I was assigned to the Dallas Field

10    Division Office.  And prior to that I was in the St.

11    Thomas Resident Office.

12    Q.   I would like you to think back to November of 2004.

13    Where were you stationed at that time?

14    A.   The St. Thomas Resident Office.

15    Q.   And did you have occasion to participate in an

16    investigation at that particular time?

17    A.   Yes, I did.

18    Q.   What generally speaking was your role in that

19    investigation?

20    A.   I was one of the initial case agents that organized

21    the investigation and coordinated surveillances,

22    investigative plans of action.

23    Q.   Did you have a co-case agent?

24    A.   Yes.  That was Michael Goldfinger.

25    Q.   And specifically on November 30th of 2004, were you

1    involved in an activity associated with that

2    investigation?

3    A.    Yes.

4    Q.    What was that?

5    A.    We were going to conduct a control purchase of

6    narcotics using a confidential source by the name of

7    Theodore Phillips.

8    Q.    What happened in that regard?

9    A.    What we did was prior to that day we made our

10   operational plan utilizing the confidential source,

11   Mr. Phillips.  And part of that is having him report to

12   a mutual location, searching him, giving him operational

13   funds, giving him the target location, coordinate

14   surveillance.

15   Q.    Let's back up.  You're using some terms that maybe

16   you're really familiar with --

17   A.    Sorry.

18   Q.    -- but we might not be.  "Operational funds," what

19   do you mean?

20   A.    It's government funds that are supplied -- money,

21   U.S. currency that are supplied to someone who is

22   cooperating with the government to purchase narcotics,

23   to further criminal investigation.

24   Q.    All right.  So what happened on November 30th in

25   that regard with Mr. Phillips?

1      What did you do?

2   A.   We supplied him with, with funds to purchase

3   narcotics.  We took him to the target location.  We set

4   up a surveillance and we observed him proceed to the

5   area to make the narcotics purchases.

6   Q.   What happened after that, as far as your

7   involvement was concerned?

8   A.   As far as my involvement, we met with Mr. Phillips

9   after the narcotics purchase was conducted.  I took

10  possession of the narcotics, searched Mr. Phillips to

11  make sure there wasn't any contraband left on him, and I

12  secured the evidence, the drug evidence in a heat-sealed

13  evidence envelope.

14  Q.   When you say you secured it in a heat-sealed drug

15  envelope, what do you mean?

16       What did you do?

17       Just describe what you did.

18  A.   With gloves on, I take the drug evidence from him,

19  field test it for the presence of cocaine.  Then I would

20  put it in an evidence envelope.  I would sign the

21  evidence envelope with a witness, and I would seal it

22  and prepare it to be sent off to our laboratory.

23  Q.   Okay.

24       MR. LINDQUIST:  Could we have the witness shown

25  Exhibit 35A for identification.

```
 1           (Government's Exhibit No. 35A marked)

 2    BY MR. LINDQUIST:

 3    Q.   Do you see that 35A there in front of you?

 4    A.   Yes.

 5    Q.   What is that that you're looking at?

 6    A.   It was the narcotics evidence that was --

 7    Q.   First of all, what -- the exhibit consists of what?

 8         A photograph?

 9    A.   Yes.  It's a photograph of 16 plastic baggies.

10    Q.   And do you recognize that photograph?

11    A.   Yes.

12    Q.   How is it that you recognize that photograph?

13    A.   It's the, a photograph of the drug evidence that

14    was acquired by Theodore Phillips that I took possession

15    of.

16    Q.   And does that photograph fairly and accurately

17    portray what you received from Mr. Phillips that day?

18    A.   Yes.

19              MR. LINDQUIST:  I offer Exhibit 35A into

20    evidence.

21              MR. HODGE:  Same objection, Your Honor.

22              MR. MOORE:  I join counsel.

23              THE COURT:  All right.  35A is admitted.

24         (Government's Exhibit No. 35A admitted)

25    BY MR. LINDQUIST:
```

1    Q.   Now, Mr. Adams, looking at the screen we see

2    Exhibit 35A.  Now tell us what we're looking at, as far

3    as its content.

4    A.   Looking at 16 small plastic baggies, holding

5    cocaine.

6    Q.   And --

7              MR. HODGE:  Objection, Your Honor.

8              THE COURT:  All right.  Agent Adams, the items

9    depicted, it's what you suspect to be cocaine; is that

10   correct?

11             THE WITNESS:  Yes.

12             THE COURT:  All right.  If you can use that

13   reference.

14             THE WITNESS:  Yes, sir.

15             THE COURT:  All right.  Go ahead.

16   BY MR. LINDQUIST:

17   Q.   Now, do you see those individual baggies?

18   A.   Yes, I do.

19   Q.   Can you give us an idea from your personal

20   involvement with them on that occasion how much they

21   weigh?

22        Any idea?

23             MR. HODGE:  Objection.  Foundation.

24             THE COURT:  Overruled.

25             THE WITNESS:  No, I wouldn't want to guess on

1    the weight.  I would have to look at the lab results.

2    BY MR. LINDQUIST:

3    Q.   All right.  Fair enough.

4         MR. LINDQUIST:  Let's leave it -- we'll just

5    leave it there.

6         Now if we could put the lights back up, please.

7

8    BY MR. LINDQUIST:

9    Q.   Now you indicated that you took possession of these

10   suspected narcotics; is that correct?

11   A.   Yes.

12        MR. LINDQUIST:  I'm thinking that you have

13   there in front of you, there's a stack of packages.

14   Take a look and see if you can find the one with sticker

15   35B on it.

16        (Government's Exhibit No. 35B marked)

17   BY MR. LINDQUIST:

18   Q.   Do you have that?

19   A.   I do.

20   Q.   Do you recognize that?

21   A.   Yes, 35B.

22   Q.   All right.  What -- do you recognize what 35B

23   consists of?

24   A.   It's the heat-sealed evidence envelope that was

25   utilized on November 30th.  This is what I put the

1    suspected drug evidence into.

2    Q.    And when you, when you sealed that up, was it

3    intact, its integrity in place?

4    A.    Yes, it was.

5    Q.    And once you sealed that up, what did you do with

6    it?

7    A.    I secured it in the St. Thomas Resident Office.  We

8    have a temporary drug storage facility, and it was

9    stored there until it was sent off to the, our south

10   central laboratory.

11   Q.    And when it went into that storage, when you put it

12   in there, was the package intact?

13   A.    It was intact.

14   Q.    Did you have occasion to deal with this particular

15   package after that, as far as the lab was concerned?

16   A.    Yes, sir.

17   Q.    What did you do?

18   A.    On December the 2nd, I then personally mailed it

19   off after taking it out of the temporary drug storage

20   facility.

21   Q.    When you took it out of the temporary drug storage

22   facility, how was the package as far as its integrity,

23   its seal, was concerned?

24   A.    It was intact.

25   Q.    And how did you send it to the lab?

1    A.    Intact, by certified mail.

2    Q.    All right.  So when it left your hands going to the

3    lab, the packaging was intact; is that correct?

4    A.    Yes, sir.

5    Q.    All right.  Go ahead and set that down, if you

6    will.

7          Did you have involvement as far as the

8    investigation was concerned otherwise, in sending other

9    packages to the lab?

10   A.    Yes.

11         MR. LINDQUIST:  If you would look up there, see

12   if you can find 36B.

13        (Government's Exhibit No. 36B marked)

14         THE WITNESS:  36B is not up here.

15         MR. LINDQUIST:  That is because I have it right

16   here.

17        May I approach him, Your Honor?

18         THE COURT:  Yes.

19         THE WITNESS:  Thank you.

20   BY MR. LINDQUIST:

21   Q.    Do you recognize 36B?

22   A.    Yes.

23   Q.    How do you recognize it?

24   A.    36B is a heat-sealed envelope that I utilized on

25   December 7th of 2004.  I used this to also secure

1    suspected narcotics evidence that was acquired on that

2    day from Theodore Phillips.

3    Q.   Was that done with Agent Goldfinger?

4    A.   Yes, it was.

5    Q.   And did you have -- what did you do with that once

6    you sealed it?

7    A.   Once I sealed it, again, as a process I submit it

8    to the temporary storage facility until I then retrieve

9    it to be sent off to the laboratory.

10   Q.   Did you retrieve it to send it off to the lab?

11   A.   On the next day, December 8th, yes.

12   Q.   When you retrieved it to send it off to the lab,

13   describe the integrity of the packaging.

14   A.   It was intact, the same way I had sealed it the day

15   prior.

16   Q.   And how did you send it to the lab?

17   A.   Certified mail.

18   Q.   Fine.

19            MR. LINDQUIST:  Go ahead and set that down and

20   take a look at 37B.

21        (Government's Exhibit No. 37B marked)

22   BY MR. LINDQUIST:

23   Q.   And you should have that one up there, I believe.

24   A.   I do.

25   Q.   Do you recognize that?

1    A.    Yes.

2    Q.    And what -- how is it that you're able to recognize

3    that?

4    A.    By my signature.  It's a heat-sealed evidence

5    envelope that I utilized to secure suspected narcotics

6    that was acquired on December 21st 2004.

7    Q.    All right.  And what did you do once you sealed the

8    suspected narcotics in that bag?

9    A.    Once I sealed the suspected narcotics, I stored it

10   in our temporary drug facility at the St. Thomas

11   Resident Office.

12   Q.    After that, did you have any involvement as far as

13   it going off to the lab?

14   A.    I sent it out to the lab on December 22nd, 2004.

15   Q.    Tell us what the packaging was like when you sent

16   it out to the lab.

17   A.    It was intact.  And I sent it certified mail; was

18   normal procedure.

19   Q.    Very good.

20            MR. LINDQUIST:  Now, if you would, sir, take a

21   look at --

22   BY MR. LINDQUIST:

23   Q.    Do you see 39A-2 and 39B-2 up there?

24   A.    Yes.  I have both.

25            (Government's Exhibit No. 39B-2 marked)

1    BY MR. LINDQUIST:

2    Q.    Do you recognize those?

3    A.    Yes.   These are heat-sealed envelopes that were

4    utilized on January 18th, 2005.

5    Q.    Did you have some involvement in those going to the

6    lab?

7    A.    Yes.

8    Q.    What was your involvement?

9    A.    My involvement was placing suspected drug evidence

10   into these heat-sealed envelopes on the 18th, sealing

11   those envelopes, stored them temporarily in our St.

12   Thomas temporary drug storage facility, and then on the

13   19th sending those exhibits out to our laboratory.

14        And they were intact from the time I sealed them on

15   the 18th to the time I sent them out on the 19th.

16        MR. LINDQUIST:   Sir, thank you very much.

17   Your Honor, those are the questions that I have.

18        THE COURT:   All right.

19   Attorney Hodge?

20        MR. HODGE:   Court's indulgence?

21        THE COURT:   Yes.

22   (Pause)

23        MR. HODGE:   No questions, Your Honor.

24        THE COURT:   All right.   Attorney Moore?

25        MR. MOORE:   Thank you.

```
 1                        CROSS-EXAMINATION

 2    BY MR. MOORE:

 3    Q.   Good afternoon, Agent Adams.

 4    A.   Good afternoon.

 5    Q.   In your capacity as a, in the resident office of

 6    DEA here in St. Thomas, did you ever have occasion to

 7    sign any 103 vouchers for Mr. Damian Daniels?

 8    A.   No.

 9    Q.   How about a Tamika Monsanto?

10    A.   No.

11              MR. MOORE:  Thank you.

12              THE COURT:  Redirect?

13              MR. LINDQUIST:  No, thank you.

14              THE COURT:  Agent Adams, thank you for your

15    testimony.

16         You may step down.

17              THE WITNESS:  Thank you, sir.

18              THE COURT:  Next witness.

19              MR. LINDQUIST:  Darnell Blake.

20         (Pause)

21              THE CLERK:  At the end respond, "I do."

22         (Witness sworn)

23              THE WITNESS:  I do.

24              THE CLERK:  Please be seated.

25         THEREUPON, DARNELL BLAKE, having been duly sworn,
```

```
1    was examined and testified as follows:

2                        DIRECT EXAMINATION

3    BY MR. LINDQUIST:

4    Q.   I'm sorry.  Good afternoon.

5    A.   Good afternoon.

6    Q.   Tell us your name.

7    A.   Darnell Blake.

8    Q.   What do you do for a living, sir?

9    A.   I'm a special agent with the Drug Enforcement

10   Administration.

11   Q.   How long have you done that?

12   A.   A little over 11 years.

13   Q.   And did you have occasion to be assigned here to

14   the St. Thomas office at some point in time?

15   A.   Yes, from --

16   Q.   Go ahead.

17   A.   Yes, from 2003 to 2006.

18   Q.   And specifically referring you to January 24 of

19   2005, were you involved in a particular investigation

20   that encompassed that day?

21   A.   Yes.

22   Q.   Tell us what your involvement was in that

23   investigation?

24   A.   I was part of a surveillance unit that was covering

25   a drug buy in the Savan area of St. Thomas.
```

1    Q.    Did that involve a confidential informant?

2              MR. HODGE:  Objection.  Leading.

3              THE COURT:  Sustained.

4    BY MR. LINDQUIST:

5    Q.    Describe what, what, if any, involvement you had

6    with an informant on that occasion?

7              MR. HODGE:  Objection.  Leading.

8              THE COURT:  Overruled.

9              THE WITNESS:  I received some drugs from the

10   informant after he made the buy in the Savan area.

11   BY MR. LINDQUIST:

12   Q.    And what did you do with those drugs once you

13   received them from him?

14   A.    I field tested it and sealed it up in a DEA drug

15   envelope.

16   Q.    Okay.  What did you do after that?

17   A.    After I sealed it up, I initialed it and sent it

18   off to the lab, for analysis.

19   Q.    Did you do that on the same occasion?

20   A.    Yes.  I mailed it out on the same day.

21   Q.    So when you sent it off to the lab describe for us

22   the packaging as far as its seal and the integrity of

23   that seal was concerned?

24   A.    Well, I sealed the package and I initialed it,

25   where the seal was.

1    Q.    Take a look up there.   There's a number of plastic

2    packages that have some exhibit stickers on them.   Look

3    for number 40 -- 40B.

4    A.    I have it.

5    Q.    Do you recognize that?

6    A.    Yes.

7    Q.    How is it that you're able to recognize that?

8    A.    My name is on it and the seal at the top with my

9    initials.

10   Q.    How did you send that off to the lab?

11   A.    I mailed it out.

12   Q.    When you mailed it out, describe for us the

13   packaging as far as the integrity of the seal was

14   concerned.

15   A.    Well, when I mailed it out the top here was sealed.

16   This bottom was not sealed, like in this fashion.

17   Q.    I'm sorry?

18   A.    This bottom wasn't sealed in this fashion.

19   Q.    Okay.   So, something took place after you sent it

20   to the lab; is that correct?

21   A.    Yes.

22   Q.    But when you sent it out to the lab, was it

23   completely sealed and intact?

24   A.    Yes, it was.

25              MR. LINDQUIST:   Thank you.   Those are the

1    questions that I have.

2         THE COURT:  All right.  Attorney Hodge?

3         MR. HODGE:  Court's indulgence?

4         THE COURT:  Yes.

5    (Counsel conferring)

6         MR. HODGE:  No questions, Your Honor.

7         THE COURT:  All right.  Attorney Moore?

8         MR. MOORE:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10   BY MR. MOORE:

11   Q.   Good afternoon, Agent Blake.

12   A.   Good afternoon.

13   Q.   Sir, have you ever signed and approved any DEA

14   payment vouchers 103's, I guess they're called, for

15   Mr. Damian Daniel?

16   A.   Yes, I believe I have.

17   Q.   How many?

18   A.   I don't recall.

19   Q.   Thank you.

20        Have you approved any vouchers for a Tamika

21   Monsanto?

22   A.   No.

23         MR. MOORE:  Thank you.

24         THE COURT:  Redirect?

25         MR. LINDQUIST:  No, thank you.

1           THE COURT:  All right.  Agent Blake, thank you

2      for your testimony.

3         You may step down.

4           THE WITNESS:  Thank you.

5           THE COURT:  Next witness.

6           MR. LINDQUIST:  Mark Thomas.

7         (Pause)

8           THE CLERK:  Please raise your right hand.  At

9      the end respond, "I do."

10        (Witness sworn)

11          THE WITNESS:  I do.

12          THE CLERK:  Please be seated.

13        THEREUPON, MARK L. THOMAS, SR., having been duly

14     sworn, was examined and testified as follows:

15                      DIRECT EXAMINATION

16     BY MR. LINDQUIST:

17     Q.   Good afternoon, sir.

18     A.   Good afternoon.

19     Q.   Tell us your name, would you, please?

20     A.   Mark Leslie Thomas, senior.

21     Q.   Where do you work?

22     A.   I work for the Virgin Islands Police Department.

23     Q.   How long have you worked there?

24     A.   Fourteen years.

25     Q.   Give us an idea of what you've done during the

1    course of your career with VIPD, the various

2    assignments?

3    A.   I've worked with the High Intensity Drug

4    Trafficking Task Force for about 13 years.

5    Q.   Back in, let's see, 2005, what was -- what were the

6    nature of your -- what was the nature of your

7    responsibilities then?

8    A.   Back in 2005, I was working drug investigation on a

9    particular case.

10   Q.   And is that case what brings you to court today?

11   A.   Yes.

12   Q.   I'm referring you specifically to February 15 of

13   2005.  Were you involved in that particular

14   investigation?

15   A.   Yes, I was.

16   Q.   And what was your involvement on that day in that

17   investigation?

18   A.   On that date in question, I received some drug

19   evidence from Agent Goldfinger --

20   Q.   Okay.

21   A.   -- after an undercover buy.

22   Q.   What did you do with that drug evidence once you

23   got it from him?

24   A.   I -- it was processed, which it was photographed,

25   sealed, and my signature was put on the package.  And

1  then it was relinquished to the drug evidence custodian,

2  which was Mike Aguilar.

3  Q.   Who gave it to Mike Aguilar?

4  A.   I did.

5  Q.   When you gave it to him, describe for us the

6  integrity of the seal on the packaging?

7  A.   It was sealed.  It was stamped, heat-sealed and my

8  initials and the date were on it.

9  Q.   Did you have occasion after that to have, to do

10  something with that same package?

11  A.   Yes.  The next day it was relinquished back to me

12  by Michael Aguilar, and it was mailed out.

13  Q.   When you got it back from Aguilar, describe for us

14  the integrity of the sealed package.

15  A.   It was in the same condition I gave it to Mike

16  Aguilar.

17  Q.   And then what did you do with it?

18  A.   I mailed it to the Southeast Regional Laboratory.

19  Q.   And tell us what the condition of the bag was when

20  you mailed it to the laboratory?

21  A.   It was in the same condition.

22  Q.   All right.  Take a look up there in front of you.

23  There's some bags up there, some packages, with some

24  yellow stickers on them.  Look for 41B.

25       Do you have that?

| | |
|---|---|
| 1 | A.   Yes, I do. |
| 2 | Q.   Looking at 41B, do you recognize it? |
| 3 | A.   Yes. |
| 4 | Q.   How do you recognize it? |
| 5 | A.   It has my signature on the top, my initials MLT, |
| 6 | and it has also my, witnessed by M. Thomas. |
| 7 | Q.   And is that the package that you referred to |
| 8 | earlier in your testimony? |
| 9 | A.   Yes.  It's in my handwriting. |
| 10 | Q.   Okay.  And it's the same thing you testified to |
| 11 | earlier; is that correct? |
| 12 | A.   That's correct. |
| 13 | MR. LINDQUIST:  All right.  Thank you. |
| 14 | Those are the questions that I have. |
| 15 | THE WITNESS:  Thank you. |
| 16 | THE COURT:  Attorney Hodge? |
| 17 | MR. HODGE:  No questions, Your Honor. |
| 18 | THE COURT:  Attorney Moore? |
| 19 | MR. MOORE:  None, Your Honor. |
| 20 | THE COURT:  All right. |
| 21 | Agent Thomas, thank you for your testimony.  You |
| 22 | may step down. |
| 23 | THE WITNESS:  Thank you. |
| 24 | May I be excused? |
| 25 | THE COURT:  Any need for Agent Thomas? |

```
 1              MR. HODGE:  No, Your Honor.

 2              MR. MOORE:  No, sir.

 3              THE COURT:  All right.  You're excused.  Thank

 4    you very much.

 5              THE WITNESS:  Thank you.

 6         (Witness excused)

 7              THE COURT:  Next witness.

 8              MR. LINDQUIST:  Michael Aguilar.

 9         (Pause)

10              THE CLERK:  Please raise your right hand to

11    take the oath.  At the end respond, "I do."

12         (Witness sworn)

13              THE WITNESS:  I do.

14              THE CLERK:  Please be seated.

15              THE WITNESS:  Thank you.

16         THEREUPON, MICHAEL AGUILAR, having been duly sworn,

17    was examined and testified as follows:

18                        DIRECT EXAMINATION

19    BY MR. LINDQUIST:

20    Q.   Good afternoon, sir.

21    A.   Good afternoon.

22    Q.   Tell us your name.

23    A.   Michael Aguilar.

24    Q.   What do you do for a living?

25    A.   Special Agent with the Drug Enforcement
```

1    Administration.

2    Q.   How long have you done that?

3    A.   Approximately 12 years.

4    Q.   And you're currently assigned where, what region?

5    A.   The Caribbean Division.

6    Q.   Did you serve at any point in time here on

7    St. Thomas?

8    A.   Yes.

9    Q.   Over what period of time?

10   A.   Approximately 2003 to 2006.

11   Q.   Until 2000 when?

12   A.   Until 2006.

13   Q.   I'm sorry.   Thank you.

14        Referring back to 2004, 2005, were you involved in

15   a particular investigation that brings you here today?

16   A.   Yes.

17   Q.   What was your general responsibilities as far as

18   that investigation was concerned?

19   A.   I was involved in different aspects of the

20   investigation, including surveillance, arrest warrants,

21   search warrants, and as drug evidence custodian.

22   Q.   Let's talk first about an event on December 28th of

23   2004.   Are you with me?

24        Do you know what I'm referring to?

25   A.   Yes, sir.

1    Q.    What happened on that particular day, as far as you

2    personally were concerned?

3    A.    I received a drug exhibit from Special Agent

4    Michael Goldfinger.  I submitted that to the drug

5    evidence vault for safekeeping, and subsequently mailed

6    that to the DEA laboratory for analysis.

7    Q.    Take a look, there are some packages up there.

8    They all have some yellow stickers.  Look for 38B.

9          Do you have that?

10   A.    Yes, sir.

11   Q.    Do you recognize that?

12   A.    Yes, sir.

13   Q.    How do you -- how are you able to recognize that,

14   Agent Aguilar?

15   A.    I've got my name as well as my initials labeled on

16   the back.

17   Q.    Does this contain what Agent Goldfinger gave to you

18   that day?

19   A.    Yes.

20   Q.    When you received it from him, describe for us the

21   nature of the packaging, as far as its sealed integrity.

22   A.    It's sealed along the top here with this top seal,

23   with the initials of the agent's, as well as the date

24   and some other data.

25   Q.    Was the bag completely sealed?

1    A.    Yes.

2    Q.    And what did you do with it?

3    A.    Submitted it to the drug evidence vault for

4    safekeeping temporarily.

5    Q.    And afterwards, did you have something else to do

6    with it?

7    A.    Yes.  The next day I mailed it to the DEA

8    Laboratory for analysis.

9    Q.    When you got it out of the temporary storage, the

10   nature of the seal?

11   A.    It was still intact, in the same condition.

12   Q.    And when you shipped it off or mailed it off to the

13   lab, tell us what the condition of the seal was?

14   A.    The seal was still intact, in the same condition.

15   Q.    Now, if -- very good.  Go ahead and set that down,

16   if you would.

17   A.    (Complies)

18   Q.    Now, you've mentioned that your general

19   responsibilities included evidence custodian; is that

20   correct?

21   A.    Correct.

22   Q.    Just in a word or two, explain what those

23   responsibilities were.

24   A.    Just provide secure, short-term storage for drug

25   evidence before it's mailed to the laboratory for

1    analysis.

2    Q.   And why is it important to maintain the integrity

3    of these items before they go to the lab?

4    A.   Just to preserve the evidence as they were seized

5    throughout the chain of custody.

6    Q.   All right.  Did you have any other role as far as

7    this particular investigation was concerned?

8    A.   I participated in arrest warrants, search warrants,

9    seizure warrants, and other enforcement activity

10   involved in the investigation.

11   Q.   You mentioned search warrants; is that correct?

12   A.   Yes, sir.

13   Q.   Did you have any involvement with the search of the

14   property known as the farm?

15   A.   Yes.

16   Q.   When did that occur in relation to what you've just

17   described as far as your involvement in the

18   investigation?

19   A.   October 5th, 2005.

20   Q.   All right.  And what was your involvement as far as

21   the execution of that search warrant was concerned?

22   A.   I was on the search team that was involved in the

23   property.  So we searched the property, secured it, and

24   I also took photographs that day of the property.

25   Q.   And where was that property located?

1    A.   I believe it was Number 41 Estate, I think Caret,

2    Caret Bay, on the north side of St. Thomas.  And we just

3    referred to it as the farm.

4    Q.   And based upon your personal involvement in that

5    investigation, that farm corresponded to what subject of

6    the investigation?

7    A.   Mr. Mark.

8    Q.   And do you, do you know Mr. Mark?

9         Do you recognize him?

10   A.   Yes.

11   Q.   Is he in the courtroom today?

12   A.   Yes.

13   Q.   Would you point him out and describe what he's

14   wearing, please?

15   A.   The gentleman, gentleman right here with the

16   glasses and, I guess yellow or cream-colored shirt.

17        MR. LINDQUIST:  Your Honor, may the record

18   reflect that he has identified Defendant Mark?

19        THE COURT:  Yes.  The record will reflect the

20   witness has identified Defendant Mark.

21   BY MR. LINDQUIST:

22   Q.   Just tell us, generally speaking, what took place

23   as far as the search warrant that was exercised or that

24   was, yeah, exercised at the farm?

25   A.   The search was conducted of the property.  There

1    was several outbuildings, as well as some individuals

2    that were at the property.  So we made contact with them

3    and searched the property looking for contraband and

4    other items.

5    Q.   And describe, if you will, a little more what the

6    structures on the property consisted of?

7    A.   There was the main driveway.  To the right of the

8    driveway there was a brick or concrete building,

9    residential-type structure.

10        To the middle of the driveway I think there was two

11   vehicles.  And to the left of the driveway was another

12   residence or concrete structure.

13        And then kind of towards the back left was a large,

14   I believe wooden structure for housing chickens or

15   fighting cocks.

16   Q.   What, if anything, did you find with regard to

17   dogs?

18   A.   There were several --

19             MR. HODGE:  Objection.  Leading.

20             THE WITNESS:  -- dogs --

21             MR. HODGE:  Objection.  Leading.

22             THE COURT:  Sustained.

23   BY MR. LINDQUIST:

24   Q.   Describe what else you found, as far as animals

25   were concerned.

```
 1    A.    Outside of --
 2              MR. HODGE:   Objection.   Leading.
 3              THE COURT:   Sustained.   Rephrase.
 4    BY MR. LINDQUIST:
 5    Q.    Describe what else you found.
 6    A.    There was, on the exterior of the wooden structure,
 7    approximately half a dozen dogs, staked at various
 8    locations, and some other doghouses, as well as outdoor,
 9    you know, equipment and barrels and other things of that
10    nature.
11              MR. LINDQUIST:   Could the witness be shown
12    Government's Exhibit 166A for identification, please.
13         (Government's Exhibit No. 166A marked)
14    BY MR. LINDQUIST:
15    Q.    Do you see that 166A?
16    A.    Yes.
17    Q.    What is that, as far as the thing we're looking at,
18    the item?
19    A.    This is the aerial photograph of the residence
20    which I described, showing the driveway, the two
21    residential structures, and the outbuilding that
22    contained the chickens.
23    Q.    Does the photograph fairly and accurately portray
24    what you saw that day when you executed the search
25    warrant in October of 2005?
```

1    A.    Yes.

2              MR. LINDQUIST:   I offer 166A into evidence,

3    please.

4              MR. HODGE:   Objection.   Foundation, Your Honor.

5              THE COURT:   Attorney Moore?

6              MR. MOORE:   I join counsel's objection,

7    Your Honor.

8              THE COURT:   All right.   Exhibit 166A is

9    admitted.

10         (Government's Exhibit No. 166A marked)

11   BY MR. LINDQUIST:

12   Q.    Now, Agent Aguilar, there should be up there in

13   front of you a mouse that's a laser, laser pointer.   I

14   think it activates on top.   If you can -- do you have

15   it?

16   A.    Yes, sir.

17   Q.    Just point out the various features that you

18   mentioned before.

19   A.    As I mentioned, the driveway comes in here to the

20   property.   These are the -- this is the first

21   residential structure here, and this is the larger

22   residential structure here.

23         And then this structure here is the, kind of wooden

24   outbuilding that had the chickens and the livestock.

25   And then the dogs were staked, kind of, I believe in

1    this area right here.

2    Q.   All right.  Very good.  Thank you.

3         MR. LINDQUIST:  Let's go ahead and have the

4    lights back up please.

5         Could the witness be shown 166B?

6

7    BY MR. LINDQUIST:

8    Q.   Do you see 166B?

9    A.   Yes, sir.

10   Q.   Do you recognize that?

11   A.   Yes, sir.

12   Q.   How is it that you're able to recognize that?

13   A.   This is a photograph I took, looking, I believe it

14   was through that wooden structure out, looking outside

15   to the exterior towards the rear, towards the dogs.

16   Q.   And does this photograph fairly and accurately

17   portray what you saw that day, what you were looking at

18   when you took that photograph?

19   A.   Yes.

20   Q.   All right.  Let's go to 166C.

21        Do you recognize 166C?

22   A.   Yes.

23   Q.   What's that?

24   A.   This is an exterior photo looking in towards that

25   wooden structure.  This is showing the outside, showing

1   some of the doghouses on the exterior to that

2   outbuilding.

3   Q.   Does 166C fairly and accurately portray what you

4   found that day?

5   A.   Yes.

6         MR. LINDQUIST:  166D, please.

7

8   Q.   Do you recognize 166D?

9   A.   Yes.

10   Q.   What's that?

11   A.   Just a photograph of one of the dogs that was on

12   the exterior of the property, of that outbuilding.

13   Q.   Does 166D fairly and accurately portray what you

14   saw and photographed that day?

15   A.   Yes.

16         MR. LINDQUIST:  166E.

17

18   Q.   What's that?

19   A.   Once again, just an exterior view of that

20   outbuilding, showing one of the doghouses and one of the

21   dogs.

22   Q.   Does it fairly and accurately portray what you saw

23   and photographed that day?

24   A.   Yes.

25         MR. LINDQUIST:  166F.

1    BY MR. LINDQUIST:

2    Q.    What's that?

3    A.    Another picture of a dog, standing on top of a

4    doghouse on the exterior of the building.

5    Q.    Does it fairly and accurately portray what you saw

6    on that particular day, as far as its content?

7    A.    Yes.

8            MR. LINDQUIST:   166G.

9    Q.    What are we seeing there?

10   A.    Once again, a picture taken from inside the

11   outbuilding, looking outwards at one of the dogs and the

12   doghouses on the exterior of the outbuilding.

13   Q.    Does 166G fairly and accurately portray what you

14   saw that day as reflected in this photograph?

15   A.    Yes.

16           MR. LINDQUIST:   166H, please.

17

18   BY MR. LINDQUIST:

19   Q.    What are we seeing there in 166H?

20   A.    Once again, from inside the outbuilding, looking

21   outwards towards the exterior at one of the dogs on the

22   outside of the building.

23   Q.    Does it fairly and accurately portray what you saw

24   that day?

25   A.    Yes.

1          MR. LINDQUIST:  166I.

2     BY MR. LINDQUIST:

3     Q.   What's that?

4     A.   Once again, a photo of a dog on the outside of the

5     outbuilding, next to a doghouse.

6     Q.   Does it fairly and accurately portray what you saw

7     that day?

8     A.   Yes.

9          MR. LINDQUIST:  166J.

10    Q.   What's that?

11    A.   This is a pen on the inside of that outbuilding, as

12    you walked in that outbuilding on the left-hand side.

13    Q.   And does this photograph fairly and accurately

14    portray what you saw that day?

15    A.   Yes.

16         MR. LINDQUIST:  166K.

17    Q.   What are we seeing here?

18    A.   This was the interior portion of one of the out

19    buildings that showed just the, the chickens and where

20    they were housed.

21    Q.   Does it fairly and accurately portray what you saw

22    that day?

23    A.   Yes.

24         MR. LINDQUIST:  166L.

25    BY MR. LINDQUIST:

1    Q.    What's that?

2    A.    Once again, the interior shot, showing where the

3    chickens were being housed on the inside.

4    Q.    Different direction, though, inside the building?

5    A.    Yeah, I'm not -- correct -- or -- don't recall

6    exactly the orientation of that photo.

7    Q.    Does it fairly and accurately portray what you saw

8    that day?

9    A.    Yes.

10         MR. LINDQUIST:  166M, please.

11   BY MR. LINDQUIST:

12   Q.    What are we seeing there?

13   A.    Another similar photo of the interior of the

14   outbuilding, showing the chickens and the pens and how

15   they were housed.

16   Q.    Does it fairly and accurately portray what you saw

17   that day?

18   A.    Yes.

19         MR. LINDQUIST:  166N.

20   Q.    Now what are we seeing?

21   A.    Once again, just looking at the different pens that

22   are stacked up with the chickens, an outhouse.

23   Q.    Does this photograph, 166N, fairly and accurately

24   represent what you saw that day?

25   A.    Yes.

```
 1              MR. LINDQUIST:  166-O.
 2    BY MR. LINDQUIST:
 3    Q.   What are we seeing?
 4    A.   Similar photo of the outbuilding, showing the
 5    inside, showing the different housing, pens stacked for
 6    the chickens on top of each other.
 7    Q.   Does this photograph accurately portray what you
 8    saw that day?
 9    A.   Yes.
10              MR. LINDQUIST:  166P.
11    Q.   What's that?
12    A.   Once again, an interior view of the outbuilding
13    showing the different pens for the chickens.
14    Q.   Does it accurately portray what you saw that day?
15    A.   Yes.
16              MR. LINDQUIST:  And 166Q.
17    Q.   What are we seeing?
18    A.   Once again, the interior of the outbuilding, just
19    showing the pens for the chickens.
20    Q.   Does it accurately portray what you saw that day?
21    A.   Yes.
22              MR. LINDQUIST:  Your Honor, I offer exhibits
23    166B through -Q into evidence.
24              THE COURT:  Attorney Hodge?
25              MR. HODGE:  Objection, Your Honor.  Relevance
```

1    and 403.

2             THE COURT:  All right.  As to everything, or

3    some things?

4             MR. HODGE:  403 as to everything, and

5    relevance --

6             THE COURT:  If it's not too much of a problem,

7    do you mind standing up when you're speaking?

8             MR. HODGE:  403 as to everything, and

9    relevance -- sorry, Your Honor -- and relevance as to J,

10   K, L, M, N, O, P -- I don't recall how far we went.  Q?

11   And Q.

12            THE COURT:  All right.

13       Attorney Moore?

14            MR. MOORE:  Yes.  Everything about chickens, K

15   through Q; and with regard to all of the dog pictures

16   after A, I believe, B through D; I just think it's

17   cumulative, and for 403 objection.

18            THE COURT:  All right.  Exhibits 165[sic]B, C

19   and J are admitted.

20

21       (Government's Exhibit Nos. 166B, 166C, 166J

22   admitted).

23

24            THE COURT:  The others are under advisement.

25            MR. LINDQUIST:  That's D, C and --

1          THE COURT:  B like "baby," C like "Charley," J

2     like "Jack."

3          MR. LINDQUIST:  May we publish 166B, C and J,

4     Your Honor?

5          THE COURT:  Yes.

6          MR. MOORE:  Your Honor, that's Q.

7     BY MR. LINDQUIST:

8     Q.   Agent Aguilar, what are we seeing here?

9     A.   This is a shot taken from the interior of that

10    outbuilding, looking out towards the outside, the

11    exterior of that outbuilding, with one of the dogs and

12    one of the doghouses.

13         MR. LINDQUIST:  166C, please.

14    BY MR. LINDQUIST:

15    Q.   What are we seeing there?

16    A.   This is just an exterior view of that outbuilding,

17    showing the doghouses on the exterior of that building,

18    and the dogs -- at least one of the dogs is towards the

19    left rear of the building.

20         MR. LINDQUIST:  And 166J, please.

21    BY MR. LINDQUIST:

22    Q.   And what are we seeing there?

23    A.   This is a pen, right as you walk in that

24    outbuilding, as you entered the building to the

25    left-hand side was a pen.

```
 1    Q.   All right.
 2              MR. LINDQUIST:  Thank you.  We can put the
 3    lights back on.
 4         Agent Aguilar, thank you.
 5         Thank you, Your Honor.
 6              THE COURT:  Thank you.
 7         Attorney Hodge.
 8              MR. HODGE:  Court's indulgence?
 9              THE COURT:  Yes.
10         (Pause)
11                        CROSS-EXAMINATION
12    BY MR. HODGE:
13    Q.   Good afternoon, Officer Aguilar.
14    A.   Good afternoon, sir.
15    Q.   Did I pronounce your name correctly?
16    A.   Aguilar, correct.
17    Q.   Tell me, when you searched the farm, was it the
18    purpose of your search to locate narcotics -- narcotics
19    or narcotics paraphernalia?
20    A.   Yes.
21    Q.   Did you find any?
22    A.   No.
23              MR. HODGE:  If I could have Government's
24    Exhibit 166A.
25    BY MR. HODGE:
```

1    Q.    Tell me, how did you get to the farm?

2    A.    We drove, we drove -- I don't recall the specific

3    route, but we drove our vehicles to the farm.

4    Q.    Did you ever fly above the farm?

5    A.    I don't recall if I specifically did.  At one point

6    we did have aerial surveillance to get the photograph,

7    but I don't recall.

8    Q.    Were you the one who took the aerial photograph?

9    A.    I don't recall.

10   Q.    Were you on board for the aerial photograph?

11   A.    I recall during this time period I was doing aerial

12   surveillance but I don't remember at that specific point

13   if we were involved in another case or in this case.

14   Q.    Okay.

15         MR. HODGE:  A moment, Your Honor?

16         THE COURT:  Yes.

17      (Pause)

18         MR. HODGE:  No further questions.  Thank you,

19   Mr. Aguilar.

20         THE COURT:  Thank you, Attorney Hodge.

21      Attorney Moore?

22         MR. MOORE:  Thank you, Your Honor.

23                 FURTHER CROSS-EXAMINATION

24   BY MR. MOORE:

25   Q.    Good afternoon, Agent Aguilar.

1   A.   Good afternoon, sir.

2   Q.   In your employment responsibilities at the DEA when

3   you were in the Virgin Islands, did you have the

4   authorization to approve payment vouchers and 103's --

5   payment of vouchers for people working for the DEA or

6   doing services and getting reimbursed?

7   A.   Maybe.

8   Q.   Well, let me ask you this:  Did you ever have

9   occasion to approve a 103 or payment voucher for

10   Mr. Damian Daniel?

11   A.   I don't recall.

12   Q.   Okay.

13       How about for Ms. Tamika Monsanto?

14   A.   I'm not familiar with that name.

15   Q.   Okay.  You are familiar with Damian Daniel?

16   A.   I've heard that name before, yes.

17   Q.   Okay.

18       MR. MOORE:  No further questions, Your Honor.

19       THE COURT:  Thank you, Attorney Moore.

20   Any redirect?

21       MR. LINDQUIST:  No, thank you.

22       THE COURT:  Agent Aguilar, thank you for your

23   testimony.  You may step down.

24       THE WITNESS:  Thank you.

25       THE COURT:  Next witness.

```
 1            MR. LINDQUIST:  Theodore Phillips.

 2        (Pause)

 3            THE CLERK:  Please raise your right hand to

 4    take the oath.  And at the end respond, "I do."

 5        (Witness sworn)

 6            THE WITNESS:  I do.

 7            THE CLERK:  Please be seated.

 8        THEREUPON, THEODORE PHILLIPS, having been duly

 9    sworn, was examined and testified as follows:

10                     DIRECT EXAMINATION

11    BY MR. LINDQUIST:

12    Q.   Good afternoon, sir.

13    A.   Good afternoon.

14    Q.   Tell us your name, would you, please?

15    A.   My name is Theodore Phillips.

16    Q.   And where are you from?

17         Where were you born and raised?

18    A.   St. Thomas, Virgin Islands.

19    Q.   And how old are you, sir?

20    A.   Fifty-one.

21    Q.   Can you just give us an idea of your education

22    background?

23    A.   I went to Jarvis School, Tutu Elementary School,

24    and Eudora Kean High School.

25    Q.   What have you done for a living?
```

1   A.   I was a corrections officer.

2   Q.   And where were you a correction officer?

3   A.   St. Thomas, Virgin Islands.

4   Q.   At some point in time, did your work as a

5   correction officer cease?

6   A.   Yes, sir.

7   Q.   And what, what occasioned, what caused that work to

8   end?

9   A.   One day in 2004, I was over in Smith Bay, Coki

10   Point Beach, and agents came and searched a group of us

11   and found a little bit of marijuana on my person.

12   Q.   Okay.  And as a result of that, you quit work, or

13   you were not able to work as a corrections officer, is

14   that correct?

15   A.   Yes, sir.

16   Q.   As a result of that, did you begin to provide some

17   work for law enforcement?

18   A.   Yes, sir.

19   Q.   Generally speaking, what did you do for law

20   enforcement?

21   A.   Make certain purchases in the Savan area.

22   Q.   And can you tell us when that happened, what years?

23   A.   The month of November 2004.

24   Q.   Until when?

25   A.   2005, February.

1    Q.    And do you remember how many, how many buys you did

2    for law enforcement?

3    A.    About seven.

4    Q.    Did you receive money to do this?

5    A.    Yes, sir.

6    Q.    And what was the money for?

7    A.    The money was to make purchases, sir.

8    Q.    Did you receive money for you personally, not just

9    to purchase drugs but for you personally?

10   A.    During that time, no, sir; at no time.

11   Q.    Tell us what you did in making these purchases

12   from, you say, November of 2004 until 2005.  Just tell

13   us what you did.

14   A.    Well, I was briefed and wire to go to, up in the

15   Savan area to certain individual and make purchases of

16   marijuana and crack cocaine.

17        MR. HODGE:  Objection.  Relevance.

18        THE COURT:  Overruled.

19   BY MR. LINDQUIST:

20   Q.    And just tell us, tell us what you did once you got

21   the money and you went into the Savan.  Tell us what you

22   did.

23   A.    When I got the money I went into the Savan area,

24   meet the individuals, make a purchase, and left the area

25   and returned to the agents and give, return -- turned

1    over the crack cocaine or marijuana to the agents.  I

2    were debriefed.

3    Q.   Between the time that you, you got the crack

4    cocaine in your hands and gave it to the agents, did you

5    do anything with it?

6    A.   No, sir.

7    Q.   How did you carry it between where you got it, from

8    the person you bought it from and when you gave it to

9    the agents?

10   A.   Just put it in my pocket.

11   Q.   And after you gave it to the agents, what happened?

12   A.   They looked at it and count it out to make sure

13   whatever the amount I was told to buy was the exact

14   amount.

15   Q.   Describe what it was that you were wearing, as far

16   as any mechanical device.

17          MR. HODGE:  Objection.  Leading.

18          THE COURT:  Overruled.

19          THE WITNESS:  Before I left the office of the

20   agents, I was placed with a wire on my person, and to go

21   up in the area.  So while I was making these

22   transaction, the device was on me to -- all the

23   transactions was taking place, to record it.

24   BY MR. LINDQUIST:

25   Q.   And once the transaction was over with, what was

1    done with the recording device that had been on your

2    body?

3    A.   The recording device was then take off of my person

4    by the agent.

5    Q.   During the course of these seven buys that you did,

6    did you buy what you believed was crack cocaine from a

7    particular individual?

8    A.   I buy crack cocaine from an individual, yes, sir.

9    Q.   And do you remember the name of that individual?

10   A.   Allen Dinzey.

11   Q.   Allen Dinzey?

12   A.   And other member named Prince.

13   Q.   Okay.  How many times did you buy what you thought

14   was crack cocaine from Mr. Dinzey?

15   A.   About five occasion.

16   Q.   Now, in the course of purchasing that stuff from

17   Mr. Dinzey, did you obtain a telephone number?

18   A.   Yes, sir.

19   Q.   How did you get a telephone number?

20   A.   Mr. Dinzey give it to me.

21   Q.   All right.  What did you do with that telephone

22   number after Mr. Dinzey gave it to you?

23   A.   I gave the telephone number to the agents.

24          MR. HODGE:  Objection.  Hearsay.

25          THE COURT:  Overruled.

```
 1    BY MR. LINDQUIST:

 2    Q.   After you gave that telephone number to the agents,

 3    did you make any telephone calls to Mr. Dinzey with that

 4    number?

 5    A.   Yes, sir.  While at the HIDTA office, we called

 6    back Mr. Dinzey at that same number.

 7    Q.   Now, Mr. Phillips, with regard to the recording

 8    device that you testified to --

 9           MR. LINDQUIST:  Your Honor, if I may, I need to

10    locate an exhibit.

11           THE COURT:  Yes.

12           MR. LINDQUIST:  May I approach the witness?

13           THE COURT:  Yes.

14           MR. LINDQUIST:  Mr. Phillips, I've handed you

15    what has been marked as Exhibit 35C-3.

16    (Government's Exhibit No. 35C-3 marked)

17    BY MR. LINDQUIST:

18    Q.   Do you see that yellow sticker on there?

19    A.   Yes, sir.

20    Q.   Do you recognize that --

21    A.   Yes, sir.

22    Q.   -- that item?

23    A.   Yes, sir.

24    Q.   How are you able to recognize it?

25    A.   This was one of the transactions that, in the past,
```

1    one of the transaction I make.

2    Q.   Do you remember which one it was?

3    A.   Not exactly which one, but it was one of them that

4    I make.

5    Q.   Now, again, how do you recognize it?

6         Do you see something on there?

7    A.   I see my initial, that through viewing the

8    transaction, my initial is on it.

9    Q.   All right.  When you initialed it, you initialed it

10   as a result of doing what with regard to that, that

11   disk?

12   A.   Saying that, making sure that this is one of the

13   transactions that, that I, that the individual that I

14   met through making a transaction that it's on this CD or

15   video.

16   Q.   So you looked at that CD or that video, is that

17   correct?

18   A.   Yes, sir.

19   Q.   Did that CD --

20        THE COURT:  Attorney Lindquist, you're

21   referring to "that CD."  Is there an exhibit number that

22   --

23        MR. LINDQUIST:  There is.  I apologize.

24   BY MR. LINDQUIST:

25   Q.   That 35 -- that CD which is 35C-3, correct?

1    A.   Yes, sir.  Yes, sir.

2    Q.   Does that CD, that 35-3--- 35C-3, does that fairly

3    and accurately contain a video of one of those purchases

4    that you made at that time?

5    A.   Yes, sir.

6              MR. HODGE:  Objection.  Foundation.

7              THE COURT:  Overruled.

8    BY MR. LINDQUIST:

9    Q.   And that's based on what you physically, you

10   yourself, sir, is that right?

11   A.   Yes, sir.

12             MR. LINDQUIST:  Your Honor, I offer

13   Exhibit 35C-3 into evidence.

14             MR. HODGE:  Objection, Your Honor.

15             MR. MOORE:  I join counsel's objection, Your

16   Honor.

17             THE COURT:  All right.  35C-3 is admitted.

18        (Government's Exhibit No. 35C-3 admitted)

19             MR. LINDQUIST:  Your Honor, may we publish that

20   to the jury?

21             THE COURT:  Yes.

22             MR. HODGE:  Objection, Your Honor.  Relevance.

23        (Exhibit playing)

24             THE COURT:  I'm the one that caused it not to

25   be shown, because it was displaying material that isn't

1    relevant.

2          Is that where --

3                MR. LINDQUIST:  (Indicating)

4                THE COURT:  All right.

5    BY MR. LINDQUIST:

6    Q.   Who is that?

7    A.   That is Buddah.  And I counting money in front of

8    him.

9    Q.   What's happening now?

10   A.   I just make a transaction of some marijuana.

11               MR. HODGE:  Objection.  Relevance.

12               THE COURT:  Is there a section that gets to the

13   transaction?

14               MR. LINDQUIST:  Yes.

15   BY MR. LINDQUIST:

16   Q.   Now where are you going?

17   A.   Walking out of the Savan area.

18         And this here is when I go on the side of Red Ball

19   to another individual.

20   Q.   All right.  Who is that?

21   A.   Mr. Allen Dinzey.

22   Q.   What's happening now?

23   A.   Making arrangement to make a purchase of some crack

24   cocaine.

25   Q.   Who is that?

1    A.    Mr. Dinzey.

2    Q.    What's happening now?

3    A.    Mr. Dinzey bring out some crack cocaine in some

4    little plastic bag.

5    Q.    What are you doing?

6    A.    Counting them.  Also counting the money in my hand

7    to pay Mr. Dinzey.

8    Q.    Now what's happening?

9    A.    Right there I'm tying the plastic bag with the

10   crack cocaine and walking out of the area.

11   Q.    That ends the transaction; is that correct?

12   A.    Yes, sir.

13   Q.    And then after this took place, where did you go?

14   A.    Walked down the street to my pickup spot to where

15   the agents told me to, would pick me up.  They picked me

16   up.

17        I hand over the crack cocaine, marijuana, to the

18   agents, and the device was taken off of me by agents,

19   and we went to HIDTA headquarters.

20   Q.    With regard to the seven purchases that you did

21   with law enforcement, did you follow essentially the

22   same procedure?

23   A.    Same procedure, every time.

24        MR. LINDQUIST:  Thank you, Mr. Phillips.

25        I have no further questions, Your Honor.

```
 1                THE COURT:  All right.

 2                MR. HODGE:  Court's indulgence?

 3                THE COURT:  Yes.

 4           (Pause)

 5                     CROSS-EXAMINATION

 6      BY MR. HODGE:

 7      Q.   Mr. Phillips, good afternoon.

 8      A.   Good afternoon.

 9      Q.   You -- you've testified about purchasing crack

10      cocaine from a person by the name of Mr. Dinzey?

11      A.   Yes, sir.

12      Q.   Is Mr. Dinzey in the room today?

13      A.   Not that I know, sir.

14      Q.   You also purchased crack cocaine from someone by

15      the name of Buddah, is that right?

16      A.   Yes, sir.

17      Q.   Is Buddah in the courtroom today?

18      A.   Not that I noticed, sir.

19      Q.   And it's your testimony that you were not paid

20      anything for your services?

21      A.   No, sir.

22                MR. HODGE:  Thank you.

23           No further questions, Your Honor.

24                THE COURT:  All right.

25           Attorney Moore.
```

```
 1              MR. MOORE:  I have no questions, Your Honor.

 2              THE COURT:  All right.  Redirect?

 3              MR. LINDQUIST:  No, thank you.

 4              THE COURT:  Mr. Phillips, thank you for your

 5      testimony.

 6          You may step down.

 7              THE WITNESS:  May I be excused, Your Honor?

 8              THE COURT:  Is there any further need for

 9      Mr. Phillips?

10              MR. LINDQUIST:  Not as far as I'm concerned.

11              THE COURT:  Attorney Moore?

12              MR. MOORE:  No, Your Honor.

13              THE COURT:  Attorney Hodge?

14              MR. HODGE:  No, Your Honor.

15              THE COURT:  All right.

16          No.  You're excused.  Thank you, sir.

17          (Witness excused)

18              THE COURT:  Next witness.

19          THE CLERK:  At the end respond, "I do."

20          (Witness sworn)

21              THE WITNESS:  Yes, I do.

22              THE CLERK:  Please be seated.

23          THEREUPON, PATRICIA BURN, having been duly sworn,

24      was examined and testified as follows:

25                          DIRECT EXAMINATION
```

```
 1     BY MR. LINDQUIST:

 2     Q.   Good afternoon.

 3     A.   Good afternoon.

 4     Q.   Tell us who you are.

 5     A.   My name is Patricia Burn, B-u-r-n, and I'm a

 6     forensic chemist for drug enforcement in Miami, Florida.

 7     Q.   How long have you done that?

 8     A.   With DEA, I've worked for them almost 11 years.

 9     And prior to that I was a chemist with the U.S. Virgin

10     Islands for four and a half years.

11     Q.   Give us an idea of what it is that you do as a

12     forensic chemist.

13     A.   As a forensic chemist, my primary duty is to

14     analyze suspected drug substances and report my

15     findings.

16     Q.   What qualifies you to do that?

17     A.   I have a master's in forensic science and six

18     semester hours of drug analysis.  And I received

19     training from both the U.S. Customs while working in the

20     U.S. Virgin Islands, and when I started working with

21     Drug Enforcement, I was trained six months with them as

22     well.

23     Q.   From a practical standpoint, how many times have

24     you been involved in the analysis of some chemical

25     substance over the course of your career?
```

1    A.   Well, it is part of my daily duties, so I average,

2    probably about 30 to 40 exhibits per month; and over the

3    course of 14 years, so.

4    Q.   Do the multiplication?

5    A.   Yeah.  It's been quite a few.

6    Q.   All right.  All right.  And what, what chemicals in

7    particular do you deal with?

8    A.   Chemicals, or the controlled substances?

9    Q.   I'm sorry.  Poor choice of terms.

10        What substances?

11   A.   We could deal with -- usually Schedule I or II

12   drugs, which are those drugs that -- Schedule I drugs

13   would have no medical use, and Schedule II would be some

14   limited medical use of drugs.

15   Q.   Do these schedule drugs include cocaine?

16   A.   Yes, it would, yes.

17   Q.   Does that include crack cocaine?

18   A.   Well, cocaine in general, yes.

19   Q.   Okay.  Including crack cocaine, is that right?

20        MR. HODGE:  Objection.  Asked and answered.

21        THE WITNESS:  Yeah.  I mean, we don't use the

22   word "crack cocaine."  We use our, our chemical name for

23   that drug.

24   BY MR. LINDQUIST:

25   Q.   And what is that chemical name?

1    A.    Cocaine base.

2    Q.    Can you just give us an idea of the methodology

3    that you utilize to analyze a substance for cocaine?

4    A.    We do a series of tests, using instrumentation and

5    known standards of cocaine and we do a comparison-type

6    analysis.

7    Q.    Is that particular methodology generally accepted

8    within the scientific community as far as determining

9    whether or not a substance contains cocaine?

10   A.    Yes, that is correct.   It is generally accepted.

11   Q.    And is that the methodology that you have utilized

12   as you've testified to in the course of your career?

13   A.    Yes, it is.

14         MR. LINDQUIST:   Your Honor, I submit Ms. Burn

15   as an expert in chemical -- substance analysis,

16   particularly with regard to cocaine.

17         THE COURT:   What's the methodology that you

18   use, Ms. Burn?

19         THE WITNESS:   I'm not sure what you're asking.

20   Like what specifically --

21         THE COURT:   How is it that you determine

22   whether a substance is a controlled substance or not?

23      What do you do, for instance?

24         THE WITNESS:   Well, it's necessary that we have

25   two types of tests which are considered confirmatory,

1    and an example -- examples of those tests would be gas

2    chromatography with a mass spectrum detector, which

3    detects the mass or characteristic spectrum of the

4    substance.

5        And then another example would be infrared

6    spectroscopy, which gives another characteristic

7    spectrum.

8           THE COURT:  Have you ever been qualified in any

9    court to testify as an expert -- Attorney Lindquist, do

10    you want to inquire on that?

11           MR. LINDQUIST:  Thank you.

12           THE WITNESS:  Yes, I have.

13    BY MR. LINDQUIST:

14    Q.   And where, and how many times?

15    A.   I've been qualified as an expert in Federal Court

16    70 -- more than 70 times, probably close to 78 times,

17    and in superior -- or State Court close to 200.

18           MR. LINDQUIST:  With that, Your Honor, I would

19    ask that she be accepted as an expert in this field.

20           THE COURT:  Attorney Hodge?

21           MR. HODGE:  No objection, Your Honor.

22           THE COURT:  Attorney Moore?

23           MR. MOORE:  I have no objection, Your Honor.

24           THE COURT:  All right.  Patricia Burn will be

25    qualified as an expert in --

1          What area, Attorney Lindquist?

2               MR. LINDQUIST:  In the area of substance

3    analysis, particularly with regard to cocaine.

4               THE COURT:  All right.

5          (Continuing) -- as a forensic chemist in the area

6    of substance analysis, controlled substance analysis.

7          Ladies and gentlemen, you may recall that I told

8    you yesterday that most witnesses testify as fact

9    witnesses.  There are some witnesses who have an

10   expertise in an area, and in that area they may testify

11   in the form of an opinion.

12         Ms. Burn has been qualified as an expert as a

13   forensic chemist in the analysis and identification of

14   controlled substances.  So she may be permitted or she

15   is permitted to testify in the form of an opinion on

16   that subject.

17         Go ahead.

18              MR. LINDQUIST:  Thank you.

19   BY MR. LINDQUIST:

20   Q.   Ms. Burn, there in front of you, I think, are a

21   number of packages.

22         If you would look for 37B.

23         Do you have that?

24   A.   Yes, I do.

25   Q.   Do you recognize that?

1    A.    Yes.    I recognize my signature on both labels and

2    my handwriting.

3    Q.    Tell us, if you would, generally speaking, what it

4    is that you do when something is submitted to you for

5    analysis, what you do as far as the packaging is

6    concerned, and then your analysis itself?

7    A.    When I receive an item such as this for analysis,

8    it should be in a sealed, intact condition.  And I take

9    note of that condition.

10        And I'll take a weight of the envelope with

11    everything before I open it, to compare that with the

12    paperwork that is submitted.

13        And then I proceed to open it and remove the

14    contents and take note of what is contained in the

15    packaging.

16    Q.    With regard to this particular exhibit, 37B, when

17    you received it, describe for us the nature of the

18    packaging as far as the integrity of the seal.

19    A.    The seal was intact, which I'm referring to the

20    upper seal here (indicating).

21    Q.    And when you say "the seal was intact," was there

22    any perforation, any opening to the package at all?

23    A.    No, not at all.

24    Q.    So once you received it, then what did you proceed

25    to do?

1  A.   I opened the packaging and I removed the contents,

2  taking note of the contents, and proceeded to analyze

3  the contents of the packaging.

4  Q.   How did you analyze the contents of this particular

5  package?

6  A.   This, this particular item, initially it was

7  several smaller packages.  I believe, it was 20

8  packages.  And I tested each of them individually using

9  an identification technique.

10     And finding that they were all the same substance,

11  I was able to combine them, and proceeded to do a full

12  analysis on the, on the mixed sample.

13  Q.   All right.  And what was the result of your

14  analysis, as far as determining what the substance

15  contained?

16  A.   I found that the substance contained in this

17  package was cocaine base.

18         MR. LINDQUIST:  Your Honor, I offer Exhibit 37B

19  into evidence -- before I do that, may I just ask one

20  more question?

21         THE COURT:  Yes.  Go ahead.

22

23  BY MR. LINDQUIST:

24  Q.   When you were finished, what did you do with the

25  packaging?

1    A.   When I finished with my analysis, I returned the

2    item to the original envelope and put my own seal on it

3    and dated it and heat-sealed it.

4        And then I took a weight after analysis, recorded

5    that on the envelope and then returned it to our vault

6    so that it could be returned for safekeeping.  There's a

7    bar coding and they, I relinquish it to our evidence

8    technician.

9    Q.   As you hold that exhibit in your hand today, 37B,

10   is it in the same condition as when you sealed it up

11   after your analysis?

12   A.   Yes, it is.

13          MR. LINDQUIST:  All right.  I offer 37B into

14   evidence, Your Honor.

15          THE COURT:  Attorney Hodge?

16          MR. HODGE:  No objection, Your Honor.

17          MR. MOORE:  I have none, Your Honor.

18          THE COURT:  37B is admitted.

19       (Government's Exhibit No. 37B admitted)

20   BY MR. LINDQUIST:

21   Q.   Now, Ms. Burn, you indicated that when you analyzed

22   this when you first received it, there were individual

23   packages; is that correct?

24   A.   Yes, it was.

25   Q.   Describe those individual packages for us.

1    A.    I believe they were clear Ziploc bags or clear

2    bags.  I'm not sure if they were Ziploc.

3    Q.    Okay.  And can you give us an idea of their

4    dimension, their size?

5    A.    I would have to refer to my notes.

6    Q.    That's okay.  I don't know if it's that --  do you

7    recall if you weighed each one of those?

8    A.    I believe -- yeah.  They were small, clear, Ziploc

9    bags, and they were labeled with a black "K," the letter

10   "K."

11   Q.    And do you see those bags inside there?

12         Are they sealed inside that package?

13   A.    No.  I believe they were separated to be

14   fingerprinted.

15   Q.    Okay.  Do you recall if you weighed those

16   individual baggies?

17   A.    No, I didn't do any weight of the substance until I

18   tested.  And then once I, I tested everything and

19   determined that they all contained the cocaine base, I

20   combined the substance for a weight.

21   Q.    All right.

22         MR. LINDQUIST:  Your Honor, may I retrieve that

23   from the witness, so that it can be published on the

24   document camera?

25         THE COURT:  Yes.

```
1    BY MR. LINDQUIST:

2    Q.   Now, first we're seeing 37B, is that correct?

3    A.   Yes, that is correct.

4    Q.   And tell us what we're looking at there.

5    A.   That is the evidence bag that I was just testifying

6    to.

7    Q.   And this stuff here is the what?

8    A.   That is the substance I determined to be cocaine

9    base.

10   Q.   Or crack cocaine; is that correct?

11   A.   It could be known as that, yes.

12         MR. LINDQUIST:   Thank you.

13   Thank you, Your Honor.   I have no further questions

14   of Ms. Burn.

15         THE COURT:   Attorney Hodge?

16                   CROSS-EXAMINATION

17   BY MR. HODGE:

18   Q.   Good afternoon, Ms. Burn.

19   How are you?

20   A.   Good afternoon.

21   Q.   Tell me, is it accepted, an accepted method of

22   identification to simply go by the way a substance

23   looks?

24   A.   I'm not sure what you're asking.   But you cannot

25   assume something is, contains a certain substance just
```

1    by appearance, no.

2    Q.    So basically, if you saw some white powder, that

3    wouldn't tell you that's got to be cocaine?

4    A.    No, no, not at all.  Not by appearance, no.

5    Q.    So you would have a doubt at that point?

6    A.    Yeah.  I mean, without doing any analysis -- I

7    would never approach anything in that manner, sir.

8    Q.    Okay.  You're familiar with the concept of a field

9    test, right?

10   A.    Yes.

11   Q.    So even substances that are tested with a field

12   test, the field test isn't infallible, is it?

13   A.    What a field test is, it's a chemical reaction.

14   And there's a series of chemicals, depending on the

15   substance being tested.  And it's used in the field.

16   But it's considered scientifically as a presumptive

17   test, to presume something contains that substance,

18   meaning it's not conclusive.

19   Q.    So there's some doubt at that point?

20   A.    There's a possibility, yes.

21   Q.    Okay.

22        MR. HODGE:  I'm sorry.  One moment, Your Honor?

23        THE COURT:  Yes.

24   (Pause)

25        MR. HODGE:  No further questions, Your Honor.

1        Thank you, ma'am.

2              THE COURT:  All right.  Thank you, Attorney.

3        Attorney Moore?

4              MR. MOORE:  I have no questions, Your Honor.

5              THE COURT:  Any redirect?

6              MR. LINDQUIST:  No, thank you.

7              THE COURT:  Ms. Burn, thank you for your

8        testimony.  You may step down.

9              THE WITNESS:  Thank you.

10             THE COURT:  Next witness.

11             MR. LINDQUIST:  Lannette Allison.

12        (Pause)

13             THE CLERK:  Please raise your right hand.  At

14        the end respond, "I do."

15        (Witness sworn)

16             THE WITNESS:  I do.

17             THE CLERK:  Please be seated.

18        THEREUPON, LANNETTE ALLISON, having been duly

19        sworn, was examined and testified as follows:

20                      DIRECT EXAMINATION

21        BY MR. LINDQUIST:

22        Q.   Good afternoon.

23        A.   Good afternoon.

24        Q.   Tell us your name, please.

25        A.   Lannette Allison.

1    Q.    What do you do for a living?

2    A.    I'm a supervisory chemist.

3    Q.    What do you do as a supervisory chemist?

4    A.    It's my responsibility to supervise a group of

5    forensic chemists.  By "supervise," I mean that I review

6    their case work prior to sending it out to courts.

7    Q.    And where do you work as a supervisory chemist?

8    A.    I work for the Drug Enforcement Administration in

9    Largo, Maryland.

10    Q.    How long have you been a supervisory chemist?

11    A.    I've been a supervisory chemist for two years.

12    Q.    Prior to that, what did you do?

13    A.    Prior to that, I was a senior forensic chemist.

14    Q.    And a senior forensic chemist for how long?

15    A.    Approximately two years.

16    Q.    And before that?

17    A.    I was a forensic chemist.

18    Q.    All right.  For how long?

19    A.    For six years.

20    Q.    All right.  And all of those years, with whom?

21    A.    The Drug Enforcement Administration.

22    Q.    And before being with the Drug Enforcement

23    Administration, what did you do?

24    A.    Before working for the Drug Enforcement

25    Administration, I worked for Solaire Genomics performing

1    DNA sequencing.

2    Q.   Tell us, generally speaking, what a forensic

3    chemist does.

4    A.   For the Drug Enforcement Administration, I perform

5    analysis on submitted drug evidence for the presence or

6    absence of controlled substances.  And I also testify to

7    my findings in a court of law.

8    Q.   Tell us what your qualifications are as a forensic

9    chemist.  What allows you to do that?

10   A.   I have a bachelor's of science degree in chemistry

11   from Jackson State University in Jackson, Mississippi.

12        I've completed an in-house training sponsored by

13   the Drug Enforcement Administration, which gives me the

14   certification to do the analysis that I do on the

15   submitted drug evidence.

16        I've also attended various instrumental courses

17   sponsored by the manufacturers of the instruments that

18   we use on a daily basis.

19   Q.   Does this work address controlled substances?

20   A.   Yes, it does.

21   Q.   What kind of controlled substances?

22   A.   Cocaine hydrochloride and cocaine base, heroin

23   hydrochloride, methylene dioxymethamphetamine,

24   methamphetamine, LSD, opium, marijuana and others;

25   steroids, pharmaceuticals.

1   Q.   Give us an idea of your practical experience as far

2   as this work is concerned?

3   A.   I've analyzed over a thousand exhibits.

4   Q.   What portion of that relates to cocaine or cocaine

5   base?

6   A.   As for cocaine base, I'm not sure; but cocaine in

7   general, approximately half of those exhibits.

8   Q.   Does your work include having been qualified as an

9   expert in the courts?

10   A.   Yes, it does.

11   Q.   How many times have you been qualified as an expert

12   and testified in the court system?

13   A.   Approximately 45 times.

14   Q.   And where?

15   A.   Here in St. Thomas, Virgin Islands; St. Croix,

16   Virgin Islands; San Juan, Puerto Rico; the District of

17   Columbia; and also Norfolk, Virginia.

18   Q.   Can you give us an idea of the type of testing that

19   you would utilize as a forensic chemist with regard to,

20   for example, cocaine?

21   A.   It depends on the sample, but typically there would

22   be instrumental tests and possibly color tests and a

23   purity test.

24   Q.   And why, why the difference, why the variation?

25   A.   There are lot of different tests that can be

1    utilized in order to identify a substance.  And

2    therefore, depending on how the substance, the nature of

3    the substance, you get to determine which instruments

4    that you want to use in order to determine that sample.

5    Q.   Are those particular tests generally accepted

6    within the scientific community as far as the

7    identification of controlled substances, particularly

8    cocaine?

9    A.   Yes, they are.

10          MR. LINDQUIST:  Your Honor, I would offer

11   Ms. Allison as an expert in the field of forensic

12   chemistry, specifically with regard to cocaine.

13          THE COURT:  Ms. Allison, with respect to your

14   methodology, what two types of tests are typically used

15   or two most common types that may be used?

16          THE WITNESS:  Infrared spectroscopy -- excuse

17   me.  Infrared spectroscopy and also gas chromatography

18   coupled with a mass selective detector.

19          THE COURT:  All right.

20       Attorney Hodge?

21          MR. HODGE:  No objection, Your Honor.

22          THE COURT:  Attorney Moore?

23          MR. MOORE:  No objection.

24          THE COURT:  All right.  Ms. Allison will be

25   qualified as an expert forensic chemist in the analysis

1    and detection of controlled substances.

2         As I told you previously, ladies and gentlemen,

3    that allows Ms. Allison to testify in the form of an

4    opinion, unlike most of the other witnesses who you've

5    heard from who have testified as fact witnesses.

6         Go ahead.

7              MR. LINDQUIST:  Thank you.

8    BY MR. LINDQUIST:

9    Q.   Ms. Allison, look there in front of you, and I

10   think you'll see a number of packages.  Look for the one

11   bearing the yellow sticker, 38B.

12   A.   Yes, sir.

13   Q.   Take a look at that and tell us if you recognize

14   it.

15   A.   I'm sorry, just give me a second -- yes, I do.

16   Q.   How is it that you're able to recognize it?

17   A.   I recognize this exhibit by the initials on the

18   labels that are my initials, and also my initials on the

19   inside of the evidence envelope.

20   Q.   When you received this particular exhibit, can you

21   tell us what, if anything, you did as far as evaluating

22   the integrity of the packaging?

23   A.   The first thing I did when I received this exhibit

24   was to assure that the seals were intact, and they were

25   intact when I received this exhibit.

1    Q.    What then did you do with regard to that exhibit?

2    A.    I visually examined the contents of the exhibit,

3    along with the paperwork that was submitted with it, to

4    determine whether or not the case number, exhibit number

5    and also the primary description matched what was on the

6    paperwork.

7        And I also took a weight of this exhibit to ensure

8    that there was consistency with the weight of the

9    exhibit versus what was on the paperwork.

10   Q.    What then did you do?

11   A.    Then I proceeded to open the exhibit and prepare it

12   for analysis.

13   Q.    What then happened?

14   A.    I performed the analysis.  I formed a conclusion.

15   Then I resealed the exhibit and returned it to the

16   vault.

17   Q.    And as far as the particular test or tests that you

18   used in the analysis, tell us what they were?

19   A.    I performed a color test on all the bags, and also

20   a GC mass spec, which was the GC -- the gas

21   chromatograph coupled with the mass selective detector,

22   on each of the bags.

23       Then I combined the bags and I then did a gas

24   chromatograph test and a purity test, and I used the gas

25   chromatography as well.

1    Q.   And what did you conclude as far as the nature of

2    the substance?

3    A.   I concluded that this exhibit contains cocaine base

4    at a purity of 87 percent pure.

5    Q.   What then did you do as far as the packaging was

6    concerned?

7    A.   I resealed it inside the envelope and returned it

8    to the vault.

9    Q.   Tell us, that exhibit as you hold it in your hands

10   there today, does it differ at all from the integrity of

11   the package when you returned it to the vault after your

12   analysis?

13        THE COURT:  Attorney Lindquist, if you can

14   refer to the exhibit number, so the record is clear.

15        MR. LINDQUIST:  Thank you.  I apologize.

16   BY MR. LINDQUIST:

17   Q.   That 38B, as you hold that 38B there in your hands,

18   can you tell us how, how it is in relation -- is it any

19   different than when you sealed it and put it in the

20   vault after your analysis?

21   A.   Do you mind if I look at my notes real quick?

22   Q.   That's up to the judge.

23        THE COURT:  Are you having a problem

24   recollecting something?

25        THE WITNESS:  I'm having a problem

1    recollecting --

2              THE COURT:  Yes or no?

3              THE WITNESS:  I'm sorry.  Yes, sir.

4              THE COURT:  You are.

5         All right.  You want to go through the protocol,

6    Attorney Lindquist?

7              MR. LINDQUIST:  Sure.

8    BY MR. LINDQUIST:

9    Q.   Is there something that you can look at that would

10   help refresh your recollection as far as what we're

11   talking about?

12   A.   Yes, sir.

13   Q.   And what would you be looking at?

14   A.   My worksheet that bears the description of when I

15   resealed it.

16   Q.   All right.  Would -- go ahead and take a look at

17   that, and then when you're done, set it aside, if your

18   memory is refreshed.  Okay?

19   A.   Yes, sir.

20        (Pause)

21   Q.   Is your memory refreshed?

22   A.   Yes, sir, it is.

23   Q.   All right.  Now my question then is, that

24   Exhibit 38B, as you hold it in your hands, tell us how

25   it is, as far as its packaging integrity, in comparison

1     to when you submitted it or put it into the vault after

2     your analysis that day?

3     A.    It's in the same condition as when I resealed it.

4           MR. LINDQUIST:  Your Honor, I offer Exhibit 38B

5     into evidence, please.

6           THE COURT:  Attorney Hodge?

7           MR. HODGE:  No objection, Your Honor.

8           MR. MOORE:  I have no objection, Your Honor.

9           THE COURT:  All right.  38B is admitted.

10    (Government's Exhibit No. 38B admitted)

11          MR. LINDQUIST:  Thank you.

12    BY MR. LINDQUIST:

13    Q.    Ms. Allison, I think you indicated that when you

14    first received it, the exhibit contained individual

15    packages or baggies, is that correct?

16    A.    Yes, sir.

17    Q.    Can you tell us how many there were?

18    A.    There were 20.

19    Q.    And can you give us an idea of their dimension,

20    size?

21    A.    I don't recall.

22    Q.    Very good.

23          May I retrieve that so that we can publish that?

24          THE COURT:  Yes.

25    BY MR. LINDQUIST:

1    Q.   Ms. Allison, first you see the exhibit sticker 38B.

2    This is what you just had in your hands is that correct?

3    A.   That is correct.

4    Q.   And then --

5         THE COURT:   Attorney Lindquist, speak into the

6    mic- -- you want to pull the microphone --

7         MR. LINDQUIST:   Sorry.

8    BY MR. LINDQUIST:

9    Q.   And then turning that over, what are we seeing

10   there?

11   A.   That is the powder material that I combined to

12   perform my analysis.

13   Q.   And we see another package that's attached to this.

14   And what does that consist of?

15   A.   That is the, that contains the actual packaging of

16   the individual powder samples, rock samples.

17   Q.   As you received them?

18   A.   Yes, sir.

19        MR. LINDQUIST:   Thank you very much.

20        Those are the questions that I have.   Thank you.

21        THE COURT:   Attorney Hodge?

22

23                      CROSS-EXAMINATION

24   BY MR. HODGE:

25   Q.   Good afternoon, Ms. Allison.   How are you?

1    A.    Good afternoon.  I'm fine, thank you.

2    Q.    Tell me, is it possible to identify cocaine by its

3    appearance alone?

4    A.    No, sir.

5    Q.    So even if you had a white, powdery substance, it

6    would be doubtful whether that was cocaine, correct?

7    A.    I would have to perform an analysis to make a

8    positive identification.

9    Q.    In other words, you would have at least a doubt?

10   A.    Yes, sir.

11          MR. HODGE:  Thank you.

12       No further questions, Your Honor.

13          THE COURT:  Attorney Moore?

14          MR. MOORE:  I have no questions, Your Honor.

15          THE COURT:  Redirect?

16          MR. LINDQUIST:  No, thank you.

17          THE COURT:  Ms. Allison, thank you for your

18   testimony.

19       You may step down.

20          THE WITNESS:  Thank you.

21          THE COURT:  Next witness.

22          MR. LINDQUIST:  Mr. Carlos Diaz.

23       (Pause)

24          THE CLERK:  Please raise your right hand to

25   take the oath.  At the end respond, "I do."

```
 1          (Witness sworn)

 2               THE WITNESS:  I do.

 3               THE COURT:  Please be seated.

 4          THEREUPON, CARLOS J. DIAZ, having been duly sworn,

 5     was examined and testified as follows:

 6                         DIRECT EXAMINATION

 7     BY MR. LINDQUIST:

 8     Q.   Good afternoon, sir.

 9     A.   Good afternoon.

10     Q.   Tell us your name, would you?

11     A.   Carlos J. Diaz.

12     Q.   What do you do for a living, sir?

13     A.   I'm a forensic chemist.

14     Q.   And where do you work as a forensic chemist?

15     A.   At the Southeast Lab for the DEA Drug Enforcement

16     Administration.

17     Q.   How long have you worked there as a forensic

18     chemist?

19     A.   Six and a half years.

20     Q.   What are your qualifications -- what qualifies you

21     to be a forensic chemist?

22     A.   I have a bachelor's degree in chemistry and a

23     bachelor's degree in criminal justice.

24     Q.   And have you received formal training with specific

25     regard to forensic chemistry?
```

1    A.    Yes.

2    Q.    Tell us about that.

3    A.    I completed an in-depth training at the Southeast

4    Lab, which included standard laboratory operating

5    procedures, instrumentation, and the analysis of

6    controlled and non-controlled substances.

7    Q.    What's your practical experience, as far as the

8    analysis of controlled substances?

9    A.    I have been analyzing controlled substances for

10   about five and a half years.

11   Q.    And give us an idea of the kinds of controlled

12   substances that you have analyzed, perhaps telling us

13   first those that you analyze most often?

14   A.    Cocaine, marijuana, heroin, methamphetamine.

15   Q.    Can you give us an idea of how many times you have

16   analyzed a substance for cocaine, as best you can?

17   A.    I would say, very roughly, rough number would be

18   about over 300, 400 times.

19   Q.    Have you testified in court in your capacity as a

20   forensic chemist?

21   A.    Yes, I have.

22   Q.    How many times?

23   A.    Approximately 25.

24   Q.    And those approximately 25 times, were you

25   qualified as an expert in forensic chemistry?

1    A.    Yes.

2    Q.    Can you give us an idea of the particular tests

3    that are used in analyzing controlled substances,

4    particularly cocaine, as a forensic chemist?

5    A.    Gas chromatography, that's one.  And there's

6    another, gas chromatography/mass spectrometry.  And

7    there's infrared spectroscopy.

8    Q.    Are those particular tests generally accepted

9    within the scientific community as far as analyzing

10   controlled substances?

11   A.    Yes.

12            MR. LINDQUIST:  Your Honor, I offer Mr. Diaz as

13   an expert in the field of forensic chemistry.

14            THE COURT:  Attorney Hodge?

15            MR. HODGE:  No objection, Your Honor.

16            THE COURT:  Attorney Moore?

17            MR. MOORE:  None, Your Honor.

18            THE COURT:  All right.  Ladies and gentlemen,

19   Carlos Diaz will be qualified as an expert in forensic

20   chemistry, specifically the evaluation of whether a

21   substance has a controlled substance present.

22        As you may recall, that means that he can testify

23   in the form of an opinion.

24        Go ahead.

25   BY MR. LINDQUIST:

1    Q.    Mr. Diaz, look there in front of you.  You should

2    see some packaging.  Look for some packages with the

3    yellow sticker 39A-2, first of all.

4         Do you have that, 39A-2?

5    A.    Yes.

6    Q.    Do you recognize it?

7    A.    Yes, I do.

8    Q.    How do you recognize it?

9    A.    It has my label on the bottom and my information on

10   the label.

11   Q.    When you received this exhibit, tell us what you

12   did as far as identifying the integrity of the

13   packaging?

14   A.    When I received this exhibit, it had three factory

15   seals and one seal on the top made by the agent.

16   Q.    Was it completely intact?

17   A.    Yes.

18   Q.    What did you do then with that exhibit once you

19   received it?

20   A.    I proceeded to get, I proceeded to do my analysis.

21   Q.    What analysis did you do?

22   A.    I got a gross weight, first of all, then I get my

23   net weight, and then I proceeded to run the techniques I

24   said before.

25   Q.    And as a result of that analysis, did you come to a

1    conclusion as to what this substance contained?

2    A.    Yes.

3    Q.    And what was that conclusion?

4    A.    This exhibit contains cocaine base.

5    Q.    Were you able to determine the purity level of it?

6    A.    Yes.

7    Q.    What was the purity level?

8    A.    70 percent.

9    Q.    And when we talk about purity level, what is meant

10   by that?

11   A.    It's the amount -- you have a net weight, that net

12   weight -- the amount of pure substance in the substance

13   itself.

14   Q.    Once you had done your analysis, what did you do

15   with the packaging?

16   A.    I sealed it up and returned it to the vault, to the

17   evidence custodian.

18   Q.    That Exhibit 39A-2, as you hold it there in your

19   hands, does it differ at all from the way it was when

20   you sealed it up on that particular occasion?

21   A.    No.

22        MR. LINDQUIST:  Your Honor, I offer 39A-2 into

23   evidence please.

24        THE COURT:  Attorney Hodge?

25        MR. HODGE:  Relevance, Your Honor.

1          MR. MOORE:  Your Honor, I'll just join my

2     colleague's objection.

3          THE COURT:  All right.  39A-2 is admitted.

4       (Government's Exhibit No. 39A-2 admitted)

5          MR. LINDQUIST:  Just set that aside, if you

6     would, sir.

7          THE WITNESS:  (Complies)

8     BY MR. LINDQUIST:

9     Q.   Now, if you would look for 39B-2.  Do you have

10    that?

11    A.   Yes.

12    Q.   Do you recognize it?

13    A.   Yes.

14    Q.   And how do you recognize that?

15    A.   It has my seal on the bottom, my label and my

16    information on the top.

17    Q.   When you received it, what was the condition of the

18    packaging?

19    A.   Three factory seals with an agency on the top.

20    Q.   What did you do with that packaging?

21    A.   I began my analysis.

22    Q.   Tell us what you did.

23    A.   I got my gross weight, my net weight, and then I

24    ran the techniques previously described.

25    Q.   And in your opinion, what does the substance

1    contains?

2    A.   It contains cocaine base.

3    Q.   Did you determine the purity level?

4    A.   Yes.

5    Q.   What was that?

6    A.   Seventy percent.

7    Q.   After you did your analysis, what then did you do

8    as far as the substance was concerned and the packaging?

9    A.   I sealed it and returned it to the evidence vault.

10   Q.   That Exhibit 39B-2, as you hold it there in your

11   hands, how does it compare to how it was when you sealed

12   it up on that particular day?

13   A.   It is, it looks the same.

14         MR. LINDQUIST:  I offer Exhibit 39B-2.

15         THE COURT:  Attorney Hodge?

16         MR. HODGE:  Same objection.

17         THE COURT:  Attorney Moore?

18         MR. MOORE:  Same response, Your Honor.

19         THE COURT:  All right.  39B-2 is admitted.

20      (Government's Exhibit No. 39B-2 admitted)

21   BY MR. LINDQUIST:

22   Q.   Now, Mr. Diaz, if you would also look there for

23   package bearing Exhibit Number 40B --

24         THE COURT:  Attorney Lindquist, are there a

25   group or is there a group that the witness will be

1    testifying about, that perhaps might be susceptible to

2    collective testimony?

3          MR. LINDQUIST:   This actually is the third of

4    the three that he's going to be addressing.

5          THE COURT:   All right.

6    BY MR. LINDQUIST:

7    Q.   Do you see 40B?

8    A.   Yes.

9    Q.   Do you recognize that?

10   A.   Yes.

11   Q.   And how is it that you're able to recognize that?

12   A.   It has my seal on the bottom, and my information on

13   the top, on the top seal.

14   Q.   And when you received this, did you verify the

15   integrity of the packaging?

16   A.   Yes.

17   Q.   And tell us about that, was it intact?

18   A.   I see here that there's some information, this

19   could have been re- -- I could have done a reanalysis on

20   this, I believe, I don't have the report for that with

21   me, but it had the other chemist's seal on the bottom,

22   and the two factory seals on the top and the agency on

23   the top.

24   Q.   The significant thing is when you received it, was

25   the packaging intact?

1    A.    Yes.

2    Q.    All right.  What did you do then, as far as that

3    item was concerned?

4    A.    I proceeded to my analysis, net weight -- gross

5    weight, net weight, and I ran my tests.

6    Q.    And as a result of your testing, what conclusion

7    did you reach as far as the nature of the substance?

8    A.    I do not have that report in front of me at this

9    moment.

10   Q.    Do you have it somewhere?

11   A.    I do not have it with me in this particular time.

12   Q.    I'm sorry?

13   A.    I do not have it with me at this particular time.

14   Q.    All right.  Let's just, just set that aside for now

15   and we'll deal with that later.

16        (Pause)

17             MR. LINDQUIST:  All right, Mr. Diaz.  Thank you

18   very much, sir.

19        Thank you, Your Honor.  Those are the questions

20   that I have.

21             THE COURT:  Attorney Hodge.

22

23                        CROSS-EXAMINATION

24   BY MR. HODGE:

25   Q.    Good afternoon, Mr. Diaz.

1    A.    Good afternoon.

2    Q.    How are you?

3    A.    All right.

4    Q.    Tell me, is it possible to identify cocaine merely

5    by visual inspection?

6    A.    I do not believe so, scientifically, no.

7    Q.    So even if there were some white powder found,

8    there would be a doubt, to say the least, as to whether

9    or not that was cocaine?

10   A.    It would be suspicious.  But until you run, until

11   you run the tests, you cannot say -- I cannot say it's

12   cocaine.

13   Q.    Okay.  So as a reasonable person, there would be a

14   doubt?

15   A.    Yeah, there could be a doubt, yes.

16             MR. HODGE:  Thank you.

17        No further questions.

18             THE COURT:  Attorney Moore?

19             MR. MOORE:  No questions of the witness, Your

20   Honor.

21             THE COURT:  All right.

22        Redirect?

23             MR. LINDQUIST:  No, Your Honor.

24             THE COURT:  Mr. Diaz, thank you for your

25   testimony.

1      You may step down.

2      Next witness.

3          MR. LINDQUIST:  Elizabeth Adkins.

4      (Pause)

5          THE CLERK:  Please take the witness box and

6  please raise your right hand to take the oath.  At the

7  end respond, "I do."

8      (Witness sworn)

9          THE WITNESS:  I do.

10     THEREUPON, ELIZABETH ADKINS, having been duly

11  sworn, was examined and testified as follows:

12                      DIRECT EXAMINATION

13  BY MR. LINDQUIST:

14  Q.   Good afternoon.

15  A.   Good afternoon.

16  Q.   Tell us your name, please.

17  A.   Elizabeth Adkins.

18  Q.   What do you do?

19  A.   I'm a forensic chemist.

20  Q.   How long have you been a forensic chemist?

21  A.   Almost nine years.

22  Q.   Tell us what your qualifications are as a forensic

23  chemist.

24  A.   I have a bachelor of science degree from Ohio

25  University in forensic chemistry.  I have six months

1    in-house training, and I've had training along the way

2    in my job.

3    Q.    From a practical standpoint, what experience do you

4    have as far as a forensic chemist -- I'm sorry, let's

5    approach it this way.

6         Tell us, generally speaking, what you do as a

7    forensic chemist?

8    A.    I analyze exhibits that are assigned to me.   I

9    write down my findings in a report and I testify in

10   court when I'm needed.

11   Q.    When I refer to your practical experience, how many

12   times have you been -- how many times have you evaluated

13   substances over the course of the years that you've

14   indicated?

15   A.    I've analyzed about 5,000 exhibits.

16   Q.    Can you give us an idea of the substances involved

17   in that, indicating perhaps those that are most

18   prominent?

19   A.    Are you talking about controlled substances?

20   Q.    Yes.

21   A.    The most prominent would be cocaine, either crack

22   or cocaine hydrochloride, heroin, methamphetamine and

23   marijuana are the most common.

24   Q.    You've indicated that you've testified in court; is

25   that correct?

1   A.   Yes.

2   Q.   How many times?

3   A.   About 80 times.

4   Q.   Can you give us an idea of where these courts are

5   that you've testified?

6   A.   St. Thomas, St. Croix, Puerto Rico, Florida,

7   North/South Carolina, Tennessee, Ohio, Wisconsin,

8   Indiana and Illinois.

9   Q.   In these testimonies, have you been qualified as an

10   expert, as a forensic chemist?

11   A.   Yes, I have.

12   Q.   Can you give us an idea the particular tests that

13   are commonly used in the analysis of controlled

14   substance, particularly cocaine?

15   A.   I use a gas chromatograph/mass spectrometer, a gas

16   chromatograph, and an infrared spectrophotometer.

17         MR. LINDQUIST:  Your Honor, I offer Ms. Adkins

18   as an expert in forensic chemistry.

19         THE COURT:  Attorney Hodge?

20         MR. HODGE:  No objection, Your Honor.

21         THE COURT:  Attorney Moore?

22         MR. MOORE:  I have no objection, Your Honor.

23         THE COURT:  All right.  Elizabeth Adkins will

24   be qualified as a forensic chemist in the area of

25   analyzing the presence of controlled substances.

1    Ladies and gentlemen, as I have told you, that

2    means that Ms. Adkins may testify in the form of an

3    opinion in the area in which she is qualified as an

4    expert.

5    Go ahead.

6         MR. LINDQUIST:   Thank you.

7    BY MR. LINDQUIST:

8    Q.   Ms. Adkins, there in front of you are some

9    packages.  Look for the one that has the yellow sticker

10   on it, 41B.

11   Do you have that?

12   A.   Yes.

13   Q.   Do you recognize it?

14   A.   Yes, I do.

15   Q.   How is it that you recognize it?

16   A.   I recognize it by my handwriting on the sticker

17   here, my seal at the bottom, and signature, and the

18   handwriting is mine on the interior packaging.

19   Q.   How is it that this came into your possession?

20   A.   I was assigned it by my supervisor to analyze.

21   Q.   When this -- when it came into your possession, did

22   you evaluate the integrity of the packaging when you got

23   it?

24   A.   Yes, I did.

25   Q.   Why did you do that?

1    A.   Every piece of evidence I get, I make sure that it

2    is sealed before I start.

3    Q.   Why is that?

4    A.   To ensure that nothing was tampered with on the

5    inside.

6    Q.   And the condition of this particular exhibit when

7    you got it, what was it?

8    A.   It was sealed.

9    Q.   What did you do after you received it?

10   A.   After I received it, I took a weight of the heat

11   seal here and everything inside and recorded it.

12   Q.   What then did you do?

13   A.   And then I proceeded to analyze the exhibit with

14   the instrumentation I said earlier.

15   Q.   And what conclusion, if any, did you reach as far

16   as the nature of the substance contained therein?

17   A.   The exhibit contained cocaine base.

18   Q.   And did you identify the purity level of it?

19   A.   Yes.

20   Q.   What was the purity level?

21   A.   Seventy-three percent.

22   Q.   After you did your analysis, what then did you do?

23   A.   I repackaged the drug and placed it inside, and

24   took a weight and then I returned it to the vault.

25   Q.   And can you tell us, the package as you hold it in

1   your hands there today, the nature or the integrity of

2   the packaging in relation to when you returned it to the

3   vault after your analysis?

4   A.   Yes, it's the same.

5        MR. LINDQUIST:  I offer Exhibit 41B into

6   evidence, please.

7        MR. HODGE:  Your Honor, I object as to

8   relevance.  And this is the same objection as for each

9   of the substance exhibits.

10       THE COURT:  Attorney Moore?

11       MR. MOORE:  Your Honor, I have a continuing

12   objection as well, but I have no specific objection to

13   this.

14       THE COURT:  All right.  41B is admitted.

15     (Government's Exhibit No. 41B admitted)

16       MR. LINDQUIST:  Those are the questions that I

17   have of Ms. Adkins.  Thank you.

18       THE COURT:  Attorney Hodge?

19                    CROSS-EXAMINATION

20   BY MR. HODGE:

21   Q.   Good afternoon, Ms. Adkins.  How are you?

22   A.   Good.  How are you?

23   Q.   Not too bad.

24       Tell me something:  Is it possible to identify

25   cocaine by eyesight alone?

1    A.    No.

2    Q.    So even if a substance were white powder, to say

3    the least, you would have a doubt as to whether or not

4    it could be cocaine?

5    A.    Well, I wouldn't form an opinion until I performed

6    the instrumental analysis I talked about earlier.

7    Q.    Because there would be no way to tell?

8    A.    No, not just by looking.  You couldn't be a hundred

9    percent sure.

10            MR. HODGE:  Thank you.

11        No further questions.

12            THE COURT:  Attorney Moore?

13            MR. MOORE:  No questions, Your Honor.

14            THE COURT:  Redirect?

15            MR. LINDQUIST:  No, thank you.

16            THE COURT:  Ms. Adkins, thank you for your

17    testimony.

18        You may step down.

19        Next witness.

20            MR. LINDQUIST:  Deepa Vanmali.

21        (Pause)

22            THE CLERK:  Please raise your right hand to

23    take the oath.  At the end respond, "I do."

24        (Witness sworn)

25            THE WITNESS:  Yes, I do.

1          THEREUPON, DEEPA VANMALI, having been duly sworn,

2    was examined and testified as follows:

3                  DIRECT EXAMINATION

4    BY MR. LINDQUIST:

5    Q.   Good afternoon.

6    A.   Good afternoon.

7    Q.   Tell us your name, please.

8    A.   Deepa Vanmali.

9    Q.   And what do you do for a living, ma'am?

10    A.   I'm a forensic chemist with the Drug Enforcement

11    Administration.

12    Q.   How long have you been a forensic chemist with DEA?

13    A.   Approximately six and a half years.

14    Q.   Prior to that, were you involved in forensic

15    chemistry?

16    A.   Not in forensic chemistry, but in forensics.  I was

17    a crime scene investigator.

18    Q.   Tell us what your qualifications are as a forensic

19    chemist?

20    A.   I have a bachelor of science degree in forensic

21    science, with a minor in chemistry.

22    Q.   Give us an idea, in a word or two, what you do as a

23    forensic chemist?

24    A.   I'm responsible for the analysis of evidence that's

25    submitted to the laboratory for the presence of

 1   controlled and non-controlled substances.

 2        I also testify to those findings if needed, and

 3   assist law enforcement in the seizure of clandestine

 4   laboratories.

 5   Q.   What's your practical experience as far as

 6   forensics chemistry in the analysis of controlled

 7   substances?

 8   A.   I had approximately seven months of on-the-job

 9   training at the laboratory.  And that consisted of

10   standard laboratory operating procedures,

11   instrumentation, and analysis of evidence.

12   Q.   Have you testified in court as a forensic chemist?

13   A.   Yes, I have.

14   Q.   How many times?

15   A.   Twenty-five times.

16   Q.   Were you qualified as an expert in forensic

17   chemistry in conjunction with that testimony?

18   A.   Yes, I was.

19   Q.   Are there particular controlled substances that you

20   have worked with more than others in your work as a

21   forensic chemist?

22   A.   Yes.

23   Q.   What are the more prominent ones?

24   A.   Cocaine, methamphetamine and marijuana.

25   Q.   Are there particular tests that you utilize in

1    testing a substance for cocaine?

2    A.    Yes.

3    Q.    What are those tests?

4    A.    Gas chromatography, mass spectroscopy and Fourier

5    transform infrared spectroscopy.

6    Q.    Are those tests generally accepted within the

7    scientific community for those purposes?

8    A.    Yes.

9              MR. LINDQUIST:  Your Honor, I offer Ms. Vanmali

10   as an expert in forensic chemistry particularly with

11   regard to the analysis of substances for cocaine.

12             THE COURT:  Attorney Hodge?

13             MR. HODGE:  No objection, Your Honor.

14             THE COURT:  Attorney Moore?

15             MR. MOORE:  No objection.

16             THE COURT:  All right.  Ms. Vanmali will be

17   qualified as an expert in forensic chemistry,

18   specifically in the area of analyzing the presence of

19   controlled substances.

20        Ladies and gentlemen, that means, as I've told you,

21   as an expert Ms. Vanmali may testify in the form of an

22   opinion in the area in which she is qualified.

23        Go ahead.

24             MR. LINDQUIST:  Thank you.

25   BY MR. LINDQUIST:

1   Q.    Look there in front of you.   There are some

2   packages.   And if you would try and find the packages

3   with Exhibit Numbers 35B and 36B on them?

4   A.    Yes, I have it in front of me.

5   Q.    Do you -- let's start with 35B.   Do you recognize

6   that?

7   A.    Yes, I do.

8   Q.    How is it that you recognize that?

9   A.    I recognize it by my handwriting that's on the

10  interior bags, and also my handwriting on the seal that

11  I placed at the bottom of the evidence envelope.

12  Q.    And look at 36B, and tell us if you recognize that

13  as well?

14  A.    Yes, I do.

15  Q.    How do you recognize that?

16  A.    The same as Exhibit 35B.   I recognize this by my

17  handwriting on the interior bags and the, my handwriting

18  on the seal that I put at the bottom of the evidence

19  envelope.

20  Q.    How did these items come into your possession?

21  A.    I received these at the Southeast Laboratory, from

22  the evidence technician.

23  Q.    When you received them, did you evaluate the

24  integrity of the packaging?

25  A.    Yes.   I ensured that there wasn't any signs of

1 tampering and I ensured that the seal placed by the

2 agent was intact.

3 Q. Did you do that for both Exhibit 35B and 36B?

4 A. Yes.

5 Q. What did you find as far as the integrity of the

6 packaging?

7 A. That it was in a sealed condition.

8 Q. What then did you do with regard to 35B?

9 A. I verified the information on the evidence label to

10 the information on the DEA 7.  And the DEA 7 is the form

11 that's submitted with the evidence itself.

12  I then obtained a gross weight of the package,

13 which is the weight of the entire evidence envelope and

14 its contents.  And then I proceeded to open the evidence

15 envelope at the bottom and remove the contents for my

16 analysis.

17 Q. And what -- same question with regard to

18 Exhibit 36B.

19 A. Yes.  I did the same thing.  I verified the

20 information on the evidence label against the

21 information on the DEA 7.

22  I obtained a gross weight, and then I opened up the

23 heat seal at the bottom to remove the contents for

24 analysis.

25 Q. What then did you do from an -- analytically, with

1    regard to the contents of those exhibits, 35B and 36B?

2    A.   I obtained a net weight of the substance, which is

3    the weight of just the substance alone.

4    Q.   What then did you do as far as the analysis?

5    A.   And then I proceeded to grind the substance and

6    remove a portion for analysis.

7    Q.   Now when you say grind the substance, why did you

8    have to grind the substance?

9    A.   I grind it so that it's uniform in size, the

10   mixture is completely mixed, so that it's -- in

11   chemical -- chemistry words -- it's homogenous.

12   Q.   And what tests did you perform as far as analyzing

13   those substances in 35B and 36B?

14   A.   I performed a Fourier transform infrared

15   spectroscopy, gas chromatography/mass spectroscopy, and

16   gas chromatography coupled with flame ionization

17   detection.

18   Q.   And what were the results of your analysis as far

19   as Exhibit 35B is concerned?

20        THE WITNESS:  Your Honor, may I refer to my

21   notes?

22        THE COURT:  Do you have a problem recollecting?

23        THE WITNESS:  I just want to verify.  I don't

24   want to misspeak.

25        THE COURT:  All right .

1      You want to take her through the protocol?

2           MR. LINDQUIST:  Sure.

3  BY MR. LINDQUIST:

4  Q.   Is there something you can look at that would

5  refresh your recollection in that regard?

6  A.   Yes.  It's my report.

7  Q.   Go ahead and take a look at that, and once you've

8  refreshed your recollection, put it aside and let us

9  know.

10      (Pause)

11 A.   Okay.  Government's Exhibit 35B contained cocaine

12 base with a net weight of 4.9 grams and a purity of

13 90 percent.

14 Q.   And 36B, what was the result of your analysis?

15      Once again, do you need to refresh your

16 recollection?

17 A.   Yes.

18 Q.   All right.  Take a moment and do that, and let us

19 know when your memory is refreshed.

20      (Pause)

21 A.   Okay.

22 Q.   Okay?

23 A.   Yes.

24 Q.   Now, tell us.

25 A.   Government's Exhibit 36B contained cocaine base

1   with a purity of 90 percent and a net weight of

2   7.5 grams.

3   Q.   Once you had done your analysis, what did you do as

4   far as the packaging was concerned?

5   A.   I placed it back into the original evidence

6   envelope.

7   Q.   And that is both with regard to 35B and 36B?

8   A.   Yes.

9   Q.   And as far as sealing it, what did you do?

10  A.   Excuse me?

11  Q.   As far as sealing it, what did you do?

12  A.   I placed the seal at the bottom, where I had opened

13  it, and I heat-sealed the evidence envelope for both of

14  them.

15  Q.   Now, those exhibits, 35B and 36B, as you hold them

16  in your hands there today, from a standpoint of

17  packaging integrity, how do they compare with the way

18  they were after you performed your analysis?

19  A.   They're in the same condition as when I last seen

20  them.

21  Q.   Thank you.

22        MR. LINDQUIST:  Your Honor, I offer 35B and 36B

23  into evidence.

24        THE COURT:  Attorney Hodge?

25        MR. HODGE:  Same objection, Your Honor.

1          MR. MOORE:  I join, Your Honor.

2          THE COURT:  All right.  35B and 36B are

3    admitted.

4        (Government's Exhibit Nos. 35B, 36B admitted)

5          MR. LINDQUIST:  Thank you.

6     I have no further questions of Ms. Vanmali.

7          THE COURT:  Attorney Hodge?

8                     CROSS-EXAMINATION

9    BY MR. HODGE:

10   Q.   Good afternoon, Ms. Vanmali.  How are you?

11   A.   I'm good, thank you.

12   Q.   Tell me, is it possible to detect cocaine based

13   purely on a visual inspection?

14   A.   No.

15   Q.   So even if a substance, a white powdery substance

16   may appear to look like cocaine, one would have to have

17   at least a doubt as to whether or not it was actually

18   cocaine?

19   A.   You would have to do some kind of test to either

20   give you an idea that it might be cocaine, or a

21   confirmatory test to confirm that it is cocaine.

22   Q.   In fact, even a field test -- you're familiar with

23   the field test, correct?

24   A.   The color tests?

25   Q.   I, I...  In our discovery, we -- the officers

```
 1    occasionally make reference to --
 2              THE COURT:  All right.  Stop.  Stop.
 3              MR. LINDQUIST:  I would object --
 4              THE COURT:  No.  Ask a question.  It's not a
 5    discussion.  Just ask a question.
 6    BY MR. HODGE:
 7    Q.   Are you familiar with the field test?
 8    A.   Yes.
 9    Q.   Okay.  So is the field test conclusive?
10    A.   No.  It just gives you an idea of what may be, what
11    the sample may be.
12    Q.   So even with, even a substance that has been field
13    tested and field tested positive, it's doubtful whether
14    it will actually turn out to be cocaine in the end?
15    A.   Yes, but like I said, it will give you an idea that
16    it might be cocaine if it tests positive.
17              MR. HODGE:  Thank you.
18         No further questions, Your Honor.
19              THE COURT:  All right.
20         Attorney Moore?
21              MR. MOORE:  Yes, Your Honor.
22
23
24                   FURTHER CROSS-EXAMINATION
25    BY MR. MOORE:
```

1    Q.    Good evening, Ms. Vanmali.

2    A.    Good evening.

3    Q.    Part of your basic training with the DEA, the

4    courses you take, is one of the courses one to train on

5    how to testify in court?

6    A.    No, we -- not exactly.  We actually have training

7    in courtroom procedures and demeanor.

8            MR. MOORE:  Thank you.

9        No further questions.

10           THE COURT:  Attorney Lindquist, redirect?

11           MR. LINDQUIST:  No, thank you.

12           THE COURT:  Ms. Vanmali, thank you for your

13   testimony.

14       You may step down.

15           THE WITNESS:  Thank you.

16           THE COURT:  Next witness?

17           MR. LINDQUIST:  Your Honor, would you grant us

18   a sidebar?

19           THE COURT:  All right.  Yes.

20       (Sidebar discussion held as follows).

21           MR. MOORE:  Your Honor, I may need a

22   physiological break shortly, Your Honor.  Or I'll be

23   dancing back here.

24           THE COURT:  Okay.  I thought the government was

25   at the end, that's why I --

1          MR. LINDQUIST:  Well, that's really what I

2    would like to address.  I anticipate three more

3    witnesses.  We're a full day ahead of schedule.

4          The two next witnesses that I have, because of the

5    logistics and the trial starting on Monday as opposed to

6    Tuesday, were not able to arrive until -- one comes in

7    tomorrow morning.  The other one, I'm not sure is even

8    in.

9          And so what I was wondering, if we could break for

10   the evening so I would have an opportunity to get these

11   witnesses squared away, and then start first thing in

12   the morning.

13         We anticipate being done tomorrow.

14         THE COURT:  Well, let's take the one you have

15   tonight, then.  The jurors are ready to work.  We've had

16   issues and as we head into --

17         MR. LINDQUIST:  The one we have tonight is Mark

18   Joseph, and he's going to be several hours.

19         THE COURT:  We need to start him, then.  We

20   need to start him.

21         MR. LINDQUIST:  How  -- may I ask --

22         THE COURT:  I suspect if there is someone who

23   is a Seventh Day Adventist, we will ending early on

24   Friday, guaranteed.

25         The defense so far has indicated that they intend

1     to put on a case.  We already have issues with jurors.

2     I don't know how long the defense case will be.

3          MR. MOORE:  Can I give you an indication?

4          THE COURT:  Certainly.

5          MR. MOORE:  For the benefit of all concerned.

6     I anticipate potentially four witnesses on behalf of

7     Mr. Blyden.  I think there's a brief case, as well, put

8     on by Mr. Mark, who can speak for himself -- Mr. Hodge

9     will speak for himself.

10          THE COURT:  Right.  And I suspect there will be

11     arguments on Rule 29 and just a few other things.  So --

12          MR. LINDQUIST:  Well --

13          THE COURT:  -- I have a jury now that's willing

14     to listen, and I don't know if I'll have this option

15     tomorrow.  Tomorrow is -- are all the defense witnesses

16     here and ready to go?

17          MR. MOORE:  No, Your Honor.  But --

18          THE COURT:  I mean not now, obviously;

19     tomorrow.

20          MR. MOORE:  Yes, but there's -- we have a

21     Damian Daniel to call back, if you want to do something

22     with him tomorrow for -- I got the, I got the

23     information I need.  I still need 103's.

24          THE COURT:  You said -- you said you don't know

25     if, one of your witnesses, when they're coming in.

1          MR. LINDQUIST:  I don't know if he's arrived.

2     I know that one is not here until tomorrow.  And I don't

3     know if the other one has arrived.  And from a

4     foundational standpoint, I need the one that I don't

5     know that has arrived yet before Mark Joseph testifies.

6          THE COURT:  Well, you can offer testimony

7     subject to connection.  Is this people who are going to

8     testify about the MODs?

9          MR. LINDQUIST:  The MO disks.

10          THE COURT:  I don't --

11          MR. LINDQUIST:  Can you give us an idea of how

12     late we're going this evening?

13          THE COURT:  I would like to go for another

14     20 minutes or 30 minutes, if -- hold on one second.

15       (Pause)

16          THE COURT:  Yeah, I think we can go for a

17     little bit longer, maybe another 20 minutes or so,

18     25 minutes.

19       I'm going to pose a question to them soon, and I'll

20     see how -- I'll gauge their response and see if they can

21     hang in there.

22       But this jury is ready to work today, and I would

23     like to take advantage of it.  And I suspect we'll end

24     early tomorrow.  And I haven't inquired, nor do I plan

25     to unless it's brought to my attention, whether there's

1    a Seventh Day Adventist in there.  But usually there is.

2         And I think we're fortunate no one has said that

3    they need to get back to St. John.  That's something

4    else that I'm concerned about.

5         We've already had one person who has canceled their

6    vacation, another person who has said that they had a

7    bunch of trips planned for work.  So if they're here and

8    they're willing to work, I like to push them, to the

9    extent that they can accommodate the pushing.

10        So I would like to get as much testimony in, is the

11   short answer.  And I suspect that notwithstanding the

12   unavailability of Mr. Velez, if he's coming here, then

13   there's something that Mr. Joseph needs to testify to

14   that requires Mr. Velez's testimony, the Court can

15   always conditionally take evidence subject to connection

16   at some later time.

17            MR. LINDQUIST:  Okay.

18            THE COURT:  So let's proceed.

19            MR. MOORE:  Your Honor, am I allowed to take

20   this break?  I mean, just five minutes.

21            THE COURT:  Yeah, we might -- well, let me pose

22   my question to the jury, but, yes -- I don't want you --

23            (Laughter).

24            MR. MOORE:  Thank you, Your Honor.

25            MR. LINDQUIST:  You're going to pose that

1    question now?

2              THE COURT:  Yes.

3        (End sidebar discussion, open court as follows)

4              THE COURT:  Ladies and gentlemen, I know it is

5    late in the day and this trial has been going on.

6    You've been so patient and so cooperative.  I would like

7    to spend another 20 more minutes tonight.  If you can do

8    that without a break, fine.

9        But if you need a break, we'll take a short break

10   now.  We'll come back, we'll get 20 more minutes of

11   testimony in, if you can handle it, and then we'll

12   resume tomorrow.

13       I think we're at a point where, I think, we can

14   move the trial along, and I want you to get as much

15   evidence as possible during the day.  And I know it's

16   been a long one already.

17       Would you like a break now, or would you like to

18   just go through?

19       (Jurors indicating)

20             THE COURT:  All right.  I think the jury is

21   saying, "Let's go," meaning let's proceed with the

22   trial.

23       So Attorney Lindquist, call your next witness.

24             MR. LINDQUIST:  Mark Joseph.

25             THE COURT:  This is a hard-working group of

1    jurors.

2         (Pause)

3             THE CLERK:  At the end respond, "I do."

4         (Witness sworn)

5             THE WITNESS:  I do.

6             THE CLERK:  Please be seated.

7

8         THEREUPON, MARK JOSEPH, having been duly sworn, was

9    examined and testified as follows:

10                    DIRECT EXAMINATION

11   BY MR. LINDQUIST:

12   Q.   I don't know whether it's afternoon or evening, but

13   good afternoon or evening.

14   A.   Good evening.

15   Q.   Who are you?

16   A.   My name is Mark Joseph.

17   Q.   And where do you work, sir?

18   A.   I'm a detective with the Virgin Islands Police

19   Department.

20   Q.   How long have you been with VIPD?

21   A.   I've been with VIPD seven years.

22   Q.   And prior to that, were you involved in law

23   enforcement?

24   A.   Yes.  I was with the V.I. Housing police for seven

25   years; a total of fourteen years.

1    Q.   Where were you born and raised?

2    A.   Born and raised here in St. Thomas.

3    Q.   And went to school here as well?

4    A.   Yes.

5    Q.   Just give us an idea of your educational

6    background.

7    A.   I graduated high school from here, went to college,

8    have an associate's degree in police science from the

9    University of The Virgin Islands.

10   Q.   During your work with VIPD, have you had occasion

11   to work with federal agencies?

12   A.   Yes.  I am a deputized federal agent with the Drug

13   Enforcement Administration.  I've been in that

14   assignment for the last 12 years.

15   Q.   Can you give us an idea of your involvement in the

16   investigation that, generally speaking, that brings us

17   into court today?

18            MR. HODGE:  Objection.  Leading.

19            THE COURT:  Overruled.

20            THE WITNESS:  Yes.  I was a co-case agent and

21   assisted with the end phases of the investigation.

22   BY MR. LINDQUIST:

23   Q.   Did that involvement include the telephone

24   interceptions?

25   A.   Yes.

```
 1              MR. LINDQUIST:  Your Honor, if I may, I'm not

 2    sure...

 3    BY MR. LINDQUIST:

 4    Q.   Detective Joseph, are there some exhibits up there,

 5    41, 42 and 43, and some large Expando files?

 6         Do you see them?

 7    A.   Would you say the numbers again?

 8    Q.   41 -- excuse me -- 42, 43 and 44?

 9    A.   Yes.

10    Q.   Take a look at the file that's got the number "42"

11    on it.  Do you see Exhibit 42A in there?

12    A.   Yes.

13    Q.   Do you recognize that?

14    A.   Yes.

15    Q.   And what is that?

16    A.   This is the, what's called an MO disk.  It's an

17    original recording of an intercepted -- calls from an

18    intercepted telephone.

19    Q.   What was your involvement as far as the telephone

20    interceptions were concerned?

21    A.   I was a monitor, which meant that I listened to the

22    actual telephone calls.  I also assisted in the

23    transcribing of the voice calls into written media.

24    Q.   Okay.  And the particular MO disk that you're

25    looking at there, Exhibit 42A, that corresponded to what
```

1    telephone number?

2    A.   This corresponded to telephone number 340-344-6598.

3    Q.   And who was the individual associated with that

4    telephone number?

5    A.   Allen Dinzey.

6           MR. HODGE:  Objection.  Foundation.

7           THE COURT:  Overruled.

8           THE WITNESS:  Mr. Allen Dinzey.

9    BY MR. LINDQUIST:

10    Q.   And also look in there at Exhibit 42B.  Do you see

11    that?

12    A.   Yes.

13    Q.   Do you recognize that?

14    A.   Yes.

15    Q.   What's 42B in relation to 42A?

16    A.   This is what's called a working copy.

17        The original stays sealed, and a copy is made that

18    can be used to do other things with.

19    Q.   Were you involved in the creation of that working

20    copy?

21    A.   I did not make the copy, no.

22    Q.   Take a look at Exhibit 43A.  It's in that other

23    file folder there.

24        Do you recognize that, 43A?

25    A.   Yes.

1   Q.   What's that?

2   A.   This is also an MO disk of calls that were

3   intercepted on the telephone line.

4   Q.   And what telephone number is associated with that?

5   A.   954-558-6188.

6   Q.   And what individual is associated with that number?

7   A.   Mr. --

8          MR. HODGE:   Objection.   Foundation.

9          THE COURT:   Sustained.

10     Actually, I'm going to reverse my ruling on 42A.

11  The number is in, but the association, the person to

12  whom the number is ascribed, you'll disregard that

13  portion with respect to 42A.

14     Go ahead.

15  BY MR. LINDQUIST:

16  Q.   Take a look at 43B.   Do you see that?

17  A.   Yes.

18  Q.   What's that?

19  A.   This is a working copy of the calls from 43- --

20  Q.   43A?

21  A.   -- 43A, yes.

22  Q.   And as far as the content is concerned, what's the

23  relationship between 43B and 43A?

24  A.   It's a copy of all the calls that are on 43A.

25  Q.   Talking about the MO disk -- well, let's go on.

1      Go ahead and set that aside, and let's look at 44A.

2   And then we'll come back to that.

3      Do you recognize 44A?

4   A.   Yes.

5   Q.   And what is that?

6   A.   This is an MO disk of the calls that were captured

7   under a Title III investigation of a telephone line.

8   Q.   And what telephone number is associated with that?

9   A.   This is 787-934-1177.

10  Q.   And Exhibit 44B, do you see that?

11  A.   Yes.

12  Q.   What's that?

13  A.   This is the working copy, which is a copy of all

14  the calls that are on the original disk.

15  Q.   And the content relationship between 44B and 44A?

16  A.   They're identical.

17  Q.   Now, with regard to the MO disk, the original

18  media, 42A, 43A, 44A, single call or multiple calls?

19  A.   Multiple calls.

20  Q.   Can you give us an idea, just generally speaking,

21  how many calls each MO disk contains?

22  A.   I couldn't give you the exact number, but they

23  are -- some has hundreds, I believe one has over a

24  thousand.

25  Q.   Now what 's the purpose for creating the working

1    copy and what you've referenced as 42B, 43B and 44B?

2    A.   Because with Title III investigations, the

3    original, which would be the MO disk, has to remain

4    sealed, in a sealed condition, as it was when it was

5    removed from the machine.  And it cannot be opened.  So

6    everything that is, if you want to do anything with the

7    calls, it has to be from the working copy.

8    Q.   What, then, did you do as far as the working copy

9    was concerned, in creating media for individual calls?

10   A.   Each individual call from the working copy, a copy

11   was made of each individual call.  And that would be

12   called the trial disk.

13   Q.   And did you create -- were trial disks created in

14   this particular case?

15   A.   Yes.

16   Q.   And those trials disks came from the working

17   copies, what working copies?

18   A.   The same working copies, 42B, 43B and 44B.

19            MR. LINDQUIST:  Now, I'm going to refer you to

20   Exhibits 45C through 164C.

21        (Government's Exhibit Nos. 45C through 164C marked)

22   BY MR. LINDQUIST:

23   Q.   Are you familiar with those exhibits numbers?

24   A.   Yes.

25   Q.   And what do those exhibit numbers correspond to?

1   A.   The individual calls that were made from the

2   working copy.

3   Q.   And where are those individual -- those are the

4   trial disks?

5   A.   Yes.  The trial disks.

6   Q.   And where are those individual trial disks

7   presently?

8   A.   I believe you have them.

9   Q.   All right.  Here in the courtroom?

10  A.   Yes.

11  Q.   In these file folders; is that correct?

12  A.   Yes.

13  Q.   Prior to your coming to court today, did you have

14  occasion to sit down and listen to those trial disks in

15  relation to the working copies that you've testified,

16  42B, 43B and 44B?

17  A.   Yes.  I listened to every single call on the trial

18  disk and compared them to the calls on the working disk,

19  to make sure that they were the same.

20  Q.   All right.  And with regard to those trial disks,

21  45C to 164C, what did you find as far as the content as

22  to those trial disks and the working copies?

23  A.   That they were exactly the same.

24  Q.   Now with regard to those trial disks, were you able

25  to identify which trial disks corresponded to which MO

1    disks?

2    A.    Yes.

3    Q.    Or which working copies of MO disks?

4    A.    Yes.

5    Q.    Are you able to tell us, just from your own memory,

6    or is there -- do you have something that you could look

7    at to refresh your recollection so that you could tell

8    us?

9            MR. HODGE:  Objection.  Leading.

10           THE COURT:  Sustained.  He didn't say he has a

11   problem recollecting.  Ask him the question.

12   BY MR. LINDQUIST:

13   Q.    Can you tell us what, the individual trial disks,

14   which MO disk they correspond to?

15   A.    No.  There are too many calls.

16   Q.    Is there something you could, you could refer to

17   that would refresh your recollection as far as that is

18   concerned?

19   A.    Yes, the exhibit list of the calls.

20   Q.    Okay.  Do you have that there with you?

21   A.    No, I do not.

22   Q.    But your testimony is that all of the trial

23   exhibits correspond to each of the -- or correspond to

24   one of the three MO disks; is that correct?

25   A.    Yes.

1           MR. HODGE:  Objection.

2           THE COURT:  Okay.  Sustained.  It's been asked

3    and answered.

4        Next question.

5    BY MR. LINDQUIST:

6    Q.   As you listened to those trials disks, were you

7    able to identify the speakers in those calls?

8    A.   Yes.

9    Q.   How were you able to identify the speakers?

10   A.   From throughout the investigation, as the calls

11   would come in, you listen to them, you start to become

12   familiar with the voices.  We do surveillance to

13   establish whether or not a particular person is actually

14   using a phone.

15       We run databases checks, such as license, voter

16   registration, passports, other database checks such as--

17           MR. HODGE:  Objection.

18           THE COURT:  Okay.  Overruled.

19           THE WITNESS:  -- other database checks for

20   identification, leads from other investigations, other

21   agents and confidential sources.

22   BY MR. LINDQUIST:

23   Q.   With regard to the calls associated with the MO

24   disk 42A, were you able to identify the speaker that

25   corresponded to that telephone?

1    A.    Yes.

2    Q.    And how were you able to identify that speaker?

3    A.    From listening to the calls and after the person

4    was arrested.

5    Q.    What do you mean, after the person was arrested?

6    A.    The person --

7              MR. HODGE:  Objection.  Foundation.

8              THE COURT:  Overruled.

9         You're speaking on personal knowledge?

10             THE WITNESS:  Yes, Your Honor.

11             THE COURT:  All right.  Go ahead.

12             THE WITNESS:  The person that was using the

13   telephone that was intercepted was arrested by us.

14   BY MR. LINDQUIST:

15   Q.    Go ahead.

16   A.    And after he was arrested, I became familiar with

17   his voice from interviewing him after the arrest.

18   Q.    Who was the individual that used the telephone

19   associated with MO disk 42A?

20   A.    Allen Dinzey.

21   Q.    And in reviewing the calls associated with the MO

22   disk 43A, were you able to identify the user of that

23   telephone?

24   A.    Yes.

25   Q.    And how are you able to identify the user of that

1    telephone?

2    A.   Again, from becoming familiar with the voices on

3    the telephone calls as they were intercepted through

4    database checks, to verify identification, such as

5    license databases, voter registration, passports,

6    vehicle registrations and other database checks, other

7    case investigations, agents --

8              MR. HODGE:  I object.

9              MR. LINDQUIST:  Go ahead -- I'm not sure if I

10   heard something.

11             MR. HODGE:  I said objection.

12             THE COURT:  All right.  Go ahead, but with the

13   next question.  Sustained.  I think it was getting into

14   a long narrative.

15   BY MR. LINDQUIST:

16   Q.   So were you able to identify the speaker that used

17   the telephone associated with the MO disk 43A?

18   A.   Yes.

19   Q.   And who was that speaker?

20   A.   Mr. Vernon Fagan.

21   Q.   Now with regard to the MO disk associated with --

22   or MO disk Exhibit Number 44A, did you have occasion to

23   listen to the calls related to that MO disk?

24   A.   Yes.

25   Q.   And were you able to identify the user of that

1    telephone, the primary speaker?

2    A.    Yes.

3    Q.    How were you able to do that?

4    A.    Through becoming familiar with the calls, the

5    voices on the calls as they come in --

6          THE COURT:  How was it that you became familiar

7    with the voice?

8          THE WITNESS:  By listening to them on numerous

9    times, Your Honor, and also after the individual was

10   arrested.

11   BY MR. LINDQUIST:

12   Q.    What do you mean, "after" --

13         MR. HODGE:  Objection, Your Honor.

14         THE COURT:  Overruled.

15   BY MR. LINDQUIST:

16   Q.    What do you mean, "after the individual was

17   arrested"?

18   A.    The individual that was using the telephone was

19   arrested by us --

20         THE COURT:  When you say "by us," were --

21         THE WITNESS:  I wasn't present at the arrest.

22   But after the arrest, I became familiar with his voice.

23   BY MR. LINDQUIST:

24   Q.    And how is it -- what were the circumstances --

25         MR. HODGE:  Objection.

```
 1              THE COURT:  Overruled.

 2    BY MR. LINDQUIST:

 3    Q.   What were the circumstances that allowed you to

 4    become familiar with his voice?

 5    A.   Hearing his voice after he was arrested.

 6    Q.   And who was that individual, the primary user of

 7    that phone?

 8    A.   Mr. Gelean Mark.

 9    Q.   Is Mr. Gelean Mark --

10              MR. HODGE:  Objection.

11    BY MR. LINDQUIST:

12    Q.   -- in the courtroom today?

13    A.   Yes, he is.

14    Q.   Would you point him out and describe what he's

15    wearing?

16    A.   He's seated at -- to the right of Attorney Hodge,

17    wearing a cream-colored shirt and he has on glasses.

18              MR. LINDQUIST:  May the record reflect that he

19    has identified Mr. -- the Defendant Mark?

20              THE COURT:  Yes, the record will reflect the

21    witness has identified Defendant Mark.

22    BY MR. LINDQUIST:

23    Q.   Now in listening to the telephone calls, the trial

24    disks that were created from the MO disks, were you able

25    to identify other speakers that those three individuals
```

1    that you've testified to were speaking to?

2    A.   Yes.

3    Q.   Is there any of those -- any one of those calls

4    where one of those three individuals is not involved in

5    the conversation?

6    A.   No.

7    Q.   Are there many of those calls where two of those

8    three individuals are talking together?

9         MR. HODGE:  Objection.  Leading.

10        THE COURT:  Sustained.

11   BY MR. LINDQUIST:

12   Q.   In listening to those calls, tell us what you found

13   as far as those three individuals and their conversing

14   together.

15   A.   That on any call, at least one of the three

16   individuals would be on it, and on several of the calls

17   at least two of the individuals would be on the same

18   call.

19   Q.   In conjunction with the creation of the trial disks

20   and your review of them, what, if anything, did you have

21   to do with the creation of transcripts?

22   A.   I had to listen to each individual call and reduce

23   to writing what was verbally said on each call.

24   Q.   Why were you tasked with that?

25   A.   Because I'm from here, I grew up here, I understand

1    the local dialect.  And a lot of the other agents are

2    not from here, and they have trouble understanding the

3    local dialect.

4    Q.   All right.  And was a transcript created for each

5    of the trial disks 45C through 164C?

6    A.   Yes.

7    Q.   And have you had a chance to review those?

8         And those would be transcripts 45B through 164C?

9    A.   Yes.

10        (Government's Exhibit Nos. 45B through 164C marked)

11   BY MR. LINDQUIST:

12   Q.   And can you tell us what the relationship is

13   between the transcripts and the trial disks as to those

14   particular exhibits?

15   A.   Each trial disk, a transcript was made of the trial

16   disk, corresponding to that individual trial disk.

17   Q.   And you personally did that?

18   A.   Yes.

19   Q.   Word for word?

20   A.   Yes.

21   Q.   All right.  And so what is your testimony as far as

22   the content relationship between the transcript, each

23   transcript and each trial disk, as far as Exhibits 45

24   through 164 are concerned?

25   A.   That each transcript corresponds in written form of

1    what is verbally spoken on each individual trial disk.

2    Q.   And do those transcripts therefore fairly and

3    accurately portray in the written form what is verbally

4    presented on the trial disks?

5    A.   Yes.

6              MR. HODGE:  Objection.

7              THE COURT:  Sustained.

8    BY MR. LINDQUIST:

9    Q.   So the content relationship between each transcript

10   and each trial disk is what?

11   A.   The content --

12             MR. HODGE:  Objection.

13             THE COURT:  Overruled.

14             THE WITNESS:  The content is the same.

15   BY MR. LINDQUIST:

16   Q.   With regard to those exhibits, 45 through 164, the

17   content generally dealt with what as far as this

18   investigation is concerned?

19             MR. HODGE:  Objection.  Leading.

20             THE COURT:  Overruled.

21             THE WITNESS:  The content dealt with the

22   conversations between the individuals that were

23   intercepted on each telephone call.

24   BY MR. LINDQUIST:

25   Q.   And why were those particular conversations put

1    onto trial disks and transcribed?

2    A.   So that you could have a written version of what

3    was being said on the individual disks.

4    Q.   And what was the relationship as far as the drug

5    investigation was concerned?

6    A.   That it represented the information that was being

7    said on the telephone in written form.

8         MR. LINDQUIST:  Your Honor, then I would offer

9    Exhibits 45 through 164, 45C the trial disk -- 45C being

10   the trial disk, and B being the transcript, 45 through

11   164.

12        THE COURT:  Agent Joseph, who are the speakers

13   on those, 45 through 164?

14        THE WITNESS:  They were --

15        THE COURT:  Were you able, were you able to

16   identify the speakers?

17        THE WITNESS:  Yes, I was, Your Honor.

18        THE COURT:  Who were they?

19        THE WITNESS:  They were either Mr. Vernon

20   Fagan, Mr. Gelean Mark or Mr. Allen Dinzey, conversing

21   with other individuals or conversing amongst themselves.

22        THE COURT:  The other individuals, did you

23   identify those other individuals?

24        THE WITNESS:  Not all of them, Your Honor.

25   Some were unknown speakers.  But anyone else that could

1    have been identified was identified.

2            THE COURT:  Who were those others?

3            THE WITNESS:  They were different individuals,

4    such as -- you want me to call names?

5            THE COURT:  Yes.

6            THE WITNESS:  Yes.  Mr. Phillip DeLuigi,

7    Mr. Dave Long, Mr. Tai Vu, Mr. Walter Ells, Mr. Glenson

8    Isaac, Mr. Louis Rabsatt, Mr. Henry Freeman, Mr. Kelvin

9    Moses.

10         They were numerous, Your Honor.

11            THE COURT:  All right.

12         Attorney Hodge?

13            MR. HODGE:  Your Honor, I object to the --

14    counsel is seeking to introduce all of these?

15            MR. LINDQUIST:  Yes, I am --

16            THE COURT:  Attorney, what's your -- do you

17    have an objection?

18            MR. HODGE:  Yes, Your Honor.  I object to --

19            THE COURT:  All right.

20            MR. HODGE:  I object to the transcripts for

21    each of these exhibits, 45 through --

22            THE COURT:  All right.  The Court isn't going

23    to consider the transcripts at this point.  At this

24    point the Court is only considering 45C through 164C,

25    the disks.

1        MR. HODGE:  Object, Your Honor.

2        THE COURT:  Attorney Moore?

3        MR. MOORE:  Your Honor, I'm not entirely sure a

4   complete foundation has been established for their

5   entry.

6        THE COURT:  So you object?

7        MR. MOORE:  Yes, Your Honor.

8        THE COURT:  All right.  Thank you.

9     Ladies and gentlemen, I said 20 minutes, and I

10   intend to keep my word.  Twenty minutes have elapsed.

11   We didn't get as far as I thought we might have.

12     But thank you for your patience and your

13   cooperation.

14     Let me remind you, especially since I think you've

15   got an awful lot of testimony in today and over the past

16   few days, it is really important that you not read, not

17   listen to, not view anything touching on this case in

18   any way.

19     You really need to focus on the evidence that's in

20   this courtroom, not someone else's view of it or someone

21   else's spin on the evidence.

22     Additionally, you are not to discuss this case with

23   anyone.  As I said before, we take that very seriously.

24     If someone attempts to discuss it with you, bring

25   it to the Court's attention promptly and we will deal

1    with it.

2        Do not do any sort of investigation of the matters

3    discussed here.

4        There is so much information there might be a

5    temptation to take a look and see what you can find out

6    about certain things.  Resist the urge.  Resist that

7    temptation.  You need to focus on things in court, not

8    things outside of court.

9        Finally, keep an open mind.  The evidence is still

10   coming in.

11       With that, let me wish you a pleasant evening, and

12   thank you for your patience again.

13       We'll see you at the same time tomorrow, 8:45.

14   Thank you.

15       (Jury out, 6:52 p.m.)

16           MR. MOORE:  Your Honor, may I be excused

17   briefly?

18           THE COURT:  Yes.  Be seated.

19       (Pause, Attorney Moore not present)

20       (Attorney Moore present)

21           THE COURT:  All right.  Agent Joseph, you

22   remain under oath.

23       Do you understand?

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  You are not to discuss your

1    testimony between now and when we resume tomorrow

2    morning at 9:00 a.m.

3         Do you understand?

4              THE WITNESS:  Yes, Your Honor.

5              THE COURT:  And you are to be on the witness

6    stand by 9:00 a.m. tomorrow morning.

7         Do you understand?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  All right.  Thank you.  Have a

10   pleasant evening.

11        You can step down.

12             THE WITNESS:  Thank you.

13        (Witness stood aside)

14             MR. MOORE:  Your Honor, thanks for the

15   accommodation.

16             THE COURT:  Of course.

17        All right.  Is there anything we need to cover

18   before we adjourn for the day?

19             MR. HODGE:  Your Honor, I just wanted to

20   clarify one thing.  In error I indicated I had no

21   objection with respect to the first, maybe two or three

22   introductions of the cocaine exhibits.  And I just

23   wanted to make sure that it was understood that my

24   relevancy objection, that was, was rejected, is

25   applicable to all the cocaine substances.

1        MR. MOORE:  Your Honor, the --

2        THE COURT:  Attorney Moore, anything else?

3        MR. MOORE:  With regard to the tapes that are

4   about to be played, my foundation issue was not a major

5   thing.

6     I know sometimes if you're trying to make a

7   transcript, you sometimes do things with the tape, and

8   maybe it was done with the copy, to enhance or to take

9   out background noise or things that are of assistance to

10  prepare the transcript.

11    So to the extent the original tape is the original

12  tape and it hasn't been enhanced or augmented or altered

13  in some fashion, if even for the benefit of clarity or

14  to make the conversations clearer, crisper and more

15  distinct, nevertheless, I just wanted some confirmation

16  that they had not been augmented for even the purposes

17  of preparing the transcript.

18        THE COURT:  All right.  So are you saying you

19  do not have an objection if there's no alteration?

20        MR. MOORE:  With that, if that witness makes

21  that representation, then I have no objection.

22        THE COURT:  All right.

23    And Attorney Hodge, what's your position?

24        MR. HODGE:  I'm sorry.  Court's indulgence?

25        THE COURT:  Yes.

1    (Counsel conferring)

2         MR. MOORE:  That's in lieu of the transcripts,

3    Your Honor?

4         THE COURT:  Right.  This is just the voice.

5         Attorney Lindquist, did you have anything else you

6    wanted to bring to the Court's attention before we

7    adjourn?

8         MR. LINDQUIST:  No.  Pending this, I don't

9    believe so.

10        THE COURT:  All right.

11        How many more witnesses does the government have?

12        We're still in the middle of this examination, and

13   I think you said you had two others.

14        MR. LINDQUIST:  It depends on the ruling here.

15   Agent Joseph.  And depending on the ruling, Mr. Velez,

16   and then Mr. Peak.  Mr. Peak will be very, very brief.

17        THE COURT:  All right.

18        MR. HODGE:  And Your Honor, the -- I don't

19   withdraw my objection with respect to the tapes.

20        THE COURT:  All right.

21        I'm going to sustain the objection if there's a

22   foundational issue.  So that objection is sustained with

23   respect to 45 to 164.

24        MR. LINDQUIST:  Could the Court --

25        THE COURT:  I note that it's 119, is that

1   right?

2        Are there 119 calls, Attorney Lindquist?

3           MR. LINDQUIST:  I don't know.  I haven't

4   counted.

5           THE COURT:  45 through 164, is it consecutive?

6           MR. LINDQUIST:  Yes.

7           THE COURT:  And inclusive of the ending

8   numbers, the border numbers 45 and 164.  So that's --

9   all right.  I think that's 120.  All right.

10          MR. LINDQUIST:  Can the Court give us an idea

11  of the foundational issue?

12          THE COURT:  No.  I think that will be advisory.

13       But the Court always runs through the Starks

14  analysis in order to -- when it's doing these, so I

15  think everyone is aware of that, so...

16       All right.  Counsel, thank you for your patience

17  today, and I will see you tomorrow morning.

18       If there are any issues, please bring them to the

19  Court's attention.  I am happy to hear them before we

20  begin at 9:00 a.m.  The Court is available at 8:30 or

21  sometime thereabouts.

22       All right.  Thank you.  Have a pleasant evening.

23          MR. HODGE:  Thank you, Your Honor.

24       (7:00 p.m., court in recess)

25

1                                    ---

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                            <u>CERTIFICATE</u>

4

5              This document is hereby certified

6            to be a true and accurate transcript

7               of the foregoing proceedings.

8

9

10      /s_____   <u>May 29, 2010</u>
                  Chandra Kean, RMR            DATE
11             Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25