DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

```
                                        )
UNITED STATES OF AMERICA, and THE       )
PEOPLE OF THE VIRGIN ISLANDS,           )
                                        )
              Plaintiffs,               )    Criminal No. 2009-20
                                        )
          v.                            )
                                        )
GELEAN MARK, a/k/a "KERWIN", and        )
JEROME BLYDEN,                          )
                                        )
              Defendants.               )
_____)
```

ATTORNEYS:

**Kim R. Lindquist, AUSA**
**Nolan D. Paige, AUSA**
St. Thomas, U.S.V.I.
     *For the plaintiffs.*

**Mark D. Hodge, Esq.**
St. Thomas, U.S.V.I.
     *For the defendant Gelean Mark.*

**Treston E. Moore, Esq.**
St. Thomas, U.S.V.I.
     *For the defendant Jerome Blyden.*

<u>**MEMORANDUM OPINION**</u>

     This Opinion memorializes the Court's October 7, 2010 ruling

on the motion by, Gelean Mark ("Mark") and Jerome Blyden

("Blyden") for a new trial in this matter based on the

government's failure to disclose materials[1].

---

     [1]The defendants moved for a new trial on several other grounds.  The
Court previously addressed those issues in a separate Opinion.

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 2

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 19, 2009, a grand jury handed down an indictment in the instant case against Mark and Blyden. On October 1, 2009, a grand jury handed down a superseding indictment. Count One charged Mark and Blyden, with participating in or operating a racketeering enterprise involving narcotic sales, illegal gambling, and violent acts including attempted murder, in violation of 18 U.S.C. § 1961 et seq. Count Two charged Mark and Blyden with the attempted murder of Trevor Nicholas Friday Jr. ("Friday") in aid of racketeering, in violation of 18 U.S.C. § 1959. Count Three charged Mark and Blyden with the assault with a dangerous weapon of Friday in aid of racketeering activity, in violation of 18 U.S.C. § 1959. Count Four charged Blyden with the assault with a dangerous weapon of Damien Daniels in aid of racketeering, in violation of 18 U.S.C. § 1959. Count Five charged Mark and Blyden with using a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924. Counts Six and Seven charged Blyden with money laundering, in violation of 18 U.S.C. § 1956, and bank fraud, in violation of 18 U.S.C. § 1344.[2]

---

[2] On the morning of trial, the government moved for dismissal of Counts Six and Seven. The Court granted that motion.

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 3

A trial in this matter was held from May 3, 2010 to May 8, 2010.  The government presented testimony from witnesses who were engaged in drug trafficking with Mark, taped phone conversations between Mark and another member of the drug conspiracy, Vernon Fagan, about drug trafficking and dogfighting activity, and conversations between other drug dealers which discussed Mark's distribution network in the Virgin Islands.  Among the government's witnesses were, James Springette ("Springette") and Elton Turnbull ("Turnbull"), who testified that they were engaged in drug trafficking activities with Mark.

On May 7, 2010, the jury sent the judge a note that they had reached a unanimous verdict. The foreperson then read the jury's verdict in Court. Following a request by Blyden for a poll of the jury, one juror when asked if the verdict was his unanimous verdict, responded "Yes and no." (Trial Tr., 251, May 7, 2010.) Finding that the juror's response indicated a lack of unanimity, the Court then instructed the jury to return to deliberation.

Following further deliberation, the jury returned a verdict on May 8, 2010.  They found Mark guilty on Counts One and Three and not guilty on Counts Two and Five.  They found Blyden guilty on Count Three and not guilty on Counts One, Two, and Five.

On May 24, 2010, Turnbull testified in another criminal case in this Court, *United States v. Fagan et al.*, Criminal Number

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 4

2006-80.  After the conclusion of the direct examination of Turnbull, the defense requested Jencks material.  The government asserts that "[believing that any Jencks obligations had been complied with, but otherwise out of caution and following trial on May 25, 2010, the United States searched files associated with witness Turnbull but found none." (Gov'ts' Resp. to Def. Mark's Mot. For New Trial 13.)

On May 25, 2010, the government contacted the Criminal Chief of the United States Attorney's Office for the Middle District of North Carolina.  The government was then informed that the Office for the Middle District of North Carolina "had inadvertently overlooked a file containing letter written by Turnbull to that office." (*Id.* at 14.)

On that same day, the government also communicated with a federal agent associated with the Turnbull investigation in North Carolina, James Bryan ("Bryan"), about correspondence between him and Turnbull. Bryan informed the government that he had received 5 letters from Turnbull and 9 letters from Springette.

The United States Attorney's Office of the Virgin Islands undertook a more thorough review of their files and found four additional letters from Turnbull.

All of these documents were turned over to the defense in the *Fagan* trial.  However, given that their discovery occurred

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 5

after the conclusion of the trial in the above-captioned matter, they were not disclosed during the instant criminal trial.

The defendants moved for a new trial based on the government's failure to disclose letters sent by Springette and Turnbull, to the United States Attorney's Offices of the Middle District of North Carolina and District of the Virgin Islands, Bryan, and this Court.


## II. **DISCUSSION**

When deciding a Rule 33 motion for a new trial, the Court is provided somewhat more discretion than what is afforded under Rule 29. Under Rule 33, the Court may grant a new trial "in the interest of justice." *United States v. Charles*, 949 F. Supp. 365, 368, 35 V.I. 306 (D.V.I. 1996). In assessing such "interest", the court may weigh the evidence and credibility of witnesses. *United States v. Bevans*, 728 F. Supp. 340, 343 (E.D. Pa. 1990), *aff'd*, 914 F.2d 244 (3d Cir. 1990). If the Court determines that there has been a miscarriage of justice, the court may order a new trial. *Id.* "The burden is on the defendant to show that a new trial ought to be granted. Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Clovis*, Crim. No. 94-11, 1996 U.S. Dist. LEXIS 20808, at *5 (D.V.I. Feb. 12, 1996).

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 6

## A. The Jencks Act

The government is subject to disclosure requirements under the Jencks Act, 18 U.S.C. § 3500. That act "requires that the government disclose prior recorded statements of its witnesses that are 'related' to the subject mater of their testimony." *United States v. Hill*, 976 F.2d 132, 139 (3d Cir. 1992). It provides that:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which related to the subject matter as to which the witness has testified.

18 U.S.C. § 3500(b). "A written statement made by said witness and signed or otherwise adopted or approved by him . . . ." constitutes a "statement" under the Act. *Id.* at § 3500(e)(1).

The Supreme Court has consistently held that the harmless error rule governs violations of the Jencks Act. *Rosenberg v. United States*, 360 U.S. 367 (1959); *Goldberg v. United States*, 425 U.S. 94 (1976); *Campbell v. United States*, 373 U.S. 487 (1963). "The test for harmless error is whether it is highly probable that the error did not contribute to the conviction." *United States v. Zomber*, 299 Fed. Appx. 130, 134 (3d Cir. 2008)(unreported). In applying this test to an asserted Jencks violation, "we must analyze the prejudice resulting from the non-

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 7

disclosure of the [material] in terms of its potential usefulness to the defense." *United States v. Hill*, 976 F.2d 132, 141 (3d Cir. 1992).

In *Rosenberg v. United States*, 360 U.S. 367 (1959), the Court noted that a failure to produce may be held harmless if the defense otherwise had access to the same information:

> An appellate court should not confidently guess what defendant's attorney might have found useful for impeachment purposes in withheld documents to which the defense is entitled. However, when the very same information was possessed by defendant's counsel as would have been available were error not committed, it would offend common sense and the fair administration of justice to order a new trial.

*Rosenberg*, 360 U.S. at 371.

## B. *Brady/Giglio*

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of prosecution."  In order to demonstrate a *Brady* violation, a defendant must show that "(1) evidence was suppressed; (2) the suppressed evidence was favorable to the defense; and (3) the suppressed evidence was material either to guilt or punishment." *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005)(internal quotations and citations omitted).  The

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 8

suppression of the evidence by the government may be violative of *Brady* even if done inadvertently. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)(noting that one of the elements of "a true Brady violation" is the suppression of evidence "either willfully or inadvertently"). As to the materiality prong, the Court of Appeals for the Third Circuit has held that "[t]he materiality standard for *Brady* claims is met when the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." *United States v. Mitchell*, 365 F.3d 215, 254 (3d Cir. 2004)(quotation marks omitted).

The holding in *Brady* was extended to include impeachment evidence in *Giglio v. United States*, 405 U.S. 150, 154 (1972). To prove a *Giglio* violation, a defendant must show the same three prongs required under the test for a *Brady* violation. *See United States v. Risha,* 445 F.3d 298, 303 (3d Cir. 2006)(applying the three-part *Brady* test where impeachment evidence was withheld).

### III. <u>ANALYSIS</u>

None of the letters on which the defendants base their Jencks and *Brady/Giglio* claims directly reference either Mark or Blyden. Most of the letters relate to Springette and Turnbull's cooperation with the government and their desire to be given some

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 9

favorable treatment for their efforts[3].  For example, in one of

the letters sent to Bryan, Springette requests aid from the

government in light of the value of his testimony in criminal

trials:

> Mr. Bryan, I'am [sic] not asking anyone for an
> expedited ruling on my Rule 35. I am simply asking for
> some sort of intervention and assistance in getting me
> a recommendation to go to an F.C.I. I have been
> straight-forward, honest, and attentive as a government
> witness, and according to the pollin gof the jury in
> the last trial they said they would have voted to
> acquit had it not been for my testimony.

(Letter from James Springette to James Bryan, September 21,
2008.)

Turnbull's letters also appealed for some measure of

assistance from the government in return for his cooperation.  In

one such letter to Assistant United States Attorney Robert

Hairston of the Middle District of North Carolina, Turnbull

stated:

> Ever since my testimony I have been available for
> testimony at five different trials . . . in three
> different Federal districts (the Middle District of
> N.C., Augusta, GA, and St. Thomas U.S.V.I.)
>
>                    . . . .
> As things stand I have three questions, which
> hopefully you can answer: 1) Whether you truly
> intend on filing a motion of rule 35B on my behalf
> (as was told to me by agent J. Bryant); 2) if so
> when: and lastly I would like to inquire as to the

---

[3]In a few of the correspondences Springette forwards letters to the
government from individuals who he believes are contacting him in order to
draw on his drug trafficking contacts.

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 10

> status of my inclusion into the Witne[4] Protection
> and Relocation Program?

(Undated Letter from Elton Turnbull to Assistant United
States Attorney Hairston.)

## A. Jencks Act

The defendants assert a Jencks violation because following the direct examinations of both Springette and Turnbull they moved for any Jencks material for those witnesses and "several dozen letters from both Springette and Turnbull to the Assistant United States Attorney and even to the Court itself[5]" were not turned over. (Def.'s Mot. for New Trial 19.)

In *United States v. Zomber*, 299 Fed Appx. 130 (3d Cir. 2008), a defendant challenged his conviction because of the government's failure to produce information due to him under the Jencks Act and *Brady*.  Zomber and his codefendant were charged with conspiracy to commit mail and wire fraud, "stemm[ing] from three false and misleading letters written by, or at the direction of Zomber and [his codefendant]." 299 Fed. Appx. 132.

---

[4] This word was truncated in the copy of the letter provided to the Court.

[5] In his motion for a new trial, Mark additionally asserts that "the Court improperly engaged in *ex parte* communication with the Government regarding one of those pieces of exculpatory correspondence without alerting defendants to the existence of the underlying exculpatory correspondence or to the Court's correspondence to the Government regarding the same." (Def.'s Mot. for New Trial 17-18.)  The Court, consistent with its standard practice regarding fee requests from witnesses, forwarded the letter to the Office of the United States Attorney for the District of the Virgin Islands for whatever action it deemed appropriate.

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 11

The letters were aimed at inducing Joseph Murphy ("Murphy"), a collector of antique firearms, to buy four Colt firearms owned by Zomber and his codefendant.

Murphy was the government's key witness at trial. He testified that he would not have paid the price for the firearms had he been aware of their true value. At the close of the case, the jury found Zomber guilty of conspiracy to commit mail and wire fraud.

Thereafter, Zomber became aware of letters, in the government's possession, that Murphy had sent to Bill Gates ("Gates") in which he proposed that he would sell Gates his firearm collection "'at cost with no traditional mark-up and no dealer commission.'" *Id.* at 132. Zomber moved for vacatur of his conviction based on the government's failure to disclose those letters. The district court denied his motion, holding that the letters did not constitute Jencks material because: (1) " they 'were not sent to or provided to an investigating officer'" and (2) they were "'unrelated to a criminal investigation or prosecution." *Id.* at 134 (quoting *Zomber v. United States*, 2007 WL 85308, * at 18 (E.D. Pa. Mar. 19, 2007)). Zomber appealed that determination.

As to the finding that the letters were unrelated, the Third Circuit disagreed. The Court noted that Murphy's letters

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 12

"solicit negotiations for the very firearms at issue in this case
. . . and they reveal Murphy's assessment of the value of those
firearms." *Id.* at 134-35.

Having found that the letters were subject to Jencks
disclosure, the Court then turned to whether the defense suffered
prejudice because of the absence of the letters at trial.  The
Court found prejudice and held that the error was not harmless
because evidence about Murphy selling the firearms "at cost," was
relevant to the issue of whether Murphy paid an inflated price
when he purchased the firearms.

In *United States v. Nicolapolous*, 30 F.3d 381 (2d Cir. 1994)
the Court of Appeals for the Second Circuit addressed a Jencks
violation claim in a RICO case. There, three defendants were
convicted of RICO and RICO conspiracy charges involving gambling
and loansharking activities, stemming from their participation in
a criminal enterprise in Astoria, Queens.

At the trial in the matter, Spyredon Fioravantes
("Fioravantes"), a witness who ran a loansharking business in New
York City "in cooperation with and in competition" with the
defendants' enterprise, gave testimony.  Fioravantes testified
about his experience interacting with defendants' enterprise.  On
direct examination, he acknowledged that he had been involved in
criminal activities including drug dealing, loansharking, and

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 13

illegal gambling.  He also admitted that he was a state prisoner serving a sentence for dealing heroin and that he had perjured himself in the trial of the heroin matter.

During cross-examination, Fioravantes' testified that as part of his loansharking business, he used a notebook to record, in Greek, the names, telephone numbers, and amounts due from individuals whom he had given illegal loans.  Upon eliciting the testimony describing the notebook, the defense counsel moved for production of the notebook pursuant to the Jencks Act.  The government countered that the notebook's disclosure was unnecessary in that it would constitute cumulative evidence about Fioravantes' loansharking, and also noted that the names of the loan recipients constituted sensitive information.

In balancing the interest in keeping certain names confidential, with the defendants' right to confront Fioravantes, the trial judge ultimately had Fioravantes review the notebook and specify which persons he had referred to in his testimony. The defendants later appealed the judge's conditional disclosure of the information in the notebook.

The Court of Appeals for the Second Circuit did not find that the limited disclosure of the notebook's contents resulted in any prejudice to the defendants.  The Court emphasized that the impeachment value of this additional evidence of Fioravantes'

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 14

loansharking was minimal at best: "[T]here appears to be no non-cumulative use that appellants could have made of the notebook in attacking Fioravantes' credibility . . . . Appellants have failed to suggest how the material might conceivably have aided them beyond providing virtually irrelevant details of loansharking that Fioravantes freely admitted to at trial "[6] *Nicolapolous*, 30 F.3d at 383.

The Court also found significant the fact that there was other evidence presented suggestive of the defendants' guilt:

> Finally, Fioravantes's testimony was not the only evidence showing the appellants' commission of the crimes of which they were convicted. *See Petrillo*, 821 F.2d at 90 (distinguishing cases finding that withheld impeachment evidence prejudiced defense on grounds that in those cases "witness whose credibility was at issue supplied the only evidence linking the defendant(s) to the crime"). In fact, the jury heard tape recordings of [the defendants], and others discussing their gambling and loansharking activities.

*Id.* at 384-85.

Here, a Jencks Act violation occurred with respect to the government's failure to disclose the Springette and Turnbull letters in response to the defense's motion. The letters constituted recorded "statements" of Springette and Turnbull.

---

[6]The Second Circuit noted that Federal Rule of Evidence 608(b) would have called for the exclusion of prior evidence of bad acts under the circumstances presented. Though the evidence at issue here, regarding the motives of the cooperating witnesses, does not implicate that Rule, the issues that the *Nicolapolous* Court dealt with in evaluating cumulative evidence may have a broader application.

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 15

Though they did not involve information related to the criminal matter itself, their discussion of the motives of Springette and Turnbull's motives for testifying in criminal cases made them "related" to their testimony for Jencks purposes. *See United States v. Borelli*, 336 F.2d 376, 393 (2d Cir. 1964)("We can see no reason why a statement that would support impeachment for bias and interest does not 'relate' to the witness' testimony as much as a statement permitting impeachment for faulty memory[.]")

Having determined that there was a Jencks violation, the Court was then required to evaluate if that violation resulted in prejudice to the defendants. *See Zomber,* 299 Fed. Appx. at 135 (turning to an analysis of the prejudice that resulted from the government's non-disclosure following a determination that the disclosure constituted a Jencks Act violation).  This standard analyzes the prejudice by examining the undisclosed evidence "in terms of its potential usefulness" to the defendants, and represents "a more exacting" standard than the standard used to adjudge a *Brady* error.  *United States v. Hill*, 976 F.2d 132, 141 (3d Cir. 1992).

The information offered in the letters here would not have gone to challenging discrepancies in Springette and Turnbull's testimony about drug trafficking activities.  Rather, such information would have served to expose the motives behind

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 16

Springette and Turnbull's testimony.  The presumptive utility of

the letters were as ammunition to challenge Springette and

Turnbull's credibility.  The government inquired about

Springette's plea agreement:

> Q: Were you convicted pursuant to a plea agreement?
> A: Yes, I was.
> Q: Are you here today pursuant to a plea agreement?
> A: I am here on the request of the Court, yes, sir.
> Q: In conjunction with that plea agreement, did you
> enter into a cooperation agreement as well?
> A: Yes, sir.
> Q: And what were the terms of that cooperation
> agreement as it relates yourself?
> A: To truthfully testify or assist the government when
> I'm called upon to, sir.

(Trial Tr. at 345-346, May 4, 2010.)  The government asked

similar questions of Turnbull, and received similar responses

(Trail Tr. at 40, May 5, 2010.)  Neither of the defendants'

counsel cross-examined Springette or Turnbull about their plea

agreements or any sentence reduction they hoped to receive in

connection with their testimony at trial.

The Court is mindful of the Supreme Court's admonition that

courts "should not confidently guess what defendant's attorney

might have found useful for impeachment purposes in withheld

documents to which the defense is entitled." *Rosenberg*, 360 U.S.

at 371.  Though defense counsel did not elect to question

Springette and Turnbull about their plea agreements, defense

counsel may have used the letters to impeach those witnesses by

United States v. Mark et al.
Criminal No. 2009-20
Memorandum Opinion
Page 17

probing into their motives for testifying.

Even assuming *arguendo*, the letters would have wholly undermined Springette and Turnbull's credibility, the Court notes that as in *Nicolapolous* there was ample evidence, other than the testimony of those two witnesses, of the Mark-Blyden enterprise's drug trafficking activities.  The government presented telephone calls between Mark and co-conspirators suggesting the coordination of the importation and distribution of drugs. Additionally, there was testimony from Glenson Isaac about Blyden's role as the enforcer in the enterprise's narcotics sales and gambling activities.

In sum the Court found that "it is highly probable" that the failure to disclose the letters "did not contribute to conviction." *Zomber*, 299 Fed. Appx. at 135.

## B. *Brady/Giglio* Claim

"It is axiomatic that defense counsel should be permitted to expose to the jury facts relative to a witness' possible motivation to testify favorably for the prosecution or his potential bias for or against any party to the criminal proceeding." *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000). "Suppressed evidence that could have been used to impeach a government witness can affect the outcome if it is not cumulative of other impeachment offered at trial." *United States*

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 18

*v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007).

In *United States v. Schell*, 775 F.2d 559 (4th Cir. 1985),
the defendants in a RICO conspiracy case raised *Brady* and *Giglio*
claims, related to the government's failure to produce letters
from a cooperating codefendant, Anthony Alvino ("Alvino") to an
Assistant United States Attorney.  The letters discussed Alvino's
plea agreement with the government.  The defendants contended
that the letters between the witness and the Assistant United
States Attorney would have demonstrated that the cooperating
codefendant was assured leniency in exchange for his testimony.

The Fourth Circuit found the government's failure to
disclose the letters to constitute "at most, harmless error."
*United States v. Schell*, 775 F.2d 559, 567 (4th Cir. 1985).  It
noted that Alvino's reasons for cooperating were borne out in
Alvino's testimony at trial:

> Upon direct examination of Alvino, the government elicited
> the fact that Alvino was testifying pursuant to a plea
> agreement and one of the appellants' attorneys cross-
> examined Alvino as to his motivation for testifying.
> Additionally, Alvino's testimony was corroborated by the
> testimony of three other witnesses. Moreover, neither the
> Alvino-Jividen letters nor the original signature page of
> the Lindsey plea bargain agreement would have exculpated the
> appellants. Thus, they would not have affected the outcome
> of the trial and we conclude their non-disclosure
> constituted, at most, harmless error.

*Id.*

Here, as in *Schell*, there is nothing in the letters that

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 19

was exculpatory.  The Court did not find that, in light of the significant body of evidence, including other witness testimony and recorded conversations about the enterprise's drug trafficking operations, there was a "reasonable probability" that the jury would have decided differently had defense counsel been able to use the letters in their cross-examination.

As to the impeachment value of the requests contained in Springette and Turnbull's letters for sentence reductions and favorable treatment, similar evidence was elicited by the government in asking if the defendants were present in Court pursuant to a cooperation agreement.  The contents of the letters at issue here were more along the lines of aspirational requests than concrete agreements.  This is not an instance where the government failed to controvert a cooperating witness' denial of the existence of a plea agreement. *Cf. United States v. Williams,* 343 F.3d 423, 439 (5th Cir. 2003), *cert denied,* 540 U.S. 1093 (2003) ("A *Giglio* violation usually occurs when a cooperating witness denies having a plea agreement and the prosecutor fails to correct the misstatement.").  Without demonstrating the requisite materiality of the information in the Springette and Turnbull letters, the defendants failed to establish a *Brady* or *Giglio* violation.

*United States v. Mark et al.*
Criminal No. 2009-20
Memorandum Opinion
Page 20

## IV.  CONCLUSION

For the foregoing reasons, the defendants' motions for a new

trial based on Jencks and *Brady/Giglio* violations were **DENIED.**


S\_____

**CURTIS V. GÓMEZ**
**Chief Judge**